UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

                         :

UNITED STATES OF AMERICA

                         :

    - v. -                               17 Cr. 077 (WHP)

                         :

LUIS DIAZ, JR, and
LUIS JAVIER DIAZ,               :

              Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## THE GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANTS' MOTIONS
## <u>PURSUANT TO FED. R. CRIM. P. 29 AND 33</u>

                                  JOON H. KIM
                                  Acting United States Attorney for
                                  the Southern District of New York
                                  One St. Andrew's Plaza
                                  New York, New York 10007

Edward B. Diskant
Daniel M. Tracer
Benet J. Kearney
Assistant United States Attorneys
  -- *Of Counsel* --

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

I.    BACKGROUND ......................................................................................................... 1

    A.    The Government's Case ...................................................................................... 2

    B.    The Defense Case ............................................................................................... 5

II.    THE DEFENDANTS' MOTIONS SHOULD BE DENIED ........................................... 6

    A.    Legal Standard ................................................................................................... 7

        1.    Rule 29 ...................................................................................................... 7

        2.    Rule 33 ...................................................................................................... 9

    B.    The Government Presented Evidence Sufficient Establish Each and Every ...................... 9

    Element of Counts Two and Four With Respect to Luis Javier Diaz ........................................ 9

    C.    Venue Was Proper in the Southern District of New York. ................................................ 13

        1.    Legal Standard ........................................................................................ 14

        2.    Argument ................................................................................................ 14

    D.    The Court Properly Declined to Give a Jury instruction on the  Stockbroker Exception. ................................................................................... 18

    E.    The Government's Cross-Examination of Luis Diaz, Jr. Was Proper and Did  Not Unfairly Prejudice Either Defendant. ........................................................................... 21

        1.    Legal Standard ........................................................................................ 22

        2.    Argument ................................................................................................ 23

CONCLUSION............................................................................................................... 28

# TABLE OF AUTHORITIES

**Federal Cases**

*Holland* v. *United States*, 348 U.S. 121 (1954)…………………………………………………...8

*Jackson* v. *Virginia*, 443 U.S. 307 (1979)………………………………………………...…….7

*United States* v. *Acosta*, 17 F.3d 538 (2d Cir. 1994)……………………………………………….28

*United States* v. *Aguiar*, 737 F.3d 251 (2d Cir. 2013)………………………………………......9

*United States* v. *Alfonso-Perez*, 535 F.2d 1362 (2d Cir. 1976)………………………………….19

*United States* v. *Annabi*, 2012 U.S. Dist. LEXIS 161372 (S.D.N.Y. Nov. 7, 2012)…………….12

*United States* v. *Baljit*, 202 F. Supp. 2d 196 (S.D.N.Y. 2002)………………………………..12

*United States* v. *Banki*, 685 F.3d 99 (2d Cir. 2012)…………………………………………...16

*United States* v. *Beauchamps*, 488 Fed. App'x 509. (2d Cir. 2012)………………………...…9

*United States* v. *Beverly*, 5 F.3d 633 (2d Cir. 1993)……………………………………….…..25, 28

*United States* v. *Beck*, 625 F.3d 410 (7th Cir. 2010),……………………………………..,,,22

*United States* v. *Cabrales*, 524 U.S. 1 (1998)……………………………..……………………17

*United States* v. *Caracappa*, 614 F.3d 30 (2d Cir. 2010)…………………………………….....7

*United States* v. *Cassese*, 428 F.3d 92 (2d Cir. 2005)…………………………………….…..12

*United States* v. *Cherico*, No. 08 Cr. 786 (CM), 2012 WL 1755749,
    (S.D.N.Y. May 16, 2012)………………………………………………………………....8

*United States* v. *Coppola*, 671 F.3d 220 (2d Cir. 2010)…………………………………..…8

*United States* v. *Costello*, 255 F.2d 876 (2d Cir. 1958)………………………………………......9

*United States* v. *Cuti*, 720 F.3d 453 (2d Cir. 2013)……………………………………………....7

*United States* v. *Davis*, 689 F.3d 179 (2d Cir. 2012)…………………………………………18

*United States* v. *Espaillet*, 380 F.3d 713 (2d Cir. 2004)…………………………………..7, 8

*United States* v. *Ferguson*, 246 F.3d 129 (2d Cir. 2001)……………………………...………9

*United States* v. *Figuero*a, 618 F.2d 934 (2d Cir. 1980)………………………………………...22

*United States* v. *Garcia*, 936 F.2d 648 (2d Cir. 1991)…………………………………………...25

*United States* v. *Gelzer*, 50 F.3d 1133 (2d Cir. 1995)……………………………………...…22

*United States* v. *Guadagna*, 183 F.3d 122 (2d Cir. 1999)…………………………………...8

*United States* v. *Havens*, 446 U.S. 620 (1980)………………………………….……………..24

*United States* v. *Heaps*, 39 F.3d 479 (4th Cir. 1994)……………..……………………………..12

*United States* v. *Jackson*, 335 F.3d 170 (2d Cir. 2003)……………..…………………………7, 8

*United States* v. *Jiau*, 734 F.3d 147 (2d Cir. 2013)……………………………..………….7

*United States* v. *Katsougrak*is, 715 F.2d 769 (2d Cir. 1983)……………………………….22

*United States* v. *Kaufman*, No. 13 Cr. 411–02 (JMF), 2014 WL 2048198
 (S.D.N.Y. May 19, 2014)…………………………………………………..…12

*United States* v. *Kim*, 246 F.3d 186 (2d Cir. 2001)……………………………………14, 15

*United States* v. *Martinez*, 54 F.3d 1040 (2d Cir. 1995)…………………………….…7, 8

*United States* v. *Mensah*, 515 Fed. App'x 59 (2d Cir. 2013)………………………………..7

*United States* v. *Nixon*, 777 F.2d 958 (5th Cir. 1985)………………………………...26

*United States* v. *Oshatz*, 704 F. Supp. 511 (S.D.N.Y. 1989)…………………………..…..26

*United States* v. *Payton*, 159 F.3d 49 (2d Cir. 1998)………………………….22-23, 25

*United States* v. *Peterson*, 357 F.Supp.2d 748 (S.D.N.Y. 2005)………………………...17

*United States* v. *Perez*, 387 F.3d 201 (2d Cir. 2004)…………………………………….22

*United States* v. *Plitman*, 194 F.3d 59 (2d Cir. 1999)…………………………………......8

*United States* v. *Powell*, 469 U.S. 57 (1984)………………………………………….28

*United States* v. *Preldakaj*, No. 08 CR 1054(SAS), 2010 WL 3154560
 4 (S.D.N.Y. Aug. 3, 2010)……………………………………………………12

*United States* v. *Presley*, 24 F. App'x 12 (2d Cir. 2001)………………………………..26-27

*United States* v. *Reifler*, 446 F.3d 65 (2d Cir. 2006)……………………………….…..8

*United States* v. *Rodriguez-Moreno*, 526 U.S. 275 (1999)………………………...…..14

*United States* v. *Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990)…………………………..27

*United States* v. *Rosa*, 17 F.3d 1531 (2d Cir. 1994)……………………………...…………8

*United States* v. *Russo*, 74 F.3d 1383 (2d Cir. 1996)…………………………………….19

*United States* v. *Rutigliano*, 790 F.3d 389 (2d Cir. 2015)………………………...14, 18

*United States* v. *Sabhnani*, 599 F.3d 215 (2d Cir. 2010)……………………….…19

*United States* v. *Salemo*, 499 Fed. App'x 110 (2d Cir. 2012)……………………………......8

*United States* v. *Sampol*, 636 F.2d 621 (D.C. Cir. 1980)……………………………...22

*United States* v. *Sanchez*, 969 F.2d 1409 (2d Cir. 1992)…………………………….....9

*United States* v. *Scott*, No. 08 Cr. 360 (HB), 2009 WL 36548
  (S.D.N.Y. Jan. 7, 2009)…………………………………………………………………..13

*United States* v. *Temple*, 447 F.3d 130 (2d Cir. 2006)………………………………………..…..7

*Toussie* v. *United States*, 397 U.S. 112 (1970)………………………………………………..16

*United States* v. *Ulloa*, 511 Fed. App'x 105 (2d Cir. 2013)………………………………………....8

*United States* v. *Velastegui*, 199 F.3d 590 (2d Cir. 1999)………………………………………….15

*United States* v. *Walker*, 191 F.3d 326 (2d Cir. 1999)……………………………………………7

## Statutes and Rules

18 U.S.C. § 1956…………………………………………………………………………..14, 17

18 U.S.C. § 1960………………………………………………………………………..15, 16

18 U.S.C. § 3237……………………………………………………………………….....14

Fed. R. Crim. P. 29………………………………………………………………………...1, 6-8

Fed. R. Crim. P 33……………………………………………………………….…………1, 6, 9

Fed. R. Evid. 401…………………………………………………………………………..…..22

Fed. R. Evid. 402………………………………………………………………………………...22

Fed. R. Evid. 403………………………………………………………………………………...22

On November 15, 2017, defendants Luis Diaz, Jr. and Luis Javier Diaz were found guilty of multiple counts each, all stemming from their use of Miami Equipment & Export Company ("Miami Equipment"), a Miami-based company under their control, as an unlicensed money transmitting business between approximately 2010 and 2016.  The verdict capped a two-week jury trial before this Court at which the Government presented comprehensive, corroborated, and overwhelming evidence of the defendants' guilt.   Indeed, at the end of the trial, this Court denied from the bench the defendants' pending motions for judgements of acquittal pursuant to Fed. R. Crim. P. 29 ("Rule 29").  (Tr. 1116-17.)

Notwithstanding that ruling, and in seeking to undo the jury's work, the defendants now raise a host of arguments – including many arguments made to and necessarily rejected by the jury – in support of their latest motion for a judgment of acquittal pursuant to Rule 29. Alternatively, the defendants seek a new trial pursuant to Fed. R. Crim. P 33 ("Rule 33") on the grounds that (1) the Court's jury instructions with respect to venue and the definition of a "money services business" were incorrect., and (2) the Government's use of certain bank records during the cross examination of Luis Diaz, Jr. was improper and that any alleged impropriety was insufficiently remedied by the Court's curative instruction.  For the reasons that follow, the Government respectfully submits that these motions should be denied in their entirety.

## I.    BACKGROUND

In Indictment 17 Cr. 077 (the "Indictment"), the defendants were charged for their roles in operating an unlicensed money transmitting business through their family-owned import and export company, Miami Equipment.  Specifically, the defendants were alleged to have used Miami Equipment to transmit over $100 million on behalf of various individuals and entities based primarily in South and Central America, including on behalf of KCT, a construction consortium based in Venezuela.  For that conduct, the defendants were charged with one count

of conspiracy to operate an unlicensed money transmitting business (Count One) and one count of the substantive crime (Count Two). The defendants were further alleged to have engaged in a conspiracy to commit, and the commission of, international money laundering (Counts Three and Four, respectively) by repeatedly engaging in international money transfers intended to promote the unlicensed money transmitting offenses described above.

### A.    The Government's Case

At trial, the Government offered the testimony of nine witnesses, including a representative from the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"), two law enforcement officers involved in the investigation, and Annette Diaz Rojas, the daughter of defendant Luis Diaz, Jr. and the sister of defendant Luis Javier Diaz who served, at all relevant times, as the bookkeeper for Miami Equipment.

Theodore Vlahakis, a compliance and enforcement officer at FinCEN, testified to the requirement that money remitters register with the U.S. Department of the Treasury ("Treasury") and explained to the jury the significance of that registration requirement, particularly as it related to FinCEN's mission to safeguard the American financial system from illegal financial activity. (Tr. at 68-77). Mr. Vlahakis also testified that neither of the defendants, nor Miami Equipment as an entity, had ever registered with FinCEN as a money transmitter. (Tr. at 96-97).

Lieutenant Matthew de la Rosa, one of the agents and task force officers overseeing the investigation, testified about the general course of the investigation, including search warrants that were conducted on two email accounts used by the defendants – ljdiaz@miamiequipment and javier@miamiequipment.com – as well as to a search of the defendants' offices. (Tr. at 145-146, 148-154). Through Lieutenant de la Rosa, the Government offered the core of its case, namely dozens of documents and records obtained from the defendants' offices and email accounts, including dozens of emails sent from co-conspirators in Venezuela to one of the two

2

email addresses associated with the defendants, ljdiaz@miamiequipment and

javier@miamiequipment.com.  In these emails, co-conspirators in Venezuela – typically

"Elisbert Becerra," an employee of KCT – informed the defendants that they would be receiving

money from KCT and directed them to transfer that money on to various third party payees,

including shell companies such as Adinar, Kingsway, Posner, and Levack as well as various

individuals, including Teddy Peralta, Fidel Ramirez, and Ana Losada.  (*E.g.*, GX 103-T, 106-T,

104-T, 114-T, 116-T.)  Frequently, Becerra would attach sham invoices that purported to

document services these payees were providing to Miami Equipment in return for these

payments.  (*Id.*)  While many of these emails were addressed to "Luis," trial testimony

established that the ljdiaz@miamiequipment.com account was used by *both* defendants.  (*E.g.,*

Tr. at 491, 506).[1]

Bank records for some of these entities such as Adinar, Posner, and Levack established

that many of these entities were, in fact, controlled by the same people running KCT, meaning

that the transfers through the defendants' accounts seemingly served no legitimate business

purpose or were otherwise suspicious.  (*E.g.*, GX 208, 209, 211).  The Government also offered a

series of identical contracts for "consulting services" between some of these payees and Miami

Equipment, all signed by Luis Diaz, Jr.  (*E.g.*, GX 151-153.)

In addition to documents reflecting transfers made by the defendants on behalf of KCT,

the Government offered through Lieutenant de la Rosa a series of emails and accompanying

records reflecting transfers done on behalf of various other entities, including Alimentacion,

---

[1] In fact, Luis Diaz, Jr. maintained a personal account – luisd300@bellsouth.com – and on cross examination conceded that others, including co-defendant Luis Javier Diaz, used the email account ljdiaz@miamiequipment.com and would then sometimes forward those emails on to him at his Bell South email address, consistent with a number of the email chains offered by the Government at trial  (*E.g.*, GX 103-T; Tr. at 779, 786).

3

Manzanillo, and Taller Importaciones. (*E.g.*, GX 121-T, 122-T, 129-T). These transfers typically involved a South American company sending money to Miami Equipment, only to have the defendants swiftly move that money back to the South American company's bank accounts located in the United States. (*Id.*) Substantially all of these transactions entailed emails sent exclusively to the javier@miamiequipment.com address – one trial testimony established was used primarily by the defendant Luis Javier Diaz. (Tr. at 491). And at least one of those transactions, a $69,975 transfer made at the behest of Taller Importaciones, made express reference to a three percent fee being charged by Luis Javier Diaz and Miami Equipment for the transfer. (GX 129-T.)

Finally, bank records for the defendants' accounts were offered, including records for the primary account used by the defendants to make substantially all of the transfers described above. According to those records, Luis Diaz, Jr. and Luis Javier Diaz – who identified themselves as the President and Vice President of Miami Equipment, respectively – along with Annette Diaz Rojas were the only signatories on that Miami Equipment account. (GX 201-A). The Government also introduced export records through the testimony of U.S. Customs Officer Richard Castagna demonstrating that Miami Equipment received far more money than was justified by the volume of exports they had declared to customs. (Tr. at 103-122.)

The Government also called Ms. Diaz Rojas who testified that, despite being the bookkeeper of Miami Equipment for well over a decade, she had no familiarity with substantially all of these transactions made at the behest of KCT and other South American entities. (Tr. at 475, 485-86.) By contrast, Mr. Diaz Rojas was familiar with Miami Equipment's export business and the large customers with whom it did export work. (Tr. at 479-80; 508.) Ms. Diaz Rojas also identified the two primary email accounts used by the defendants

4

as part of the charged conduct, the ljdiaz@miamiequipment.com account, which Ms. Diaz Rojas testified belonged to her brother, Luis Javier Diaz, but was also used by others at the company, and javier@miamiequipment.com which was used primarily by Luis Javier Diaz.  (Tr. at 490-91).

Additionally, with respect to financial transactions – and, in particular, transfers made out of the Miami Equipment operating account relevant to substantially all of the transactions at issue in this case – Mr. Diaz Rojas testified that while she technically caused most of these transfers to be made, she did so only at the direction of her father, Luis Diaz, Jr., and her brother, Luis Javier Diaz.  (Tr. at 479.)

The Government also called three payees who received money from the defendants – Mark Borst, Fernando Castellar, and Ana Losada, each of whom testified, in substance, that they or their companies had never provided any services to Miami Equipment and that the payments they or their companies received were in return for goods or services sold or provided to individuals based in Venezuela.  Mr. Borst and Ms. Losada additionally confirmed that invoices purporting to be from them to Miami Equipment were fake, while Mr. Castellar testified that he had been directed by others at KCT to create a fake invoice to Miami Equipment ostensibly reflecting services he provided to the defendants.  (Tr. at 60-64; 314-322; 540-43.)

### B.    The Defense Case

The defendants elected to put on a case and called one witness, the defendant Luis Diaz, Jr.  In addition to describing his background and the formation of Miami Equipment, Luis Diaz, Jr. testified about how he became involved in working with KCT.  In particular, he described how he met Enrique Pradella, who owned Trimeca, one of the component companies of KCT.  (Tr. at 663.)  Later on, Luis Diaz, Jr. was introduced to Antonio Padrin, owner of KBT, and Mario Herrera, owner of Cielemca.  (Tr. at 664-66.)  Then in or around 2008, Luis Diaz, Jr. had a

5

meeting in Venezuela with Pradella, Padrin, and Blas Herrera, the brother of Mario Herrera. (Tr. at 667.)  At that meeting, Luis Diaz, Jr. learned about KCT and agreed to act as KCT's "representative" in the United States.  (Tr. at 668.)  From that point on, Luis Diaz, Jr. and Miami Equipment placed orders and "serviced" invoices for KCT.  (Tr. at 669.)

On cross examination, however, Luis Diaz, Jr. was shown the signed contract between Miami Equipment and KCT that established that Miami Equipment was not KCT's representative and that made no mention of the defendants' moving money on behalf of KCT. (Tr. at 774; GX 170.)  Moreover, Luis Diaz, Jr. confirmed that, in connection with Miami Equipment's transfers from KCT to Adinar, Kingsway, and many other payees, Miami Equipment had no role other than to receive money from KCT and transfer it onwards to the payee. (*E.g.*, Tr. at 778, 794.)  Further, Luis Diaz, Jr. testified that he made many of the payments on behalf of KCT – pursuant to sham invoices – without any understanding of what the payments were for, simply because he "trusted" his counterparts at KCT.  (*E.g.*, Tr. at 805, 806.)

The case was given to the jury at approximately 9:30 a.m. on November 15, 2017.[2]  At approximately 5:00 p.m. that same day, the jury sent out a note indicating that it had reached a verdict.  (Tr. at 1096-97.)   Luis Diaz, Jr. was convicted on all four counts, while Luis Javier Diaz was convicted on Counts Two and Four only.

## II.   THE DEFENDANTS' MOTIONS SHOULD BE DENIED

The defendants' motions for a judgment of acquittal, pursuant to Rule 29, and for a new trial, pursuant to Rule 33, should be denied.  With respect to both defendants, the Government presented sufficient evidence of each element of the counts of which they were convicted.  While

---

[2] The jury was charged on the afternoon of November 14, 2017 and recessed at approximately 5:10 p.m. that evening, but did not commence deliberations until the next morning. (Tr. at 1076-78.)

defendants advance several arguments regarding purported improprieties and errors at trial, none of these grounds were in fact improper or erroneous and none constitute the sort of "manifest injustice" required to warrant a new trial.

### A.    Legal Standard

#### 1.    Rule 29

"To prevail on an insufficiency of the evidence claim under Rule 29, a defendant bears the 'heavy burden' of showing that 'no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt.'" *United States* v. *Mensah*, 515 Fed. App'x 59, 61 (2d Cir. 2013) (quoting *United States* v. *Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010); *see also United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (noting the defendant's "heavy burden" on a Rule 29 motion); *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979) (explaining that a jury's verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). In other words, "'[a] judgment of acquittal' is warranted 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States* v. *Jiau*, 734 F.3d 147, 152 (2d Cir. 2013 (quoting *United States* v. *Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).

When evaluating a Rule 29 motion, the Court should "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States* v. *Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted); *accord United States* v. *Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995). Even where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *United States* v. *Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (quoting *United States* v. *Temple*, 447 F.3d 130, 137 (2d Cir. 2006)).

Thus, "[t]he task of choosing among the permissible competing inferences that can be drawn from the evidence is for the jury, not a reviewing court." *United States* v. *Salemo*, 499 Fed. App'x 110, 112 (2d Cir. 2012) (quoting *United States* v. *Coppola*, 671 F.3d 220, 239 (2d Cir. 2010)); *see also United States* v. *Espaillet*, 380 F.3d at 718 ("[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." (quoting *United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)); *id.* ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." (quoting *United States* v. *Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)))); *United States* v. *Ulloa*, 511 Fed. App'x 105, 107 (2d Cir. 2013) (reasoning that a conviction must be affirmed, after "credit[ing] every inference that could have been drawn in the government's favor, . . . so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt" (quoting *United States* v. *Reifler*, 446 F.3d 65, 94 (2d Cir. 2006))).

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable." *United States* v. *Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994; *see also United States* v. *Cherico*, No. 08 Cr. 786 (CM), 2012 WL 1755749, at *2 (S.D.N.Y. May 16, 2012) (McMahon, J.) (same); *United States* v. *Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it."). Accordingly, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *United States* v. *Guadagna,* 183 F.3d at 130 (quoting *Holland* v. *United States*, 348 U.S. 121, 139 (1954); *see also United States* v. *Martinez*, 54 F.3d at 1042 ("[I]t is the task of the jury, not the Court, to choose among competing inferences.").

8

2.    Rule 33

Rule 33 provides that upon a defendant's motion "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "It is well-settled that motions for new trials are not favored and should be granted only with great caution." *United States* v. *Costello*, 255 F.2d 876, 879 (2d Cir. 1958); *United States* v. *Beauchamps*, 488 Fed. App'x 509, 510 (2d Cir. 2012) ("District courts should exercise their Rule 33 authority only 'sparingly' and in 'the most extraordinary circumstances.'") (quoting *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice." *United States* v. *Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks and alteration omitted). In other words, "there must be a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks and edits omitted).

**B.    The Government Presented Evidence Sufficient Establish Each and Every Element of Counts Two and Four With Respect to Luis Javier Diaz[3]**

Defendant Luis Javier Diaz seeks a judgment of acquittal on Counts Two and Four, claiming principally that the trial evidence was insufficient to establish the elements of either offense. (Brief of Defendant Luis Javier Diaz (Dkt. 72) ("LJD Br.") at 10, 14.) Specifically, Luis Javier Diaz contends, with respect to Count Four, that there was "no evidence" that the defendant, as a principal, or an aider and abettor, transported, transmitted or transferred funds

---

[3] Luis Diaz, Jr. also asserts, in his post-trial brief, that "[t]he evidence presented at trial was insufficient to prove each element of [Counts One through Four] of the Indictment." (Brief of Defendant Luis Diaz, Jr. (Dkt. 71) ("LDJ Br.") at 4.) However, the only specific argument he appears to make in support of that assertion – that there was "a lack of venue in the Southern District of New York" – is wrong as a matter of law, as addressed in far greater detail below. To the extent the motion can be read to raise any other arguments in support of a Rule 29 motion by defendant Luis Diaz, Jr., they are either directly addressed herein or were already considered and rejected by this Court in previously denying his Rule 29 motion.

internationally to promote the unlicensed money transmission offense charged in Count Two. (*Id.* at 10.) With respect to Count Two, Luis Javier Diaz similarly contends there was insufficient evidence to support the jury's verdict, including insufficient evidence that the defendant "controlled, conducted, managed, supervised, directed or owned" Miami Equipment knowing that it was used as a money transmitting business or knew that it was operating without a license. (*Id.* at 13.)

Particularly when viewed in the light most favorable to the Government – the standard, of course, required for a Rule 29 motion – the trial evidence overwhelmingly established Luis Javier Diaz's guilt with respect to Counts Two and Four, and the defendant's instant motion does little more than seek to rehash arguments that were made to and necessarily rejected by the jury in returning its verdict. With respect to both counts, the Government offered substantial evidence that Luis Javier Diaz was intimately involved in running Miami Equipment as a money transmitting business, both with respect to the transactions completed on behalf of KCT and those completed on behalf of other entities, including Taller Importaciones.

Indeed, the Taller transaction – Government Exhibit 129-T – is itself sufficient to support the defendant's conviction on both Counts Two and Four. In that transaction, Taller transferred $69,975.00 from Venezuela to the defendants' operating account in the United States, accompanied by instructions sent by email to Luis Javier Diaz at the email address javer@miamiequipment.com, on where to further remit the money. Shortly thereafter, and consistent with the instructions emailed to Luis Javier Diaz, the money was remitted, less a three percent fee charged by the defendants.

A reasonable juror could readily conclude from that exhibit alone that Luis Javier Diaz was (1) using Miami Equipment as a money transmitter, charging a fee in the process, and (2)

10

causing money to be transferred into the United States from Venezuela and on to the account of the ultimate payee as a part of and to promote that money transmitting operation.  A reasonable juror could further conclude that the defendant, as the vice president and part owner of this small family business, was aware that it was neither registered with FinCEN nor had obtained a money transmitting license from the State of Florida at the time this transaction took place.

This was, of course, just one of dozens of transactions highlighted at trial, many of which involved instructions sent to an email account Luis Javier Diaz used, ljdiaz@miamiequipment.com, and transfers into an out of an account this defendant was a signatory to and controlled the use of.  Indeed, as noted above, his own sister, the company bookkeeper, testified that Luis Javier Diaz was one of two people at the company who could and did direct her to make money transfers, and a reasonable jury could and did conclude that this defendant was involved in receiving the payments and transfer instructions from KCT and causing those further transfers to be made.  (Tr. at 479.)  The jury's finding in that regard is also consistent with the numerous examples in which emails to Luis Javier Diaz directing that transfers be made are then, in fact, completed, a sequence of events that is only logically possible if Luis Javier Diaz had the ability to and, in fact, did play some role in causing those transfers to be made.  (*See, e.g.*, GX 113.)

In urging this Court to overturn the jury's verdict, not to mention the Court's own prior ruling on this very motion, the Luis Javier Diaz primarily repeats arguments that he made at trial, including the argument that many of the KCT-related emails were addressed to his father, co-defendant Luis Diaz, Jr.  (LJD Br at 7, Tr. at 1004-05,[4] 1012-13).  However, as noted above, the

---

[4] While the header to these pages of the transcript incorrectly refers to them as "Summation – *Mr. Flynn*" – they are, in fact, a part of the closing statement of Mr. Quinon on behalf of Luis Javier Diaz.  (*E.g.*, Tr. 1002, 1009.)

evidence with respect to those emails was considerably more nuanced and, more important, the jury clearly heard and considered that argument before nonetheless returning its verdict. *See*, *e.g.*, *United States* v. *Kaufman*, No. 13 Cr. 411–02 (JMF), 2014 WL 2048198, at *6 (S.D.N.Y. May 19, 2014) (denying Rule 29 motion based on arguments presented to and rejected by the jury); *United States* v. *Annabi*, 2012 U.S. Dist. LEXIS 161372, at *26 (S.D.N.Y. Nov. 7, 2012) (CM) ("Defendants' reiteration of an argument the jury rejected does not explain how 'no rational trier of fact could have found the defendant[s] guilty beyond a reasonable doubt.'") (citing *United States* v. *Cassese*, 428 F.3d 92, 98 (2d Cir. 2005); *United States* v. *Preldakaj*, No. 08 CR 1054(SAS), 2010 WL 3154560, at *4 (S.D.N.Y. Aug. 3, 2010) (denying Rule 29 motion based on arguments presented to the jury because "[w]hile the jury could have accepted [the defendant's] arguments, it did not"); *United States* v. *Baljit*, 202 F. Supp. 2d 196, 202 (S.D.N.Y. 2002) ("[T]his argument was made to the jury and rejected when it returned a conviction on Count Two.").

Additionally, the defendant makes a new argument – ostensibly premised on the Fourth Circuit's decision in *United States* v. *Heaps*, 39 F.3d 479, 483-86 (4th Cir. 1994) – about how the Government's evidence was insufficient because the Government did not establish what the various ultimate payees, including Adinar, Kingsway and Posner did with the money once the defendants transferred it to their accounts. However, the argument is of no moment here, because the Government was not required to establish what, if anything, happened *after* the defendants caused the money to be transferred through their account to the ultimate payee. It was sufficient for the Government to prove, as it did, that the defendants caused funds to be transferred from a place outside of the United States to or through a place within the United States, or vice versa. Once the money landed in the accounts controlled by the ultimate payees

12

in this scheme, the crime charged in Count Four was complete, and no further evidence regarding any subsequent uses or transfers of that money was required.

With respect to Count Two, the defendant makes only a token effort to challenge the sufficiency of the Government's evidence, principally reiterating arguments made at trial. For substantially the reasons set forth in some detail above, the Government submits those arguments are equally meritless in the context of Count Two. *Cf. United States* v. *Scott*, No. 08 Cr. 360(HB), 2009 WL 36548, at *9 (S.D.N.Y. Jan. 7, 2009) ("It is quite true that the intent element would be lacking if the jury accepted [the defendant's] theory at trial . . . . However, in convicting [the defendant] of attempt at the first trial, the jury necessarily rejected this theory.") (internal quotations omitted). In particular, there was substantial evidence, including the Taller transaction described in detail above, from which a rational jury could and did conclude that this defendant knowingly participated in the unlicensed money transmitting offense charged in Count Two. To the extent the Luis Javier Diaz now seeks to argue that "the evidence at most proved Javier worked at Miami Equipment" rather than controlling, managing or owning it, that claim is starkly belied by the trial evidence, including bank records in which the defendant identified himself as the Vice President, the testimony of his sister, Annette Diaz Rojas, that the defendant was a part owner of the company, and numerous emails/exhibits demonstrating the defendant's ability to cause transactions to be completed through the Miami Equipment account.

Accordingly, the defendant's motion pursuant to Rule 29 should be denied.

### C.      Venue Was Proper in the Southern District of New York.

The defendants also argue that venue was improper in the Southern District of New York and that the Court wrongfully declined to give the defendants' requested jury instructions on venue. (LDJ Br. at ¶¶ 4-5.) This argument is wrong and fails to support a judgment of acquittal or a new trial.

1.      Legal Standard

Title 18, United States Code, Section 3237(a) provides that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."  It is well settled that that "conspiracy is a continuing offense in which venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators."  *United States* v. *Rutigliano*, 790 F.3d 389, 395–96 (2d Cir. 2015) (internal quotations omitted).  With respect to crimes other than conspiracy, the Court "must initially identify the conduct constituting the offense [] and then discern the location of the commission of the criminal acts."  *United States* v. *Rodriguez-Moreno*, 526 U.S. 275, 279 (1999).   Venue is then proper in any district in which those actions constituting the offense "began, continued, or concluded."  *United States* v. *Kim*, 246 F.3d 186, 191 (2d Cir. 2001). Thus, for example, in the case of wire fraud, the Second Circuit has held that venue is appropriate in the Southern District of New York where faxes and wires were sent by out-of-state defendants "to and by Chase Manhattan bank" as part of the scheme.  *Id.* (holding that where the operative crime is the transmission of a wire, "a wire is 'transmitted' both where it was sent and where it was received").  In addition, the money laundering statute provides its own expansive provision for venue, namely that a money laundering prosecution may be brought in "any district in which the financial or monetary transaction is conducted" and that a "person who conducts [] any portion of the transaction may be charged in any district in which the transaction takes place."  18 U.S.C. §§ 1956(i)(1)(A) & (i)(3).

2.      Argument

Venue was proper in the Southern District of New York on all counts.  With respect to Counts One and Three – the conspiracy counts – venue was proper in any district in which overt

14

acts occurred.  The indictment itself alleged numerous overt acts committed in the Southern District of New York (*see* Indictment ¶¶ 3(a), 3(b), 3(c), and 3(d)), and the evidence at trial conclusively proved the occurrence of these overt acts in the district (*see* GX 103-1; GX 116).  Accordingly, the conspiracies alleged in Counts One and Three were properly charged and tried in this district.

With respect to Counts Two and Four – operation of an unlicensed money transmission business and international money laundering – venue is also proper in the Southern District of New York because they are continuing offenses of which a part of the conduct occurred in the district.  Title 18, United States Code, Section 1960 criminalizes the "transferring funds on behalf of the public by any and all means" without a license.  18 U.S.C. § 1960(b)(2).  The use of the verb to "transfer" in the statute indicates that the crime involves the movement of money from one place to another, and hence the criminal conduct occurs where the transfer is both sent and received.  *Cf. United States* v. *Kim*, 246 F.3d at 191 (holding that a wire is transmitted both where it was sent and where it was received).  Likewise, the Second Circuit has defined an unlicensed money transmitting business as a business that "receives money from a customer and then [] transmits that money to a recipient in a place that the customer designates, usually a foreign country." *United States* v. *Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999).  Here, there is no question that the defendants caused millions of dollars to be transferred from Florida to bank accounts in New York as part of their unlicensed money transmitting business.  (*See, e.g.*, GX 103-1; GX 160; GX 161.)  Moreover, the evidence at trial also established that it was reasonably foreseeable to the defendants that the criminal transactions would occur, in part, in New York inasmuch as instructions contained in both invoices and email associated with numerous of the

15

defendants' unlicensed money transmissions specified that payments should be made to or through bank accounts in New York.  (*Id.*)

The defendants' argument to the contrary during trial based on *Toussie* v. *United States*, 397 U.S. 112 (1970), is misplaced.  (*See* Tr. at 561.)  In *Toussie*, the Supreme Court held that the failure to register for the draft was not a continuing offense, but rather a standalone violation that was complete at the time of the failure to register.  *Toussie*, 397 U.S. at 122.  However, the statute in that case simply required "that all young men [] between the ages of 18 and 26 shall register 'at such time or times and place or places' as the President may prescribe" for the draft. *Id.* at 115.  There was no further proscribed course of conduct.  By contrast, the mere failure to register an unlicensed money transmitting business will not result in the commission of any crime unless the defendant actually engages in the business of money transmitting.  18 U.S.C. § 1960; *United States* v. *Banki*, 685 F.3d 99, 114 (2d Cir. 2012), *as amended* (Feb. 22, 2012) ("[S]ection 1960(a) requires that the unlicensed entity be an illegal money transmitting business.") (internal quotations omitted).  It is this course of conduct which gives rise to criminal liability and, accordingly, the crime is punishable in any district in which the course of conduct occurs.[5]

Similarly, international money laundering, which involves the "transport[ation], transmi[ssion], or transfer[]" of funds into our out of the United States, is a continuing offense

---

[5] The Defendants also wrongly asserted that "all the money transmitting prosecutions in this district have been where the business was in this district." (Tr. 563.)  Not so.  The Government has identified numerous cases which involved out-of-district businesses that transferred money into the Southern District of New York.  *See, e.g.*, *United States v. Castrillon*, 05 Cr. 156 (CM) (prosecution involving Florida-based businesses); *United States v. Mazza-Alaluf*, 07 Cr. 403 (PKC) (prosecution involving Chile-based business); *United States v. Marmilev*, 13 Cr. 368 (DLC) (prosecution involving Costa Rica-based business); *United States v. Murgio*, 15 Cr. 769 (AJN) (prosecution involving Florida-based business).

under both the conventional criteria for a continuing offense as well as under the unique provisions of section 1956(i). *See United States* v. *Peterson*, 357 F.Supp.2d 748, 752 (S.D.N.Y. 2005) ("The money laundering charge also involves, in the context alleged here, a continuing offense, as the Government alleges that Peterson caused illegal proceeds of his insurance fraud scheme to be cleared through New York for transmission to a bank account in the Cayman Islands.") (citing *United States* v. *Cabrales*, 524 U.S. 1, 7, (1998)); 18 U.S.C. § 1956(i). The evidence at trial conclusively demonstrated that the defendants sent money from their bank accounts through bank accounts in New York, New York for further transfer to locations overseas in furtherance of their unlicensed money transmitting business. (*See, e.g.*, GX 103-1; GX 162.) Under section 1956(i), these international funds transfers by the defendants each constituted "a single, continuing transaction," and the defendants could thus be prosecuted for conducting "any portion of the transaction . . . in any district in which the transaction took place." 18 U.S.C. § 1956(i)(3). Put simply, because the illegal transactions occurred, in part, in New York, the defendants could be prosecuted here for those transactions. Accordingly, venue was proper for all four counts in the Southern District of New York.

The defendants' proposed edits to the jury instruction on venue were also properly denied. The venue instruction proposed by the parties in their original joint requests to charge came directly from the model federal jury instructions and was not objected to by either party. (*See* Joint Request to Charge, Dkt. No. 41, pg. 41; *see also* Modern Federal Jury Instructions, Instr. 3-11.) Then, during the charge conference on November 9, the defendants asked for the venue instruction to be modified in two respects: (a) they requested that the instruction omit that the defendants need not have been present in the district; and (b) that the instruction be modified to state that an act committed by the defendant must have occurred in the district in order to

establish venue. (Tr. 620.) However, these proposed edits to the instruction were both properly rejected. The first edit sought to excise a correct statement of the law that would be necessary for the jury's consideration of the case. It is black letter law that the defendant need not have been present in the district as long as part of the crime was committed there, and the jury was properly informed of that fact. *United States* v. *Rutigliano*, 790 F.3d at 296. The defendants' second proposal – that the jury should have to find some act that the defendant committed in the district in order for venue to lie – simply misstated the law. In fact, a defendant need not commit acts or even have actual knowledge that the crime will be committed in a particular district to establish venue. Rather, it is sufficient if part of the crime occurs in the district and the commission of such criminal conduct would have been "reasonably foreseeable to the defendant." *United States* v. *Davis*, 689 F.3d 179, 186 (2d Cir. 2012). Here, the fact that the defendants knowingly transmitted tens of millions of dollars to accounts in New York, pursuant to written instructions in emails and invoices, provided an ample legal basis for venue. To instruct the jury that more was required would have been in error.

In sum, venue was proper for all counts in the Southern District of New York, and the defendants' proposed edits to the venue instruction containing heightened venue requirements were properly rejected.

### D.     The Court Properly Declined to Give a Jury instruction on the Stockbroker Exception.

The defendants also argue that the Court improperly declined to give their requested jury instruction about the stockbroker exception to the operation of a money transmitting business. (LDJ Br. at ¶ 7.) Such a jury instruction would have been inappropriate, however, because there was no factual support in the record for such a charge.

18

### 1.    Legal Standard

Under well-established Second Circuit law, a defendant is only entitled to a jury instruction on a defense theory "for which there is any foundation in the evidence." *United States* v. *Russo*, 74 F.3d 1383, 1393 (2d Cir. 1996) (quoting *United States* v. *Alfonso-Perez*, 535 F.2d 1362, 1365 (2d Cir. 1976)).  Even where there is some evidence to support a defense theory, a defendant is not entitled to have the exact language he proposes read to the jury.  *United States* v. *Russo*, 74 F.3d at 1393.  Reviewing courts look at a jury instruction in its entirety to ensure that it "adequately communicate[s] the essential ideas to the jury."  *United States* v. *Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010).

### 2.    Argument

The defendants' requested charge was not warranted because it had no basis in the evidence introduced at trial.  The parties' pretrial joint proposed request to charge included a comprehensive definition of a "money transmitting business" derived from the model federal jury instructions.  (*See* Joint Request to Charge, Dkt. No. 41, pg. 12; *see also* Modern Federal Jury Instructions, Instr. 50A-34.)  That definition made clear that a money transmitting business means an entity whose business is to transfer money on behalf of the public and in exchange for a fee.  (*Id.*)  At the charge conference on November 9, the defendants first proposed that the definition include additional language, namely: "Generally, acceptance and transmission of funds as an integral part of the execution and settlement of a transaction other than the funds transmission itself (for example, in connection with a bona fide sale of securities) will not cause a person to be a money transmitter" (the "Stockbroker Exception").  (Tr. at 604-06.)  At that time, the Court reserved judgment until the close of evidence to see if a sufficient evidentiary basis would be introduced to support the Stockbroker Exception.

19

Following the close of evidence, the Court revisited the Stockbroker Exception. (Tr. at 926.) At that time, having heard all the evidence the Court inquired of defense counsel what basis there was in the record for including the Stockbroker Exception. (Tr. at 929.) When pressed, defense counsel could only respond that the defendants were "servicing KCT, who is paying consultants, employees and individuals." (Tr. at 930.) In other words, defense counsel could put forth no basis for the Stockbroker Exception in the record because there was none. To the contrary, defendant Luis Diaz, Jr., testified time and again that Miami Equipment played no role whatsoever other than transferring the money in connection with payments by KCT to various payees that formed the basis of the Government's charges. (*See, e.g.*, Tr. at 764:12-5 (Miami Equipment performed no work with respect to Stewart Title payment); Tr. at 768:9-15 (no work with respect to Pamnet payment); Tr. at 784:1-8 (no work with respect to Adinar payments); Tr. at 789:4-14 (no work with respect to Levack payments); Tr. at 792:21-793:2 (no work with respect to Cielemca); Tr. at 800:5-7 (no work with respect to Fidel Ramirez payments); Tr. at 808:19-22 (no work with respect to Quinfra payments). The defendant's own testimony thus demonstrated that the defendants played no substantive role other than that of a money transmitter with respect to the subject transactions and the Stockbroker exception was thus inapplicable. Moreover, to the extent that the defendant claimed that their payments to companies like Siemens and EMA were in fact ancillary to legitimate non-transmission work (*see* Tr. at 929), the Government repeatedly stated both to the Court and the jury that such payments to actual vendors did not form the basis of its unlicensed money transmitting business charge (*see, e.g.*, Tr. at 29; 928; 934.)

Accordingly, the defendants were not entitled to a jury instruction on the Stockbroker Exception when it had no factual support. The Court also correctly noted that introducing the

20

concept of a sale of securities would be "confusing" to the jury and bore no parallel to the facts adduced at trial. (Tr. at 930.)  Furthermore, the instruction as given was sufficient to instruct the jury that to find the defendants guilty of operating an unlicensed money transmitting business, they had to find that it was a business whose purpose was to transfer funds – not some other legitimate ends to which payment was merely ancillary. (Tr. at 1046 ("A money transmitting business is a business which for a fee accepts funds for transfer within or outside the United States.").)  Moreover, the Court explicitly permitted the defense to argue to the jury that the payments were purely incident to legitimate services. (Tr. at 931.)  And the defendants in fact pressed that argument to the jury, including through the use of Government Exhibit-300 which included the Stockbroker Exception verbatim within an official form promulgated by the Treasury Department. (Tr. at 989; GX 300.)  In other words, despite the irrelevant and confusing nature of the Stockbroker Exception, the defendants were amply able to present it to the jury.

In sum, there was no basis in the record for the Court to deliver the Stockbroker Exception as part of the jury charge, and in any event, the defendants were able to effectively argue to the jury that the defendants were not functioning as a money transmitting business.

**E.**    **The Government's Cross-Examination of Luis Diaz, Jr. Was Proper and Did Not Unfairly Prejudice Either Defendant.**

The defendants next contend that the Government's cross examination of Luis Diaz, Jr. regarding cash deposits into his Wells Fargo bank account (the "Wells Fargo Account") was unfairly prejudicial because: (1) the Government lacked a good faith basis for its question regarding the charging of a fee in connection with such deposits, and (2) because the exhibit regarding the cash deposits could suggest that the defendants were engaged in criminal activity other than the offenses charged in the indictment. On the contrary, the Government had a good faith basis for questioning Luis Diaz, Jr. about the cash deposits (including about whether he

21

charged a fee for accepting cash deposits), and the bank records pertaining to those deposits, all but two pages of which were ultimately stricken from the record, were properly offered and did not unfairly prejudice either defendant.

                1.      <u>Legal Standard</u>

"As a general matter, all relevant evidence is admissible under the Federal Rules of Evidence unless specifically excluded." *United States* v. *Perez*, 387 F.3d 201, 209 (2d Cir. 2004); *see* Fed. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Yet, otherwise relevant evidence nevertheless "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. This principle does not exclude *all* prejudicial evidence, however. Rather, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect ... beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States* v. *Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States* v. *Figuero*a, 618 F.2d 934, 943 (2d Cir. 1980)).

In the context of cross-examination, the trial court may, in its discretion, preclude questions for which the questioner cannot show a good-faith basis. *United States* v. *Katsougrak*is, 715 F.2d 769, 778-79 (2d Cir. 1983). But a good-faith basis does not require uncontroverted proof of the matter. Rather, "[a] well reasoned suspicion that a circumstance is true" is sufficient. *United States* v. *Beck*, 625 F.3d 410, 418 (7th Cir. 2010) (quoting *United States* v. *Sampol*, 636 F.2d 621, 658 (D.C. Cir. 1980)). *See also United States* v. *Payton*, 159

22

F.3d 49, 59 (2d Cir. 1998) ("The government need not offer extrinsic evidence to show that a defendant lied so long as it can point to a good-faith basis for its questions.").

### 2.    Argument

During defendant Luis Diaz, Jr.'s direct and cross examinations, the defendant repeatedly asserted that (1) Miami Equipment was not and had never been a money transmitting business (Tr. at 639, 748, 813), and (2) that he only accepted in-bound deposits into his account from KCT with directions to further remit the funds because he knew and "trusted" KCT. (Tr. at 666, 668, 788, 805).  On cross examination, he specifically denied having accepted cash deposits into Miami Equipment's bank account for "anything that wasn't related to a service or a sale that [he] made" or using those accounts "to move money for other people."  (Tr. at 812-13.)

In order to impeach Luis Diaz, Jr. with respect to those assertions, the Government offered into evidence records regarding the Wells Fargo Account – GX 203, 203A, and 203B (the "Exhibits").[6]  These records demonstrated that numerous cash deposits were made into the Wells Fargo Account from disparate locations, including bank locations in the New York area, and by people the defendant ultimately conceded he did not know (Tr. at 825).  Although not offered at trial, the Government was prepared to offer direct evidence linking that account to an unlawful money transmitter in the New York City area during the exact same time period as the cash deposits highlighted for the jury.  (*See* Government's Motions *in Limine* (Dkt. 32 at 7-8); *id.* Ex. B (October 3, 2017 letter) at 1-3.)

In their instant motions, the defendants contend the cross examination was prejudicial for at least two reasons: first, they contend the Government lacked a good faith basis for questioning

---

[6] As the Court may recall, the records in question were at least initially subject to a stipulation in which the parties agreed that these records were authentic and were created and maintained consistent with the requirements for "Records of Regularly Conducted Activity" within the meaning of Fed. R. Evid. 803(6).  *See* GX 2001 ¶ 4(a).

the defendant about whether he "charged a fee" in connection with accepting (and transferring) these cash deposits.  Second, they contend the evidence unfairly suggested to the jury that the defendants were engaged in structuring or domestic money laundering.   Both arguments are without merit.

As an initial matter, there can be no dispute that by opting to testify, Luis Diaz, Jr. placed his credibility at issue.  When a defendant takes the stand, "[i]t is essential . . . to the proper functioning of the adversary system that . . .  the government be permitted proper and effective cross-examination in an attempt to elicit the truth."  *United States* v. *Havens*, 446 U.S. 620, 626-27 (1980).  As the Court observed, in denying the defendants' motion for a mistrial, "we all know that when a defendant takes the stand and makes a blanket, categorical statement, they open themselves up to an attack on their credibility, which is fair ground for cross-examination." (Tr. at 863.)  Here, the defendant did just that – he made blanket statements, denying that he had "ever been in the money transmitting business" denying that he had ever maintained accounts that he "used . . . to move money for other people," and denying that he had ever accepted "cash for anything that wasn't related to a service or a sale that we made."  (Tr. at 813).  Given that testimony, the Government was entitled to impeach the defendant's credibility on those points, which the Exhibits fairly did.  The Exhibits offered by the Government demonstrated that The Wells Fargo Account, which the defendant controlled, had been used to make a large number of cash deposits from places like New York, where the defendant had no regular business presence, by people the defendant did not know, and which the jury could fairly conclude were not, in fact, "related to a service or sale [the defendants] made."  (*Id.*).[7]

---

[7] In instant motion, defendant Luis Javier Diaz contends the Government improperly questioned Luis Diaz, Jr. about the identity of the individual depicted in the two surveillance photographs contained in GX 203B.  (LJD Br. at 5.)  However, the objection strips away the context to the

24

The defendants' contention that the Government lacked a good-faith basis for asking Luis

Diaz, Jr., whether he charged a fee in exchange for accepting cash deposits into the Wells Fargo

Account is simply inaccurate.  As detailed extensively in the Government's pretrial briefing and

as noted above, the Government had a substantial factual predicate for believing that the Wells

Fargo Account was being used by the defendants to unlawfully move money on behalf of third

parties, including direct evidence linking that specific account and "Miami Equipment" to a

convicted unlawful money transmitter in the New York City area during the exact same time

period as the cash deposits highlighted for the jury.  (*See* Government's Motions *in Limine* (Dkt.

32 at 7-8); *id.* Ex. B (October 3, 2017 letter) at 1-3.  *See also* November 13, 2017 letter (Dkt.

50))[8]  That good faith basis was only bolstered by evidence of the cash deposits in the account

which the defendant was unable to explain, made by people the defendant conceded he did not

---

questions: Luis Diaz, Jr., when confronted with evidence of cash deposits made into his account
by persons located in New York, sought to offer an innocent explanation for them, namely, that
"there was a gentleman, [a] company called Intel Tractor . . . He would advise us that there was
going to be money deposited into our account for purchases that he had made from us . . . And I
believe the gentleman's name is Raul Menendez."  (Tr. at 824.)  The Government was then
entitled to impeach the defendant's credibility on that proffered innocent explanation by
confronting the witness with pictures of the individuals making some of those cash deposits in
New York – individuals the defendant conceded were not, in fact, Mr. Menendez. (*Id.* at 825.)
*Cf. United States* v. *Payton*, 159 F.3d 49 at 58 ("When a defendant offers an innocent
explanation, [he] 'opens the door' to questioning into the truth of his testimony, and the
government is entitled to attack his credibility on cross-examination."); *see also United States* v.
*Beverly*, 5 F.3d 633, 640 (2d Cir. 1993) (defendant's testimony as to his unfamiliarity with guns
opened the door to questioning about his prior possession and use of guns); *United States* v.
*Garcia*, 936 F.2d 648, 654 (2d Cir. 1991) ("[O]nce [defendant] testified that he had no idea that
the white powder was cocaine, he opened the door for the Government to impeach his testimony
by establishing on cross-examination that he was familiar with and indeed had used cocaine as
recently as the day before his arrest").

[8] Indeed, counsel for defendant Luis Javier Diaz, in moving for a mistrial, all but conceded that
the Wells Fargo Account was being used as part of an illicit, international money moving scheme
– what he called a "*casa de cambio*" or "black market peso" exchange.  (Tr. at 857).

know, and in the face of false denial of having ever accepted cash from persons unconnected to his legitimate export business. Moreover, with respect to the charging of a fee, in particular, the Government offered extensive evidence that the defendants were in the business of charging a fee in connection with moving money for others, (*see, e.g.*, GX- 103-T, -105-1-T, -113-T, and -116-T), and therefore the Government was entitled to inquire as to whether that practice also extended to the cash deposits made by strangers into the Wells Fargo Account. *Cf. United States* v. *Oshatz*, 704 F. Supp. 511, 514 (S.D.N.Y. 1989), aff'd, 912 F.2d 534 (2d Cir. 1990) ("That does not mean that the basis in fact must be proved as a fact before a good faith inquiry can be made.") (quoting *United States* v. *Nixon*, 777 F.2d 958, 970 (5th Cir. 1985)).[9]

Finally, and even assuming this sole question was somehow improper, the defendants identify no undue prejudice stemming therefrom. The Government asked the question once and Luis Diaz, Jr. answered in the negative. The Government did not seek to introduce any additional evidence regarding fees beyond what was already in evidence, nor did the Government address the issue further in rebuttal or summation.

With respect to the defendants' second contention – that the Exhibits might suggest the defendants' involvement in structuring or domestic money laundering offenses – as the Government indicated at the time, it had no intention of implying the defendants' involvement in such conduct through the exhibits, and readily consented to the "strong curative instruction," the Court provided. (Tr. at 872-73.)[10] The Court also struck Government Exhibit 203B, which

---

[9] The suggestion that the Government should accept the proffer by counsel for Luis Diaz, Jr.'s co-defendant that Luis Diaz, Jr. had no knowledge of the cash deposits and should be permitted to testify to his lack of knowledge outside of the presence of the jury (Tr. at 817-18), does not obviate the Government's good faith basis for asking the question.

[10] In addition, structuring and domestic money laundering – financial crimes – are no more inflammatory than the offenses for which the defendants were on trial. *See, e.g.*, *United States* v.

26

contained the chart listing various cash deposits and the two surveillance images from the record, and reduced Government Exhibit 203A to two pages consisting of two deposit slips evidencing two cash deposits of $5,000 each.  (Tr. at 866-68.)  Finally, the Court informed that jury that it was striking 203B and a significant portion of 203A, telling them that the stricken material could not be considered by them in any way.  (Tr. at 873.)   These measures were more than sufficient to address any concern of possible prejudice resulting from the Exhibits and related questioning.[11]

In the instant motions, the defendants rely primarily on the fact that the jurors, during their deliberation, asked to see Government Exhibit 203B.  However, the jurors also asked to see nearly two dozen other exhibits, including exhibits unique to each defendant, and exhibits relevant to other bank accounts.  The jurors also asked to have specific testimony read back. And the jurors spent an entire day carefully weighing the evidence and deliberating before returning their verdict.  Moreover, as a consequence of the jurors' request for GX 203B, the Court was afforded a second chance to remind the jury again that the exhibit had been stricken from the record, an instruction, particularly once clarified, the jury is presumed to have followed. *See, e.g.*, *Richardson* v. *Marsh*, 481 U.S. 200, 206 (1987) (it is "an invariable assumption of the

---

*Presley*, 24 F. App'x 12, 14 (2d Cir. 2001) ("Because the [other] drug sale is no more inflammatory or disturbing than the crimes for which [the defendant] was on trial, there was little danger that the Rule 404(b) evidence unfairly prejudiced him."); *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) ("Rule 403 does not bar evidence of other bad acts that "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged.")

[11] That is particularly true given that, as noted, the Government did not mention the Exhibits or the Wells Fargo Account in either its summation or rebuttal, focusing the jury instead exclusively on the extensive evidence regarding the defendants' BB&T account.

law that jurors follow their instructions"); *See also United States* v. *Beverly*, 5 F.3d at 641 ("it is axiomatic that jurors are presumed to follow their instructions.").

There is no evidence that the jury disregarded this instruction, particularly once it was reiterated during deliberations. In urging a contrary conclusion, the defendants suggest this Court engage in a speculative inquiry into the jury's thought process, even though it is well established that "[c]ourts have always resisted inquiring into a jury's thought processes." *United States* v. *Powell*, 469 U.S. 57, 67 (1984); *see also United States* v. *Acosta*, 17 F.3d 538, 546 (2d Cir. 1994) (same). Indeed, if anything, the verdict reflected the jury's careful consideration of the trial evidence and its careful effort to follow this Court's instructions on the law.

## CONCLUSION

For the foregoing reasons, the defendants' motions for relief pursuant to Rules 29 and 33 should be denied.

DATED:  January 2, 2018
  New York, New York

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By: _____/s/_____

Edward B. Diskant
Daniel M. Tracer
Benet J. Kearney
Assistant U.S. Attorneys
Southern District of New York
Tel. (212) 637-2294/2329/2260

28