UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LUIS DIAZ, JR., and LUIS JAVIER DIAZ,<br><br>        *Defendants.* | 17 Cr. 77 (WHP) |

**EXHIBITS TO SENTENCING MEMORANDUM OF LUIS DIAZ, JR.**

SELENDY & GAY PLLC
Christine H. Chung
1290 Avenue of the Americas
New York, New York  10104
(212) 390-9009

*Attorneys for Defendant Luis Diaz, Jr.*

# EXHIBIT A

Case 1:17-cr-00077-WHP    Document 89    Filed 05/25/18    Page 2 of 212

**EXHIBIT A**

**TABLE OF CONTENTS**

Abalia, Peter ............................................................................................. 001

Amezaga, Jose P. ...................................................................................... 002

Amezaga, Jose M. ..................................................................................... 003

Amezaga, Pablo.......................................................................................... 005

Amezaga, Rosa M........................................................................................ 006

Bello, Oscar M............................................................................................. 007

Bienes, Orlando........................................................................................... 008

Blanco Ariza, Donaldo A............................................................................. 009

Bravo, Gladys.............................................................................................. 011

Bringas, Margarita ..................................................................................... 013

Carbonell, Gladys E. ................................................................................. 015

Diaz, Alexander Pablo ................................................................................ 017

Diaz, Eduardo ............................................................................................. 018

Diaz, Lucy ................................................................................................... 020

Diaz, Michael Albert.................................................................................... 022

Diaz-Rojas, Annette .................................................................................... 024

Di Falco, Erick ............................................................................................ 026

Di Falco, Jussepe C..................................................................................... 027

Dixon, Fred.................................................................................................. 028

Espinosa, Cristina ...................................................................................... 029

Falero, Emilio.............................................................................................. 031

Fernandez Castillo, Luis Arevalo................................................................ 033

Fernandez Gutierrez, Luis Arevalo .......................................................................... 037

Fernandez, Rafael.................................................................................................... 041

Fox, Jose R. ............................................................................................................. 042

Garcia, Miguel......................................................................................................... 043

Gonzalez, Angel L.................................................................................................... 047

Grande, Francisco.................................................................................................... 049

Jiminez, Eugenio ..................................................................................................... 051

Jiminez, Jim............................................................................................................. 052

Jiminez, Lourdes Diaz.............................................................................................. 054

Larrazabal, Luis J. ................................................................................................... 055

Luejez, Carlos .......................................................................................................... 058

Morin, Eugenio ........................................................................................................ 060

Pacheco, Maria T. .................................................................................................... 062

Perdomo, Jose .......................................................................................................... 063

Perez-Puelles, Sister Eva ......................................................................................... 064

Rexach, Laura I......................................................................................................... 065

Rey, Martha R........................................................................................................... 066

Rojas, Manuel Jesus. ............................................................................................... 068

Ruiz, Nelson. ............................................................................................................ 070

Santiago, Maria A..................................................................................................... 072

Sicilia, Sergio J. ....................................................................................................... 073

Suarez, Ricardo R. ................................................................................................... 074

Torres, Gustavo A. ................................................................................................... 075

Traviesa, Robert........................................................................................................ 076

Vigil, Manuel..................................................................................................... 078

Vigil, Michelle Diaz............................................................................................ 080

Vivacqua, Carolina Victoria ............................................................................... 082

January 28th, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY  10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

My name is Peter Abalia, I am a retired Special Agent for the United States Treasury IRS-CI.  For approximately 15 years I lived with my family across the street from Luis Diaz' residence in Miami, FL.  Even though I had no business dealings with Luis Diaz, I socialized with him and his family two or three times a month.

When I was told about his indictment and trial for federal crimes in New York, I was shocked and in a state of disbelief.  It was painful to believe that Luis Diaz was intentionally involved in the crime.  I have known him to be a person of high morals, integrity and incapable of committing a crime against the United States intentionally. I do not have all the facts on the case but to the best of my knowledge, I know that Diaz had no knowledge or intent that he was committing a crime against the United States. He thought that he was helping customers and friends to repatriate money from a corrupt communist country in South America.

As previously mentioned, I have known Diaz and his family for many years and can attest to his integrity and moral values and he has always been a law abiding citizen. If I can be of any help to you or the Probation Officer conducting the Pre Sentence Investigation, please don't hesitate to contact me at the above telephone number.

Sincerely,

Peter P. Abalia
███████████
Miami, Florida  33176
Tel: 305-████████

001

January 28th, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

My name is Jose Amezaga and I am the cousin of Lucy (Amezaga) Diaz, the wife of Luis Diaz Jr, whom I have known personally and professionally for over 50 years. Our families are extremely close and we have frequent reunions throughout the year to celebrate our families and each other's company.

Although I am now retired, I had been working since I was 12 years old in all sorts of jobs to help my family financially and pay my way through college. In the last 40 years I was very involved with business in Latin America. Of those, 29 years were with Ingersoll-Rand Co. and retired as Vice President and General Manager for Latin America in 2005. The last 11 years I continued to work with Blackmer (a Dover Company), Stanley Black and Decker and Schwing, all the time as Vice President of Sales and Marketing for Latin America.

At Ingersoll-Rand I had the opportunity to work with Luis Diaz Jr. of Miami Equipment and Export, selling them equipment and parts for export to Latin America. It is worth mentioning that every single transaction we made with them was done with the utmost professionalism and their payment record was impeccable.

Luis Diaz Jr. is now facing some tough challenges for decisions he may have made without prior knowledge of the consequences. In those 40 years I mention above, I saw many highly ethical and great professionals make unintentional mistakes. And there is a reason. Latin America and the Caribbean is a complicated region consisting of 33 countries (plus 15 dependencies of other countries) and practically all of them are different culturally, with different languages, different importation laws and requirements, different legal currency laws, etc. And then there is the issue of friendships. It is a region where your word, relationships and character still have a lot of meaning. If you are not careful you may be asked to do things that in some countries may be acceptable but in others, particularly in the United States, are not.

Since I worked for large corporations most of my professional life, we were constantly instructed and had to become very familiar with the laws of the United Stated. And all our employees had to sign the company's Code of Conduct and fully understand the Corrupt Practices Act. However, I can attest to the fact that of the more than 2,000 small export companies in South Florida, most are not familiar with them. These are people that work hard to make a living and sustain their families and these are people that do not wake up in the morning trying to figure out how to break the laws of the United States.

I have known Luis Diaz Jr. most of my life and I can assure anyone that he is a person of great family values, a great professional with great integrity and that to the best of my knowledge did not intend to break any laws of the United States or any other country by his actions.

Sincerely,

Jose P. Amezaga

Coral Gables, FL 33134
Tel: 305-███████
Email: ███████@gmail.com

002

Honorable Judge William H. Pauley III                    March 5, 2018
United States District Court
Sothern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 007

Your Honor I am writing you on behalf of my brother in law Mr. Luis Diaz Jr.

My sister Lucy and I left Cuba in 1961 and landed at the Miami International airport. She was 14 and I 16 years old. We both were send to an orphanage place in Dubuque, Iowa. Luckily for both we were claimed by an uncle and both returned to Miami to live with them. My sister graduated from High school and couple of years latter married Luis. I continued my studies and got married in 1968. In June 1969 I was drafted in to the army and was sent to Fort Gordon in Georgia and latter transferred to Fort Richardson in Alaska. I served for two years and got an honorable discharge with the rank of first sergeant. While stationed in Alaska my wife and I applied for the US citizenship and both became American Citizens. After my service in the army I returned back to school and graduated from the University of Miami in 1972 and began working for Florida Power & Light electric company and held the title of principal engineer when I retired in 2006.

As for my brother in law, Luis, I knew he was an excellent student and had graduated from the University of Georgia Tech. It happened that my wife Rosa Maria, to who I am still married, knew Luis and his family from Cuba since they lived in the same neighborhood.

Having Luis for a brother in law is a blessing. He has been married to my sister Lucy for more than 50 years and they still love each other very much and together they raised five wonderful children. In many occasions Luis had demonstrated his concern for other people like the time when my mother could not longer live by herself and Luis offered to convert his two car garage into a room with a bath and closet so my mother could move in and live with them. This garage was Luis passion where he spent many hours doing mechanical work on his and his children cars and yet he gave up this hobby and moved the cars outside just so my mother could have a room of her own.

I have also witnessed Luis going through very difficult times when his business slowed down because doing business with South America is risky due to the ups and down in their socio-economic situation. Luis is the type of person that never gave up hope and endured the bad times and was able to lift up his company with his hard work and persistence. Even today after all he has been through he is in high spirit and continue to get up every morning and go to work.

Your Honor I do know this is a country found in the rule of the law and the law has to be respected and adhere to. I do know that not knowing about the law is not an excuse to break the law and giving that I will truly respect your final decision in rendering the sentence you feel most appropriate to this case, but that said I hope you take in consideration that my brother in law is truly a man of his word and I firmly believe that he made an honest mistake based on his belief he was doing nothing wrong and least that he was breaking the law. Why do I know that? Not only he is a very honest man, but a man of high integrity and social morals that looks for the well being of his family, friends and the society as a whole.

Your Honor I truly hope you consider all the suffering Luis, his wife Lucy, his children and his family has come to endure during this period of uncertainty and I ask you to take the path of a lenient sentence based on Luis personal character and integrity.

Sincerely

Jose M. Amezaga

<span style="background:black">████████████</span>

Cutler Bay, Fl. 33157
Tel: (305) ████████
E-mail: ████████████@comcast.net

004

March 15, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY  10007

Re:  United States of America v. Luis Diaz, Jr and Luis Javier Diaz
     Case No. 17 CRIM 077

Dear Judge Pauley:

My name is Pablo Amezaga.  I am submitting this letter on Behalf of Luis Diaz, Jr. who is due to be sentenced shortly.

Luis Diaz is my brother in law.  He married my sister when I was 6 years old.  Luis has been a hard-working, law-abiding family man that raised five children that have grown up to be outstanding human beings with wonderful loving families of their own.  His children are college educated, hard-working and respectful.  They always support each other especially now during this difficult time.  Family is first for them.  They have given him nine grandchildren that sparkle when they see him.

Luis is the patriarch of the family, bringing everyone together during happy and sad times.  My mother, who passed away the week of Luis' trial, lived with him and my sister for over 30 years.  He always treated her with respect and cared for her like she was his own mother.  He would prepare her breakfast, give her her medications, and make sure she was comfortable.

Luis has been looking forward to enjoying the rest of his life with his wife, but instead is facing time in prison.  I do not know how this will affect my sister and their family.  Their faith remains strong.

Your Honor, I am asking you to be merciful in your sentencing.

Respectfully,

Pablo Amezaga
Davie, FL 33331

005

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

March 7, 2018

Your Honor I am writing this letter on behalf of Mr. Luis Diaz Jr.

My name is Rosa M. Amezaga I have been living in this country since November, 1961.
I graduated from Miami Beach Senior High in 1965, began working as a bank teller after graduating and in 1968 got married. A year later my husband enlisted in the U.S. Army and was send to Alaska to finish his assignment. During my husband service in Alaska we both became U.S. Citizens. In 1971 came back to Miami where most family and friends resided. I have three children, one girl and two boys and two grand children. I am retired now.

Your Honor the reason for my writing is to add to my husband's letter, Jose Amezaga, and let you know how much I love and what I think of my dear friend Luis Diaz Jr. which I consider as a brother. I first met Luis in Cuba around 1957 when our families made residence in the same Havana neighborhood called Aldabo. We had formed a group were we play, ride bicycle, go dancing, play ball, talked about dreams out loud and many more activities. Luis was and still is one of the friends you trust and and could count on. Coming from a family we consider of high moral values, and of the same faith and integrity. Luis has always been considered part of our family.

Luis left Cuba and travel to the US to study at the University of Georgia Tech. becoming and instant celebrity in the group and when for political reason my family and I left Cuba in 1961 and arrived in Miami we kept in touch and knew of each other throughout friends and family, specially my brother

Luis met my sister in law Lucy through my brother and married her making us closer as members of the same family. They started their family in Chicago, because of job allocation, where Luis Javier the first of five kids was born. They have been to Mexico, Ecuador and back to Miami. From day one, he has been an excellent father and provider not only of life necessities, but of good moral and decency teachings. Luis has been a very hard worker and a conscious man that has always rendered a helping hand to others whenever the need rise. When hurricane Andrew hit Miami in 1992 our home got damaged very badly by both wind and water damage that render it unlivable. The next day Luis showed up and pick all of us my three kids my husband and me and drove us to his home where we stayed there for approximately a month. There were 12 of us under his roof, sleeping and eating. He offered his home unconditionally and without reservation. Luis and his family have gone through some rough times because of his business dealing with Latin America where the economy in those countries is very unstable and unpredictable, but he had always kept his good spirits and faith throughout his life and was able to revive the business and continued to flourish.

Your Honor is for these reason that I respectfully ask you to consider granting Luis as lenient sentence as is allowed, in order for him along with his wife and immediate family to be able to continue to serve and contribute to society and others, like they have done for many years.

Cordially,

Rosa M. Amezaga

Cutler Ridge, Fl. 33157
Tel: (305) ▮▮▮▮▮
E-mail: ▮▮▮▮▮▮▮@comcast.net

006

April 2, 2018


Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America vs. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

Dear Judge Pauley:

I am submitting this letter on behalf of Luis Diaz, Jr. who will be facing sentencing before you.

My name is Oscar M. Bello and I was employed as an engineer for thirty years by Florida Power and Light Company in Miami, Florida. My position was Principal Engineer at the time of my retirement. I have been married to Gloria A. Bello for 53 years and we have two sons. Their names and professions are: Oscar E., an Electrical Engineer and Ricardo, a Cardiothoracic surgeon.

Luis came into our family when he married my first cousin Lucy Amezaga Diaz 50 years ago. As a member of our family I always found him to be a person of impeccable conduct. Luis and his wife have a beautiful family of five children and nine grandchildren.  Not to mention, that his mother-in-law, Piedad Amezaga, was an integral member of the family. She lived with Luis and Lucy for 33 years until her recent passing at the age of 101. Luis and Piedad always maintained a relationship of respect, kindness, concern and affection for each other. Luis has always displayed his loving character to all that surround him. He has high religious beliefs which he has imparted on his family.  I always found him to be an honest and caring person always thinking of other people's needs.

I strongly believe the unlawful behavior of Luis was due to his lack of knowledge of the law as it applied to the charges for which he was tried.  I do not think our community would benefit from sending Luis to jail as it would be detrimental to his immediate family, friends and our society.  He has always demonstrated to be a person of high standards and I will continue to have a very high opinion of him.

I would ask for your leniency as you decide on the sentencing.  I believe he deserves a chance to be able to recover his life as for the past year Luis and his family have endured constant stress and suffering.

Your Honor thank you very much for taking time from your busy schedule to read and consider the points addressed in this letter.

May your sentencing reflect your mercy on Luis and his family.

Sincerely,

*Oscar Y Bello*

Oscar M. Bello
███████████
Miami, FL  33165                              Home Phone: (305) ███████
Email: ███████@comcast.net              Cellular:  (305) ███████

007

Date:1/29/2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United State Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case NO. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

I would like to introduce myself, I am Orlando Bienes, DDS and I own a dental practice in Miami, Fl. I am writing to provide a character reference for Luis Diaz. I have known Mr. Diaz for over 50 years. While I am aware of the charges that he has been convicted of, I implore you to see beyond the mistakes that he has made and understand that he is an upstanding father, family man and friend.

Mr. Diaz came to the United States from Cuba in search of the America dream. He graduated college from Georgia Tech with a degree in engineering. Mr. Diaz worked for corporate America prior to following his dream and starting his own business. During this time Mr. Diaz also created a beautiful family. He always remained a loyal husband to his wife Lucy and a loving father to his 5 children.

Not having a family of my own, Mr. Diaz opened his home to me every holiday. The Diaz home is always welcoming and overflowing with love and I cherish every moment spent with them. It is ever so apparent what a large void his absence will create in his family and within the community.

Mr. Diaz is a kind, hard-working and humble man, and I would be remiss not to mention how extraordinarily valuable he is to his family and friends. I appreciate your time and consideration to this matter.

Sincerely,

Orlando Bienes DDS MAGD

Miami, FL 33133
Email: ▮▮▮▮@aol.com

008

**Honorable Judge William H. Pauley III**
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007                                    February 8, 2018

Re:    **United States of America v. Luis Diaz, Jr. and Luis Javier Diaz**
       **Case No. 17 CRIM 077**

My name is Donaldo Antonio Blanco Ariza, a Venezuelan citizen. I am of legal age, married, 59 years old, father of three children, and bearer of National Identity Card No. ▮▮▮▮▮▮ and Venezuelan Passport No. ▮▮▮▮▮▮. I am a Senior Technician in Public Works, and a businessman. I have several companies in Venezuela, and one in Colombia, in the areas of construction, oil, the manufacture of doors and windows, and the import and export of goods and services. Construcciones y Mecánica, C.A. (CONYMECA), founded in 1985, is the oldest of these companies.

In 1988, I started business relationships with several companies in the State of Florida, for the acquisition of machinery, trucks, and parts. Among these companies, I came to know **Miami Equipment & Export**, represented by Messrs. **Luis Diaz and Luis Javier Diaz**. Over the years, this company grew to become a reliable and trustworthy provider, given its seriousness and compliance with our requirements.

Throughout all these years, the business relationship has endured due to the amiability, seriousness, honesty and commitment demonstrated by Messrs. Luis Diaz and Luis Javier Diaz, as well as their family members who through the years have joined the company. This has led to an honest and sincere friendship.

Honorable Judge William H. Pauley III, with all due respect and because I know Messrs. Luis Diaz and Luis Javier Diaz, their seriousness, honesty, and because I know that they are excellent fathers, they do not deserve to be going through this situation, and if they made a mistake, as do all humans, I assure you that it was not with the intention of violating the law, nor with the intention of damaging anybody or any institution. I humbly request, Honorable Judge, that you be benevolent and compassionate when imposing the sentence.

Without anything further, and while praying to God that these words may in some way help make your sentence carry the least harm possible to Luis and Luis Javier Diaz, as well as to their respective families, I say farewell to you.

Very truly yours,
[illegible signature]
Donaldo A. Blanco A.
Passport No. ▮▮▮▮▮▮

**Honorable Judge Willian H. Pauley III**
United States District Court
Southern District of New York
United State Court House
500 Pearl Street
New York, NY 10007                                    Fecha: 08-Feb-2018.

Ref.: **United States of America Vs Luis Diaz Jr. and Luis Javier Diaz.**
     **Caso No: 17 CRIM 077**

Mi nombre es Donaldo Antonio Blanco Ariza, venezolano, mayor de edad, casado, de 59 años de edad, padre de tres hijos, portador de la Cedula de Identidad número ▇▇▇▇▇▇ y Pasaporte Venezolano No: ▇▇▇▇▇▇, Técnico Superior en Obras Civiles y Empresario. Tengo varias empresas en Venezuela y una en Colombia, en el área de la construcción, Petrolero, Fábrica de Puertas y Ventanas, Importación y Exportación de Bienes y Servicios, siendo la empresa Construcciones y Mecánica, C.A. (CONYMECA) la más antigua, que data desde 1985.

Desde el año 1988 inicié relaciones comerciales con varias empresas en el Estado de la Florida de los Estados Unidos de Norte América, para la adquisición de maquinarias, camiones, piezas y partes, dentro de las cuales conocí a la empresa **Miami Equipment & Export**, representada por los Señores **Luis Diaz y Luis Javier Diaz**. Con el transcurrir de los años esta empresa se convirtió en un proveedor seguro y confiable por su seriedad y cumplimiento a nuestros requerimientos.

Durante todos estos años la relación comercial se ha mantenido, por el buen trato, seriedad, honestidad y cumplimiento que han demostrado los señores Luis Diaz y Luis Javier Diaz, así como también, su familia que con el tiempo se integraron a la empresa y que nos llevó a una relación de amistad sincera y honesta.

Honorable Judge William H. Pauley III, con todo el respeto que Ud. se merece y por conocer a los señores Luis Diaz y Luis Javier Diaz, su seriedad, honestidad, excelentes padres, que no merecen estar viviendo esta situación, que, si cometieron alguna falta como todo ser humano, me atrevo asegurar que no ha sido con la intensión de violar la Ley, ni de causarle daño a personas o institución alguna. Humildemente le pido honorable Judge, tenga benevolencia y compasión al momento de dictar sentencia.

Sin más a que referirme y rogándole a Dios que estas palabras de algún modo puedan ayudar a que su decisión en cuanto a la sentencia, sea lo menos perjudicial posible para Luis y Luis Javier Diaz, como para sus respectivas familias, me despido de Usted,

Atentamente,

Donaldo A. Blanco A.
Pass. No: ▇▇▇▇▇▇

010

March 20, 2018

**Honorable Judge William H. Pauley III**
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

**United States of America v. Luis Diaz, Jr. and Luis Javier Diaz**
**Case No. 17 CRIM 077**

I write this letter in support of my son-in-law, Luis Javier Diaz.

My name is Gladys G. Bravo. I arrived from Cuba in 1969, together with my husband, Jorge J. Bravo, 3 children, and expecting my daughter Elena, who was born that same year, 3 months after arriving in Miami. I became an American citizen in 1976. I am a practicing Catholic and a have been a member of St. Brendan's Parish since the year that we arrived.

All our lives have taken place in Miami, where my husband has worked and where my children were educated.

I met Luis Javier, or "Lou" as we know him, in 1992, when he began dating my daughter Elena, the youngest of my children. He was always a polite young man and respectful towards all our family. They married in 1994 and he has always behaved himself as a good husband, father, son and friend to all.

They've given me 3 grandchildren who are my greatest treasures and have brought pride and happiness to my life. I know they have made a mistake but as a Catholic and a Christian, I believe that all of us deserve a second chance. Is there anyone who hasn't made a mistake in their life?

I ask that you not reduce the life of a father, a husband and a son-in-law to one mistake, and I appeal to your mercy and your humility.

Thank you,

[signature of Gladys G. Bravo]
Gladys G. Bravo
███████████
Miami, FL 33174
USA
786-████████

011

March 20, 2018

**Honorable Judge William H. Pauley III**
**United States District Court**
**Southern District Court of New York**
**United State Court House**
**500 Pearl Street**
**New York, NY 10007**

**United States of America v. Luis Diaz, Jr. and Luis Javier Diaz**
**Case No. 17 CRIM 077**

Excribo esta carta de soporte para mi yerno Luis Javier Diaz

Mi nombre es Gladys G. Bravo. Llegue de Cuba en el año 1969 con mi esposo Jorge J. Bravo, tres hijos y esperando mi hija Elena que nacio ese mismo año a los tres meses de llegar a Miami. Me hice cuidadana Americana en el año 1976. Practico la religion Catolica y soy miembro de la parroquia de St. Brendan desde el mismo año que llegamos.

Toda nuestra vida ha desarrollado en Miami donde mi esposo trabajo y se educaron mis hijos.

Conoci a Luis Javier, "Lou" como lo llamamos, en el año 1992 que empezo a salir con mi hija Elena, la mas chiquita de mis hijos. Siempre fue un joven educado y respetuoso con toda la familia. Ellos se casaron en el año 1994 y siempre se ha comportado como un buen esposo, padre, hijo y amigo con todos.

Ellos me han dado tres nietos que son mis mas apreciados tesoros que han traido a mi vida orgullo y alegria. Yo se que han cometido un error pero como Catolica y Cristiana creo que todos merecemos una segunda oportunidad. Quien no ha cometido un error en su vida?

Le pido que no resuma la vida de un padre, un esposo y un yerno honrado y bueno en un solo error y apelo a su misericordia y su humildad.

Gracias,

*Gladys G. Bravo.*

**Gladys G. Bravo**
████████
Miami, FL 33174
USA
PH: 786-████

012

Miami, March 22, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz, Jr.

I want to make you aware that in the more than 30 years I have known Mr. Luis Diaz and his esteemed family, I have witnessed his moral character and human quality, both with his family and those of us who are not family members.

I have known Luis Diaz as the husband of the first cousin of my best friend, Liliana Azcunce de Ruesga and son-in-law of Ms. Piedad Amezaga, my mentor and guardian.

Mr. Luis Diaz is an honorable man of integrity, noted for his compassion and always being willing to help others at their most desperate moments. I state this because I myself have received his help and that of his dear family when no one would give me a hand, and, in his case, he has always given me a plate of food and a word of comfort.

I want to state that apart from appreciation and admiration, the only thing I feel for Mr. Luis Diaz and his family is great affection.

Sincerely,

[Signature]

Margarita A. Bringas

Miami, FL 33173
Tel.: 786-
@gmail.com

013

Miami, March 22nd 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

Quiero hacer de su conocimento que en los mas de 30 años que conozco al Ing. Luis Diaz y a su apreciable familia, he sido testigo de su calidad moral y humana tanto con su familia como con los que no pertenecemos a ella.

Yo conoci a Luis Diaz por ser esposo de la prima hermana de mi mejor amiga, Liliana Azcunce de Ruesga y yerno de la Sra. Piedad Amezaga, mi mentora y protectora.

El Ing. Luis Diaz es un hombre integro, honorable, destacado por su compasion y el estar dispuesto siempre a ayudar a los demas en los momentos mas apremiantes. Lo constato porque yo misma he recibido su ayuda y la de su querida familia cuando nadie me brindo una mano y en su casa siempre se me brindo un plato de comida y una palabra de Consuelo.

Quiero constatar que aparte de agradecimiento y admiracion, lo unico que siento por el Ing. Luis Diaz y su familia es un gran cariño.

Sinceramente,

Margarita A. Bringas

Miami, FL 33173
Tel: 786-
@gmail.com

014

March 15, 2018

The Honorable William H. Pauley, III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, New York 10007

Re:    United States of America vs. Luis Diaz, Jr. and Luis Javier Diaz
       Case No:  17 CRIM 077

Your Honor:

I am submitting this letter on behalf of Luis Diaz, Jr. First, please allow me introduce myself. My name is Gladys E. Carbonell, and I reside in Miami, Florida. I am a Cuban American who arrived in the United States on ███████, 1962, at the age of 15. I attended 9th grade at Ida Fisher Middle School and attended and graduated High School from Miami Beach Senior High School. After graduation, I started working at Miami Beach First National Bank, and worked there for approximately eight years. In 1973 I started working for Attorney Thomas J. Gaine as his legal secretary. Thereafter I pursued a career on the legal field, as a secretary and paralegal.

I have known Lucy and Luis Diaz, Jr. since 1964. After my father died on my 21st birthday, I have been considered an adopted member of their family. I attended their wedding in 1966 and saw their five children grow into honest and productive citizens. For years I have shared most holidays with the Diaz family, and have celebrated with them their children's weddings, baby showers and other events. I have always known Mr. Diaz to be a person of exceptional moral character, an extremely helpful person, very hard working and very honest person, accomplished family man, who has lived an exemplary life with a clean record. A few years ago, I had to undergo bilateral cataract surgery and Mr. Diaz drove me to and from the hospital for both surgeries. I can assure Your Honor that any infringement of the law on the instant case, was a mistake without knowledge or intent in breaking any law. For these reasons I pray Your Honor take into consideration Mr. Diaz' clean past, hard work, his history as an honest person and loving family man.

Respectfully submitted,

Gladys E. Carbonell

Gladys E. Carbonell
███████████
Miami, FL 33173-2110
Tel: (305)███████
E-Mail: ████████@hotmail.com

015

March 19, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY  10007

United States of America v. Luis Diaz Jr. and Luis Javier Diaz
Case No. 17 CRIM 007

Dear Judge Pauley III:

My name is Alexander Pablo Diaz, I am Luis Diaz's youngest son. I was born and raised in Miami, FL. I graduated from The University of Florida with a B.S. in Environmental Horticulture. Afterwards, I was granted an assistantship to pursue an M.S. in Ornamental Entomology. Immediately after I graduated I was offered a job in horticulture at Costa Farms, the largest foliage nursery in the world. I am currently employed at the same nursery as the Production Manager of the Cactus and Succulent Division and have been with the company for 12 ½ years. I got married in 2013 and have been blessed with 2 children.

My Dad, Luis, is and has always been a strong center figure in my family keeping us all together as a very close family. For him family has always come first and he has worked tirelessly even to this very day to provide for us. Since I could remember my dad has always worked in the company that he built up on his own and has been able to send all of us to good schools so we could be successful as well.

As child growing up my father led a great example of hard work and living humbly and below our means. I was fortunate that my father was able to provide me with the guidance and support to put us through private catholic schools from elementary to high school. At an early age my father would let me work in his warehouse every summer and I was able to learn what it took for him to be successful and provide for his family. He taught me early the value of the dollar and that if I wanted something I had to work hard for it. However, at the same time he supported us in our education and made big sacrifices to put me through college and I am very fortunate that he was able to financially support me through my education at the University of Florida, so I was not burdened with any heavy loans when I graduated. After I graduated I was fortunate to be granted with an assistantship to pursue an M.S. at the University of Florida, because at that time my father was not able to continue to financially support my education

I have many wonderful memories from my childhood. Some of the most unforgettable moments where being with my father and brothers in the sports car races in Sebring and Daytona, Florida. We would rent a camper and go out for the weekend together and stay in the camper at the race track. My brothers and I would get very excited when my dad would get home with the camper to go to the races for the weekend. We would walk through the in-field

016

before the races and visit each of our favorite cars and team. I vividly remember when I was about 10 years old my dad taught me how to use his good camera and allow me to carry it and shoot pictures of the cars.

As I have grown and started a family of my own it is really humbling to realize what a good job my mother and father did raising five children. My mother and father are very humble, with unwavering faith, they are honest and simple people and have taught us to have good values, faith and provide us with all that we needed to be successful on our own. I understand what a big sacrifice it was for my parents to raise five children and provide us with a good life and an opportunity to be successful. My father had to work many long hours, full weekends and travelled significantly to create a successful business. He had to sacrifice a lot of time away from his wife and children in order to provide us with a good life. Even though he spent many hours working he spent quality time with his family and loved us all very much. I hope to be able to do as good job raising my children as my parents did raising us.

My dad has run an honest business and I strongly believe that if there was anything that was done wrong in the business it was due to others taking advantage of my father's honesty and good heart and willingness to help others. My father will never knowingly do anything against the law and even less do anything that would hurt our family. My father and I are grateful that your Honor takes the time to consider my words and be lenient in your judgment towards my family's future.

Alexander Pablo Diaz

Miami, FL 33173

@gmail.com

Tel: 305-

017

# Eduardo Diaz

████████████████
Coral gables, FL 33134
305-████████

**Honorable Judge William H. Pauley III**
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: Luis Diaz

My name is Eduardo Diaz, one of Luis Diaz Jr. and Lucy Diaz's five children. I have been truly blessed with the most wonderful parents who have provided me and my siblings with an exceptional upbringing. They have been married for over 50 years and my mother is the world to my father. Through their example, they have instilled in us a strong moral foundation based on our Catholic faith. It was important to them that we would attend Church on Sundays as a family. My father is the center of our family, the rock. No doubt, I am who I am because of his love and sacrifice. Showing us through his actions to treat others as you would like to be treated, to help those in need, to be humble and to work at everything we do. My father is the type of man who puts the needs of others before his needs. A special memory I have of my father helping others was during my middle school years. I had a friend whose parents were going through economic difficulties. I turned to my father to see if we could help in any way. He immediately reached out to my friend's father to assist him in identifying employment opportunities and even provided them with a modest car for temporary transportation till they were able to make ends meet again.

My father emigrated from Cuba without his family at the age of seventeen and has had to work his whole life for everything he has. He earned his Engineering degree from Georgia Tech and then established a lifelong career in the heavy equipment business. My father has sacrificed and dedicated his whole life to provide for his family, it has not always been easy. In his early career he had to travel extensively throughout North and South America, was relocated as an expatriate to several different countries, all the while learning the business and gaining valuable experience. I know these early years were not easy for them. There were many times, especially at the beginning when he was establishing Miami Equipment and later during several economic down turns that money was very tight. I can recall my mother explaining to us that we were not able to get new shoes or toys, etc. Raising five children I am certain is not easy. As I look back I know we were blessed, always loved abundantly and even in tough times we never felt we were missing anything.

My father worked countless hours, so he could provide for us. Education being of the upmost importance to him. My parents made sure we all went to Catholic schools and eventually provided each of us with the opportunity to attend college. All five children attended College and four received their degree, an achievement, I accredit to my parent's hard work and tremendous sacrifice. Through many

tough times and good times, our family has become strong and we rely on our faith and each other's love to get through tough times, as we will have to do once again.

Growing up there has been no better example of who to look up to than my father. Honor, commitment, love, patience is what my dad has taught me. Now being a father myself I cherish the fact that I had a father who taught me through example what it is to be a husband and father. His faith, work ethic and love are an invaluable gift I hope to pass on to my children. My father now has 9 grandchildren my two kids included in that number. His grandchildren need him as do the rest of us. I long for him to attend my children's games, communions, and graduations. To be able to pick my children up at school, ballet practice or even an overnight sleep over. Just the other day my father came over to help my son with his math homework. Time is a precious thing your honor, and my dad is now 76 years old and still an active part in the lives of his grandchildren. Society is lacking role models and individuals who know what hard work and honesty is, let my grandchildren learn how to be honest hard-working individuals from their grandfather. You have no idea how my kids and the rest of our family admire my dad, I can't imagine having that taken away.

During my summers in high school I began to help at my dad's warehouse. When interacting with his employees, I realized how much they loved him and he them. He treated all with respect and helped in any way he could. Many times placing their needs before his. I know of many times; my father did not take a paycheck to ensure that his workers were paid. The impact of those summers working with my dad has shaped who I am today. I like to think that I am such hard worker and honest person because of the lessons I got at my summer job with my dad.

My parents are simple people; they still live in the same modest home we grew up in. They have earned what they have the hard way through many years of hard work. My father is not trying to become rich through crime. On the contrary, because he is so good, he was taken advantage of by manipulative individuals. He would never knowingly break the law or hurt anyone. At any time if anyone, any organization, bank or government agency would have notified them of requiring a license no doubt they would have complied. Your honor, in a letter I cannot express how special a person my father is. I can assure you, my father is an exceptional and honorable man. I humbly ask you for your greatest sympathy; please do not separate him from us.

Respectfully,

Eduardo Diaz

019

Miami, March 19, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

Your Honor,

My name is Lucy Diaz and I am the wife of Luis Diaz.

I came to the United States in 1961 at the age of fourteen with my older brother because of the communist regime in Cuba. The government said that they were going to take over the education of all children in Cuba and all the private schools including all Catholic schools were closed, the priests and nuns were ordered to leave the country. Indoctrination started in the schools and at fourteen years old I was put on a program where I would have to go into the country side, live there and teach illiterate people how to read. My parents feared for our safety and our future.

At the age of seventeen I met Luis, and when I turned nineteen we got married. My husband was twenty four years old. At the time, he was working with International Harvester Co. in Chicago, and we lived there for two and a half years, where our oldest son and daughter were born. We have been married for fifty two years.

My husband is a wonderful person, he has a great heart, and loves to help people, and according to our means we have helped many people in need. I love the way he is, he is very optimistic and makes me laugh, even in hard times. He is a great father, he has worked so hard all his life to provide for our family and be able to send our sons and daughter to Catholic schools and to the University. It hasn't been easy, we are middle class people, and having a business dealing with South America is very hard because it's a very unstable region, so it has been ups and downs all our life. Thanks to our strong belief in God, who has always been there with us, we were always able to make it.

Your Honor, my husband is a person of principles, for him GOD, FAMILY AND HONESTY are the most important things in life. We have been able to raise our children with the same values, and now they are doing the same with their own children, and we are so very proud for this. We have nine grandchildren.

020

021

Your Honor, I want to tell you that my husband made a mistake without any bad intent, because I know him very well. For nothing in the world he would have done anything against the law, this is not the kind of people we are. To this day I cannot believe we are in this awful situation. It has damaged our family name, our situation has been in the local news and in local newspapers and our Company has had to stop doing business. We are suffering tremendously. We love and respect this country that gave us the opportunity to start a new life.

Please have compassion for my husband, he is the center of our family, his children and grandchildren need him, I need him, I cannot imagine my life without him.  Luis would be seventy seven years old in December, he also needs me, if he goes to prison it would be devastating for both of us, we have been suffering so much. My husband means the whole world to me.

May God bless you always.

Respectfully,

Lucy Diaz

Miami, FL 33165
Tel: 305-

Miami, March 13th 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am sending this letter on behalf of my father, Luis Diaz Jr.

Luis Diaz Jr., married to Lucy Diaz for 51 years. I am the middle child out of five.

My father is a God fearing, God loving, virtuous man. The son of Luis Diaz Sr. and Adela Diaz, both born in Spain. Due to war in Spain, my grandparents had to leave their home in search of a stable and safe life. They moved to Cuba and made it their home.

Years later they would face an even worse situation, as Castro took over the country, and took claim of all possessions. My father had left to study in Georgia Tech in 1959 from which he graduated with a degree in Mechanical Engineering. He returned to Cuba one more time to spend time with his parents and friends while on break from his studies. In 1961 they all had to leave Cuba.

My father has never returned to Cuba and has absolutely no interest in returning while the current communist government is still in power. At this point, I believe he has accepted the reality that he would never visit his country of birth again. My grandparents and my parents faced extremely difficult times, but through all the trials they were confronted with, they never lost faith in God and worked very hard to create a new life in this great Country we now call Home. We are all very proud of our father, who is the keystone of our family, and are grateful for all his work and sacrifice. My father's life has been completely dedicated to his family. He has put all his energy in making sure my mom and his five children were always provided for, that my siblings and I had a good education so we would be better adapted to succeed in the world.

My father, Luis Diaz Jr. and Luis Javier Diaz, my brother, are not criminals. I guarantee that if my father had any idea or sense that what was presented to him was illegal, he would have never accepted the work. My father had no intent or knowledge that he was committing a crime.

Your Honor, I ask you to consider the punishment that my father and brother have already had to endure. The pain of seeing what his wife, children and grandchildren are experiencing. His oldest son, my brother's life will never be the same. His wife and three children, who are just starting life have been forever fractured. My sister Annette and I, being called by the prosecution as witnesses for their case.

022

My father's only daughter having to testify in court, something that was very painful for both my dad and my mother.

My father's business, which he started from a desk in his bedroom in 1983, with five kids, has been destroyed. Miami Equipment & Export Co. was a service based business serving Central and South America and the Caribbean, supplying spare parts and heavy machinery for the construction and agricultural industries. Miami Equipment & Export Co. operated for over 35 years. My father planned to pass the Company on to his children so a few years ago he split ownership between three of his children who worked at Miami Equipment & Export Co. and decided that we wanted to continue the business.

The day our Company was raided by the government, we were left without the means to continue our work. All of the computers and servers were taken, several of our customer's files, our order log, they also took my personal cell phone and tablet. It took about six months to start receiving the seized items back. Though at the time we were told that they were not here to close down the Company, we found ourselves unable to operate. This interruption caused us great difficulties and created problems with our customers. The following day, scrambling to restart, we come to find that the Company's bank account had been frozen. This caused a huge ripple effect that extended both to our suppliers, our customers and employees, still affecting us until this day.

Due the reports in the news, our main supplier, CNH (Case New Holland) closed our account, as well as similar issues with other suppliers. Needless to say, things just kept crashing. The company's second bank, in which we have a line of credit, also closed the account resulting in the end of our operations. We found ourselves unable to pay suppliers, creditors, employees, health insurance and continue serving our customers. Wells Fargo closed the retirement accounts, my father and my brother's personal bank accounts were closed as well. Both have been left without any options and as a consequence they and all of our family are suffering.

To me, a perception has been introduced about my father that is a false perception. I pray that the true perception comes forward, the fact that my father is an honest, very hard working man and my brother is also a true and very hard working man. We lived a normal middle class life, but now we are all struggling to stay afloat and my father Luis Diaz Jr. and my brother Luis Javier Diaz have both been left with nothing.

In life we all make mistakes, I humbly ask you to give my father and brother a second chance.

Your Honor, I thank you for taking the time in reading my letter.


Thank you,

Michael Albert Diaz

███████ Miami, FL 33157 - Tel: 305-██████ - Email: ██████@att.net

023

February 27, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

My name is Annette Diaz-Rojas and I am his only daughter.

The first word that comes to mind when describing my father is selfless. He has never put himself first. All I have ever seen is from him is hard work to ensure his wife and kids were provided with whatever they needed.

My father is the person I admire most in this world. He has taught me to never give up. His life has been one battle after another. It has not been easy for him. He came from Cuba when he was 17 years old. Communism took over his country and he found himself in college with barely any money. He had to work two jobs to put himself through college going hungry when money was scarce.

He finished college and met my mother who he has been married to for almost 52 years. They had five children and raised a beautiful family. We had a wonderful upbringing. Our house was always full of kids. We lived in the house where all our friends wanted to be at. He worked very hard to put us all in Catholic schools. I know this was a very huge sacrifice for him because I have two children of my own and have made it a priority to provide them with the best education I could afford. I was brought up with the belief that an education was necessary and that it was the one thing no one could take from me.

When he was about 40 years old he decided to open his own business. He had to reinvent himself and figure out how to provide for his family. I remember when he started his new business with a rotary phone from his bedroom. My father worked tireless hours and started Miami Equipment without a penny. His determination to make it work came only from the love he had for us.

In time, Miami Equipment moved to an office. Little by little the business grew. Miami Equipment had good years and bad years, but he never gave up.

Through the good times and the bad times I always saw my father helping others in need. He would give to others even when he was personally going through a financial struggle. His loyalty, selflessness

024

and determination are the valuable lessons my father taught me while I was growing up. This was the example given to me on a daily basis.

I was put in a very difficult situation when I was subpoenaed to testify against my father and brother. They both have been the men in my life who I look up to and admire. I always valued their opinion and felt they always wanted the best for me. Yet I stood there in the court room giving evidence that could possibly hurt them. Even though I stated the truth, I knew from the bottom of my heart that they had no intent of doing anything illegal. This was devastating for me as well as for them.

With what my father is facing today, he has not given up. He has an extraordinary amount of faith. I know these charges against my father are very serious, but please know he would have never done anything, knowingly, to put his family in this situation. The man I know, love and respect would have never wanted to hurt his family. He has spent his whole life fighting so that he could give us the values and knowledge to succeed and make a difference in this world.

I greatly appreciate that you will take the time to read my thoughts and feelings for my father.

Respectfully,

Annette Diaz-Rojas

Miami, FL 33156
305-

025



**Erick Di Falco**
**715 NE 76 Street**
**Miami, FL 33138**

April 2, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United State Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

My name is Erick Di Falco, Aeronautical Engineer, 38 years old, married for 5 years, and father of two girls, A⬛ 4 and J⬛ 2. I became involved in the business of my family when we became dealers for a few construction equipment manufacturers in 2006, and have been doing the same ever since.

I have known Mr. Luis Diaz Jr. for about 26 years, I was 12 at that time. I can say that in all the time I have known him, Mr. Luis has been a decent, hardworking and trustworthy person. He is very well known in his business community as such.

Mr. Luis has a beautiful family, I have always seen them together at work, or personal related events. Mr. Luis' wife has been a volunteer for many years in a local school, helping in the library, teaching kids to speak Spanish, and tending to their grandchildren during their time off. I have always looked up to Mr. Díaz and his family for making a very solid name for themselves through hard work, while keeping a strong focus on their family.

I thank you for taking the time to read this letter, and we all will pray together for this family.

Respectfully,

Erick Di Falco
⬛
Miami, FL 33138
PH: 305-⬛
⬛@gmail.com

026

**Jussepe Di Falco**



**Doral, FL, 33178**

April 2, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United State Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

My name is Jussepe C. Di Falco, I am a 64 year old construction businessman, born in Venezuela to Italian parents, married to my wife for 41 years, we have one son and two daughters.

I have the pleasure of meeting Mr. Luis Diaz Jr. in the mid-nineties, time in which I started traveling to the USA in search for construction equipment and parts for our business. I also met his son Luis Javier Díaz who was still very young at the time.

At first, my relationship to Luis Díaz Jr. and Luis Javier Díaz, was strictly professional. I presented our equipment needs, which they would fulfill through their company. Most of these requests turned into purchases, which were carried in a very responsible and transparent way. Throughout the years, I got acquainted with the rest of the family, which has always been involved in one way or another in the business. All these years of experience with this family, give me enough confidence to state that in my opinion, they are decent, honest and respectful people. If they made mistakes, could not have been with the ulterior intention of breaking the law or harming others.

Honorable Judge William H. Pauley III, as a father and a grandfather, and with all due respect, I pray to God that you can find a place for compassion in your heart for them and their families.

Sincerely,

Jussepe Di Falco
PH: 786-███████
███████@gmail.com
████████████

Doral, FL 33178

027



Fred A. Dixon

████████████

Hialeah, FL 33018

(305)██████

January 30, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United State Court House
500 Pearl Street
New York, NY  10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

**I am submitting this letter on behalf of Luis Diaz, Jr.**

My name is Fred  A. Dixon and I have personally known Luis Diaz Jr. since 1991 to present.  He was my mentor and a father figure throughout these years as well as providing his knowledgeable years of experience in the field related to buying equipment and equipment auctions.   This along with teaching me all about the heavy equipment & parts business in general which has always been an asset for the companies I have been employed with.

I have known him always to be a hardworking, dedicated, responsible, honest individual always doing things justly and with the upmost care.  I have purchased parts from his company, Miami Equipment & Export, through various companies that I have worked for and I have experienced only excellent quality of parts and great customer service.   I have known his family since this time as they also worked the business and knew them all to be as well as hard working, honest, proper individuals always willing to help and give sound advice.

I have nothing but the upmost respect and it is an honor to have known him in my field of business and personal life.

Any further information you may require please feel free to contact me at (305)████████.

Sincerely

Fred A. Dixon

028

# CRISTINA ESPINOSA

Certified Public Accountant

█████████████

Miami, Florida 33143

Cespincpa@mwleng.com

305-████████

February 12th, 2018

**Honorable Judge William H. Pauley III**
United States District Court
 Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: Luis Diaz Jr. and Luis Javier Diaz

Your Honor,

My name is Cristina Espinosa, a certified public accountant, University of Florida graduate. I am a former Tax Manager from KPMG. I started my own tax practice in 1984 working in conjunction with KPMG and the State of Florida in the certification of  Low Income Housing Projects. In 2007 I become co-owner of MWL Engineering Corporation, a small manufacturing company in South Florida. We have approximately 40 employees, participate in the Work Opportunity Tax Credit (WOTC) Program and have employed veterans, ex-felons as well as other disadvantage groups.  We sponsor student work programs in our facilities with Miami Dade County School.   Currently my tax practice is limited to family investments. I am the oldest of five,  my four brother's and I were fortunate to have parents that brought us from Cuba on January 12th, 1961 and taught us that freedom, family and God were instrumental in finding happiness. They showed us that a good education and honest hard work would open doors for us and through their example we like so many other Cubans in our circumstances have been able to have a good life here in the United States. My Father, Angel Espinosa, started a Laundry & Dry Cleaning business in Coconut Grove in 1962.  My mother, Mery Bravo Espinosa, was able to be a stay at home Mom taking care of all of us including our grandparents. She taught us that education was something no one could ever take from us and instilled in us the love of learning, a strong belief in God and that a close loving family was central to happiness.

My parents were the godparents of Elena Bravo Diaz and my Stepdaughter Michelle Vigil married Eduardo Diaz, Luis Javier's brother and Luis Diaz Jr's son. When my father first saw Eddie and Michelle together, he told us these are good people, Elena and now Michelle could not have found better men.  These are honest, hardworking family men who have a strong belief in God and a belief in the goodness of people and through ignorance and misguided trust they did not realize that they were committing an unlawful act.

029

Luis Jr., came from Cuba as a young man alone as his parents had the sense to get him out before he was of military age. He put himself through school graduating from Georgia Tech as a Mechanical Engineer.  He met Lùcy Amezaga, an incredible loving and giving women, who also came over from Cuba as a young girl, and together they have raised five upstanding children teaching them the same values my parents taught us, a strong belief in God, close family and hard honest work. Since 1977, they have lived modestly in the same small house in the southwest part of Miami whom they've shared with their five children and beloved grandmother who passed, November 17th, 2017, the day after their conviction at the age of 101.

Luis Javier and Elena, have three children, Alexander (18), Stephanie (17) and Andrew (14). Their family life revolve around their children schedules spending weekends at their school sporting events and school programs. The three are good students and enthusiast sports advocate thanks to their parents emphasis on education and community. Stephanie was diagnosed with Type 1 Diabetes a few years ago,  yet with the strong support of her family she has braved through it and continues to  not only be top of her class but a strong participant in the school soccer team.  Luis Javier has coached his son's school basketball team and daughter's soccer team. He  coached other children as a volunteer at the YMCA South Miami Community Center and active fund raiser for the Type 1 Diabetes Walk. He is a member of the Kiwanis's Club and an active member of Epiphany Catholic Church. It is needless to say how devastated these three teenagers are by what's happening by this and how desperately they want and need to have both their parents by their side.

 Both Luis Diaz, Jr and Luis Javier Diaz have been exemplary citizens, they have no prior record of any wrong doing of any kind,  quite the contrary they are men of strong moral convictions and positive contributions to our community. They are good family men who fell into something they didn't understand, had they been aware they would not be facing these circumstances.

I respectfully ask the Court for upmost leniency for both these men, their sentencing and the lives of their wife's and children lies in your hands. Please weigh their good moral character and how they have lived their lives, which with the exception of this unfortunate mistake, has always been for the good of their family and the community around them. A mistake which has already caused them and their family emotional and financial suffering which should be punishment enough.  Luis, Jr and Luis Javier will spend the rest of their lives castigating themselves for the pain they have inflicted upon their family caused by their ignorance and their trust in humanity. A family now left with virtually nothing financially, which is being torn apart emotionally and which will be further crippled if they are taken to prison and unable to continue to assist in their support.

 I am just one person whom you do not know, but I give you my word that I as well as my entire family, support and believe that Luis, Jr and Luis Javier did not knowingly break any laws. Please allow them and their family the opportunity to continue to live together, they have more than paid for their ignorance already.

Respectfully,

Cristina Espinosa

030

Miami, March 26th 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

Your Honor,

My name is Emilio Falero and I have known Mr. Luis Diaz Jr. for more than 25 years, since I began to teach Fine Art lessons to his son, Michael, being a professional fine artist myself, in the Miami area.

I have also known Mr. Luis Diaz Jr's wife and her family since childhood. We are both from the same hometown in Cuba (Sagua La Grande)

I have nothing but fine memories of her and her family, as charitable, honest, decent, Christian, friendly and reliable people, ever ready to help and to serve others, disinterestedly. I remember in Sagua La Grande, Lucy Diaz's mother and her aunts, always helping people in need, cooking for the sick and visiting their houses constantly looking for ways to help in whatever form they could.

In Miami, Lucy Diaz's mother "Tatin", offered hair treatments and wigs for free to women suffering from cancer, and the consequences of chemotherapy on their hair loss. She also gathered used clothing from family and gave it to me to take it to the Sisters of Charity to clothe the homeless. She lived with Lucy and Luis in Luis's house for many years and Lucy took care of her until she recently died at 101 years old.

Lucy inherited her kindness and disposition for doing charitable works for others in need and today continues to do so with the help of Luis who is also a very generous person regarding those in real need, including the Sisters of Charity.

When my parents arrived from Cuba with literally nothing, they received a warm welcome from Lucy's family, specially Lucy's father and her uncle who helped them with their dental problems for free, since they were both dentists and their houses were always open to welcome them every time. I am eternally grateful to them for the disinterested love they showed to my parents.

I have the same feelings in regards to Mr. Luis Diaz Jr. through all the years I have known him and I testify for his nobility of character and his integrity as a husband, as a father and as a person in general.

Luis himself also practices charity constantly, with the homeless and with his own employees whenever they have times of need in their families, also with other persons that come to him for help. He is always ready to help with an open heart.

If he did break the Law in any circumstance, I believe he did it out of ignorance and not out of malice or ill intention, much less out of greed or dishonesty.

031

Because of the distressful situation that the Diaz family is going through, I respectfully beg you to be lenient in your application of the sentence.

Your Honor, I wholeheartedly submit to your decision and put my faith in God and on your good judgement that it will be just, merciful and lenient.

I believe that some time in our lives we all will need some little mercy. May the truth prevail.

Respectfully yours,

Emilio Falero

Good Shepherd Parish

████████████

Miami, FL 33183
Cell phone: 305-████████

032

February 5, 2018

**Honorable Judge William H. Pauley III**
**United States District Court**
**Southern District of New York**
**500 Pearl Street**
**New York NY 10007**

### United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
### Case No. 17 CRIM 077

**I am submitting this letter on behalf of Luis Diaz, Jr.**

I, Luis Arevalo Fernandez Castillo, Venezuelan, of legal age, resident of the State of Nueva Esparta, Margarita Island, 32 years of age, Civil Engineer, Director and Shareholder of the company Constructora Los Fernandez, c.a., declare that I know Mr. Luis Diaz, Jr. through my Father, Shareholder and President of the stated company, who introduced me to Mr. Luis in view of establishing a commercial relationship.

In 2007, my father and I were founding a construction company called Constructora los Fernandez. To do this, we needed new construction equipment (heavy machinery) and my father told me we were going to Miami, and there, there were some people from whom he had purchased his first construction equipment and parts some years before for his company Constructora G. & R c.a. That is how we arrived in Miami at the offices of Mr. Luis called Miami Equipment and Export. He invited us to join him at the Ritchie Bros. auction in Orlando Kissimmee, and that was how our business relationship began.

Since then we have gone to several auctions together, importing endless parts, and he has advised us on a number of equipment parts and medical material purchases.

It is worth noting that over all these years of my business relationship with Mr. Luis Diaz, he has become a very good friend of ours and we have made an obligatory visit to his office every time we travel to Miami. Over all these years of our relationship we have discovered that Mr. Luis is an honest, humble and simple person with impeccable behavior. In reference to him, and although I do not know his case, I am sure that if

1

[Signature]

033

He made any mistakes it was never on purpose, much less with the intent to break the laws of your country.

This is why we ask that your honor consider Mr. Luis Diaz Jr. as the correct person he has always been in relation to both work and family.

Thank you


_____[Signature]_____
Luis Arevalo Fernandez Castillo

█████████  ███
████████  ███████
Nuevo Esparta
Venezuela
Ph.: (58-414) ██████
Email: ██████ @hotmail.com

2

034

05 de Febrero 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District Of New York
500 Pearl Street
New York NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

**I am Submitting this letter on behalf of Luis Diaz Jr.**

Yo, Luis Arévalo Fernández Castillo de nacionalidad Venezolano mayor de edad, residente en el Estado Nueva Esparta Isla de Margarita, con 32 años d edad, de profesión Ingeniero Civil Director y Accionista de la empresa Constructora Los Fernández, c.a. declaro que conocí al ciudadano Sr. Luis Diaz Jr. por medio de mi Padre, Accionista y Presidente de dicha empresa el cual me presento al Sr. Luis en miras de establecer una relación comercial.

En el año 2007 mi padre y yo estábamos fundando una empresa constructora llamada Constructora los Fernández. Para esto necesitábamos nuevos equipos de construcción (maquinaria pesada) mi papa me dijo que fuéramos a Miami y allí estaban unas personas a las que le había comprado el a sus primeros equipos de construcción y repuestos hace unos años atrás para su empresa Constructora G & R c.a. Es así como llegamos a Miami a la oficina del sr Luis llamada Miami equipment and Export. El nos invitó a acompañarlo a la subasta de Ritchie Bross en Orlando Kissimmee y fue así como empezamos nuestra relación laboral.

Luego de esto hemos ido a varias subastas juntos importado infinidad de repuestos, él nos ha asesorado en varias compras de equipos repuestos y materiales médicos.

Cabe destacar que todos estos años de relación comercial el Sr. Luis Diaz se ha vuelto un buen amigo nuestro y una visita obligada a su oficina en todos nuestros viajes a Miami. En todos estos años de relación hemos descubierto que el Sr. Luis es una persona honesta humilde y sencilla y de una conducta intachable. Cuando se le hace referencia y aunque desconozco su caso estoy seguro que si

1

035

036

cometió algún error nunca fue a propósito y mucho menos con interés de romper las leyes de su país.

Es por eso que le pedimos al honorable juez que considere al Sr. Luis Diaz Jr como la persona correcta que siempre ha sido laboralmente como familiarmente

Gracias

Luis Arévalo Fernández Castillo

███████████
███████████
█████████████████

Nuevo Esparta
Venezuela
PH: (58-414)████████
Email: ████████@hotmail.com

2

April 10, 2018

**Honorable Judge William H. Pauley III**
**United States District Court**
**Southern District of New York**
**500 Pearl Street**
**New York, NY 10007**

**United States of America v. Luis Diaz, Jr. and Luis Javier Diaz**
**Case No. 17 CRIM 077**

**I am submitting this letter on behalf of Luis Diaz Jr.**

I, Luis Arevalo Fernandez Gutierrez, Venezuelan, of legal age, resident of the State of Nueva Esparta, Margarita Island, 65 years of age, Civil Engineer representative and Shareholder of the company Constructora Los Fernandez, c.a. (active), constructora G&R C.A. (inactive), Desarrollos El Valle C.A. (active) and Centro Medico El Valle C.A., herein declare that I have known Mr. Luis Diaz Jr. for more than 25 years, working in the field of parts and machinery imports for my companies through his company Miami Equipment & Export Co. We have gone to various auctions together, maintaining a business relationship and a friendship that has developed with the passage of the years, and it is worth noting that I know Mr. Luis Diaz Jr. as a person with impeccable conduct, therefore I ask Your Honor, if my friend has committed any mistake, it was not on purpose and even less with an interest in breaking the laws of your Country.

I had the opportunity to meet Mr. Luis Diaz Jr. in 1992, thanks to the recommendation of Engineers and my friends Carlos Di Matteo Oliver Gonzalez, president of Grupo Manzanillo, C.A. and since then I have had the privilege of establishing a business relationship with the company Miami Equipment to date, with no setbacks and under a responsible work team that has never doubted him as a person.

I have no knowledge of the trial he faces at this time, but I can assure you that Mr. Luis Diaz Jr. is a good person, and I have always considered him to have remained within the legal framework in all his transactions, or at least those related to me, during all these years of working together and our mutual friendship.

[Signature]      Thank you,

1

037

_____[Signature]_____
Luis Arevalo Fernandez Gutierrez


Porlamar, Nueva Esparta
Venezuela
Ph.: (58-414) ██████████
Email: ██████████@yahoo.com

2

038

10 de Abril 2018

**Honorable Judge William H. Pauley III**
**United States District Court**
**Southern District Of New York**
**500 Pearl Street**
**New York NY 10007**

### United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
### Case No. 17 CRIM 077

**I am Submitting this letter on behalf of Luis Diaz Jr.**

Yo, Luis Arévalo Fernández Gutiérrez de nacionalidad Venezolano mayor de edad, residente en el Estado Nueva Esparta Isla de Margarita, con 65 años de edad, de profesión Ingeniero Civil representante y Accionista de la empresa Constructora Los Fernández, c.a.(activa), constructora G&R C.A (inactiva), Desarrollos El Valle C.A (activa) y Centro Medico El Valle C.A. mediante la presente carta declaro declaro que conocí al ciudadano Sr. Luis Diaz Jr. hace más de 25 años, trabajando en el área de importación de repuestos y maquinarias a mis empresas mediantes su empresa Miami Equipment & Export Co. Hemos ido a varias subastas juntos manteniendo una relación comercial y de amistad que se ha consolidado con el pasar de los anos, cabe destacar que conozco al señor Luis Diaz Jr. Como una persona de conducta intachable por lo cual le pido Honorable Juez que si mi buen amigo cometió algún error no fue apropósito y menos con ningún interés de romper las leyes de su País.

Tuve la oportunidad de conocer al Sr Luis Diaz Jr. en el año 1992 Gracias a la recomendación de los Ingenieros y amigos Carlos Di Matteo Oliver Gonzalez presidente de Grupo Manzanillo, C.A. desde esa fecha he tenido el privilegio de establecer una relación comercial con la empresa Miami Equipment hasta la fecha sin ningún contratiempo y bajo un equipo de trabajo responsable del que nunca dude de su persona.

No poseo conocimiento del juicio que encaran en estos momentos pero puedo asegurar que el señor Luis Diaz Jr. Es una buena persona y siempre he considerado que se ha mantenido dentro del marco legal en todas sus operaciones o por lo menos lo que a mí me concierne durante todos estos años de trabajo en conjunto y amistad recíproca.



Muchas Gracias,

1

039

Luis Arévalo Fernández Gutierrez

Porlamar, Nueva Esparta
Venezuela
PH: (58-414) ███████
Email: ███████ @yahoo.com

2

040



February 9, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007
United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

Dear Judge Pauley,

I am submitting this letter on behalf of Luis Diaz Jr. & Luis Javier Diaz. I have known both father and son for approximately 20 years. When I was just starting my freight forwarding business in Houston, TX they were among our first clients. Luis Diaz Jr. had been in the heavy equipment procurement business for decades. He was very well known and respected by his clients, vendors and colleagues. Luis Javier Diaz who was recently out of college was working alongside his father and was learning the business. I have had the pleasure of doing business with both father and son. They are hardworking, decent, honest, and trustworthy.

Luis Diaz Jr. is in his seventies. He came to Miami from Cuba and has worked every day of his life since he arrived. He brought up a beautiful family, educated them and taught them values. He is an exemplary man who is known for his subtle character, mild demeanor and generosity. He has children, grandchildren and a loving wife who are all suffering because of this terrible situation. This should be their time to rest and enjoy the last years of their lives in peace with their family.

Luis Javier Diaz is the oldest of the five children. He learned the business as well as the ethics and values that his father instilled in him since he was a boy. He is now also a father and husband and currently responsible for the family business in which two of his siblings work. He, like his father is a family man and works hard to provide for his children. This unfortunate situation will not only generate a personal and family tragedy, but also affect their economics.

The Diaz family is the type of family you would like to be a part of. The type of family you would want your children to eventually marry into. I have the utmost respect for them and wanted to ask you to take this into account when determining your sentence. I can be reached at +1-305-████████ or email rfernandez@energyfreight.com if you require any additional information.

Respectfully,

Rafael Fernandez
President

Jose R. Fox
1102 Sevilla Avenue
Coral Gables, FL 33134

The Honorable William H. Pauley III
United States District Judge
Southern District of New York
United States Court House
500 Pearl St.
New York, NY 1007-1312

Re: United States of America vs. Luís Diaz, Jr. and Luís Javier Diaz
    Case No: 17 CRIM 077

January 21, 2018

Dear Judge Pauley,

I am writing to you in regard to Luís Diaz and his son Luís Javier, my name is Jose R. Fox. I have a wonderful family with my wife of fifty-three years. We have four children and ten grandchildren amongst them from ages six to twenty-five. We came to the United States in 1971 and became citizens five years later. I retired in 2015 after working for forty-five years, my last twenty-six years as President and CEO of United Home Care Services, a 501 C3 organization that specializes in helping frail senior adults at home in Miami Dade County. During my career I was the proud recipient of many prestigious awards for my innovative management, leadership and advocacy on behalf of senior adults.

I have known Mr. Luís Diaz, his wife Lucy and their children for more than forty years, thirty of which we were next door neighbors. Their family is an extension of ours, Luís is not only my friend, he is like a brother to me. The Luís Diaz I know, is a person with solid Christian values. He is a practicing Catholic, who has been married for fifty-one years, a caring father of a daughter and four sons, and a grandfather to nine wonderful kids. A family man whose purpose in life is the happiness of his family; attributes shared by his son Luís Javier, and his siblings.

Luís is a successful entrepreneur who created and developed his family business by working very hard ten to twelve hours a day. His enterprise makes it possible for him and family associates to enjoy a middle-class lifestyle. Luís and Luís Javier are individuals of integrity and honesty. The type of responsible and dedicated individuals who would not look for illegal means to experience economic gain.

Your Honor, knowing them, I cannot imagine any circumstance where Luís and Luís Javier would willingly risk their family's future. I can assure you the Diaz's are excellent people with strong values and principles. I hope the issues they face will not impede on their ability to support and be with their family.

Thank you for your consideration, your Honor.

Jose R. Fox
███████@att.net
Tel. (786)████

042

March 6, 2018

**Honorable Judge William H. Pauley III**
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

**United States of America v. Luis Diaz, Jr. and Luis Javier Diaz**
**Case No. 17 CRIM 077**

My name is Miguel Garcia and I'm writing this reference letter for Luis Diaz, Jr. and Luis Javier Diaz.

I am Cuban, and I arrived in this country in 1962 when I was 19 years old, together with my father and my brother. I began working as a welder for a sugar mill. After some time, I began working for a construction company called Mac Brothers Co. I worked with them for 34 years.

During this time I met Luis Diaz, Jr. and Luis Javier Diaz, from Miami Equipment & Export Company, and I began to do some mechanical work on the machinery that they bought for resale. Eventually I retired from Mac Brothers and turned to working exclusively for Luis and Luis Javier.

Both of them have always treated me very well, always respectfully and fairly. They have helped me when I have needed it. I recall an occasion on which I needed to buy welding equipment for my service truck, but I did not have the money at that time to buy it. Luis and Luis Javier offered to buy the welding equipment for me and I repaid them little by little, when I had some additional money to pay them.

After all these years, even though I am older, when they need my help I always make myself available to them. It is a relationship that has lasted for many years and continues to this day. We have helped each other a lot, and today, I can tell you that I consider them to be a part of my family.

I have known Luis and Luis Javier's families. I have a relationship with all of them, especially with those who work for Miami Equipment & Export. They all treat me like family.

Luis (the father) is a hard-working person of high moral character. He has taught his children by example that what matters is one's sacrifice and work to be able to support their families and help those that need help.

His son Luis Javier is that type of person. I have seen all the hours of work that he has put in to benefit his company and his family.

Knowing them both, I am sure that they have done nothing on purpose or knowingly to break the laws of this country. Luis Diaz (the father) had to leave his country, Cuba, due to the political situation there and

has dedicated himself to working since he arrived in this country. Neither he nor his son would have ever put their families at risk just to make a little bit more money. They are not these types of persons.

Judge, I ask you to have compassion in your sentencing. I have seen firsthand what they have suffered and are suffering because of what has happened, and their families need both of them.

Thank you for taking the time to read this letter.

Thank you very much,

[Illegible signature]
Miguel Garcia

████████████
Miami, FL 33145
USA
Tel: 305-███████

044

March 6, 2018

**Honorable Judge William H. Pauley III**
**United States District Court**
**Southern District of New York**
**United States Court House**
**500 Pearl Street**
**New York, NY 10007**

**United States of America v. Luis Diaz, Jr. and Luis Javier Diaz**
**Case No. 17 CRIM 077**

Mi nombre es Miguel Garcia estoy escribiendo esta carta referencial para Luis Diaz, Jr. y Luis Javier Diaz.

Yo soy Cubano y llegue a este pais en el año 1962 cuando tenia 19 años junto con mi papa y mi hermano. Empeze a trabajar como soldador para una azucarera. Despues de un tiempo empese a trabajar con una compañia de construccion llamada Mac Brothers Co. Trabaje con ellos por 34 años.

Durante ese tiempo conosi a Luis Diaz, Jr y Luis Javier Diaz de Miami Equipment & Export, Co. y les empeze hacer trabajos mecanicos para las maquinas que ellos compraban para revender. Eventualmente me retire de Mac Brothers y me dedique a trabajar solamente para Luis y Luis Javier.

Los dos siempre me han tratado muy bien, siempre con respeto y han sido justos. Me han ayudado cuando me a hecho falta. Recuerdo en una ocasion que me hacia falta comprar una soldadora para my camion de servicio pero no tenia el dinero en ese momento para comprarla. Luis y Luis Javier me ofrecieron comprar la soldadora y si los fui pagando poco a poco, cuando tenia algun dinero adicional para pagerles.

Despues de todos estos años, aunque soy major, cuando ellos necesita mi ayuda siempre me ago disponible. Es una relacion que a durado por muchos años y sigue hasta hoy dia. Ambos nos hemos ayudado mucho y hoy en dia les puedo decir que yo los considero parte de my familia.

Yo e conosido a las familias de Luis y Luis Javier. Tengo relacion con todos, especialemnte los que trabajan con Miami Equipment & Export. Todos me tratan como familia.

Luis (padre) es una persona muy trabajadora y de morales muy altos. El le a enseñado a sus hijo por su ejemplo que lo importante es sacrificarse y trabajar para poder mantener a sus familias y ayudar a los que neceiten ayuda.

Su hijo Luis Javier es ese tipo de persona. Yo e visto todas las horas de trabajo que el a puesto para el bien de la compañia y su familia.

Conociendolos a los dos, estoy seguro que ellos no han hecho nada a proposito o con conocimiento que estaban rompiendo las leyes de este pais. Luis Diaz (padre) tuvo que hirce de su pais, Cuba, por la situacion politica y se a dedicado a trabajar desde que llego a este pais. El, ni su hijo, nunca hubieron puesto su familia a riesgo por tratar de ganar un poco mas de dinero. Ellos no son ese tipo de personas.

1

045

Jues, le pido que tenga compacion en su sentencia. Yo e visto de primera mano lo que han y estan sufriendo por lo que a pasado y sus familias los necesitan a los dos.

Gracias por tomar su tiempo para leer esta carta.

Muchas Gracias,

Miguel Garcia

Miami, FL 33145
USA
Tel: (305)

2

046

 **CONSTRUCTION EQUIPMENT SERVICES, INC.**
**8270 N.W. 66 ST.**
**MIAMI, Fl 33166**
**Ph: (305) 592-5600**
**Fax: (305) 592-9331**
**E-mail: angel@tigerparts.com**

February 3rd, 2018
Page 1 of 2.

Honorable Judge William H. Pauley, III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

Ref: United States of America vs. Luis Diaz, Jr. / Case No. 17 CRIM 077

Honorable Judge;

I am a U.S. citizen, submitting this letter of behalf of my friend Luis Diaz, Jr., whom I've had the pleasure of knowing for 40 years.

Mr. Diaz and I have been in the "heavy equipment business" all of our professional lives, I met him early on as I started in this business when Mr. Diaz was the President of a company by the name of "Florida Georgia Tractor", at that time, that was the oldest and longest established equipment dealer in the State of Florida.

During our long careers together in this industry, Mr. Diaz name, character and reputation is well known among dozens of equipment dealers, not only in the State of Florida but in many other parts of our country. I've have done several business deals with Mr. Diaz. Just one sale alone of used Caterpillar diesel generators was over a half million dollars.

Mr. Diaz has a reputation of honesty, integrity and dedication to his business that it is unmatched by any other firm in this field. He is a hard worker, extremely well

047

respected by his friends and competitors, but above all he is a good family man that loves his family, children and grandchildren and they also love him dearly.

Over the years I have met and done business with thousands of individuals, the vast majority of them come and go, but rarely I get to meet someone like my friend Luis, that has persisted and persevered through all kinds of ups and downs in our industry, economy and volatile export markets.

Significantly important, Mr. Diaz and his family operated business, has provided a valuable service to many companies overseas over decades, those companies have trusted him and in return our country has benefited by the untold millions worth of business that he has brought back into our country, those export sales have provided jobs for many Americans throughout our nation, not just in South Florida, over his long and distinguished business history.

I pray that you will consider my letter as you analyze the character and respect that I have for the man that I've known for 40 years, Luis Diaz, Jr.

If you need anything further concerning this matter, please do not hesitate to contact me.

Sincerely yours;

Angel L. Gonzalez
General Equipment Sales Manager
Construction Equipment Services, Inc.
Miami, FL - USA

048

Caracas, January 29, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

Honorable Judge William H. Pauley III

I am writing you this letter to ask you to please consider what I state here when making your decision and to give it the greatest possible consideration. I thank you in advance for your attention.

My name is Francisco J. Grande.

I was born on ███/1958, Venezuelan-Spanish, Mechanical Engineer with a Master's Degree in General Management from Universidad Central de Venezuela.

I began my career as a professional engineer working at a Caterpillar dealership in Venezuela owned by General Electric, then I worked for one of the leading machinery and parts sales companies (Maquinarias Mendoza), then later returned to the Caterpillar dealership. At that time I met Mr. Luis Diaz through work. Later I began to work for myself in 1992, in the same field in which I had developed my professional career, and since then I have had a friendly and business relationship.

Therefore, I state that I have know Mr. Luis Diaz for more than twenty-seven (27) years, and I attest that he is a person who is aware of his duties and obligations, responsible and a good father, in summary, he is an honorable person.

He may have made mistakes as all of us do as human beings, which we must correct, but I do not think he intended to break the law.

Therefore, Honorable Judge, I ask that you have compassion for Mr. Luis Diaz when issuing your sentence.

**Sincerely,**

[Signature]

**FRANCISCO GRANDE**

Email: ███████@gmail.com
Cell: 58414-████

049

Caracas,  29  de  Enero    de 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United State Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

Honorable Judge William H. Pauley III

Le escribo esta carta para  pedirle por favor, tenga en cuenta lo que aquí expongo a la hora de tomar su decisión y sea lo más considerado posible, gracias de antemano por la atención.

Mi nombre es Francisco J.  Grande

Nací el ▇▇▇/1958, Venezolano-Español, de profesión Ingeniero Mecánico con Majister en Gerencia General graduado en la Universidad Central de Venezuela.

Comencé mi carrera profesional de Ingeniero trabajando en un dealer Caterpillar en Venezuela propiedad de General Electric, luego trabaje en una de las empresas más importantes en venta de maquinaria y repuestos (Maquinarias Mendoza) posteriormente regrese al dealer Caterpillar, en esos entonces conocí al señor Luis Díaz por asuntos laborales.  Después comencé a trabajar por cuenta propia en el año 1992 en la misma área que me forme en mi carrera profesional desde entonces mantengo una relación de amistad y comercial.

Por lo cual, hago  constancia de que conozco al señor Luis Díaz, desde hace más veintisiete (27) años y por lo que puedo dar fe de que es una persona consciente de sus deberes y obligaciones, responsable y buen padre de familia, en resumen una persona Honorable.

Puede haber cometido errores como todos los seres humanos podemos cometer y debemos enmendar, pero pienso que  no fue con el propósito de romper la ley.

Por tal motivo,  Honorable Juez pido tenga compasión del señor Luis Díaz al momento de emitir sentencia.

Atentamente,

FRANCISCO  GRANDE

email: ▇▇▇@gmail.com
celular: 58414-▇▇▇

050

February 10th 2018

Honorable Judge William H. Pauley III
United States District Court
 Southern District of New York
United State Court House
500 Pearl Street
New York, NY  10007

United States of America v. Luis Diaz Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am writing this letter on behalf and support of  Mr. Luis Diaz Jr. and Mr. Luis Javier Diaz.

My name is Mr. Eugenio Jimenez. I am an American Citizen since July 15th 1966. I am 90 years old and am retired after working for The Coca-Cola Company for 45 years in different positions, capacities and places such as General Sales Manager in Havana, Cuba and General Sales Manager in Caracas, Venezuela. Since arriving in the United States of America in 1961 I served in various positions  such as District Manager, Sales Manager, Bottling Plant Manager  and Vice-President  in charge of Latin Affairs, Public Relations and Marketing for the Southern Division covering the area from Key West to West Palm Beach including 6 Bottling Plants and 1 New Warehouse. I retired in 1994 as á  Sr. Vice-President.

I have known Mr. Luis Diaz Jr., my brother-in-law, over 60 years and Mr. Luis Javier Diaz, my nephew, for 50 years.  I have been happily married to Mr. Luis Diaz Jr's sister for the last 56 years.  If there is someone that knows these members of our family, that someone is me.

They worked very hard and created á family business for over 30 years and have helped everybody that knocked at their door.  They are á very decent and religious family with á modest living, all of them well educated and good law-abiding citizens .

It is very hard for me to understand or comprehend that if there is no intent to do wrong  why  there is a punishment?  If á mistake has been committed, I respectfully request from you to take into consideration their past behavior during their lives and the pain the whole family will go through.

Respectfully,

Eugenio Jimenez

Doral, Florida   33178-2094
(305-         )

051

April 15, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

My name is Jim Jimenez, nephew of Luis Diaz.   I am 51 years of age.  I have deep
affection for my uncle and am writing today to show my unwavering support.  We are
such a closely knit family, that whatever affects one, affects us all.

Through this very tough period, it has been very hard for me personally to have to sit
on the sidelines and not be able to express to all concerned how adamantly and
vehemently I stand by my uncle's character & compassion.   I intend to do so now.

Since I've been an employee of the family business, I feel I have to start there. I have
worked at Miami Equipment & Export for close to 30 years, starting as a warehouse
manager when the company was in its infancy. In those many years of hard work &
determination, we had established a very strong bond with customers and suppliers,
many of which have now discontinued their relationships with us. That includes many
of our main suppliers of over 25 years, such as the J.I. Case Company.

Aside from the material losses, the uncertainty of not having a job, or health insurance
has been a major concern for my wife and I. In normal circumstances, that would be a
major concern for most people, yet since this situation arose 2 years ago, it seems
miniscule as compared to what the rest of the family is going through. The weight and
consequences has been crippling to all of us.

To be concise with all the instances of love, support and compassion that I have
received from him is impossible.  From giving me a job when I needed focus &
maturity, to always leading by example when it came to working hard and honorably,
to giving advice when I needed an ear, or to when he would make his sister (my
mother) light up in a smile, quite frankly, doesn't give it justice as to how profound &
limitless his selflessness really is.  Never (and I mean that literally) have I seen him not
try to help those that he could.

052

My uncle has been an outstanding father, uncle, husband & grandfather. His children and grandchildren are living proof. He is such an irreplaceable cog in the family, mainly for his moral compass and his ability to bring laughter, smiles and happiness to all those around him, even when circumstances were overwhelmingly hard.

We all make mistakes, Your Honor, I probably more so than the average person. I ask you to please take into consideration this testimony in support for him. I love him dearly, and at his age, and given the particular circumstances of this case, I honestly fear for his well-being.

With all respect and humility,

Jim Jimenez
███████████████
Miami FL 33174
Email: ████████@hotmail.com
Ph: 786-████████

053

March 10th 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz Jr. and Luis Javier Diaz
Case No. 17 CRIM 007

My name is Lourdes Diaz Jimenez and I am writing this letter on behalf and support of Mr.
Luis Diaz Jr. and Luis Javier Diaz. I arrived in this country in July 1961 and I became an American
citizen in 1967. I worked for Pan American Airways in the accounting department until my retire-
ment in 1991. I am now 84 years old and the older sister of Mr. Luis Diaz Jr.

I am happily married to my husband of 57 years, Eugenio Jimenez, who worked for The Coca-Cola Co.
for 45 years in Havana and in Miami. He retired in 1994 holding the position of Sr. Vice President
for the Southern Division .

Needless to say I know my brother  Luis and his son Luis Javier  since the day they were born.
  My brother and his wife Lucy are both very hard working individuals that have worked very hard to
create á family business and á beautiful  loving family. Luis Javier and his wife Elena also have always
been hard working loving parents with three fantastic kids.

Now, I do not have á business mind, so I cannot go into business transactions  or any particulars, but I
do know my brother. I know that neither him or his son Luis Javier will knowingly do anything
to break any law of this country. If á mistake was done, that is what it is, á mistake,  but I KNOW
that they will never do anything with intent to break any law.

How do I know? BECAUSE I KNOW MY BROTHER,  I know of his values, his principles and
integrity. Values that he has passed to his children. I know that he is the brother that has always
been there,  the person that has always given á helping hand to anybody that needed it, and I know of
his love for all his family.

Of course I am not á lawyer  so, I cannot understand how someone that has no intent to do anything
wrong can be blamed with breaking the law.

Your Honor, I respectfully request from you to consider their behavior during their entire lives, and the
pain that will be inflicted to all of their families, children and grandchildren.

Respectfully yours,

Lourdes Diaz Jimenez
██████████████

Doral, Fla. 33178 - Phone 305-███████

054

February 12, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007



## United States of America v. Luis Diaz, Jr and Luis Javier Diaz

## Case No.17 CRIM 077

**To the Honorable William H Pauley III**

**My name is LUIS J. LARRAZABAL and I am writing this letter on behalf of LUIS DIAZ, JR, whom I consider my best friend and with whom me and my family Have shared our lives with him and his family for the better part of the last 64 years.**

**At age 11 my father, in his infinite wisdom, thought it was a good idea to skip one school year and transferred me to an all boys La Salle High School. It was a large freshman class divided into 4 groups and in one of the groups there were was LUIS DIAZ an me.**

**LUIS DIAZ and I spent the next 5 years at La Salle High School sharing classes and as half boards lunches together, during which we talked about political issues (there was a Revolution going on) as well as our classes. We graduated in 1959 6 months after Fidel Castro had taken over the country and we went our separate ways to start a new life in the U. S.**

**I went to BELMONT ABBEY COLLEGE a Benedictine pre-engineering school near Charlotte, N. C.**

**After two years at Belmont Abbey I transferred to Georgia Tech to continue my**

055

Engineering career; and lo and behold found out that LUIS DIAZ had been studying there since we left Cuba.  And so, our interrupted lives were re-connected again at that moment.

We roomed together doing Calculus homework problems deep into the night; we attended Ga. Tech football games together and I accompanied him when he played goalie while playing soccer against the German rocket engineers in Huntsville, Alabama.

I remember when he would come in to join us from his part-time job at the local VW dealership to make ends meet.  Know this, LUIS DIAZ has worked incessantly, without any complaints his entire life.

Upon graduation both LUIS DIAZ and I got married and went to work at different venues.

LUIS & LUCY went to Chicago and MARTA and I went to Pittsburgh.  LUIS & LUCY came to visit us in Pittsburgh; LUCY already pregnant with LUIS JAVIER.  As the years went by our friendship strengthened and we became like two peas in a pod; getting together at every event in our lives.

1. LUIS & LUCY and their five children would join Marta and I during our family summer vacations in Siesta Key, Florida
2. European trip in 1980 to England, France and Spain with a group of 9 Family members including his children Luis Javier & Annette
3. A North Carolina vacation ascending Chimney Rock
4. Attending Motor racing events all over Florida always with this sons and later with his grandchildren.
5. Having dinners together on Fridays and Saturday for as long as I can remember and attending all family functions throughout the years.

Throughout our lives me working for AT&T Telephone Company and LUIS DIAZ working at his MIAMI EQUIPMENT EXPORT COMPANY, I firmly remember his

056

struggles to keep his company afloat, giving a helping hand to his children and keeping a positive attitude against all adverse circumstances.

He has been a caring and loving husband, father to five great children and numerous grandchildren.

So, it was shocking to find out what was happening to his family and their Company.

Throughout all the decades that I have known LUIS DIAZ, I have never known him to do any inappropriate or improper dealings.

In summary, I believe that in view of the decision to be made regarding a fair Sentence in this case, we must take into account the whole compendium of a long life and his admirable achievements, being a fair, honest man and excellent father, husband and loyal fried vis-à-vis the present situation we face today.

For your magnanimous consideration I remain

Sincerely yours,

LUIS J LARRAZABAL

MIAMI, FL 33173
(305)
@bellsouth.net

057

*I, Carlos Luejez, a resident of the State of Florida since 1989 and of Cuban origin, knew Mr. Luis Diaz, owner of the company MIAMI Equipment where I worked from 1993 until 2000.*

*As an honest, hardworking person and good father, and as an incomparable employer, I have never had complaints about him. We were like a family in the company.*

*I hope if there are any misunderstandings you take his background into consideration.*

*Sincerely,*

*Carlos Luejez [Signature]*

*MIAMI FL 33186*
*(305)*

Yo Carlos Luego Recidente del Estado
de la Florida desde 1989 y de
origen Cubano - Conocí al Siñor
Luis Diaz dueño de la Compañia
MIAMI Esquitman donde trabaje desde
1993 . asta 2000

Como Persona . honesta trabajadora y
Buen Padre de Familia y Como
Empliador. en comparable nunca tube
Quejos del. Pues en la Compañia
heramos Como una familia

Espero si algun mal entendido se
tomen en Consideracion sus trayetorio

Sin Mas .atte
Carlos Luego

MIAMI FL 33186
(305)

059

January 9 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United State Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

Your Honor,

I am submitting this letter on behalf of Luis Diaz, Jr.

At times is hard to express my feelings about persons that you respect and admire.

He has done many good things for my family and for myself, this person Mr. Luis Diaz Jr. I have known for over 30 years. I have work with him in different responsibilities through all does years and always the relation has been cordial and respectful. Traveling or at the office there has never been any difficulties communicating with him.

The relation built with Mr. Diaz also was very friendly between both families. Mr. Diaz family is an example of hard working parents giving their sons full education for their future and now he has seen his family grow on a straight path as he and his wife Lucy had work so hard, building in them the Catholics beliefs that they are so proud off. A very close family and well educated.

At times we have met at Sunday Mass at Saint Brendan (Columbus) High School were one of his son Eduardo and my son graduated from the same year.

I also know that Mr. Diaz has helped for many years a Nun congregation in Miami that that helped the Catholic Church in Haiti and Cuba for the needy people.

Mr. Diaz family is an example of a well loved family and also loved by the community.

060

I have seen Mr. Diaz the way that he treats everybody, it did not matter who the person was poor or not everybody was his friend and treated the same way with decency and respect.

I am very proud of having work with the Diaz family for this long time and now that my help is needed I am ready to go back to help them.

Eugenio Morin

Miami, FL 33186

██████████@hotmail.com

USMC veteran ████████

Scout Master T-83 South Fl. District

PH: 954-██████████

061

April 2, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz, Jr.
My name is Maria T. Pacheco and I am a Nationally Certified Public School Teacher
for Miami Dade Public Schools for the past 30 years. I am the daughter of Lourdes
Diaz-Jimenez, sister to Luis Diaz, Jr. I write this character reference letter to express
my support and to shed some light on the character of my uncle, Luis Diaz, Jr.

I have known my uncle, Luis Diaz, Jr. all my life - to be exact, fifty-four years. For as
long as I can remember, my uncle Luisito, as we call him, has always been a man I
admire and respect. Not only has he always shown our family the meaning of
strength and integrity, he has been a role model for me. Luisito is a man who has an
enormous amount of faith in God and whose positive outlook on every situation, be
it good or bad, always demonstrates to me that although life can be hard at times,
it's how it's perceived. He has always shown me to look forward and have faith that
everything will work out for the best, even though one may not understand what is
happening in your life.

Your Honor, Luis Diaz, Jr., is a good man. He is seventy-six years old. He is a loving
father to five children and grandfather to nine grandchildren. He is a faithful
husband to my aunt, Lucy, who adores him. He is my mother's caring brother and
my wonderful uncle. We love him dearly and stand by him during this very difficult
time. I know my uncle has accepted what is happening in his life and truly regrets
what his family is going through. As I may not fully comprehend the logistics of this
case, I know in my heart that he did not mean to do any harm to his family, nor
break any laws. For these reasons, I know he is truly sorry.

Thank you, Your Honor, for taking my thoughts into consideration. I respectfully ask
you to please show some leniency and compassion for my uncle, who has always
lived a correct and honest life. As mentioned above, I stand to offer any other
support to him as he may require.

Respectfully yours,
Maria T. Pacheco                                              786-
█████████████
Coral Gables, FL 33134

062

January 8, 2018


Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United State Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

My name is Jose Perdomo, for over 40 years I have had the pleasure of knowing Luis Diaz Jr and his family, we have been neighbors since January 1978.  For years their children played together with my children. They attended the same parochial school.

I was out of work, Luis Diaz came to my house and to help me out he offered me a job in his company as an assistant manager, which I did from 1986 to 1990 selling tractor parts and equipment to South America companies, especially Venezuela.

During this time, working together, I was able to see and appreciate Luis Diaz Jr work ethics, honesty and decency. Luis has been a decent, hardworking and trustworthy person.

If they did something that could be interpreter as wrong, may be it was because of ignorance of the laws, not because any ill doing in their parts.

Your Honor, Luis Diaz Jr and Family are a decent church going American family.

Thank you for taking time to read my letter, please take it into consideration.

Sincerely,

Jose Perdomo
Miami, Fl 33165
Cell: 305-
E-Mail: ▓▓▓▓@bellsouth.net

063

**Daughters of Charity, SVP**

████████████████

Miami, Fl 33126
Telephone:305-████████
hijasdelacaridadmiami@yahoo.com

March 20, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United State Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz, Jr.

Many years ago, the Daughters of Charity know Mr. Luis Diaz, Jr.  He has always been a great collaborator and donor for our missions in Haiti and Cuba to those less fortunate.

He is a Christian practitioner and a man of faith. For us he has been an example of charity with all.
We know that he had educated his family by example of life in Christian and moral values.

Finally, he is a good man, son, husband, father and friend.
This is the testimony we want to share with you for your consideration in favor of his case.
If you need other information, please, let me know.

*Sister Eva Perez-Puelles*
Sister Eva Perez-Puelles
Daughter of Charity of Saint Vincent de Paul

064

March 19, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz Jr. and Luis Javier Diaz
Case No. 17 CRIM 007

Dear Judge Pauley III:

My name is Laura I. Rexach. I am married to Alexander Diaz, the youngest son of Luis Diaz. I am an attorney, born and raised in Puerto Rico. My husband and I have two kids.

I first met Luis on August of 2009, when I began dating my now husband. My husband would always go to his parents' house on Mondays after work to have dinner with them. While I had already spent some time with Luis at family gatherings, it was in these dinners where I have gotten to know him the most. After seeing how Luis treats his wife Lucy with the utmost respect and love, I feel nothing but admiration for him. Their love is truly one of the greatest loves I have ever witnessed. I am sure it is because of having Luis as a role model, that my husband is the hard-working respectful man he is today.

Luis is the best grandfather to my daughter, A███. A███ is crazy about him. When I went back to work after having her, Lucy would take care of her, and when I would go to pick her up, Luis was usually already there. He would take her for a drive in his truck, and she would look forward to this every day. If I got there before Luis, I would have to wait for him to arrive before going home as she never wanted to leave without seeing her grandfather. My son, J███ (named after my ███████████), was just born, and I truly hope he has the same opportunity to bond with his grandfather as my daughter has had.

My Father and Mother in law live a very humble and modest life, they rarely take vacations, and they have dedicated their lives to their children and grandchildren. My father in law is an honest man, who is extremely grateful to the United States for the opportunities he had when Castro came into power in Cuba. He would never knowingly and willingly do anything to defraud the United States or dishonor U.S. law. So I ask, on my behalf and on behalf of my children, that your honor shows the utmost leniency towards my father in law, Luis.

Regards,

Laura I. Rexach

Miami, FL 33173
Tel: 305-███████

065

February 5, 2018

The Honorable William H. Pauley, III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007-1312

**Re:    United States of America vs. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077**

Honorable Judge Pauley:

I am writing this letter in support of Mr. Luis Diaz, Jr. I met Mr. Diaz when I interviewed for the position of Executive Assistant to the President of Florida-Georgia Tractor Company, Mr. Diaz was the President and CEO of the company. I started working for Mr. Diaz on October 3, 1978 as his Executive Assistant. About three months after I began working for him, in January 1979, I became ill and was out of work for three months due to an intestinal obstruction. I was extremely concerned for my well-being and worried about how I would support my family while I was out of work. Luckily for me, during those three months, Mr. Diaz graciously held my position and continued to compensate me my regular salary. It was a God-send for me that he showed me kindness during that difficult time in my life.

During the time that I worked for Mr. Diaz, I found him to be a very honest, hardworking individual. He was a true family man. I watched him work diligently to provide for his children—Annette, Luis Javier, Michael, Eduardo and Alex and his wife Lucy. He treated those who worked with him as family and offered to help us in times of need. I worked for Mr. Diaz until April of 1982 where I went to pursue better opportunities. Eventually, my career led me to be the Executive Assistant to the Mayor of Miami-Dade County, Alex Penelas, for twenty-five years—where I continued to work for him in private practice after his tenure as Mayor.

066

I have been friends with Mr. Diaz and his wife, Lucy, for almost 40 years. I consider them more than friends—I consider them family. During the 40 years I have known the Diaz family, we have attended each other's children's weddings. The Diaz family has always shown me compassion and kindness. I have always known Mr. Diaz to do the right thing and to lend a helping hand to his neighbor. I ask that you please show him leniency and compassion during your sentencing.

Sincerely,

Martha R. Rey

MIAMI, FLORIDA   33174

786 —

067

Monday, Febuary 12, 2018


Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, New York 10007


United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077


My name is Manuel Jesus Rojas and I am submitting this letter on behalf of my father-in-law, Luis Diaz, Jr.


Luis is a very good man, devoted to his family, wife and church. I can honestly say that he is on of the most honorable men I have ever had the pleasure of knowing. I know that Luis feels excruciating agony over the decisions he made that led to this case, and the impact this has had on his family and everyone he cares for. In no way would he have ever taken actions that he thought would hurt anyone, let alone his children.


I am very honored to call him my father as I have been a part of the Diaz family for almost 30 years, marrying his only daughter Annette in 1991. Immediately, he welcomed me into his family with open arms and has always been a pillar for me, helping me when I struggled and offering sound advice. When my father was ill, he was there to give me his support in every way and when my father passed, Luis picked up right away and was the father I needed.


He is a wonderful grandfather to my children, Nikolas and Christopher. He is always there at their events, cheering them on and being the proud grandfather. My boys adore their grandfather and they look forward to those weekends of just the men when they go as a family to sporting events, mostly car races which is his, and by extension, their favorite sport. He takes a trip once a year with the grandsons, along with his sons, and they rent a Winnebago and go to Sebring for a race. I know my eldest son Nikolas,

who is the oldest grandchild, will be devastated when his grandfather is not there when he graduates next year from the Ohio State University, the first grandchild to do so.

He is also a loving husband to my mother-in-law, Lucy. They are always at each other's side, comforting each other when things are not going well. I have been married to Annette for 26 years and I can say that I have never witnessed a terse word from them or seen them upset at each other. I truly believe that they love each other as much today and they did when they first married over 50 years ago.

I respectfully submit that he is a good man and does not deserve to be separated from his loving wife, family and friends, all of whom will feel lost without his guidance.

Sincerely,

Manuel Jesus Rojas

Miami, Florida 33156

069

January 26, 2018

**Honorable Judge William H. Pauley III**
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

**United States of America v. Luis Diaz, Jr. and Luis Javier Diaz**
**Case No. 17 CRIM 077**

Judge William H. Pauley III,

I write this letter for Luis Diaz, Jr. and Luis Javier Diaz.

By way of this letter, I hereby let it be known that I worked at Miami Equipment & Export Co. from November 11, 2006 until January 2017, a total of 10 years.

My work at Miami Equipment & Export Co. during that time was very special to me, due to the kindness that I was shown by my boss Luis Diaz, Jr. and Luis Javier Diaz, and my co-workers.

If I could turn back the clock, I would like to work for them again, because they are good people, they help those in need, especially me, and I am very grateful.

I had a good salary and good benefits with them as their employee.

They helped me when I had financial need.

They helped me bring my son from Cuba.

And I feel proud to have known them, because they are sincere, good people, honorable, kind and honest.

I am not currently with them, because I retired in January 2017.

Without anything further, I am

Cordially yours,

[illegible signature]
Nelson Ruiz

███████████████
Hollywood, FL 33024
954-██████

070

26 de Enero de 2018

**Honorable Judge William H. Pauley III**
**United States District Court**
**Southern District of New York**
**United State Court House**
**500 Pearl Street**
**New York, NY 10007**

**United States of America v. Luis Diaz, Jr. and Luis Javier Diaz**
**Case No. 17 CRIM 077**

Juez William H. Pauley III,

Escribo esta carta para Luis Diaz, Jr. y Luis Javier Diaz

Por medio de la presente hago constar que trabaje en Miami Equipment & Export, Co desde la fecha 11 de Noviembre del 2006 hasta Enedo del 2017, un total de 10 años.

Mi trabajo en Miami Equipment & Export, Co durante ese tiempo fue muy especial para mi, por los Buenos tratos que recibi de mi jefe Luis Diaz Jr., y de Luis Javier Diaz y mis compañeros de trabajo.

Si pudiera echar el tiempo hacia atras me gustaria volver a trabajar con ellos, por que son buenas personas, ayudan a los que necesitan, especialmente a mi y estoy muy agradecido.

Tuve buen salario y buenos beneficios con ellos como empleados.

Me ayudaron en mis necesidades economicas.

Me ayudaron a traer de Cuba a mi hijo.

Y me siento orgulloso de haberlos conocidos, por que son sinceros, buenas personas, honrados, amables y honestos.

No estoy con ellos actualmente por que me retire en Enero del 2017.

Sin mas a que referirme, cordialmente,

Nelson Ruiz

████████████████

Hollywood, FL 33024
PH: (954) ████████

071

January 13, 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, New York 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz, Jr.

Let me introduce myself and give you a brief recount of my journey in U.S.A. I arrived from Cuba in 1960 at the age of 15, becoming an American citizen in 1969. I went to Shenandoah Junior High and to Coral Gables Senior High School where I graduated in 1964. While in Gables High, I met Lucy Amézaga and became best friends till present.

My line of business was in the television programming distribution field from 1969 to 2003, working for producers selling the programs to television stations in Latin America through the local distribution offices they had in Miami. I worked for CBS, Viacom and Televisa when I retired to take care of my ailing 95 year old father and newborn granddaughter.

On December 31, 1963, I met Mr. Luis Díaz, Jr. at the same party where Lucy and Luis met and later married in May, 1966.

Being Lucy's best friend, I have kept in touch with them throughout all these years. Luis is a gentleman, exemplary son, brother, uncle, husband and father of five outstanding children, all with university degrees and assets to society.

During all these many years, Luis Díaz, Jr. has always been a decent hard working man, always attentive to his family's and friend's needs, never hesitating to lend a helping hand, and because of an unfortunate and unbeknownst to him turn in life, he finds himself in this inconceivable situation, completely unfair to him and to his outmost priority, his family.

I don't know if I am speaking out of turn, and please forgive me if I am, but take into consideration his lifetime behavior as an outstanding citizen, achievements, concerns and, most of all, love for his precious long family and all friends around him.

I thank you in advance for your kind decision.

Respectfully,

María A. (Capeta) Santiago

Miami, Fl 33175
Phone: 305-
e-mail:                @gmail.com

072

Miami, January 24th, 2018

The Honorable William H. Pauley III
Judge of the Court for the Southern District of New York.
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge William H. Pauley III,

My name is Sergio J. Sicilia and I know Mr. Luis Diaz Jr as friend and customer of his company since 1980. For all this years, Mr. Diaz has proved to me as an honest and good character citizen. His outstanding knowledge and service on the construction industry had always been his "business card" presentation.

I know Mr. Luis Diaz Jr since my days in college, when I used to go with my father to his office to purchase equipment and parts for our construction company. Honorable Judge Pauley, All these years sharing good and no so good moments with Mr. Diaz, give me reasons to talk about his good citizen character. Also in those situations when life hit us low, I have seen in Mr. Diaz a relented faith to get up again, and take the lead in his family and look ahead for better opportunities.

Honorable Judge Pauley, as a man of justice I pray for your good judgment, and may God give you the vision to see the good citizen and family values of Mr. Luis Diaz I had described to you, but if at the end you see mistakes he had may committed, it is my hope you also see those mistakes were not committed with premeditation, so you may apply the law with benevolence in this case.

Thanks for your time in reading my letter

Sincerely Yours

Sergio J. Sicilia
███████@gmail.com
305-███████

073

January 29, 2018

074

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17CRIM 077

This letter is being written by the undersigned on behalf of Luis Diaz who has been tried for operating an unlicensed money transmitting business and international money laundering. Having known him for more than 30 years, I was taken aback when I heard of the charges filed against him. This entire incident seems extremely out of character for someone as upright as Luis.

My name is Ricardo R. Suarez, I married in Cuba in 1962 and moved to Miami in 1974 with my family after living in New York for 12 years, where I had a daughter and a son. I retired in 2007 from Bank of America after working for 25 years as Assistant Vice-President of Operations. Our daughter and our son are married and we have a 3 year old granddaughter.

I first met Luis at the time when he was my sister's neighbor and they had already become very good friends. I have seen him over the years and his values have not changed. He is a person with solid Christian beliefs, happily married, a hard worker, very caring to his grownup children and grandchildren. When my son was in high school and looking for a part-time job, he gave him the opportunity to work at his business during the summer.

I am aware that Mr. Luis Diaz was tried because he supposedly broke the law but I believe that if true, it could only be due to regulations unknown to him at the time. I strongly feel that, if this is the case, it would better serve the community that he not be sent to prison. Sentencing him to a term in prison would only cause society to lose a citizen who would be a valuable asset and for his family to suffer even more than they already have.

He is truly a good person who deserves a chance. I humbly ask you to please give him an opportunity to set his life back on track from this ordeal.

If you have any further questions, please feel free to contact me at 305-██████████

Thanking you in advance for your time and kind consideration.

Sincerely,

*Ricardo R. Suarez (signature)*

Ricardo R. Suarez
████████████████
Miami, FL 33155

074

Miami; January 15, 2018

Honorable Judge William H.Pauley III

United States District Court

Southern District of New York

United State Court House

500 Pearl Street

New York, NY 10007

United States of America v. Luis Dias, Jr. and Luis Javier Diaz

Case No.17 CRIM 077

Dear Judge Pauley III,

I am submitting this letter on behalf of Both Luis Diaz Jr. and Luis Javier Diaz.

I am Gustavo Torres, a resident of Miami Florida since 1986, married for almost 32 years with a son and a Daughter and now with Grandson and Son in Law.

I have been working in the industry of marketing resale for overseas customers on the heavy equipment spare parts division since 1989, and I met Mr. Luis Diaz Jr. as a customer for the company that I used to work for at that time.

In 1995 I moved and started to work for Mr.Diaz Jr. at Miami Equipment and Export and work for them until year 2000, I went to work in 2000 for a larger State wide Distributor of heavy equipment, during this time I maintained business contact with Mr.Diaz and Miami Equipment. In 2010 I started my Own company and became a supplier as well as a customer to Miami Equipment and continue at this date.

What I can say about these men is that they are hardworking family with great conduct and are respected employers, partners and citizens of the community. they have my help and support with anything that they need from me, because they deserve all blessings for being good people that they are. In the time that I have spent knowing them, they have always shown great character and are people who always willing to help and give support when needed.

If any questions or need any further information, please feel free to contact me at any time.

Best regards,

Gustavo A. Torres

Miami Florida 33183

Tel: 305-

E-mail:                @aol.com

075

January 30, 2018

Honorable Judge William H. Pauley III

United States District Court

Southern District of New York

United States Court House

500 Pearl Street

New York, NY 10007

RE:United States of America v. Luis Diaz, Jr. and Luis Javier Diaz

Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

Your Honor,

   I thank you in advance for taking my feelings for Luis in consideration and hope you can recognize the Luis Diaz I know. Thirty nine years last August, Luis Diaz affected my life in a big way. I was recently married with a child on the way and wanted something else. I wanted a career. I needed a career. Luis, as president of substantial state wide equipment company, hired me, trained me and sent me to Miami ,from my hometown of Tampa, to sell construction equipment. Given the fact that I knew absolutely nothing about equipment he took a huge risk and made a big investment in me. It was hard but I was successful and would not have survived if it wasn't for Luis's guidance, patience and willingness to help. Today, I am still selling equipment and that has enabled my wife, of forty two years, and I to provide for our three daughters. I owe Luis a lot more than this letter. A lot of people do.

Everyone knows everyone in the equipment business. There can be a lot of talk and or gossip. Trustworthiness, or the lack of it, is huge. Describe a machine incorrectly or miss something and it can cost many thousands of dollars and your reputation. Never, in all these years, has anyone ever spoken negatively to me, mentioned they felt slighted on a transaction or complained about Luis's ethics and sense of fairness. It's not in his DNA. Actually, I've always viewed Luis as being a bit of a softy in what can be a rough and tumble business.

076

Two things have always appeared to me to be of utmost importance to Luis. That is family and faith. I say appeared because it's not something he wears on his sleeve or goes on about. It's subtle. It's just him. For years we have tried to meet at an annual international sports car race in Sebring Fl.. Twenty years ago it was Luis and one of his children and maybe a friend. Two years ago it was the children, the grandchildren, friends of the grandchildren, relatives and more friends. It might have been sixteen in two small campers. Never saw Luis happier.

His faith,again,is not a topic of conversation. It just seems to creep in occasionally. The Church, the Pope and prayer. I know it is genuine because it was always difficult to do or discuss business with Luis or his employees the closer it got to good Friday. And good Friday, they were always closed.

Luis is a good man with a kind heart and I can think of some instances where that has worked against him. He's not perfect, but he is a good person. Again, thank you for your time.

Sincerely,

Robert Traviesa

St. Petersburg, Fl. 33712

Ph. 727-

@baysidemach.net

077

# MANUEL VIGIL

## MWL ENGINEERING CORPORATION

6825 SW 81st Street
Miami, Florida 33143
vigil@mwleng.com
305-606-0411

February 12th, 2018

**Honorable Judge William H. Pauley III**
United States District Court
 Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: Luis Diaz Jr. and Luis Javier Diaz

Your Honor,

My name is Manuel Vigil, I am a Cuban American who came to this country when I had just turned 14. I was fortunate enough to have my Aunt and cousins welcome me into their home and hearts. We lived six of us in a small efficiency in Little Havana in a building where both fellow refugees and caring American residents personified the saying "it takes a village". I delivered newspapers in the morning before school started and telegrams in the evening before coming home. Life wasn't easy but it was good. We had everything we needed, freedom, family and health, all we had to do was to set goals and work hard with honesty and humility to achieve them. Throughout my career I have followed these dictates.  I started from the ground up and ended taking two businesses public, enabling me in 1991 to establish MWL Engineering Corporation a small precision custom fabrication company. My family and I have a strong sense of civic duty. I have two daughters Michelle and Lisa whom I love more than life itself and have been blessed by having them in my life.

Luis Diaz, Jr. came into my life more than 20 years ago when my daughter met and fell in love with her husband Eduardo Diaz, Luis Jr.'s son.  The man I know is a man of integrity, faith and quiet strength. In his life family comes above all. He is modest, compassionate and kind. He married a remarkable women, Lucy Amezaga , welcomed her mother into their home, and together as a team they've raised five remarkable children, instilling in them their deep sense of faith and a strong commitment to family.

078

Luis, Jr. is a hard working, honest person who would never compromise his integrity or put his family at risk for financial gain. Knowing Luis, Jr. and his son Luis Javier, who is married to my life partner's first cousin Elena Bravo Diaz as well as I do,  there is no doubt in my mind that father and son did not intentionally commit any crime. Luis Javier and Elena have two sons and a daughter, teenagers focused on their education and strong participants in their school's sports teams. We spend Easter's at Luis Javier's house and Thanksgiving at Luis Jr.'s , these are good people who would never purposely hurt their family. What is happening to them is unconceivable,  they have been found guilty but they are not guilty of knowingly and treacherously being a party to unlawful moving of money for unlawful financial gain. They have never lived a lavish lifestyle nor lived beyond their means. They are good people who were used by bad people.

There is nothing more important in life than your family, particularly your children. Not being there for them is a punishment they do not deserve. As a father you know well the responsibilities and privileges that come with parenthood.  The importance of having both parents be there to guide you, to give you a smile in the morning, to wipe a tear off your face when you fall or fail, and hug you when you go to bed. To steer you in the right direction and teach you never to quit. To cheer you at your games, your graduations , your wedding, the birth of their children. Don't take this away from Luis Javier, Elena and their children. Luis, Jr. is now in his twilight years. He and Lucy have endured and lived an exemplary life, don't strip them of each other or their children and grandchildren.

The family needs Luis, Jr. strength and fortitude and Luis Javier's children and wife need him.

I thank you in advance for taking the time to read my letter and hope I was able to convey my belief that both Luis Diaz, Jr. and Luis Javier's Diaz's are innocent of knowingly engaging in an unlawful act.

Respectfully,

Manuel Vigil

079



## Michelle Vigil-Diaz

Coral gables, FL 33134
305-

**Honorable Judge William H. Pauley III**
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: Luis Diaz Jr.

My name is Michelle Vigil-Diaz one of Luis Diaz Jr.'s daughter in laws. I am married to his son Eduardo Diaz. Luis Diaz Jr. is one of the most noble honorable men I know. I consider him to be my father as well and I am proud to have him in my life. Men like Luis are hard to come by. He has raised five children, been happily married, and devoted to his wife Lucy for over 50 years and has always given his children all of himself. His example of what it is to be a good father is evident in my daily life. My husband because of the example he was given growing up, is honest, committed to me and our two children, and is always there for us. I admire Luis so much, for teaching his son through words and actions how to be a good father and husband. Luis was always present in my husband's life. Talking with his family at dinner, going to my husband's basketball games growing up, and endless hours talking about cars together and going to many car races as a family. My husband because the example he had growing up comes homes and spends time talking to his children and playing with them. Whether it's going to watch our son play baseball, taking him to a car race, or brushing our daughter's hair my husband learned from his father that being there for your children is important.

Luis is a man of deep religious faith and conviction and at many times since I have known Luis this faith has helped him and myself get through tough times. His faith and devotion to family is something your Honor that is hard to find in today's world. When I was pregnant with my son, who is now 9 years old, Lucy and Luis's faith and love helped me so much. I was told at 5 months pregnant that my son was having problems and that there was a high chance that he would not survive. Luis was there for me that whole time, he assured me that God had a plan and that it would be all right. He took me to mass every weekend, and we sat in Church and prayed together. Your honor Luis did not leave my side a moment during this difficult time, his love, faith, and hope was what got me and my husband through this trying time. And I believe my son his healthy and alive because of that faith.

081

Luis is a virtuous man who is so present in the the lives of his children and grandchildren.  My two children, love their grandfather.  He spends time with them, talks with them, and gets on the floor to build Legos with them.  He is such a positive influence on so many people and is so vital to the core of our family.  I cannot imagine that being taken away.  Luis is 76 years old and has lived his whole life with honesty and integrity.  Believe me there is no circumstance imaginable that Luis would have knowingly put his family through so much turmoil.

He was taken advantage of.  He would never knowingly break the law.  This is a man who has worked his whole life for his family.  He emigrated to this country alone and put himself through college and since then has always worked for everything he has.  He lives in a modest home, and by no means has ever lived an extravagant lifestyle.  Please your Honor I plead for mercy and leniency for Luis.  I beg you not to separate him from his family.

Respectfully,

Michelle Vigil-Diaz

Miami, March 14th 2018

Honorable Judge William H. Pauley III
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York, NY 10007

United States of America v. Luis Diaz, Jr. and Luis Javier Diaz
Case No. 17 CRIM 077

I am submitting this letter on behalf of Luis Diaz Jr.

My name is Carolina Victoria Vivacqua. I am Michael Albert Diaz's wife. We have been married since 2009. For all these years that I have been part of the Diaz family I have witnessed and experienced the love that this family shares.

Luis has been married to his wife, Lucy, for almost 52 years. I have seen the very special bond that they share. Together they form the foundation of this family, raising five children and instilling in them the values that made them become wonderful persons. Luis devotes his life to Lucy, their children and grandchildren.

Luis Diaz Jr. is a hardworking man, whose life is his family, which I am blessed to be a part of. He is selfless, always willing to give a helping hand to those in need, or a comforting word when tribulations occur, as when I was confronted with my father's extremely serious illness, in which he had to undergo a major surgery and a very long rehabilitation. Luis was always very supportive and engaged in everything that my family and I were going through, offering his encouragement though God, to have strength and keeping faith during that difficult time of my life. I do respect and admire Luis Diaz Jr. immensely.

Your Honor, to say Luis Diaz Jr. is a good man would be an understatement. He has strong moral character and has worked hard all his life to provide for his family. He would never knowingly proceed in a way that would be detrimental to his family and loved ones.

I implore you to take all this into consideration as you arrive to your decision.

Thank you for your attention on this matter.

Sincerely,

Carolina Victoria Vivacqua

Miami, FL 33157
Tel: 305-███████
Email: ████████@att.net

082

# EXHIBIT B

99A9MAZS                    Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          07 CR 0403 (PKC)

MAURICIO ALFONSO MAZZA-ALALUF,

                Defendant.

------------------------------x

                                        New York, N.Y.
                                        September 10, 2009
                                        11:00 a.m.


Before:

                    HON. P. KEVIN CASTEL,

                                        District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
SARAH Y. LAI
MARK LANPHER
     Assistant United States Attorneys

ROBERT A. SOLOWAY
KATHLEEN MacMILLAN
     Attorneys for Defendant


ALSO PRESENT:  NANCY FESTINGER, MARIO MICHELENA
               Spanish Interpreters

99A9MAZS                        Sentence

(In open court; case called)

MS. LAI:  Sarah Lai for the government, your Honor. With me is AUSA Mark Lanpher and Special Agent Cesar Tchorznicki.

THE COURT:  All right.  Good to see you all.  And for the defendant.

MR. SOLOWAY:  Good morning, your Honor.  Robert Soloway for defendant Mauricio Mazza Alaluf.  And with me at counsel table is Kathleen MacMillan, also of my office.

THE COURT:  Good morning to you all.

I have a presentence report, addendum and recommendation of probation which indicates it was revised on August 31, 2009.

I have a 13-page letter from Mr. Soloway, together with a collection of family letters and pictures.

I have a letter from the government dated September 4, 2009.  And then approximately 7:20 last evening I received a second letter from the government dated September 9, 2009.

Mr. Soloway, do I have everything I should have?

MR. SOLOWAY:  You have everything that I'm aware of, your Honor, yes.

THE COURT:  Ms. Lai, do I have everything I should have?

MS. LAI:  Yes, your Honor.

THE COURT:  All right.  Has the defendant and his

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

99A9MAZS                    Sentence

counsel read, reviewed, and discussed the presentence report, addendum, and recommendation?

MR. SOLOWAY:  Yes.

THE COURT:  Does the defendant have any objections to the facts set forth in the presentence report?

MR. SOLOWAY:  The one word answer is no, your Honor.

THE COURT:  Ms. Lai, does the government have any objections to the facts set forth in the presentence report?

MS. LAI:  No, your Honor.

THE COURT:  I adopt as my findings of fact the facts as set forth in the presentence report.

Mr. Soloway, does the defendant have any objections to the guideline calculation set forth in the presentence report?

MR. SOLOWAY:  The objections to the guidelines calculations, your Honor, were identified and recited in the letter that your Honor mentioned that you had received from my office.

THE COURT:  Help me out here, Mr. Soloway, because I want to make sure I do this accurately and completely.  I understand that there are two objections that you have raised to the guideline calculation.  One is that you assert that the defendant is entitled to acceptance of responsibility level reduction, correct?

MR. SOLOWAY:  That's one of them.  Yes, Judge.

THE COURT:  And the second one is with regard to the

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

calculation of the base level to the extent that it includes an increase under 2B1.1 at level O for an amount more than $200 million?  Correct?  That's the second objection?  Have I characterized it correctly, or would you like to characterize it for me?

MR. SOLOWAY:  You've characterized it correctly, Judge.  I would just add that we also objected to the guideline -- to the PSR's conclusion or findings that 5G1.2 requires consecutive sentences here in light of the fact that the guideline sentencing range exceeds ten years, and consecutive sentences on Count One and Count Two would permit a -- are required under, I think it's 5G1.2D.

THE COURT:  Now, I don't quite understand that's a stand-alone objection.  That one escapes me, so if you could explain that a little bit better.

MR. SOLOWAY:  My objection to that -- you're referring just to that --

THE COURT:  Just that last part.

MR. SOLOWAY:  I think that my objection to that, your Honor, is as follows; is that I filed a motion, your Honor, in this case before trial that moved to dismiss Count One of the indictment, the conspiracy count, on the basis that -- the basis of the motion, the foundation of the motion was that there can't be a conspiracy in a mens rea or non-mens rea strict liability offense, that you cannot conspire was the

theory of the motion, to commit a -- you can't conspire to commit a crime that doesn't require you to have a culpable mental state.

It's my view -- and at this sentence I continue to press the argument that while it was -- that motion was denied, I believe that this theory and the foundation of that motion continues to have currency at sentence on the basis that your Honor would have, in order to get a sentence at the guideline range, which at the bottom I think is 151 months, in order to approach such a sentence, your Honor would have to impose a concurrent -- a consecutive sentence for the conspiracy count.

In light of the fact that the conspiracy, I believe, continues to have -- while your Honor denied the motion, and many judges wrestled with the strict liability aspects of this offense, in general, including Judge Kaplan across the hall when he sentenced Mr. Bah recently. So, I believe that it would be unjust and unfair in light of the nature of the conspiracy charged in this case to impose a consecutive sentence. And I wanted to raise that, while your Honor denied the motion, as an aspect for a ground for objecting to that consecutive sentence that the PSR finds you should give.

THE COURT: All right. With regard to that last objection, I adhere to my prior ruling and without, at this juncture, getting into whether a sentence under the guidelines would be a reasonable sentence or not, which I have an

independent duty to consider, I am going to overrule the legal objection that you've just asserted on that third point.

Now, with regard to the acceptance of responsibility point, does the government have anything further that it wishes to say on the subject, or has it been fully -- first of all, I guess I should ask Mr. Soloway.  You've been fully heard on that in your written submission; is that correct?

MR. SOLOWAY:  Yes, your Honor.

THE COURT:  Same question for Ms. Lai.

MS. LAI:  Nothing further to add, your Honor.

THE COURT:  Well, look, I have looked at the application notes to 3E1.1, and both application note 1A and more particularly application note 2.  And application note 2 says, in relevant part, that conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction for acceptance of responsibility.  In rare situations, a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant -- and then it says goes to trial to assert and preserve issues which do not relate to factual guilt.  And the example -- one of the examples given is the challenge to the applicability of a statute -- of a statute to his conduct.

Let me inquire of the government.  Does the government

99A9MAZS                    Sentence

contend that this defendant testified untruthfully at his trial?

MS. LAI:  No.  The government does not, your Honor. But the application note does say that in instances where a defendant goes to trial and gets acceptance points, the court should look to his pretrial conduct to determine whether he fully has accepted responsibility.

THE COURT:  Well --

MS. LAI:  And the government's view is that in his postarrest statement -- there was a 2006 interview, in his affidavit to the court, there was an aspect of his statements that suggested he was concealing the fact or not fully disclosing the fact that Turismo was a money-transmitting business.

THE COURT:  The application note does say that in each such instance, however, a determination that the defendant has accepted responsibility will be based primarily upon pretrial statements and conduct.  And I suppose that makes sense because the notion is that by going to trial, perhaps, the defendant did not accept responsibility.

Here, I've looked at the totality of circumstances, and I conclude that the defendant is entitled to a reduction for acceptance of responsibility.  This is the rare case, and the reason I conclude it's the rare case is that the defendant steadfastly asserted that the statutes charged in the

indictment had no application to his conduct.  And to test the proposition, he agreed to waive a jury, stipulate to many facts, and took the stand and testified in a truthful manner to what he had done.

So, in this context, looking at the manner that this man has proceeded, particularly in the face of the indictment, I find that it is the rare case to which the acceptance of responsibility should be given.  And, of course, the circuit has noted that the trial court is in a unique situation to assess acceptance of responsibility.  So, I'm going to give the two-level reduction for acceptance of responsibility.

Now, let me inquire whether anybody has anything further they wish to say with regard to the 2S1.3, 2B1.1 issue; if you will, the 28-level increase because of the amount of the, quote unquote, loss.

Anything further, Mr. Soloway?

MR. SOLOWAY:  I have nothing further, Judge.

THE COURT:  Ms. Lai.

MS. LAI:  No, your Honor.

THE COURT:  All right.  Here, I find that the level increase is appropriate under the guidelines.  And I start with 2S1.3, which governs a conviction under the statute under which this defendant was convicted.  And it provides for a base offense level of 6, plus the number of offense levels from the table in section 2B1.1 corresponding to the value of the funds,

if it doesn't fall under A1 of 2S1.3. And the value of the funds was in excess of 200 million and less than 400 million. And so I find that the level increase, 28-level increase is appropriate under the circumstances.

Is there any further argument on anything with regard to guidelines, Mr. Soloway?

MR. SOLOWAY: No, your Honor.

THE COURT: Ms. Lai?

MS. LAI: No, your Honor.

THE COURT: Okay. So, I conclude that the defendant is at total offense level 32 and criminal history category I.

I will now give defense counsel an opportunity to speak.

MR. SOLOWAY: Thank you, your Honor. Judge, thank you. I want to not repeat what's in the letter that I submitted to the court. I do -- you know and I know that there is no need for me to do that, to read essentially the letter that I wrote to the court.

There are some related thoughts that I think add to what has been submitted, and those I do want to briefly discuss.

I feel like since your Honor has found the defendant to be in level 32, with a sentencing guideline range at the bottom that corresponds in criminal history category I, to 121 months, that there's really nothing that I can do that's

productive here other than try to convince your Honor to use a measure in determining a reasonable and just sentence other than the arithmetic of the sentencing guidelines.

And, I want to refer to a couple of decisions by other judges, in general, about the guidelines; and particularly, a recent decision that Judge Block in the Eastern District wrote in connection with what was a securities fraud case that resulted in a sentencing guideline range of 360 months, at level 42, for two defendants who had engaged in what the judge characterized, sort of a typical pump-and-dump securities fraud criminal case in which they went to trial.  And in that case which is United States against Parris, at 573 F. Supp. 2d 744, Judge Block wrote in connection with imposing sentence in that case in which he ultimately imposed a sentence of five years, which he didn't regard as a lenient sentence, but which he wrote that he felt he had to write something more than one or two words in light of the fact that he was deviating from the sentencing guidelines to the tune of 300 months.

In that decision, Judge Block wrote that he's sentencing, I'm just going to quote one or two sentences, he says at the beginning of his decision, "I have sentenced Lennox and Lester Parris today to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life. This case represents another example where the guidelines, in a securities-fraud prosecution, have so run amok that they are

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

patently absurd on their face."

I really am not here to argue that the guidelines in this case or in any other case are patently absurd. I don't think that that's really what is called for on behalf of my client, and what is called for in general.

I've taken the time to identify what I believe not only were some legal objections to the guidelines in the letter I wrote, but some things, in general, that I thought were unfair about the application of the guidelines to my client's factual and legal situation.

And your Honor asked me whether or not I had any other specific objections to the guidelines, I could have said -- but I think I reserved it for now -- that this particular offense involves a defendant who was obviously involved in a business, over a lengthy period of time, in Chile and opened bank accounts here. And your Honor found that he was doing business in violation of the statutes here, in violation of the licensing statutes. And the 2B1.1 chart that elevates the sentencing guideline level with the escalation of the, in this case, the value of the funds, I would just point out, Judge, that in light of the fact that it -- one of the things that it incorporates or it encompasses, in doing that, is a continuing level of fault, a continuing level of transgression of the law, a continuing violation of the law to what you're doing.

And Mr. Mazza, when he came to court last week, he identified for the court that:  Gee, I was in LAX Airport, and I was interviewed by agents and I told them what I was doing, and I declared the money as I always do, and I put the money in the bank.  And he went on his way.  And a year later he was arrested in 2007 for this offense, essentially doing the same thing, continuing to do the same thing.  He opened bank accounts at Israeli Discount Bank in 2001.  Had he been arrested in 2001, in 2002, in 2003 when the value of the funds was a million dollars, $2 million, $3 million, he would be found by your Honor in violation of the statute and would have a sentencing guideline range much lower than what your Honor has found today, 121 months at the bottom, because, obviously, the value of the funds wouldn't have escalated.  And he would have been arrested and convicted on that day with that value of the funds, and he would be, just as he is now, I believe, Judge, no more a threat to continue this conduct.

And one of the things that your Honor has to consider, obviously, is, among the sentencing factors, federal sentencing factors, is deterrence.  And the defendant is deterred, your Honor, although he continues to have a disagreement with the court's application of the law to the facts.

THE COURT:  Well, of course, there is specific deterrence and general deterrence.

MR. SOLOWAY:  Right, your Honor.  And I'm referring

now to specific deterrence, to Mr. Mazza.  So on that point I think it's somewhat relevant for me to -- although I didn't -- to object to the 2B1.1 escalation in the sense that I think, in some respects, 2B1.1 measures continuing -- the level of fault, and also -- and my point, my main point being, Judge, that on the issue of specific deterrence as to Mr. Mazza, that he is not a threat.  And I object somewhat to the 244-million-dollar value because it's an accident of the case, and the way the case progressed, and the way the investigation progressed.

THE COURT:  Well, let me just throw this out so you have a chance to respond to it.  The thought has -- I've thought long and hard about this case.  Everybody in this courtroom knows that.  It's occupied a lot of my time.  And that's because the issues have been difficult and complex and it required the time that the attorneys and the court have put into it.  But, the thought has occurred to me:  What would one do -- what would a businessman do who regularly does business in this fashion with this volume of currency?  I would think that it would occur -- not a requirement of law -- but it would occur to many businessmen, perhaps universally, that if I were going to do this, on this scale, in Chile, or Uruguay, or some other country, that I would probably invest -- I don't know, 20, 50, $70,000 to get an opinion of a local lawyer on the lawfulness of the conduct, and that is not part of the record here.

I do know, and I will take account of, and I do take account of the conversation at the LAX Airport. I know about that. But I don't think that many business people would say, well, that's great, I just asked an FBI agent, I don't have to spend money on an opinion of counsel here.

Is that a fair consideration, a relevant consideration? Talk to me about that.

MR. SOLOWAY: You know, your Honor, I suppose it's a very fair consideration. And I don't want to go too far afield here but I think that one of the responses that I could make to that, having spent a lot of time on this case as well, and having spoken to a lot of people before the trial, experts. And I don't know, your Honor, that it's entirely clear what opinion you would get. This is what has been characterized to me, the money-transmitting business, as a high risk business by some people in the money -- National Money Transmitters Association, you know, that I really don't know exactly what that means. I suppose that if you want -- I believe it's a fair consideration, your Honor.

I think in light of -- you know, and I don't want to go into it here, I don't think there's any reason to go into it here, in light of the somewhat murky state of lawmaking, becoming less and less murky as time goes on, your Honor, and as these cases percolate through the system, and judges are writing on them, becoming less and less murky, notwithstanding

the Treasury Department's pronouncements and decisions, but becoming, because of the actions of the justice department and the decisions of the courts, I think we're in a different place in 2009 than we were in 2007 when Mr. Mazza was arrested.  So I think that really is the only thing.  In hindsight, it's pretty clear.

THE COURT:  Right.  Because, of course, part of what I have in mind is the following, that he goes to the -- an opinion of counsel, and let's assume that counsel is wrong, or wrong at least in my view of right and wrong.  We all know if counsel says this is unlawful conduct, then let's assume the conduct doesn't go on.  But, let's assume counsel gets the opinion wrong and says it is lawful conduct, but it's not, in fact, lawful conduct, today you would be standing before me saying, while this may not have constituted an affirmative defense -- well I think you probably would have had conversations with the government as to whether they should have ever brought the case.  You'd be having a conversation with me now about the import of that.

But, I don't want to put too much emphasis on it.  It is what it is, and I think you've done a good job of responding as well as anyone could.

MR. SOLOWAY:  Going back, I think, Judge a little bit to the point that I was making, and just finally concluding with something else that Judge Block wrote in that case where

he said that, he started the sentencing proceeding by, as he's required to, calculating the sentencing guideline range, and then he writes that he recognizes -- well he says, "I began the sentencing proceeding by correctly calculating the applicable guideline range, citing Gall, and recognize that the guidelines should be the starting point and the initial benchmark." And he says, "Although I did that, it's difficult for a sentencing judge to place much stock in a guideline range that doesn't provide realistic guidance."

And I think, and I'm just going to elaborate a little bit, that the guideline range here doesn't provide this court with realistic guidance, unfortunately. Part of it is for the reason I said before, I tried to articulate before in terms of it's just the accident of when Mr. Mazza was arrested and the resultant escalation of 28 levels for $240 million.

And I said in my letter, and I concede here, that I can't see how your Honor can sentence the defendant without regard at all to the value of the funds that's the subject matter of the offense. But, then the question becomes how does your Honor arrive at a realistic way to do that, a just way to do that, a fair and reasonable way to do that.

So, I want to just refer to Bah, to the Bah case that Judge Kaplan tried across the hall some months ago, and not with respect to the fact that there was an appeal in that case, but with respect to the sentencing proceeding in that case.

Mr. Bah received a sentence from the court, by Judge Kaplan, of one year probation in that case. And it was a case where the government -- and the PSR identified a sentencing guideline range of either 51 months at the bottom or 63 months at the bottom, depending on whether Judge Kaplan imposed obstruction of justice points for Mr. Bah's testimony. He also testified in that case. So, it was based on the value of the funds in that case. It was either, according to the government -- and I have the Bah sentencing notes. I don't know if your Honor has seen them.

THE COURT: No, I haven't.

MR. SOLOWAY: But Judge Kaplan imposed a sentence of one year probation, and it was a different case.

And he -- you know, he referred to the fact that it was a strict liability offense. And there were things that existed in that case that were different from here. Mr. Bah had a license in New Jersey and collected money in New York, at his restaurant in the Bronx, from people that he then transmitted overseas, but he had a New Jersey money transmitting license. And essentially he did the money transmitting from New Jersey. And the basis of his defense was: Gee, I had a money transmitting license and I didn't run a money-transmitting business in New York. I ran a money-transmitting business in New Jersey, even though I collected the money here in New York.

And he was found guilty. And Judge Kaplan, notwithstanding that, imposed a sentence of probation, 51 months below the bottom of the sentencing guideline range that he found, without imposing obstruction of justice points in that case.

And based on -- and he did that -- he did that, also, without regard to the safe harbor in that case, which was pressed by the defendant. The defendant argued in that case that he was entitled to the guideline level of six without escalation from 2B1.1 because he was entitled to the safe harbor. And Judge Kaplan found that he was not entitled to the safe harbor. But, relying on the 3553(a) factors, sentenced the defendant to probation. And the 3553(a) factors are, of course, the things here I would argue entitle Mr. Mazza to the sentence that we have requested in the letter that I wrote to the court.

Again, I don't want to repeat what I've said. I wrote to the court and I attached the letters of his family. I don't think there's really any real dispute here that Mr. Mazza has a family, that Mr. Mazza has a loving family, that Mr. Mazza has two parents who are over 80 years old who haven't seen him in 29 months, that he has three children, one of whom is very young. And the last thing that I did before I came over here, Judge, was I read, not -- you know, not the law and not the guidelines and not the PSR, but the letters of his family, so I

would have those on my mind when I came here.  If nobody else would, at least I would.

THE COURT:  I've read them.

MR. SOLOWAY:  So I really think that the -- what I recall, Judge, the interplay of the -- what I would call the ambiguities in the law, combined with who Mr. Mazza is, and who his family is, and the kind of life he's led, and the likelihood of him being a recidivist, that the interconnection of those things in this particular case, in a case in which Mr. Mazza was found guilty of not having or not registering his business with the different states, and combined with the kind of person he is, the kind of person the letters from his family reflect that he is, the kind of deprivations that he suffered, and I indicate in my letter, and obviously it's true that everybody suffers deprivation that's deprived of their liberty and sent to jail, I think I've identified for the court, and I said I wouldn't repeat myself, but that he has suffered more than most people would by virtue of the fact that he's five thousand miles away from his family and nobody in his family has been able to come and visit him for the 29 months that he's been in jail.

In finding a sentence that is sufficient but that's not greater than necessary to serve all the purposes of federal sentencing, I ask your Honor to find that this is a man who has been sufficiently punished for his offense at this point.  And

I just want to conclude with a reference that his brother made in a letter that he wrote to your Honor, his brother, Jose, which was dated March 24, who addresses you, your Honor, as Mr. Mazza's brother. And, you know, it's not the most emotional of the many things that were written to your Honor, but he just says that "My brother is not a criminal like those that fill the prisons of the world nowadays. And we ask you to send him back to Chile as soon as possible because our parents, in the final stage of their lives, cannot bear any longer this pain of having their son so far away and without freedom. Furthermore, his three sons and daughters also need him, as he is the fundamental support of their lives. In summary, the long time that has elapsed we believe has been enough to reorient his life. Although it is true that laws are there to be obeyed, this mistake does not make him into an evil person. I am positive this will be the hardest lesson in his life that has made him be imprisoned for over two years."

I really have nothing further to say at this point, your Honor.

THE COURT: All right. Thank you, Mr. Soloway.

Mr. Mazza, this is your opportunity to speak, to address the court directly, to bring to my attention any facts or circumstances that you believe I should take account of in passing sentence upon you today. If there's anything you wish to say, this is the time to say it.

THE DEFENDANT:  Your Honor, Madam Prosecutor, Ladies and Gentlemen, my attorney visited me yesterday afternoon and advised me many times that I should not address my comments to your Honor in the manner in which I had planned to do.  He counseled me and I listened to him.  I am no fool in that regard, but this is the only opportunity that I've had to address you.

I would have desired that this moment had occurred 29 months ago when I was first incarcerated.  My attorney has told me not to be a Don Quijote, that I can't fight against something that is already defined.  I have no doubt that your decision will be firm.  But I am absolutely convinced in my own innocence.  And I base that conviction not on the idea that your Honor is mistaken in your interpretation of the law but on the fact that the way the facts were presented is as if I had committed a crime.  And actually I have never had the intention of committing one.

So, if you would allow me, and I hope not to cause any anger or reprisal against me for trying to explain the way in which my business works, because I feel that this is the last opportunity that I will have to do it before you.  If you can manage to understand how my business works, that may give rise to the shadow of a doubt so that you would think that you do not have before you the person who has been represented to you as such.

After a very long process, I am here today and I never imagined in my worst nightmares that this would occur. I would like to begin by telling you a little about my roots and continue by telling you what I've done in my life, what my business was like, what I did, what happened to me, and what I plan to do in the future.

I come from a family of Jewish European immigrants who fled the horrors and hunger of the First World War, choosing a faraway, unknown, poor country, practically at the other end of the world, along a series of mountains, rivers, and sea. They knew no one. They knew -- they did not know the language and more or less, 90 years ago they disembarked in Valparaíso, Chile, carrying with them great wealth which I am proud to say I am one of the 120 heirs. That wealth, together with the generosity of the land of Chile, enabled them to find the desired peace to form families. My parents were born, they had grandchildren, of whom I am the oldest, and my generation then gave birth to a fourth family branch.

In our religion, there is a beautiful symbolic rite at the time of the marriage that perhaps some of you have seen at some time. After the ceremony, the groom breaks a glass, a wine glass. That symbolizes the destruction in the past of the Great Temple of Jerusalem where today the Wailing Wall stands.

But my grandparents told me something even more beautiful and just as logical in meaning. They said that this

rite means that to destroy the wedding that people were witnessing that day would be as difficult as to put the glass back together.  I will refer again to this symbol later on.

The wealth that my grandparents brought and that my family transmitted from generation to generation, I am talking about something that no one can be deprived of, not even with the most powerful force, but it can't be acquired either.  It cannot be sold anywhere.  It is something that comes to one in one's heritage, and I have that good fortune.

I inherited a culture of honest work, respect for human beings, respect for the authorities, for the laws, for regulations, honor as a virtue, love of one's family, being enterprising and tenacious.  Perhaps the most important of all of these, and that is why I am here, is honor.

Not even the best university in the world can give courses in these matters, just the university of the family. But not just any family.  Those of us who have this luck are few.

As you see, my chest is large with pride and the same thing is felt by the 119 other family members.  It would seem perhaps that this has nothing to do with the gravity of the charges against me.  But, appearances can be deceiving such as the fact that bureaucrats of this country, who acted together with my country, fabricated a case in which appearances were put together in a way that seemed to indicate a crime, and they

ended up by believing that I was a criminal.  And if I wasn't one on May 5, 2006 when I was interviewed in the Los Angeles Airport, according to those who interviewed me, and since I have not changed my conduct, of course, I can't be a criminal. If I did not violate any law at that time, I'm not violating them either afterwards.

And about, on this point of which I have not written down here, I'd like to say that you said that businessman with the level of money that I was handling, should have spent twenty, thirty, or fifty thousand dollars on legal advice.  And I didn't do that.  I didn't do it not because I wanted to save the $20,000, because I have a business that's been established in Chile, as everyone knows, which is governed by the laws of Chile.  And every one of the things that I did are in conformity with that law.

If I have a business that is established in Chile, that is legitimate, what reason would I have to want to cause a crime to be committed beyond my borders just to commit it, because I would not even benefit by it?  There would be no benefit.  No demonstrative benefit.  Nor would there be any harm.  There would be no victim.  So, what crime are they talking to me about?

I did not steal one penny.  I have not defrauded one penny's worth.  I have no victim.  I owe nothing to the United States.  I used my bank account, checking account just as

millions of account holders use theirs in this world.  I took care of my clientele which were from Chile.  There was no possibility that a customer from the United States would deliver any money to me in order to be transmitted.

MR. SOLOWAY:  Judge, can I have one moment?

THE COURT:  You may.

(Pause)

THE COURT:  One second, please.

(Pause)

THE DEFENDANT:  As you can see, he is continuing to try to persuade me not to continue.

MR. SOLOWAY:  Judge, I think I just have to say on the record to your Honor, because I've heard my client talk about the things that I have discussed with him, and I just want to say, without going into the privileged conversations, that not everything that Mr. Mazza has said about my conversations with him about what he should do at the sentence or anything else, in my view, are exactly accurate.

I have counseled him in many different ways, as is the job of the lawyer.  Obviously, your Honor knows that.  And I'm not counseling Mr. Mazza not to talk.

I'm just trying to direct him or channel him in the direction -- I'm happy to say this in front of him -- of things that are perhaps more to the point of the sentence today. That's all.  More to issues relating to what might be

considered -- the actual sentencing issues. I'm explaining to him that your Honor is aware that he continues to press his innocence and continues to have disputes with the court with respect to the application of the law to the facts of this case. I'm trying to make him understand that. And that's really all. So, with that, I'll just sit down.

THE COURT: All right. Mr. Mazza, you've heard what your attorney has said. Within reason, I will allow you to continue, and your lawyer has a job to do and oftentimes a defendant would be well advised to listen to the advice of their counsel. But, certainly I'm hear to listen to what you have to say. Go ahead.

THE DEFENDANT: I can't criticize the system. But, at this stage I've never had an opportunity to address you and to express to you truly what I did and what I didn't do. And so if I don't express that now, I will never again be able to.

As incredible as it may seem, I do have the hope in awakening something in you so that you see that there is something illogical, something that cannot be. It can't be that no matter how powerful this country is, that it has control over a business that is 8,000 miles away.

I would like to explain to you that if I had wanted to found a business inside the United States, I should have had a person to manage it. I should have had advertising or looking at it from the other side. If some customer, knowing that I

was in the money transfer business, had wanted to get in touch with me, there was no other way to do that except in Chile. There was no way.  Not even over the internet because I'm not on the internet.  So, what business is this all about?

They're talking about my checking account.  I will say, again, your Honor, unfortunately I have a checking account in this country because it is the currency that is used in Latin America, but not in order to commit a crime.  It would never pass through my mind to do such a thing.

In this long speech I had here, I was planning to say that I've never even had a traffic ticket in my life.  Why am I going to come here and commit a crime and -- to harm the reputation of my family, the reputation of my business, with zero benefit?  What kind of common sense would that make?  It's illogical.

It's said that I conspired to have a business, a money-transmitting business.  I haven't conspired to have such a business.  No one ever contacted me for me to transmit money for them or anyone.  The transactions made from my checking account were of my funds and have to do with each one of my Chilean clients.  I transferred for them.  I did not transfer for any other person in the United States.

Another thing that was said is that AFEX delivered money to me.  Yes, it's true, that did happen.  But it all depends on how it occurred.  I was a customer of AFEX.  I told

AFEX to make the transfer to Turismo Costa Brava.  I paid AFEX a commission.  And AFEX paid me, and paid me in my checking account.

So, yes, I did receive money.  Yes, it's true.  But that's my money.  I gave currency to AFEX and AFEX had to pay me for it; just as it does with the thousands or the hundreds of customers that they have.  The only difference between myself and the rest of their customers is that I, ingeniously, came with the money in a suitcase, thinking that nothing would happen because I had nothing to hide.  I had nothing to fear because I had nothing to hide.  And I delivered it to AFEX.  And AFEX paid.

If I had done that business once, that money that AFEX paid me was money from Turismo Costa Brava.  AFEX did not ask me to transfer it to this and that place.  No.  That was my business in Chile.  My customers in Chile instructed me to transfer to them, to their accounts in various places in the world.  And that does not constitute a crime.  That's why I insist on my innocence.

This is how all money-exchange houses in the world operate, not only mine, the only one that did not work as mine did in the sense of coming with money in a suitcase to be delivered to a United States company.  But I gave no one any service inside the United States.

AFEX buys money, $1.2 billion a year.  And of that,

Turismo sold them a hundred thousand.  All the other customers or the majority of those are from Latin America.  The other companies send money through trucking companies, and I did not do that.

I didn't do it for economic reasons, to save that difference.  And that raises questions of suspicions.  And they found what was most similar and they incriminated me.  But they failed in the sense that they didn't show one single transference in which I had received, as the law demands, $10,000 on one occasion, or 25,000 in a month, or 250,000 in a year to show that I was receiving money in order to transfer it.  I mean if there is no one single client who has testified against me, saying that he or she gave me in Manhattan or in the Bronx or any place, or even in my checking account, even that, and who later on gave me instructions to transfer that, and later on pay a commission to me, then there has to be a mistake.  Because it's obvious that if there is no client to testify about that, the only clients who could testify were the Chilean clients, from whom I did receive to transfer.  Now, a hundred million, two hundred million, five hundred million don't mean anything in terms of transfers.  It just means that this checking account, in fact, did receive and transfer.

Now, this conspiracy for what?  To open a checking account?  Because the allegations were that I conspired with Ms. Mazza to open a checking account, but I didn't conspire to

set up an office or a specific location, to receive money and then transfer it later on. I didn't do any of that. I mean we did agree to open a checking account. I mean and, in fact, for sure I would open a checking account again because I don't see how opening a checking account would be a crime. What I don't have any doubts it is a crime, especially now, is to receive an order to transfer, and that I didn't do.

I would have liked to continue a lot more and to maybe to discomfort you, to cause you discomfort, but everybody has advised me, including you, your Honor, not to continue, so I think I'll finish.

THE COURT: Well, no, I haven't advised you not to continue, Mr. Mazza.

THE DEFENDANT: No, no, no, no, no, pardon. I'm sorry. I didn't mean to say that. I just thought -- I just got the impression in general, through gestures that it was better if I kept this short, so I will try to --

THE COURT: Mr. Mazza, Mr. Mazza, if you have interpreted anything that I have said or done as having a view as to what you should or shouldn't say, please accept my apology. That is not my intent here.

THE DEFENDANT: No, no, your Honor I did not feel uncomfortable as if you had a view of not wanting to listen to me. I just know that everything has been decided, that I won't be able to provoke the reaction that I would hope, and maybe

just as my adviser says, what I'm going to provoke in you is some discomfort, and I don't want to do that.  So I'm just going to mention three things that I had asked my attorney yesterday to present to you, and that he told me that better not.

First of all, law 31 5330, which takes into consideration the possibility of a grace period of 180 days, which in terms of the calculation of the numbers that have me really worried here, in the sense of what involved the amounts of money transferred, it's very important for you to consider that there is a 180-day grace period in any calculation that you may need to do.  That was established by Title 31, 5330.  According to my interpretation, that should mean, although you have the authority to either give credit to my interpretation or not, my interpretation is that I wouldn't have violated the Michigan law for two reasons.  First, because the Michigan law started in effect on June -- on January 1, 2007.  And if you allow me that there's 180-day grace period to register, I would have time to register until June 30, 2007, which means that at the day of my arrest I wouldn't have been in violation, at least, of the Michigan law.

The other point that I wanted my attorney to make before you is that both the state and federal law indicate that the person who must register, or actually to get registered, is the person or the business who is responsible of receiving

99A9MAZS                     Sentence

money to transmit -- to transfer, not the checking account belonging to the business.  Simple money.  But if it's presented the way it was presented, it would look like an evidence of a failing on my part.  I had checking accounts in New York, Michigan, and Illinois.  And as your Honor said, they didn't represent a business in themselves in any case.  As the law says, they are just means to transfer money.  You could transfer money through the checking account.  You -- I could also transfer the same money that I am receiving and just take it physically to a different place or a person entrusted to do it, or different ways, other ways.  That's why the federal law says any means at all.

THE COURT:  Mr. Mazza, I've listened very patiently.  It's important that you understand what I said the last time we got together.  There was a motion to dismiss the indictment in this case.  It was decided before trial.  There was a trial, and because it was a trial to the court rather than to a jury, there were written findings of fact and conclusions of law.  After the court issued its written findings of fact and conclusions of law, there was another motion raised by the defendant after those rulings, and the court decided that motion.

The purpose of today's proceeding is not to review prior rulings, not to decide issues of guilt or innocence.  The court has ruled based on the arguments that have been presented

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

to it at the proper stage of the proceedings in the proper manner. You have steadfastly maintained your innocence. I fully understand that.

You have other remedies available to you. And at the conclusion of today's proceeding, I will inform you of your right to appeal. That's how you go about pursuing the matter of whether or not you have committed a crime in this case. The court has heard the arguments presented by able counsel in this case. I believe, if I'm right about this, you have now your third counsel in the course of this case. And you will have your right to be heard by the Appellate Court. Generally cases are heard by a panel of three judges, three different judges. They will take a new and fresh look at the arguments that have been raised. This is not the day in which guilt or innocence is adjudicated. This is the day on which I determine what sentence to impose on you for the crime of which you have been -- the crimes of which you have been convicted. And at this point, having listened patiently to you for about 45 minutes, I would ask you to direct your comments to facts and circumstances bearing on the sentence to be imposed.

THE DEFENDANT: So, considering then that your verdict is not appealable, I would like you to say that although I persist maintaining my innocence, and that it's a fact that I'm going to be imposed a sentence, I think I would ask then for that sentence to be proportional to the harm that I've caused

or to the victims that I've left behind.

THE COURT:  You may have misheard me before.  The verdict, the decision of the court on your guilt in this case is appealable.

THE DEFENDANT:  Yeah, I know that.  But I would like to get to that instance I had hoped that I had other resources.

THE COURT:  If you cannot afford the cost of counsel, counsel will be appointed to represent you on appeal, if you cannot afford to appeal.

THE DEFENDANT:  Yes, your Honor.  But I'll be deported and as you can probably understand if I haven't been able to communicate with my attorney being here, it would be more difficult to do that from my country.  If I have no right to present a good defense, later on it's going to be even more difficult.  That's why I was insisting on the possibility of trying to explain how my business worked because I hope that if I do present to your consideration the case the way they were I still had the dream that maybe you, your Honor, would understand that I didn't commit a crime.

THE COURT:  Well, I was here in this courtroom -- sir, I was here in this courtroom during your trial; and during your trial you exercised the right that is given to you to come up here and take the witness stand, and you did.  And I heard your testimony.  So, I don't quite understand your point.  But let's move on.

THE DEFENDANT:  If this concerns the issue of my testimony, I didn't prepare my testimony appropriately with my attorney.  We only had one hour.  I didn't know that I could testify about matters that were not directly related to the questions that my attorney asked me.  Because otherwise I would have exercised that right.

THE COURT:  Excuse me one second.

THE DEFENDANT:  Just to finish --

(Pause)

Just to finish, because I'm going to be post my sentence by now, I would ask to please take into consideration the extreme security measures I've been held under, the issues related to my hygiene and health, the housing together with dangerous inmates, and the crowding of the prison and the distance from my family, not having opportunities for intellectual development of any kind, lack of air conditioning, I mean pure air, fresh air, no kinds of recreation whatsoever, etc., etc.

I only hoped, I wanted to use this symbol again, I just only hoped that that wine glass that got broken at the time that you decided for me to be incarcerated, I hope that that wine glass can be put back together again, piece by piece, even though it will never be the same again.  And I hope I can walk through that door again some day with my wife and my daughter.  And when that happens, I hope soon, then you will

99A9MAZS                         Sentence

know that this wine glass that I am has been put together again.  That's not everything I wanted to say, but I'll finish here.

THE COURT:  Well, Mr. Mazza, I want the record to be abundantly clear, I have not cut you off.  It's your choice whether you wish to go on further.

THE DEFENDANT:  No, your Honor.  I'm not that stubborn like to try to continue.  I've heard the advice of my counsel and I think he has -- he's right to a certain extent.

THE COURT:  Thank you, sir.

This is the government's opportunity to speak.

MS. LAI:  Your Honor, I'll be brief.  We're not going to relitigate the facts of the case or reargue the law.  The government's perfectly aware of the defense's position, as I'm sure the court is, that he feels he is innocent.

I just want to focus on the 3553(a) factors.  As the court saw from the government's letter, which I apologize for submitting so late but there were internal discussions and I'm sure that the court is aware that we -- it is a very unusual situation for the government to seek a nonguideline sentence.

We are seeking a nonguideline sentence, in this case, your Honor, one that is more than five years.  We do feel that a ten-year sentence, as recommended by probation, is more than necessary to achieve the goals of sentencing in this case.

In reaching that decision, we considered a number of

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

factors, most important of which was general deterrence and the nature of the offenses, the seriousness of the offense. We took into consideration the fact that this conduct went on for a long time. Prior to the Patriot Act provisions to Section 1960, we couldn't have charged it because there was a mens rea requirement, or at least it seemed that there was a mens rea requirement, which later became clear there was not. But the conduct actually predated the revisions of the Patriot Act in 2001.

We took into account the fact that he -- his bank accounts were closed by one bank after another and he actually went to banks sequentially without seeking advice of U.S. counsel in between to find out what exactly he was supposed to do.

We took into account the fact that it seems to us highly incredible that he will accept suitcases of bulk cash from numerous countries, some of which were drug-producing countries, and bring bulk cash to the United States in that quantity without ever consulting the opinion of U.S. counsel or some other, at least -- U.S. counsel or the authorities.

We took into account the fact that there is no evidence that he or any of his associates ever clearly identified Turismo Costa Brava as a money-transmitting business. He repeatedly, and even today, continues to insist that his business is currency exchange and only currency

exchange, despite clear evidence to the contrary.

And of course, we took into account the fact that a third of a billion dollars was transmitted by his company over the course of -- well, ignoring pre-September or ignoring the conduct before the revisions of the Patriot Act, just from the period from January 2002 to the date of his arrest, was close to, according to the agent's testimony at trial, 350 million --

THE INTERPRETER:  I'm sorry?

MS. LAI:  $350 million.

We think that to impose a sentence -- the sentence imposed by the court should reflect the enormous quantity of the money that his company transmitted and the need to deter others from similar conduct.

He says that there are no victims in the case and while there may be no individual victims who lost money as a result of his conduct, his conduct does tend to undermine the integrity of U.S. financial institutions, which is the whole point of 1960.

As against all that, we recognize that the crime he's been charged with is a general intent crime.  There was never any evidence, direct evidence or evidence presented by the government that he knowingly moved any criminal proceeds or any -- criminal proceeds.

We also recognize the fact that he declared the money coming into the country on the numerous CMIRs.  And his

attorney has repeatedly said that he declared the money openly and notoriously. The government's view of that is he did, but he didn't declare the true owners of the money.

Finally, we took into consideration his age and the fact that he really has been involved in no criminal conduct other than operating this company for many years.

In light of all of that, we decided to seek a nonguidelines sentence in this case that is at least five years but that does take into consideration the enormous amount of money that he transmitted.

That's basically it, your Honor.

THE COURT: Thank you.

This is the court's statement of reasons for the sentence to be imposed upon the defendant. In sentencing the defendant, I've considered the presentence report, the recommendation of probation, the written statements of -- submitted by Mr. Soloway, which include family statements I've considered the original letter of the government and the very helpful and thoughtful letter which I received last evening, which I appreciated receiving. I've considered the statements of the government here this morning. I've considered the statements of Mr. Mazza this morning, that he made -- I guess they began this morning and continued into the afternoon. I've considered each of the factors set forth in Section 3553(a).

I will not comment on all that I've considered. I've

already stated on the record that I have adopted as my findings of fact the facts set forth in the presentence report, but I will note the following. With regard to the nature and circumstance of the offense, the defendant was convicted after a bench trial of conspiring to operate an unlicensed money-transmitting business and the substantive act of operating a money-transmitting business. Each of the two counts carries a statutory maximum of five years imprisonment. The facts leading to the conviction are set forth in the various memoranda and orders of this court. Defendant has, for many years, operated a business, which I'll refer to as Turismo. The funds brought into the U.S. were in large amounts of euros and other currencies, which were declared as defendant passed through customs. The currency was delivered, often delivered, to an armored car service, and then to an entity known as Associated Foreign Exchange for transmittal of U.S. dollar equivalents to U.S. bank accounts of Turismo. The amount of funds transmitted in this manner was above 200 million, less than 400 million.

The court concluded that Turismo was required to be licensed in New York, Michigan, and Illinois, but was not so licensed, and that the defendant conspired to operate the unlicensed business, and did operate Turismo.

There's never been any evidence presented by the government that the defendant ever knowingly facilitated by his

conduct any other unlawful activity such as drug trafficking or money laundering.

There is also no evidence that defendant secured an opinion of legal counsel.

In May of 2006, after he was stopped at LAX airport, he asked agents who had stopped him with about $2 million in currency whether he was doing anything wrong, and he was told that he did not appear to be violating any law.  The extent to which the agents understood the nature of his business is less than clear.  Most of the offense conduct had occurred prior to this conversation.

The defendant is -- I've also considered the history and characteristics of the defendant.  The defendant is 56 years old, a citizen of Chile, a college graduate.  He has no prior convictions.  He has lived his life principally in Santiago, Chile, and other parts of Chile.  His brother is a partner in Turismo.  His parents are both alive and living in Chile.  He has -- he and his wife have a daughter who is eleven.  He has two adult children from a prior marriage.  He claims to have assets of approximately $150,000.

I've considered the need for the sentence to afford adequate deterrence to criminal conduct and to protect the public from further crimes of this defendant.

The crime is serious.  The type of activities employed by Turismo and defendant could facilitate the laundering of

drug money.  That's part of what Congress was trying to get at in passing a statute of this nature.  Again, there is no evidence that it did facilitate such crimes, although I note that such matters are often difficult to prove.  But, there is a need to deter others from this type of conduct.  I don't believe there is any serious risk that this defendant will engage in this conduct in the future.  I strongly suspect that he will not.

I've also considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, both separately and as part of the need to avoid sentence disparities.

I've considered the sentencing guidelines, policy statements, and official commentary of the sentencing commission.  I've considered them in an advisory manner and recognize that I am not obligated to sentence within the guideline range.

I acknowledge that I have variance discretion.

I've used the guideline manual effective November 1, 2008.

The base offense level is 34.  I've given the defendant a two-level reduction for acceptance of responsibility, which leads to a total offense level of 32.  He is in criminal history category I.  The statutory maximum is five years on each count.  The guideline range would be, at

this level, 121 to 151 months imprisonment, but it is capped out at the maximum for the two crimes of 120 months.

Guideline range on supervised release is two to three years. Fine between 17,500 and 175,000 is provided for in the guidelines, and a $200 special assessment is mandatory.

By letter dated September 9, last evening, the government acknowledges that a sentence below the applicable guideline range is appropriate in this case.

The defendant operated Turismo in an open fashion. The defendant declared the amount of currency on his person on each trip. He testified truthfully at trial. And admitted his conduct but asserted that his conduct did not violate the statute.

The government argued at trial that Turismo was operating in violation of federal licensing requirements but that was not proven. It was proven that he operated in violation of the licensing requirements of three states, which is itself a violation of the federal criminal statutes of which he was convicted. The government also proved that he conspired to violate the statute.

The defendant, as noted, is 56 years of age, a hard-working businessman, and a good family man. He is unlikely to reoffend. He eagerly hopes to return to Chile to be reunited with his family. This sentence I intend to impose will serve as a deterrence to others but will take account of

all of the foregoing.

I intend to sentence defendant to 42 months imprisonment, two years supervised release, impose a fine of $20,000, and impose a special assessment of $200.

The foregoing is, in my view, sufficient but not greater than necessary to achieve the purposes outlined in Section 3553(a).

Does the defendant or his counsel have any objections to the sentence I propose to impose in this case and/or to the court's statement of reasons?

Mr. Soloway.

MR. SOLOWAY:  I should have -- and I will now, your Honor, before you impose sentence, object to the fine.  The PSR identified the defendant as indigent and recommended to the court that a fine not be imposed and that would -- is my application as to the sentence.

Other than that, I rest on the record, your Honor, with respect to all of the objections that I made and all of the requests.  I have nothing further.

THE COURT:  Okay.  Ms. Lai, does the government have any objections to the sentence I intend to impose in this case?

MS. LAI:  No.  Except that we would add that we're requesting an order of forfeiture, your Honor.

THE COURT:  When will I get the order of forfeiture?

MS. LAI:  That was faxed over yesterday.

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

THE COURT:  That was attached to your letter of last evening?

MS. LAI:  It was, your Honor.

THE COURT:  Mr. Soloway, any objection to the order of forfeiture?

MR. SOLOWAY:  I am going to object to the order of forfeiture, Judge.  The defendant was -- when he was arrested, obviously, he had a quantity of money that he was transporting in bulk.  There was also money that was seized from the remaining bank account that was opened in connection with his business in Michigan.  Those are the two quantities of money, actual money that the government has actually seized.  And the government seeks an order of forfeiture in the amount of $10 million.

My position, Judge, in light of the sentence that your Honor will impose of 42 months is that this forfeiture, which is punishment under the cases, is violative of the Eighth Amendment as an excessive fine violates the Eighth Amendment clause relating to excessive fines and is grossly disproportional to the gravity of defendant's offense.  Other than that, nothing to add, your Honor.

THE COURT:  Well, what I'm going to do is, upon reconsideration, I am going to waive the fine in this case based on limited assets, accepting the assets at face value, and in view of the forfeiture, of which I am going to sign in

this case.  In that context, there is an inability to pay the fine in light of family obligations and overall financial circumstances.

Does the government have any objection to that?

MS. LAI:  No, your Honor.

THE COURT:  Okay.

Defendant will please stand and I will impose sentence.

Mauricio Mazza Alaluf, it is the judgment of this court that you are remanded to the custody of the United States Bureau of Prisons to be imprisoned for a period of 42 months. Following release from imprisonment, you shall be placed on supervised release for a period of two years with the following terms and conditions, namely those recommended by probation.

You shall not commit another federal, state, or local crime; nor possess a firearm or destructive device.  You shall not illegally possess a controlled substance.  The mandatory drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.  The defendant shall cooperate in the collection of DNA as directed by the probation officer.

The standard conditions of supervision are imposed with the following special conditions.

The defendant shall obey the immigration laws and comply with the directives of the immigration authorities.

The defendant is to report to the nearest probation office within 72 hours of release from custody.

The defendant may be supervised in the district of his residence.

It is further ordered that the defendant shall pay to the United States a special assessment of $200, which shall be due immediately.

I have signed the forfeiture order.

As noted, I will waive the fine based upon inability to pay.

A complete, corrected copy of the presentence report shall be provided to the Bureau of Prisons and the United States Sentencing Commission.

Now, Mr. Mazza, you have the right to appeal this sentence.  If you are unable to pay the costs of an appeal, you have the right to apply for leave to appeal as a poor person. The time limits for filing a notice of appeal are brief and they are strictly enforced.  If you request, the clerk of the court will prepare and file a notice of appeal on your behalf immediately.

Do you understand, Mr. Mazza Alaluf?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  All right.  Is there anything further from the government?

MS. LAI:  No, your Honor.  I just want to let the

court know that the government is going to be docketing the sentencing letters, which we don't normally do, but we fully anticipate an appeal in this case so we want the record to be complete.

THE COURT:  That's fine.  Anything further from defendant?

MR. SOLOWAY:  Your Honor, I know we've been here a very long time.  One brief moment.  I'd like just to confer.

THE COURT:  Sure.

(Pause)

MR. SOLOWAY:  My final request relating to designation, Mr. Mazza would ask the court to recommend -- I know you can't order this -- a designation somewhere in the New York area.

THE COURT:  So recommended.

Anything further?

MS. LAI:  The government moves to dismiss the underlying indictment in this case.

THE COURT:  Without objection, that's granted.

Anything further?

MS. LAI:  No.  Thank you, your Honor.

MR. SOLOWAY:  No.

THE COURT:  All right.  Thank you all.

Mr. Mazza Alaluf, you will be back home in the not very distant future.  You still have some time to do, and then you will be

99A9MAZS                          Sentence

done with this case.  I wish you the best.

(Adjourned)

# EXHIBIT C

F1K9FAIS                         Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        14 CR 243 (JSR)

ROBERT FAIELLA,

                Defendant.

------------------------------x

                                    New York, N.Y.
                                    January 20, 2015
                                    4:32 p.m.


Before:

                HON. JED S. RAKOFF

                                    District Judge


                    APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
ALEXANDER WILSON
     Assistant United States Attorney

SIDLEY AUSTIN LLP
     Attorneys for Defendant
TIMOTHY TREANOR
TODD BEATON
DAVID DENTON

F1K9FAIS                         Sentence

(In open court; case called)

MR. WILSON:  Good afternoon, your Honor.

Alexander Wilson for the government.  With me at counsel table is Special Agent Gary Alford of the IRS.

THE COURT:  Good afternoon.

MR. TREANOR:  Good afternoon, your Honor.

Tim Treanor, Todd Beaton and David Denton for Mr. Faiella, who is sitting next to me.

THE COURT:  Good afternoon.

We're here for sentence.  The probation office has calculated the guideline range as 57 to 71 months but because of the five-year limitation on the underlying offenses the guideline range is 57 to 60 months.

In their excellent submissions or submission -- I don't think I've received anything from the government, but in the submission I received from defense counsel there was no objection to that.

That seems right to the Court as well.  Does anyone disagree with that?

MR. WILSON:  No, your Honor.

MR. TREANOR:  No, your Honor.

THE COURT:  Very good.  So that's the guideline range.

Now, this Court, of course, must sentence the defendant based on all the factors under Section 3553(a).  And I want to hear from counsel but let me just say that there are

F1K9FAIS                    Sentence

a couple of differences between Mr. Faiella and Mr. Shrem, not all of which cut in the same direction, but the one that is most glaring is that this defendant has a prior felony conviction. So it seems to me that he will have difficulty persuading me to sentence him to the same or less than Mr. Shrem. There are other factors that are to be considered.

On the other hand, Mr. Treanor, maybe I misread your sentencing submission but you don't seem to have indicated what sentence you're proposing -- not that you're required to. You say you want a sentence no greater than the bottom of this stipulated guideline range which is 57 months. And even if the government were to argue for the top of the guideline range, namely 60 months, it would not be a very prudent use of this Court's time to quibble as between 57 and 60. The relevant question is whether it should be any less than 57.

So let me hear first from defense counsel, then from government counsel, and then from the defendant if he wishes to be heard.

MR. TREANOR: Thank you, your Honor.

Your Honor, with regards to where we would like Mr. Faiella to be sentenced we're mindful of the fact that we stipulated in the plea agreement to an applicable sentencing range. We wouldn't argue for a sentence below that.

THE COURT: Let me look at the plea agreement. I'm sorry. I didn't realize this was -- normally the government

F1K9FAIS                          Sentence

doesn't include -- I shouldn't say normally, there are variations.  Does someone have a copy of the plea agreement?

MR. WILSON:  Yes, your Honor.

THE COURT:  Hand that up please.

MR. TREANOR:  Your Honor, I apologize.  This is what's called an option B agreement I think by the office, which permits the defendant to argue under 3553(a) for a sentence below the range.

THE COURT:  That's the point.

MR. TREANOR:  Right.

THE COURT:  And the U.S. Attorney's Office, to its great credit, does not take the position anymore that it used to take that you can't argue for a nonguidelines sentence.  It just says that if you are sentenced to the guideline range or lower you can't appeal or things like that.  That sometimes has that waiver involved.  There are variations on the theme.  But not the one that you're indicating.  So you're free to --

MR. TREANOR:  Correct, argue.

THE COURT:  -- argue for a nonguideline sentence.  Does the government agree?

MR. WILSON:  Oh, yes, sir.

THE COURT:  Let me hand this back to counsel.

MR. TREANOR:  Your Honor, of course, we would ask that the Court sentence Mr. Faiella with leniency and to a sentence that is as low as possible.  Now we recognize the fact that

F1K9FAIS                              Sentence

that doesn't necessarily mean that no incarceration is

appropriate.  We --

THE COURT:  You're welcome, of course, to argue about

anything you want, and I will be more than delighted to hear

you.  But what I was trying to indicate in my earlier comments,

just to move this along, is that you will have a very hard time

convincing me that the sentence should be any less than

Mr. Shrem's, given your client's prior felony conviction.

Whether it should be lots higher, a little higher, whatever,

that's a different story.  Happy to hear any argument in that

area.  But -- and you're free to argue, of course, for an even

lower than Mr. Shrem.  And I've got all the time in the world

and I'd be happy to hear you, but it may not be the most

prudent use of your time.

MR. TREANOR:  Understood, your Honor.

When comparing this case to Mr. Shrem's case there are

obviously some differences.  There are differences in who these

individuals are and there are some somewhat subtle differences

in their conduct.  But I think our -- we would like to

analogize our case to Mr. Shrem's case and argue that a

sentence that's similar to the one imposed on Mr. Shrem is

appropriate.  We think that that -- the reason for that, the

reason that that's a compelling argument is that the nature of

the offense for these two individuals is quite similar.  You

know, when this case was charged there was a lot of attention

F1K9FAIS                      Sentence

paid to the fact that this was a bitcoin case that was associated with Silk Road, Mr. Shrem was arrested with a large sum of money in his bag in an airport, and there was a lot about this case that made it look very cutting edge, like a big-time case, a real interesting case.  I think the truth of the matter is quite different.  Especially for Mr. Faiella, more so than even Mr. Shrem.

This really is a very, very simple case.  It's a simple case of -- it's about conduct committed by Mr. Faiella laying on his back in his bed in Florida where he has some -- suffering some medical issues and was trying to find ways to make a living, to be able to provide support for his family.

Now obviously he chose -- he made some mistakes and he chose to do things that are illegal.  He's accepted that, admitted that.

But really this is not a -- this case and the sentencing range that is set forth in the plea agreement is established in part based on an enhancement for being related to narcotics trafficking.  And we would argue that -- we do argue that this case is really so different from your typical narcotics case.  In your typical narcotics case you have retail sales on the street.  There's the prospect of violence.  The sentencing -- granted the sentencing ranges for the guidelines for narcotics trafficking have changed more recently, but they were established in part with the violence that surrounds

F1K9FAIS                      Sentence

narcotics in mind.  And the enhancement here we believe has something to do with that.

This offense that Mr. Faiella committed was really one that was in the online world, totally virtual.  He was doing it from his bedroom, engaged with people who were buying narcotics, retail narcotics.  They were unknown people who he was not dealing with face-to-face.  There really was no prospect of violence.  There wasn't a lot of money involved in this case.  I mean that's relative, but when you look at Silk Road and how big an operation that was and you look at the amounts that were involved with Mr. Faiella and Mr. Shrem, they were relatively quite low.  There was not a lot of profit made in this case.  And really what this is, it is a case of an individual who had some tough breaks in life, some medical issues, was rather desperate because he was unemployed, was looking to support his family, and was poking around on the internet and figured out that by advancing bitcoin to people he could earn a little premium, a little cut.  And the people who are most interested in getting a small premium from a bitcoin sale were individuals who were buying narcotics on Silk Road. And certainly Mr. Faiella sought to solicit those individuals. He advertised on Silk Road's website.

But it's really a very, very simple case.  It's a very simple crime.  It's not as complicated as one might think and as it seems to have been depicted at times in the media.  It's

F1K9FAIS                        Sentence

a very, very simple case.  And we think that that speaks to the limited nature of the sort of culpability of criminality in this case.  We think it's a sort of lesser case within the framework that it's been charged.

For that reason, we think that in some ways, because Mr. Faiella was just an individual who was helping other small-time retail individuals and not running a big business like Mr. Shrem, we think that it's an even more compelling argument on behalf of Mr. Faiella that this is -- this is not the kind of conduct that warrants a sentence in the range of 57 to 60 months that the guidelines suggest is appropriate.  So that's one way that we think that the case is favorably distinguished from that of Mr. Shrem's.

Other I think compelling factors that are similar to Mr. Shrem is the acceptance of responsibility here. Mr. Faiella -- and of course we filed a motion challenging the legal sufficiency of one of the charges.  We lost that motion. And, of course, we don't think the arguments we raised were crazy.  They were worth making.  But as soon as we lost that motion, Mr. Faiella stepped up, accepted responsibility, pled guilty, and is now here to be sentenced by your Honor.

There was some discussion, and the probation office makes an issue in the report, of whether or not he sufficiently accepted responsibility.  We had a little bit of a difficult exchange with the probation office.  Tried to explain the fact

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:17-cr-00077-WHP   Document 89   Filed 05/25/18   Page 147 of 212    9
Case 1:14-cr-00243-JSR   Document 73   Filed 02/16/15   Page 9 of 35
F1K9FAIS                         Sentence

that Mr. Faiella doesn't need to admit that he knew that the licensing requirements precluded his conduct in order to be guilty, that it's sufficient for him to have known that engaging in the conduct that he engaged in, in a manner that would facilitate the purchase of narcotics is a crime and he accepts --

THE COURT:  Actually, the old adage is ignorance of the law is no excuse.  He has to have mens rea.  And he has admitted to recognizing that his conduct was morally wrong.

But I think point that was being made by the probation officer, which you might want to address, it's one thing to say you don't know about things like the licensing requirements for a money transmitting business.  It's quite something else to say that you don't know that by facilitating, purposely facilitating the narcotics purchases of unlawful substances in a way that's designed to conceal both your and their identities and to prevent detection by law enforcement and to structure the transactions to avoid attention, that you don't know that you're involved in money laundering.  What else would it be?

MR. TREANOR:  Well, your Honor, I think my client would readily admit that that is exactly what happened; is that he engaged -- he was helping individuals to purchase bitcoin, and he knew that they were using it to buy narcotics, and he knew that was wrong.

THE COURT:  So how do you account for the fact that

F1K9FAIS                    Sentence

the letters, the very fine letters that I received from his wife and sister-in-law, mother-in-law, father, all or mostly seem to suggest that he was not aware of the illegality of what he was doing?

Again, he may not have been aware of the illegality of the licensing side but on the money laundering side how could he not be aware?

MR. TREANOR:  Your Honor, the count that he pled guilty to is operating an unlicensed money transmitter.  And I think that's the problem here.  The problem is that, having pled guilty to that, it sounds a lot like did he know that he was -- that he was operating a business that needed to be licensed.  And the answer to that is -- is Mr. Faiella would say that he didn't know; that he knew that there were licensing issues around this business.

THE COURT:  I understand the government gave him the benefit of a plea bargain that included his only having to plead to the licensing, which, again he doesn't have to know the technicalities of that law if he knows he's doing wrong as he admitted he did when he pled.  But he was charged with money laundering.  That's not before me from a sentencing standpoint.  But what I can't understand is what is he saying to his wife, to his father, that leads them to basically feel, in letters designed to help him and that do help him, by the way, they are poignant letters in many respects; saying well he didn't really

Case 1:14-cr-00243-JSR Document 73 Filed 02/19/15 Page 11 of 95

F1K9FAIS                           Sentence

understand the illegality. Yes, he may not have really understood the illegality of the first count -- though I have some questions in my mind about that, but we don't have to dwell on that -- but he knew, as sure as anyone of his intelligence and background knows, that facilitating and hiding the purchases of illegal drugs is against the law as well as being immoral. How could he not know?

MR. TREANOR: Well, your Honor, we don't take issue with anything your Honor has said. We think that's evident. Mr. Faiella would say that that's evident.

I think the issue is that he's got family members who love him and who know that he was interested in bitcoin, that he took the position that he didn't need to be licensed; whether that was right or wrong, he rationalized that part of this. I think that his family members are latching on to that as a way to feel -- to defend him and to --

THE COURT: Well, I accept that.

So you were telling me -- I don't know if there was anything further you wanted to say.

I agree with you that if -- I'll of course hear from the government on this -- if we were purely dealing with his situation versus Mr. Shrem's situation, while there are significant differences, there's a rough similarity on the facts of this case. But the big glaring difference is he's got a prior felony conviction. And I don't know if you want to say

anything about that, but that's the elephant in the room so to speak.

MR. TREANOR:  Your Honor, he does.  He has a prior felony conviction for a tax offense.  And it is what it is. Mr. Faiella pled guilty to the tax offense and it's part of his history.  It was not, in the scheme of things, a huge amount of money involved.  It was a mistake.  And it's there.  I think Mr. Faiella's aware that that is something that should in life have put him on notice that he should have operated on the straight and narrow.  But that comes back to the real -- the real sort of story here, and that is when chosen -- when given a choice between what to do when your family is in need, Mr. Faiella chose what he thought -- whatever he thought at the time.  He thought it didn't require a license.  He knew it was a problem on the narcotics aspect of it.  He knew that when he chose to engage in that conduct to try to make money to support his family.  That's really the heart of it here, and that's what led to that decision.  It's admittedly, certainly by Mr. Faiella, it was a poor decision.  And he's ready to take responsibility for that.

If I could have a minute, your Honor.

THE COURT:  Yes.

(Pause)

MR. TREANOR:  Your Honor, one additional point with regards to the money laundering aspect of this.  Half an

F1K9FAIS                         Sentence

education on a topic is a bad thing.  For Mr. Faiella when you look at simplistically at things like the money laundering statute, that means to the average lay person that you're helping to wash money, criminal proceeds typically.  This was a case in which --

THE COURT:  I understand the distinction.  And that's a fair point.  But this is why I keep drilling, perhaps too much, on the prior conviction.  Here's a man who had already had serious trouble with the law in a, if you will, somewhat technical area, tax evasion.  So, he wants to play lawyer and say:  I can help these narcotics purchasers and my reading of the licensing law or my reading of the money laundering law, assuming he even bothered to read them, which I don't know, makes me think maybe I can sneak in.  And the fact that I have already received a felony conviction for not following the law and knowing when I committed tax evasion that it was morally wrong, and even though I know for a certainty that this is morally wrong and I'm contributing at a very minimum to one of the greater scourges that our society faces, you know, I, Mr. Faiella, I didn't go to law school but by gosh I am now going to play lawyer and convince myself that this is somehow okay.

Is that the argument?

MR. TREANOR:  No, your Honor.

I think that hypothetical attributes too much thought

F1K9FAIS                          Sentence

to Mr. Faiella.  Notwithstanding the fact that we have

Mr. Shrem, who is clearly a young, bright man with a lot of

interesting ideas.  You have bitcoin which is a rather

sophisticated new, cutting-edge development.  I hope

Mr. Faiella --

THE COURT:  I agree with you that Mr. Shrem believes

that next only to the wheel bitcoin is the greatest invention

of our time, or of ever since the wheel was not of our time

but -- but I'm not sure how that cuts.

MR. TREANOR:  Well, your Honor, the point that I'm

trying to make, and I hope Mr. Faiella will forgive me for

this, but this is not a sophisticated man, your Honor.  He's

educated.  He has a college education.  But he was a plumber

before he ended up in the circumstances that he's in.  He's not

somebody --

THE COURT:  When my oldest daughter got married I was

so disappointed because, although she married a really terrific

guy, he was a lawyer.  I was hoping for a plumber, myself.

MR. TREANOR:  We all could use a good plumber, your

Honor.

I think that in going through -- trying to understand

the mental state of Mr. Faiella, I think to attribute too much

thought and complexity of thought would be wrong.  I think

Mr. Faiella is a pretty straightforward, simple guy.  I think

he was doing something that he was -- did a certain amount of

F1K9FAIS                        Sentence

surface research to assure himself that he had cover, because he felt that there was something morally wrong with helping people buy drugs. I think it's as simple as that.

THE COURT: I don't want my comments to be taken out of context. I was impressed by the sincerity of Mr. Faiella's plea, of his acceptance of responsibility. I think there is no doubt that he accepted responsibility in a way that not all defendants genuinely do. So I do take that into account.

Let me hear from the government. Thank you.

MR. WILSON: Thank you, your Honor.

Taking, as your Honor has suggested, I think, the baseline here of Mr. Shrem's sentence, since that does seem to be clearly the appropriate baseline to work from, the government would offer that Mr. Faiella's culpability and the necessary sentence here is significantly greater than Mr. Shrem's for a variety of reasons, the first of which your Honor has clearly already identified, which is here we have a prior felony offense which seems to have had no deterrent effect in that case. Obviously, the sentence was probation and a year's home confinement.

I don't want to dwell on it. Your Honor has identified all the issues and I don't -- unless you wish me to, I don't think I need to address it further.

THE COURT: I'll forego that pleasure.

MR. WILSON: There are a number of other issues here

Case 1:17-cr-00077-WHP Document 89 Filed 05/25/18 Page 154 of 212    16
Case 1:14-cr-00243-JSR Document 73 Filed 02/15/18 Page 16 of 95

F1K9FAIS                          Sentence

though and I think keying off that one to look at very clearly is the need for specific deterrence in this case. Obviously I have not been counsel on this throughout and I've only read the sentencing transcript from Mr. Shrem, but my understanding and my sense of your Honor's views is that specific deterrence of Mr. Shrem was not a particularly key issue there, I don't think. The government thought it was a key issue, and it seems to have largely been presumed that that wasn't what we were worried about.

THE COURT: I think that's a fair point. And I'm going to give, of course, defense counsel a chance to respond to any of these points before we hear from the defendant himself. But usually in white collar cases -- this is really in some respects a white collar case; that's one of the points that defense counsel, in fact, was making, that this is not a case involving violence -- you don't have to worry about specific deterrence. These are folks who make serious mistakes but very rarely are recidivists. You'll get, every once in a while, the professional conman. But in a situation like Mr. Shrem's or, one would have thought, Mr. Faiella's you don't have to worry about specific deterrence. But in his case clearly he didn't learn the lesson. And so the notion is that a greater sentence may carry that message.

MR. WILSON: Yes, your Honor. And I think it goes beyond just the prior felony and the willingness to reoffend

F1K9FAIS                          Sentence

and there are just a couple of other points I want to point you
to.

In this case Mr. Shrem obviously ultimately stopped
providing bitInstant services to the defendant.  And at that
time he understood that the reasons were because they were
having issues with what he was providing.

That did not stop Mr. Faiella, which you might have
thought would have been a warning sign.  Instead, he
reorganized himself and began essentially doing the exchanges
directly through personal accounts and the trust account on
Silk Road.

Then Silk Road was seized.  And that, you would
certainly have thought, would have been enough of a warning for
anyone who was easy to deter, that this business was no longer
one he could safely engage in and that he needed to stop.  But,
as your Honor knows, that's not what happened.  The successor
Silk Road 2 spinoff website went up and the defendant continued
the same conduct on that website until his arrest.

That's a lot of opportunities for him to have stopped,
none of which he took and, I think, suggests a real
possibility, if not a likelihood, that absent a very
substantial sentence here, beyond what we were ever talking
about with Mr. Shrem, he may continue to commit crimes.

I think you also have to look, your Honor, in this
capacity, as you've said, white collar crimes, generally this

Case 1:17-cr-00077-WHP   Document 89   Filed 05/25/18   Page 156 of 212   18
Case 1:14-cr-00243-JSR   Document 73   Filed 02/13/18   Page 18 of 95
F1K9FAIS                        Sentence

isn't an issue, partly because they are often one-time mistakes and you learn your lesson, but also because the risks of being caught in future are so high in many white collar offenses.

One of the unique problems that we face in this type of offense, with due respect to defense counsel, I think is not so simple, is the potential for anonymity. I think this also goes to what I think is not accurate about Mr. Faiella being a simple man or an uncomplicated man. He took extensive steps throughout this process ultimately once he lost BitInstant, not effective steps, but nonetheless extensive ones, to maintain his anonymity, to maintain deniability, to avoid law enforcement detection. That is a real possibility in the world in which we now live for this type of offense.

I agree, your Honor, there are some things with Mr. Shrem that cut the other way, the obvious one being subversion of a legitimate enterprise, a denial of the regulations; but cutting the other way is that this is the type of offense Mr. Faiella could, if he so chose, tried to commit as soon as he's no longer in confinement. He can go online. He can create, unfortunately, largely untraceable -- or at any rate very difficult to trace mechanisms for doing this sort of business. And the government will have to start from square one. We did not find Mr. Faiella in a vacuum. It's only because of the successful Silk Road investigation that you would become aware of someone doing this. If he's not part of

F1K9FAIS                        Sentence

a website which the government is able to successfully investigate and take down in the future, there is no particularly clear reason to believe that the government would catch him if he tried a similar scheme in the future, all of which I think points very clearly to the need for a significant or a significantly larger sentence than Mr. Shrem would receive to deter him, frankly to incapacitate him as well, to make sure that is not a possibility and that when he does comes out he knows it's not worth it to try this sort of thing again.

Another issue which is perhaps in the same vein in that it suggests --

THE COURT:  I'm not sure -- it's been a while since I've looked at Section 3553(a) -- I'm not sure that incapacitation is something I can take account of, is it?

MR. WILSON:  Well it's to protect society from future crimes by the individual.  I think it encompasses both specific deterrence and --

THE COURT:  I think I'd prefer specific deterrence.  I think I'm uncomfortable, as a legal matter, with incapacitation.

MR. WILSON:  Fair enough.  In this case I think the issue is clear in terms of specific deterrence.

This turns I think also to the point of -- I don't know that it's acceptance of responsibility.  I agree with your Honor that plainly he has accepted responsibility for the

F1K9FAIS                          Sentence

illegal elements of this offense.  But as it looks to the

possibility of recidivism here, the defendant's, I think,

continued assertion of things that are plainly not true about

his knowledge is troubling, as are a couple of other matters.

But starting with that.  The defendant, as you noted,

his family has asserted it, I think his counsel has asserted

it, that he simply did not know that he needed to be licensed.

And that's not one of the elements of the offense, and he

doesn't have to admit.  But there's a difference between not

admitting it and asserting as a mitigating factor that he

didn't understand.

Your Honor has the PSR.  It's paragraph 57.  But it

could not possibly be more clear that by July 2013 at the

latest, which is approximately six months before he ceases his

conduct when he's arrested, he knows that a money services

business, which bitcoin exchange business is, had to be

licensed.  And he's explaining to the Dread Pirate Roberts why

he doesn't want to move out of his current system which offers

him more protection, precisely because since he has to be

licensed and he's not, if law enforcement finds him, they are

going to seize the funds and him, as I think the quote --

THE COURT:  I'm glad you remind about paragraph 57.  I

should note for the record that I'm adopting the factual

findings of the presentence report.  This details, in quite

significant particularity, all the circumstantial evidence that

Case 1:14-cr-00243-JSR   Document 73   Filed 02/19/18   Page 21 of 95

F1K9FAIS                          Sentence

shows that by July 30, 2013 he was specifically aware that he was operating an unlicensed money transmitting business. That's a good point.  Thank you.

            MR. WILSON:  Certainly, your Honor.

            So obviously I think your Honor takes the point the fact that he did know and he's now claiming he didn't still, despite having been willing to plead guilty to the particular elements of the offense, I think is troubling to the government.

            I'll also note along the same vein there has been this claim that's made by Mr. Faiella that he only made $30,000.  I don't know if the particular amounts here are necessarily significant.  But it seems clear that that is not true.

            As your Honor will know from the PSR details, the commission that Mr. Faiella was charging was in the range of nine to ten percent.  Mr. Shrem, for the ones he was processing, which is only a portion, of course, was taking two percent.  And we're talking at a minimum just during the BitInstant period of the -- well, it's more than a million in total transactions.  The government and the defense have agreed that it's approximately 950,000 in drug transactions that are being funded.  That's 70 to 80,000 at the bare minimum.  I don't know why Mr. Faiella is feeling the need to cut that in half but it's very troubling to the government that he's trying to minimize his culpability here.  The profit numbers are not

F1K9FAIS                          Sentence

huge, obviously.

THE COURT:  Yes.  Well I want to hear from his counsel on that point.  I should make clear that the portion of his acceptance which I do credit is I do think that he has recognized and has made clear to the Court that he always recognized that what he was doing was wrong.  But I think you have raised some troubling issues as to some more particularized aspects of his state of mind.

MR. WILSON:  I think, your Honor, to sum it up from the government's perspective, and I know you're familiar with the term, we would certainly view what he is doing here is trying to minimize his conduct.  He's admitted he knew what he was doing was wrong, he's acknowledged his guilt.  But he continues to try to minimize it in hopes of getting a lighter sentence; and not only should your Honor not give him a lighter sentence based on those false statements, but the fact that he's making them I think raises real concerns about the likelihood of re-offense here.

I think turning probably away from the specific deterrence issues, and I know your Honor has considered and addressed it at some length with Mr. Shrem, the seriousness of the offense and the need for general deterrence, so I won't belabor those points.

THE COURT:  Every case is, obviously, particularized but in that respect, of course, the comments I made at

F1K9FAIS                    Sentence

Mr. Shrem's sentence apply equally to this situation.

MR. WILSON:  All I would say there are a couple of ways in which I think both of those cut in favor of the need for a greater sentence for Mr. Faiella than for Mr. Shrem.

The first, with respect to the seriousness of the offense, he's obviously here, the defendant, now he's the principal.  Mr. Shrem aided him.  He facilitated his conduct for part of the period.  But the principal here, the one who originated the scheme, the one who was on Silk Road, the one who knew, not just as Mr. Shrem knew, certainly, that this was facilitating illegal drug conduct, but literally was receiving messages from undercovers stating, "I'm using this money to buy cocaine," that's the defendant.  We think that's a more serious version of the offense, obviously.

In addition, he did it for longer.  He began in December 2011.  Mr. Shrem ceases working with him in October 2012.  But Mr. Faiella continues to do it for more than a year after that until his arrest in January 2014.  Your Honor can do the math but it's twice as long.  And that is something that goes to the seriousness of the offense and the defendant's culpability and warrants a greater sentence to reflect it.

Finally, with respect to general deterrence, your Honor, I think the one point that is worth making is precisely for the same reason specific deterrence is more of a concern here than it would often be in white collar crimes, because of

F1K9FAIS                         Sentence

the ability to do this anonymously, and to have some degree of serious success in concealing your activity or your identity from law enforcement, deterrence for others also requires that when the government does locate one of the people doing this and bring them to court and prove them guilty, that the sentence be significant and not to call back to --

THE COURT:  In effect what you're saying is when someone comes up with a better mousetrap for committing a crime you can't ignore the fact that they invented a new way to accomplish that crime and the word's got to get out that that's no good, it's just as bad as committing the crime the old way. So I think there is something to that.

MR. WILSON:  You said it better than I was going to, your Honor.

THE COURT:  I doubt that.  But anyway let me hear from defense counsel and then from the defendant.

MR. TREANOR:  Your Honor, just to address a couple of issues.  First of all, with regards to the exchange with Dread Pirate Roberts, the licensing issue.  That e-mail exchange, that exchange was basically a request from the Pirate, as he was referred to, for Mr. Faiella to alter his business in a way that was more of a specific exchange for Silk Road. Mr. Faiella turned down that offer.  And it is in that context that he said money service businesses require a license.  And it was not his view that he was a money service business at

F1K9FAIS                    Sentence

that time.  He looked at himself as an individual-to-individual peer operation; not like Mr. Shrem, or not like what Dread Pirate Roberts was asking him to do.  And he declined that offer.  And that proves, in a sense, the issue of whether he was parsing in his mind the licensing issue and feeling that maybe he didn't need one.

But setting that aside, because that -- we think that discussion is not particularly relevant because he knows that he was helping people buy drugs and he knows that that was wrong and that's the basis of why he's here.  So, we don't find that that e-mail supports the government's argument.

With regards to the amount made by Mr. Faiella, we don't take issue with the 60, 70, 80, whatever thousand dollars he made from this.  Mr. Faiella was sharing some of his proceeds with someone else who at times contributed to the conduct.  And in that sense --

THE COURT:  Whoa, whoa, whoa.  What does that mean?

MR. TREANOR:  Your Honor that means that Mr. Faiella is an individual who is incapacitated, is in bed for most of the day, and at times, when the business got busy, had help.

THE COURT:  So you mean there is another person unknown, presently unknown who was involved in this crime?

MR. TREANOR:  That may be correct, your Honor.

And also with regards to the split with Mr. Shrem --

THE COURT:  I'm not sure which way that cuts.  What

F1K9FAIS                         Sentence

was the background of this individual?

MR. TREANOR:  Your Honor, I can't supply any additional information.

THE COURT:  Because you can't or because your client has asked you not to?

MR. TREANOR:  Because I can't.

Your Honor, the additional fact, Mr. Shrem's split in this was not two percent; it was four percent.  So that took up a greater percentage of the proceeds of the transactions that they did together.

With regards to specific deterrence --

THE COURT:  Let me just -- I'm still troubled.  So Mr. Faiella says I should accept that he only made $30,000.  That's something he raised.  And the government says how can that be?

MR. TREANOR:  We don't take issue --

THE COURT:  And you're saying they're right with respect to what the total commission was.

MR. TREANOR:  I'm just saying --

THE COURT:  But he had to split it with another crook?

MR. TREANOR:  Your Honor, I think, walking back the math, I don't say that we agree with the government's calculation of the amount of proceeds here.  We don't take issue with it.  It sounds like it's in the right ballpark.

THE COURT:  You've just told me, and the record I'm

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1K9FAIS                    Sentence

sure reflects, that he had to split his commission with someone else.

MR. TREANOR:  Correct.  I'm starting with the total proceeds, your Honor.

THE COURT:  I understand that.

This is something he raised.  In order for me to evaluate that, I'd like to know a little bit more because it may bear on his sentence, among other things.

MR. TREANOR:  Your Honor, I don't have any additional facts to provide on that.  I can give you a breakdown of the proceeds as we understand it.  We don't take issue with what the government has raised.  We do take issue with the fact that Mr. Shrem's split was not two percent; it was four percent.

THE COURT:  Anything else from defense counsel?

MR. TREANOR:  Your Honor, two additional things.

One is with regards to specific deterrence. Mr. Faiella is not a one-man crime wave.  This is a case in which he was charged by the IRS with underreporting the proceeds of his plumbing business.  He pled guilty to that. That was a very, very simple tax case.

And then this individual got back on the internet, because he's incapacitated, was looking for ways in which he could make some money on the internet and did what he did.

But he's not an individual who has a lot of opportunity to commit criminal conduct and he's somewhat of a

F1K9FAIS                      Sentence

broken-down man at this point in his life.  And we think that that's a very important sort of mitigating factor on the specific deterrent.

I also would be remiss if I didn't mention the fact that notwithstanding Mr. Faiella's flaws he does have a family who cares very much about him.  His wife, Suzanne is here.  And they -- the family is going to -- when he is sentenced and serves a sentence, a likely sentence of incarceration, he's going to be away from them.  They have difficult circumstances. They have a very promising young son.  And Mr. Faiella is an important part of their lives.  And we would just note that they are going to lose him for that period of incarceration.

THE COURT:  Thank you very much.  Let me hear from Mr. Faiella if he wishes to be heard.

THE DEFENDANT:  Well, your Honor, at the time of the offense I saw no other way.  It still doesn't mitigate that I broke the law.  And I'm here to face the responsibility of that.  It's pretty simple, your Honor.  Whatever you sentence me to, that's what I deserve.

THE COURT:  So, it is the quality of Mr. Faiella that comes across in that short statement just now and that has come across to the Court previously that is his, in effect, strongest argument for mitigation.  When push comes to shove, this gentleman does accept responsibility; doesn't equivocate. There may be things in his submission that are arguable, but

the bottomline is really the one he just expressed so eloquently now.

There are other things that also operate in his favor: His medical problems, the situation economically which he found himself in when he undertook this activity, and always very important to the Court, and no less so here, the impact of any sentence on his fine family.

But, there is a fair amount on the other side of the balance, much of which I think has been eloquently captured by the government. He continued this activity long after there were warning signs from every corner. He knew from his own past criminal history the nature of the risk he was taking and he willingly assumed those risks. He engaged in activity which I agree with the government is not as simple as defense counsel would argue. He is sought to make use of a novel medium of exchange to facilitate drug purchases in the belief that the very nature of that exchange and its novelty would provide a particularly useful cover. And though I don't know quite what to make of it and it won't be a material fact in my sentence, he apparently did this in collusion with an unnamed individual whose anonymous identity he seeks to take advantage of through his counsel even here today as a mitigating factor for how much money he received. This is not an appealing picture. I agree with the government moreover that this is one of those relatively rare cases where specific deterrence is clearly

called for and general deterrence surely is called for, for reasons already outlined.

There is no magic in the guidelines.  I pay as little attention to the guidelines as the law permits me to do, and that's very little.  Because they are, as I've gotten tired of saying, inherently irrational.

THE DEFENDANT:  Your Honor --

THE COURT:  But -- yes.

MR. TREANOR:  Your Honor, can I have a minute, please?

THE COURT:  Yes.

(Pause)

MR. TREANOR:  Your Honor, if I could have a minute, please?

(Pause)

MR. WILSON:  Your Honor in the interim I'll just pass up the order of forfeiture to your deputy.

THE COURT:  Yes.

(Pause)

THE COURT:  Counsel.

MR. TREANOR:  Your Honor, we're fine to proceed.

THE COURT:  All right.

So I am not being much affected, and rarely have, by the guidelines.  What I am affected by is the need for specific deterrence, for general deterrence, for the nature of the crime involved.  All of those, regretful to say, cut in favor of a

F1K9FAIS                         Sentence

sentence substantially above that of Mr. Shrem.

So the sentence of the Court is that the defendant is sentenced to 48 months in prison, in other words four years; to be followed by three years of supervised release on terms I'll get to in a minute.

No fine will be imposed because the defendant has already entered into a very substantial forfeiture agreement which the Court has now signed. There is, however, a special assessment of one hundred dollars that is mandatory and must be paid.

The terms of supervised release are:

First, the mandatory conditions that the defendant shall not commit any other federal, state, or local crime.

The defendant shall not illegally possess any controlled substance.

The defendant shall not possess any firearm or destructive device.

That the defendant shall cooperate in the collection of DNA.

The defendant, within fifteen days of his placement on supervised release, will submit to one drug test, to be followed thereafter by two other unscheduled drug tests as directed by the probation officer.

There will also be imposed the standard conditions of supervision 1 through 13. They appear on the face of the

F1K9FAIS                    Sentence

judgment and will be gone over with the defendant by the probation officer when the defendant reports to begin his period of supervised release.

Finally, there are the special conditions.

First, that the defendant is to report to the nearest probation office within 72 hours of his release from custody.

Second, that he will be supervised by the district of his residence.

Now, before I advise the defendant of his right of appeal and before we talk about surrender date, is there anything else that either counsel needs to raise with the Court?

Anything from the government?

MR. WILSON:  Two things, your Honor.

I think there were a couple of objections which were -- to the PSR which were resolved in a manner by probation.  If we could just confirm on the record that there are no continuing objections from the defense to the PSR?

THE COURT:  Yes.

Is that correct?

MR. TREANOR:  I'm sorry, your Honor?

THE COURT:  Are there any further objections, continuing objections to the PSR?

MR. TREANOR:  No, your Honor.

THE COURT:  Okay.

F1K9FAIS                        Sentence

MR. WILSON:  And the other is the government would move to dismiss the open counts.

THE COURT:  That motion is granted.

Anything from defense counsel?

MR. TREANOR:  Your Honor, a couple of things.

First of all, we ask that Mr. Faiella be designated to a facility where we can receive medical attention.

THE COURT:  Yes.  I have no power to order that but I will certainly recommend it.  It is well called for here.

MR. TREANOR:  Thank you, your Honor.

With regards to the current conditions of Mr. Faiella's supervision, obviously he's going to have to report to a facility.  He's had a lot of difficulty under strict pretrial supervision making medical appointments and the like.  I know your Honor may not be in a position to address a motion to adjust his supervision to regular pretrial supervision, but I thought I would raise it now in case it's not a good use of the Court's time to raise such a --

THE COURT:  If you want to make any alterations, jointly call my chambers with your adversary and I'll take them up.  I would only do it with the approval of the probation office, but anything that both the government and the probation office approve, I would be willing to hear.  Don't guarantee I'll accept it, but I may.

MR. TREANOR:  Understood, your Honor.

F1K9FAIS                    Sentence

THE COURT:  All right.  In terms of surrender, my courtroom deputy suggests Tuesday, March 3 at 2:00 p.m. so unless there's any objection to that, that's what it will be.

And Mr. Faiella, you have a right to appeal the sentence.

Do you understand that?

MR. TREANOR:  Your Honor, Mr. Faiella understands he signed away his right to appeal within the plea agreement, but --

THE COURT:  Yes.  I'm sorry.  Thank you for reminding me that because the sentence is below the 57 months or below 60 months, so you have previously waived your right of appeal.  So I have to rephrase that.

But you should talk with your counsel anyway to be absolutely sure because if there was any ground for appeal, and I don't see any, but if there were you would have to file your notice of appeal in ten days.

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  And if you do file an appeal and you can't afford counsel for the appeal, the Court will appoint one for you free of charge.

Do you understand that?

THE DEFENDANT:  Yes.  I understand.

THE COURT:  Very good.  Thanks a lot.

F1K9FAIS                        Sentence

MR. TREANOR:  Your Honor one just issue that I just wanted to just call your Honor's attention to.  Mr. Faiella had previously raised this with the government but he has considered back surgery and he is in discussions about when that surgery might take place.  It's not scheduled.  It's not even definite it's going to happen, but I just wanted to alert your Honor to that.

THE COURT:  Well I think you need to bring that to a head one way or the other because if he needs back surgery of course we want that to occur but I don't want to be -- receive a call a week before surrender date and say he has just decided to have back surgery.  So that needs to be addressed sooner rather than later but thank you for raising it.

THE DEPUTY CLERK:  Judge I assume he wants to surrender to the institution.

THE COURT:  Yes.

(Adjourned)

# EXHIBIT D

79atbahs                          Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                        06 CR 243 (LAK)

BOUBACAR BAH,

                Defendant.

------------------------------x

                                          New York, N.Y.
                                          September 10, 2007
                                          3:00 p.m.


Before:

                HON. LEWIS A. KAPLAN,

                                          District Judge


                    APPEARANCES

MICHAEL J. GARCIA
        United States Attorney for the
        Southern District of New York
ANIRUDH BANSAL
        Assistant United States Attorney

MICHAEL YOUNG
        Attorney for Defendant

(Case called)

THE COURT:  Good afternoon.

Mr. Young, have you and Mr. Bah had the presentence report for the necessary period and both read it?

MR. YOUNG:  Yes, your Honor.

THE COURT:  It will be sealed and made available to counsel in the event of appeal.

Are there any unresolved objections?

MR. YOUNG:  We had two objections which the probation department noted in the report itself.  One is in paragraph eight where it describes Mr. Bah's company as being involved in money laundering, and we submit that there was no evidence of that in this case, so we objected to that sentence.

And also paragraph 16 we objected to the amount that the government had estimated was involved in this offense.

THE COURT:  Well, are these outstanding objections?

MR. YOUNG:  Yes, we had noted them prior to the final probation report.

THE COURT:  But are you pressing them here?

MR. YOUNG:  Pardon?

THE COURT:  Are you pushing those points here?

MR. YOUNG:  Yes, we think that they're inaccuracies. Whether we're pressing them or not, the amount only becomes relevant if your Honor decides that the defendant does not qualify under 2S1.3B3, but both we submit are factually

incorrect.

THE COURT:  And probation's recommendation on 2S1.3B3 was?

MR. YOUNG:  That was defendant does qualify.

THE COURT:  And nobody objected to that?

MR. BANSAL:  We did, your Honor, in our letter of July 20th, indicate that the defendant had not carried his burden of establishing his entitlement to a safe harbor provision.

THE COURT:  Mr. Young, do you want to be heard on the 2S1.3B3 issue?

MR. BANSAL:  Your Honor, we issued a memorandum on August 31, a second memorandum after the government filed its letter.

THE COURT:  Well, that one, I frankly tell you, I don't have.  I don't know where it is.

MR. YOUNG:  I have a copy I could hand up to you.

THE COURT:  Sure.

MR. YOUNG:  I think we explained in some detail in this memo why the defendant does qualify under that provision.

THE COURT:  Well, what do you say in response, Mr. Bansal?

MR. BANSAL:  Your Honor, the portion of Mr. Young's response on the reckless disregard section -- I think that's where this fight is being fought here.  I think that with

respect to the other prongs, the government's argument is not as strong as it is with respect to the defendant's not having established that he didn't act with reckless disregard with respect to the sources of the funds. And primarily our argument is predicated on the fact that the defendant used this roundabout system with the black market currency exchange to transfer money, which is generally done in a much more direct fashion.

The things that the defendant says with respect to the steps he took, namely that he kept records, kept an OFAC list, while on the surface they may seem like that's an indication that somebody is actually taking care with respect to the source of funds, as I think this Court knows from other cases and in some regard with respect to this case, the fact that a defendant involved in the black market currency exchange keeps records is actually part of the black market currency exchange. These transactions are supposed to be papered as if they are legitimate transactions.

What is missing here and what does make it difficult to trace the flow of funds, contrary to what Mr. Young has said here, is the link of between what is happening in the United States and what is happening in Guinea in this case, the money being sent out. That, to an outside observer, is extremely difficult to trace, and that in fact is what the lack of transparency of this bill is what let the Banco Popular

employees to file a suspicious activity report.

So I would say that the mere fact that records are being kept, that an OFAC list is kept in Mr. Bah's residence doesn't mean that he took particular care with respect to the source of money, doesn't really belie the government's position that he acted with reckless disregard considering the means that he used to transfer the money.

THE COURT:  Yeah.  So?

MR. BANSAL:  Therefore, your Honor, so we would say that the defendant hasn't carried his burden to establish that he did not act with reckless disregard with respect to the source of funds and therefore does not qualify for the safe harbor provision of 2S1.1.

THE COURT:  But what about the point that this was a strict liability offense that involved no mens rea and that the shoe doesn't exactly fit this foot.

MR. BANSAL:  Judge, if that's an argument that this guideline doesn't apply to this crime, which maybe that's what the argument is, I don't see anything in the face of the guideline that says that.  This is a run of the mill 1960 offense.  Structuring, for example, doesn't have as an element any knowledge that there is something wrong with the source of the funds.  It's strict liability.

THE COURT:  But structuring is a little different. Structuring involves putting together packets of $9,900 because

you know there's a $10,000 threshold above which it's got to be reported. I don't mean literally 9,900 in every case, but you see what I'm driving at. And there is a level of culpability involved in a typical structuring case that is not necessarily involved in this case.

MR. BANSAL: Well, it may not necessarily be involved in the sense that one doesn't need to know there's a licensing requirement in order to violate this statute. But I think that Mr. Young would agree that this defendant did know that there was a licensing requirement partly by virtue of the fact that he actually applied for and received a license in New Jersey and this defendant therefore could not sit here and say I didn't know that a license was required for what I was doing.

MR. YOUNG: And he had a license.

THE COURT: And he had a license. You took the words right out of my mouth.

MR. BANSAL: That's true, Judge.

THE COURT: Look, the way I see this case is as follows: The argument about more conventional channels of transmitting money abroad works fine if the recipients are in Paris and Frankfort and Dublin, but I don't have any reason to question that it's not a viable alternative, or at least not a reliable alternative if the recipients are in Guinea or Sierra Leone. Do you have a basis to question that?

MR. BANSAL: Judge, I don't know enough about the

79atbahs                    Sentence

banking system there, and I don't have the basis to tell you, Judge, that the system is completely as reliable as it is here and it can be used. But what I can tell you is the only thing that the Court has to say to support Mr. Bah's word on that is really Mr. Bah's word. And I think that -- well, I can say with confidence that Mr. Bah's level of candor on the witness stand and the way that he testified should lead the Court to question whether he's telling the truth on that.

THE COURT: Well, look, I don't have to rely on him entirely for that. Without meaning to be critical of anybody, I think we all know in general -- whether it applies in this specific factual circumstance, I'm not sure, of course -- but we all know in general that conditions in sub-Saharan Africa bear no resemblance to what we regard as modern civilization.

There's a piece in the *Times* this morning about the almost complete unavailability of pain killing drugs in sub-Saharan Africa, such that -- and I may quote the figures slightly wrong because this morning it's a newspaper report and now it's suddenly relevant, but the per capita use of morphine in the United States is over 17,000 what it is in sub-Saharan Africa. That tells you something. Obviously I can't rely on that wholly, but really, it's common knowledge that life in sub-Saharan Africa is not remotely approaching American and Western European standards. It may be deplorable, but it's life, it's the fact. So it's not much of a reach to ask me to

believe that whatever the banking system is down there, it doesn't work too well.

MR. BANSAL:  I certainly can't quarrel with that or the Court's overall point that life is different over there.  I would point out that we have more to indicate -- more than simply the black market currency exchange to indicate something wrong was afoot here.  And we're not asking the Court to rely on a cooperator who couldn't be trusted to come to court or even to stay in the country, I recognize that.  But what you do have is the fact that narcotics traffickers were arrested and that in their possession were business cards that indicated, at least, that they were transferring money through this defendant's business.

So it's not the mere fact of using the black market currency exchange, it's there is some indication that actual narcotic proceeds were sent through the defendant's place of business because of the seizure of those cards from these narcotics traffickers.  And that brings into play the subsection B of 2S1.3B3, which -- sorry, subsection C, which says that the funds have to actually be the proceeds of lawful activity.

Now I know that Mr. Young is going to say there was a restaurant there and there were other things going on there, that it doesn't necessarily follow from the fact that a business card is in someone's pocket that they sent money

79atbahs                    Sentence

through a particular business.  But it all adds to the overall mix of information that the Court has, and that the black market currency exchange -- it seems to me it makes it very difficult for Mr. Bah to stand here and simply say that I use the black market currency exchange only because the banking system is corrupt.  And by the way, to say that I'm using the black market currency exchange because the banking system is corrupt doesn't foreclose that I am closing my eyes to what the actual --

THE COURT:  But that was only the first point I was going to make.  First of all, there is an arguable understandable human need for the service that was being provided that was not being met by well-established legal institutions and organizations, first proposition.

Second proposition is we have a man here who has got a lot of entrepreneurial spirit.  Sometimes that's bad, but more often than not it's not a bad thing.

Thirdly, he got organized in this business and a day came when he realized he needed a license.  And New York required a half a million dollar bond, as I remember it, and he didn't have the wherewithal to come up with a half a million dollar bond, and he found out he could get a license in New Jersey.  So he went and got a license in New Jersey and he had an office in New Jersey.  Now he had this restaurant uptown.

Is it -- put aside the letter of the law, I understand

SOUTHERN DISTRICT REPORTERS, P.C.                (212) 805-0300

the letter of the law -- such a stretch in somebody's mind to say well, I got the license, so what if somebody drops the money off at the restaurant in New York and I deal with it through New Jersey.  I satisfied the point of the law anyway because I have a license.  I'm not saying that's right, I'm not saying that excuses the crime, but it's kind of understandable.

So I look at this whole thing and I say look, I understand all of the focus in Washington that is rightly being put on the black market currency exchange.  I understand all of the implications it has both for narcotics and for terrorism. I understand all that, very important.  But I wonder whether as a matter of justice in this case to this individual this rather nice abstract point is such a big deal.

MR. BANSAL:  Judge, I'm speaking much more to the letter of the guidelines.

THE COURT:  Of course, I understand that.

MR. BANSAL:  These are issues that frankly I am happy to leave to the Court's judgment whether, not withstanding the applicability of the guideline, there are some other factors which might make a sentence that is called for in this case not necessarily the lowest one that the Court deems appropriate. We take the position that the guidelines, being the collective wisdom of the courts and the sentencing commission, do take virtually all normal instances into account.  But with this Court I'm actually happy to kind of leave that decision to your

79atbahs                    Sentence

Honor.

THE COURT:  Well, if you got both enhancements that you're asking for, where would we be on the guideline range?

MR. BANSAL:  Just a minute, your Honor.  It would be at 63 to 78 months.

THE COURT:  And if you got this enhancement but not the obstruction enhancement?

MR. BANSAL:  That's actually the one that we did not calculate in the last paragraph, so I would have to take a moment, your Honor.

THE COURT:  Well, obstruction is three levels.

MR. BANSAL:  So it would be a 23, two-level enhancement, Judge, for obstruction.

THE COURT:  So 51 to 63.

MR. BANSAL:  Yes, Judge.

THE COURT:  See, I just don't see a sentence approaching either one of them in this case.  Now where short of that I were to go, I'm not sure.  But I think in the last analysis that I'm not going to resolve either the obstruction enhancement issue or the 2B1.3 issue because neither is material in my view in this case.

I'm not going to impose a sentence as high as 46 months regardless because of the 3553 factors, taking into account this defendant and the nature and circumstances of this offense, most notably the fact that in almost all respects he

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

79atbahs                    Sentence

seems to have been trying to run his operations in accordance with the law, as evidenced by getting the license in New Jersey, as evidenced by his use of the OFAC list, as evidenced by the fact he had an established place of business in New Jersey to run this money transmitting business.  I just don't think this man is a threat.  And I think a guidelines sentence would be far more than is necessary to make the point that needs to be made in this case.

MR. BANSAL:  Judge, the way that the proof -- the available proof came out at trial and the way the record stands before the Court I don't think I have anything to add to the mix of facts before the Court on that issue.

THE COURT:  Okay.  I thank you.

Mr. Young?

MR. YOUNG:  Yes, your Honor.  I would respectfully submit, your Honor, that a guidelines sentence, along the lines of what the probation department interpreted the guidelines as being, would be entirely appropriate in this case.

The probation department basically said the defendant is at level 6 because he qualifies under 2S1.3B3 and that he is entitled to a two-level reduction for acceptance of responsibility because all along he has admitted all of the facts related to the crime here.  He admitted that he didn't have a license in New York, he admitted that he had received -- accepted money at the restaurant in New York for processing

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

through New Jersey.  So he admitted all of the facts that ended up forming the basis for the jury's conviction.

Given that he admitted all those, he should get acceptance of level of responsibility points.  That would take it down to level four.

THE COURT:  Well, the difference between level six and level four is not material, and I'm certainly not giving acceptance of responsibility points to someone that went to trial.  So let's not push too far.

MR. YOUNG:  All right.  Let me simply say that at level six that is an appropriate guidelines authorized sentence.  The probation department certainly thought it was an appropriate guidelines authorized sentence.  So your Honor doesn't have to go outside the guidelines in order to find a sentence here.  I think any sentence, your Honor, that was above that level would be excessive in this case.  It would be much more than is necessary to enforce the goals of sentencing as described in 3553.

This defendant is industrious, he has a very big heart, he works very hard for the people in the Guinean community.  He is one of the leaders up there.  He set up the system because he thought it would help those people as well as their relatives in Africa.  I don't think he had any idea that what he was doing was somehow in violation of the law, and of course he wasn't required to have any idea because it's a

strict liability offense.

The jury concluded that his activities in New York were sufficient to constitute operating an unlicensed money transmitting business in New York.  Mr. Bah had no idea that that was the case, and he thought that because he had the license in New Jersey he was authorized to do what he did in New York.

He fully accepts that he is now convicted of a crime. His business has been devastated by all this.  He has already, your Honor, been severely punished, severely punished.  And I ask your Honor to consider that that punishment is more than adequate for this offense and that your Honor would impose the sentence of one year probation and the thousand dollar fine that the probation department has recommended.

Thank you.

THE COURT:  Thank you.

Mr. Bah, is there anything that you would like to say before you're sentenced?

THE DEFENDANT:  No, sir.

THE COURT:  Mr. Bansal, anything else?

MR. BANSAL:  Your Honor, I have just a point to make very briefly on the obstruction of justice issue.  Mr. Young brought up the point that Mr. Bah was unknowing with respect to what was the law was on money transmitting at the time that he was operating the business.  That doesn't speak to his state of

mind at the time that he proffered with the government and at the time that he testified, both of which times he was counseled. There could have been no mistake of what the law in this area is, and he maintained two things that is patently false. One is B&S Bah was never a money transmitting business, and two, that he never operated a money transmitting business prior to 2002. There are reams of documents that were submitted to the jury and that the Court saw.

THE COURT: B&S Bah was the restaurant; right?

MR. BANSAL: I think the restaurant was called something different.

MR. YOUNG: B&S Bah was the business in New York that operated out of the restaurant, and it was really an import/export business and ran the restaurant as well. It was all at the same location. It's hard to differentiate the different segments of it.

MR. BANSAL: He calls it an import/export business, but there are business cards where he's holding it out as a money transmitting business. So to sit here or even sit in a proffer and say I never operated this company as a money transfer business and I never operated the money transfer business prior to 2002 --

I just honestly picked a card out of this folder of evidence and it happened to be Exhibit 170, which has Boubacar Bah, B&S Bah Enterprises, Inc., money transfer and shipping.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

By the time he testifies I don't see how he can truthfully say he was not operating a money transfer business out of this location.

MR. YOUNG:  The jury found he was truthfully saying that because they acquitted him.

THE COURT:  They didn't find that he was truthfully saying that.  I think the jury -- they didn't convict him, and I think the jury was impressed by the language and accent issues.  That's my recollection of it.

MR. YOUNG:  You mean that the agents might have misunderstood or he might misunderstood?

THE COURT:  Yes.

MR. YOUNG:  In any event, throughout the trial I didn't think that what he was doing in New York constituted operating an unlicensed money transmitting business.  I still think it's a viable issue.  He thought that once he had the license in New Jersey it was okay to accept money in New York. So he was not lying when he told the agents that.  And Mr. Bansal is correct, he was counseled in those proffer sessions and counsel thought he was telling the truth.

THE COURT:  Okay.  Thank you.

Please stand for the imposition of sentence, Mr. Bah.

Mr. Bah, I have said a lot of what I wanted to say already but I haven't said absolutely all of it.  I'm certainly inclined to the view that this all began because you were

genuinely trying at the same time both to meet what you perceived to be a legitimate need by members of your community for a safe and trustworthy means of sending money to Africa, and because it provided you with an opportunity to make a dollar. And there's nothing wrong with that, that's what built this country. And those are things for which I and people generally would have respect, and there's no doubt about that. I think the fact that you have come to this country to make a better life and you are working hard to do it is just the greatest. That's what my ancestors did and that's what I hope people are doing hundreds of years from now. That's what built this country. So that's all laudable.

You did cross over the line here, and there's no doubt about it. I didn't disagree with the jury's verdict. What I would have thought if this was a crime that required what we lawyers typically refer to as criminal intent, that is, that if this would have been a crime only if you knew you were doing something wrong, I'm not sure what I would have thought about that. And I have thought a lot about it since and I'm still not sure.

But this, as it was charged, was a very highly technical crime. A crime nevertheless, but very highly technical, and I'm taking that into account. Whether you thought you were totally covered by the New Jersey license or whether you thought that you had the New Jersey license and you

SOUTHERN DISTRICT REPORTERS, P.C.                    (212) 805-0300

were just going to skate closer to the line than maybe you should have and you kind of understood that it was risky, I'm not really sure, but I have taken into account in evaluating how serious a crime it was.

The thing that bothers me most about the case, I think, is that I'm not really convinced you always told the truth about what was going on.  The points Mr. Bansal made just a minute ago strike a pretty responsive cord with me.  I'm not going to make a finding of obstruction of justice formally, but I'm going to take into account in fixing a sentence my sense that there's a pretty decent possibility that maybe you were not fully candid all along, language difficulties or accents notwithstanding.

But at the end of the day, taking into account all the factors related in the Sentencing Reform Act, including what I have come to learn about you, which of course is limited but I have come to learn something, and the nature and circumstances of the offense and the need to deter others and my very clear sense that you have learned your lesson in this case and won't take another chance like this, if indeed that's what you did as opposed to doing something that you knew was wrong, I think the appropriate sentence is this:

It is the judgment of this Court that you be committed to the custody of the Attorney General of the United States or his designee for a term of probation of one year, that you pay

a fine of a thousand dollars and that you pay the mandatory special assessment of a hundred dollars.  It's further adjudged that you forfeit to the United States your interest in the assets and property of B&S Bah Enterprises, Inc., the contents of Banco Popular account number 0909700128916 held in the name of B&S Bah Enterprises, and the contents of Wachovia Bank, account number 200009079920, held in the name of B&S Bah Enterprises.

The term of probation shall be subject to the mandatory and the standard conditions of supervision one through thirteen in addition to the following special conditions:

First, you shall not engage in the business of money transmitting without obtaining and maintaining all required licenses.

Second, you shall provide the probation officer with any financial information he or she may request.

Third, you shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the requirement of the payment of the fine.

Fourth, you shall comply with the conditions of home confinement for a period of six months commencing on a date to be determined by the probation officer.  During the period of home confinement you shall not leave your residence except to

79atbahs                        Sentence

conduct your regular business activities and to obtain emergent medical care for yourself and your spouse, and for such other activities as the probation officer may approve in advance.

Finally, you are to report to the nearest probation office within 72 hours. And I suggest you do it before the day is out.

Two more conditions of the probation: First, you shall cooperate in any proceedings that the Bureau of Customs and Immigration Services may institute. And secondly, if you are deported or removed from the United States, you shall not re-enter the United States illegally.

In saying that I want to be clear, since there are other persons present who may not understand the law, that the Court has nothing to say about the question of deportation. It's not up to me at all, it's up to the Customs and Immigration Service. I am simply providing that if the result of all this is deportation or removal, re-entry would not only be illegal but it would violate the terms of probation.

The mandatory drug testing condition is suspended because I find a low risk of substance abuse.

I advise you, Mr. Bah, that you have the right to appeal from the judgment embodied in this sentence. If you wish to appeal you must file a written notice of appeal no later than ten days after the date on which judgment is entered, which could conceivably be as early as this afternoon.

In the event you wish to appeal, you must file a written notice of appeal with the Clerk of the District Court no later than ten days after the date judgment is entered, which may be today.

If you wish to appeal and you can't afford to pay the fees necessary to do that, you have the right to apply for permission to appeal as a poor person, and if that application were granted you would be permitted to appeal without paying fees.

Is there anything further?

MR. BANSAL:  Yes, your Honor.  The defendant was convicted on count two of the S1 indictment, and we just ask that the underlying indictment as well as the other counts that he was acquitted on, count one of the S1 indictment -- which we're exactly in the same position we were in April -- be dismissed.

THE COURT:  Granted.

Anything further?

MR. BANSAL:  No.

MR. YOUNG:  One thing in connection with the home confinement.  The defendant is a practicing Muslim.  I assume he would be allowed to leave for religious purposes.

THE COURT:  No.  It has nothing to do with whether a he's a Muslim or anything else, but no.  People can pray in their homes.

79atbahs                    Sentence

MR. YOUNG:  Okay.

o0o

# EXHIBIT E

1C18YOUS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                              10 Cr. 813 (JFK)

MOHAMMAD YOUNIS,

         Defendant.

------------------------------x

                                  December 1, 2011
                                  3:20 p.m.

Before:

                  HON. JOHN F. KEENAN

                             District Judge

                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JEFFREY BROWN
JOHN CRONAN
    Assistant United States Attorneys

PHILIPPE SOLAGES
GINO L. GIORGINI III
    Attorneys for Defendant

1C18YOUS

(Case called)

THE COURT:  This is in the matter of United States of America against Mohammad Younis.

The defendant is present.  Mr. Brown is present for the government, as is Mr. Cronan.  Mr. Solages is here representing the defendant, and we have Mr. Giorgini who is also here with Mr. Solages for the defendant.

First of all, the record should reflect that I received the defendant's extensive submission and the letters that were also submitted to me, and the defendant's submission came to me on November 17, 2011, and I also received several letters in support of the defendant.  I received those primarily on November 7, 2011.  I have obviously read the government's submission.  I have read the probation report.  The government's submission I received on November 28, I read that.  I read the probation report and Mr. Solages' submissions.  The probation department recommends a sentence of probation.

I will hear you on sentence if you're ready for sentence, Mr. Solages.

MR. SOLAGES:  Thank you, your Honor.

THE COURT:  Are you ready for sentence, sir?

MR. SOLAGES:  Yes, I am.

THE COURT:  Have you gone over the probation department report with Mr. Younis?

1C18YOUS

MR. SOLAGES:  Yes, your Honor.

THE COURT:  Do you have any objections to the report?

MR. SOLAGES:  No, your Honor.

THE COURT:  All right.  I will hear you on sentencing.

MR. SOLAGES:  Thank you.

Good afternoon.  May it please the Court.

As the Court just indicated, the Department of Probation conducted a very thorough investigation and prepared a presentence report.  And in that report, the Department of Probation is recommending a sentence of three years' probation. The defense agrees with the Department of Probation's recommendation, and we are respectfully requesting that you impose a sentence of probation.

A probationary sentence is fair because of a variety of reasons.  First and foremost, Mr. Younis cooperated with the authorities since he was initially contacted, since day one. Upon being initially contacted, Mr. Younis voluntarily went to the FBI offices on at least three different occasions in Melville, Long Island to cooperate.  Mr. Younis, after retaining counsel, continued his meetings with the authorities, and we met with the authorities on two occasions here in Manhattan.  Mr. Younis supplied the government with valuable information regarding hawala and informal value transfer systems conducted here in America.  Mr. Younis was even cooperative in complying during his arrest.  The Court should

1C18YOUS

give him great consideration for his cooperation.

In addition, Mr. Younis has already suffered a great deal of punishment. He has dealt with the embarrassment of being arrested. He also has had his livelihood taken away from him. Once his former employer discovered that he had been arrested, he lost his job, and he is someone who has continuously worked since he has been here in America.

He is now also a convicted felon. His ability to work now is going to be severely undermined. In addition, he is going to have to deal with other adverse collateral consequences of having a felony conviction, but most importantly, it's dealing with the inability for him to work, and he is a hard-working man.

He is not a threat to the community. He has no prior criminal background whatsoever. He has no propensity for violence. This is a regulatory offense that he pled to. And even the government consented to his release at arraignment, which shows that he is not a threat to society.

Another reason that this Court should consider a sentence of probation is because he accepted responsibility. He acknowledged it in open court. He wrote a letter apologizing to the Court and, most importantly, his cooperation is indicative of his acceptance of responsibility.

The Court should also consider that Mr. Younis was not enriched by his actions and his conduct. He was living a very

1C18YOUS

modest lifestyle.  He does not own a home.  He rents a ground-level apartment in Centereach, Long Island, which is a working class community.  When the FBI searched his home, they did not find any major valuables, no money, no jewelry, and, most importantly, the presentence report even indicates that Mr. Younis has no major assets and he lives a very modest lifestyle.

Something the Court should also remember and it's an undisputed fact that he did not know how the recipients of the funds were going to utilize --

THE COURT:  That's the whole key to the case, what you just said.

MR. SOLAGES:  Correct.  It is the key to the case.

THE COURT:  Just to make that crystal clear, that's the key to the case.  He didn't know what was going to happen to the money, and the government has acknowledged that unequivocally.

MR. SOLAGES:  And it's acknowledged in the presentence report as well.  And I am happy that the Court realizes that because that is the key to this case.

Mr. Younis has been married for over a decade and he has a 12-year-old daughter.  He has strong contacts in his community.  We submitted several letters to the Court, and in those letters members of the community give him praise and support, and he has friends and family that support him here

today.  He is a father and a husband who supports his family as a horticulturist, in which he has a college degree.

Prior to his arrest, he had always maintained continuous employment.  I have to stress that because that's important.  He is an outstanding, productive member of society, and this man is a perfect candidate for probation.  He is the perfect candidate for community based supervision because he is responsible.  He has made all his court appearances.  In addition, he has no history of violence, no history of drug abuse, no history of alcohol abuse.  And, most importantly, since September 15th of 2010, he has been under the supervision of pretrial services.  And he has been fully compliant with all of the directives of pretrial services, and that fact is corroborated in the presentence report.

Now, as the Court is well aware, he pled under a plea agreement, and under that plea agreement it calls for a guideline range of 0 to 6 months.  As the Court first mentioned, the presentence report specifically recommends a sentence of three years' probation without a fine.  And the defense agrees with the Department of Probation.  As a result, this Court should follow probation's recommendation and impose a sentence of three years' probation.

On behalf of my client, I am asking the Court to take leniency on him because he is deserving of it.  Thank you.

THE COURT:  You are complete in your statement, is

1C18YOUS

that correct, Mr. Solages?

MR. SOLAGES:  Yes, your Honor.

THE COURT:  All right.  Fine.

Now addressing the government, Mr. Cronan, do you wish to be heard?

MR. CRONAN:  Yes, your Honor.

THE COURT:  Fine.  I have read your submission.  I understand you want a guideline sentence.  A guideline sentence is 0 to 6 months.

MR. CRONAN:  I will be brief because I think many of the facts are not really in dispute here.

I will note that Mr. Solages has talked about his client cooperating.  Cooperation is a bit of a term of art. His client gave a confession after his arrest, just to be clear.

THE COURT:  It's not 5K1.1 cooperation.  He made a statement to the authorities, and in the statement he apparently was truthful and he indicated what he had done.  OK.

MR. CRONAN:  Your Honor, I think --

THE COURT:  Is that a fair statement what I just said?

MR. CRONAN:  That is, your Honor.  At least by the end of his statements to the authorities, I will say he was complete with us.

THE COURT:  OK.

MR. CRONAN:  Your Honor, this case, I think,

demonstrates the unintended danger of a crime that may otherwise seem relatively harmless. As your Honor noted, Mohammad Younis had no knowledge as to what Faisal Shahzad intended to use the money that he provided for. But violent criminals, including people who are seeking to harm this country, need to be funded often by their criminal organizations. And when people provide hawala services like this, it's an avenue to provide that funding. Here the amount was low, as Mr. Solages points out in his submission. It was $12,000 in total, 7,000 going to Faisal Shahzad. That's why the guidelines range is so low. But for someone like Faisal Shahzad, that $7,000 was essential. That's what he needed to do what he wanted to do against our city.

Your Honor, I think for those reasons, it's important that a message be sent very clearly that unlicensed money transactions, especially when absolutely no effort is made to see where the money is going, cannot be tolerated in our country, and deterrence is particularly important in this case.

THE COURT: OK. Thank you.

Mr. Younis, please rise.

Is there anything you wanted to say, sir? If there is, you go right ahead.

THE DEFENDANT: I just want to repeat again, like I said, I am truly sorry about what I did. I did something against the law, but it will not happen ever, ever again.

1C18YOUS

THE COURT:  What Mr. Cronan said is very important. We have laws, and the reason we have laws is to prevent harm to society and, among other things, to American people.  What you did was in a sense innocent, in the sense that you didn't know what was going to be done with the $7,000 that you got from your brother.  But you shouldn't be doing that.  It's illegal to be a hawaladar or to engage in hawaladar transactions in the United States.  There is a good reason for that, and this case is illustrative of the reasons.

I have read, as I indicated, the probation report of November 22, 2011.  The probation report, as I indicated at the very beginning, recommends a sentence of probation and recommends no fine.  I disagree with the probation department about the fine aspect.  I know you're not working now, but we will get to that in a moment because I do think there has to be a certain deterrent effect here.

The guideline range of 0 to 6 months is obviously only advisory.  It's not binding upon me.  I have considered Title 18 of the United States Code, Section 3553(a), and its pertinent subdivisions.  I have carefully read all of the submissions of November 7, yours and your friends' and relatives' letters, the government submission of November 28, and Mr. Solages's sentencing memorandum of November 17.

On Counts One and Two, it is ordered that the defendant be placed on probation for a period of three years.

1C18YOUS

That's three years on each count, and the terms of probation are to run concurrently and not consecutively.

The terms of probation are to be under the mandatory and standard conditions.  Plus, I am setting the following special conditions:

That the defendant provide probation with access to any requested financial information;

That the defendant obey the immigration laws and comply with the directives of the immigration authorities; and

That the defendant submit his person, his residence, his place of business, his vehicle, or any other premises under his control to search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of release may be found.  Any search is to be conducted at a reasonable time and in a reasonable fashion.  Failure to submit to search may be grounds for revocation of supervised release.  The defendant is to inform any other residents that the premises may be subject to search pursuant to this condition.

A special assessment of $100 is ordered on each of Counts One and Two for a total special assessment of $200.

Now, although the probation department says we don't believe that the defendant has the ability to pay a fine and recommends that the fine be waived, I don't agree with them. You are an intelligent fellow.  You are a college graduate.

1C18YOUS

You will probably get a job.  The fine range here is from 1,000 to a top of 10,000.  I am ordering a fine of $2,000.  That's to be paid in equal installments of $1,000 each, unless you want to pay it earlier.  $1,000 is to be paid by December 31, 2012, and the second $1,000 is to be paid by September 1st of 2013, which gives a good period in between.

As I understand it, the forfeiture order of August 8, 2011 is still in effect.  Is that correct, Mr. Cronan?

MR. CRONAN:  Yes, your Honor, it is.

THE COURT:  I am ordering an additional monetary fine of $12,000, which is to be forfeited to the United States. That's the amount of money that he received in this hawaladar transaction from his brother and directly from his brother overseas.  So the fine is $2,000, which is within the guideline range.  And the sentence of probation is within the guideline range because the range is 0 to 6 months.

That's the sentence of the Court.  Both sides are advised of their limited right to appeal since this is a sentence within the guidelines.

MR. CRONAN:  I think the Court mentioned that you were sentencing him to Counts One and Two.  The defendant only pled guilty to Count Two of the indictment.

THE COURT:  You are right.  On August 18 he only pled guilty to Count Two.  So the special assessment is fixed at $100, not 200.  And the period of probation is on Count Two of

1C18YOUS

three years.  The fine is on Count Two of $2,000.  The forfeiture as ordered is required.

Does the government have a motion as to Count One?

MR. CRONAN:  The government moves to dismiss Count One.

THE COURT:  The application is granted.

Now, look, Mr. Younis, stay out of trouble, because I have control over you for three years.  I was to the doctor last week.  In spite of my age, he says I am in pretty good shape.  If you end up fouling up and you come back before me, you see the door to your left, you know what's in there, do you?

THE DEFENDANT:  Yes, behind the bar.

THE COURT:  The jail.  That's where you will go if you violate the terms of probation.  So behave yourself.

MR. SOLAGES:  Thank you so much.

oOo

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      -v.

DAVID YOUNGER

           Defendant.

16 Cr. 348 (JSR)

**ORDER**

Upon all are prior proceedings and submissions by the parties in the above-captioned case the Court hereby:

1. **AMENDS** the prior judgment in this case to indicate that the Court recommends to the Bureau of Prisons (BOP) that the BOP designate the defendant to a Residential Reentry Center (RRC), specifically the RRC in Bronx, New York for the service of the four month prison sentence imposed by the Court in this case so that defendant may continue to work at his medical practice and attend to patients' needs at said practice;

2. **ORDERS** that if the BOP adopts the aforesaid recommendation, then, per defendant's express consent given in open court on 1/31/17, during defendant's service of this sentence at the RRC all earnings from his medical practice, less the mandated percentage of earnings due to the BOP for subsistence expense during defendant's stay there, be given by defendant to the American Cancer Society, headquartered in Atlanta, Georgia;

3. **ORDERS** that by February 8, 2017 defendant submit to the Court for the Court's approval a specific plan for verification that all defendant's earnings from his

medical practice during the time period in which he serves his sentence at the RRC are given by defendant to the American Cancer Society, headquartered in Atlanta, Georgia;

4. **ORDERS** that the defendant's surrender date be stayed until February 20, 2017 to allow the Bureau of Prisons time to evaluate the recommendation for designation encompassed in this Order;

5. **ORDERS** that notice of this order be forwarded forthwith to the United States Marshals Service (USMS) and the Probation Office (USPO), Southern District of New York, and that the USMS and USPO deliver a true copy of this order to ECHO Team at the Federal Bureau of Prisons, Designation and Computation Center.

**IT IS SO ORDERED**

New York, New York

February ___1___, 2017

Hon. Jed S. Rakoff
United States District Judge