UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LUIS DIAZ, JR., and LUIS JAVIER DIAZ,<br><br>*Defendants*. | 17 Cr. 77 (WHP) |

## DEFENDANT LUIS DIAZ, JR.'s SENTENCING MEMORANDUM

SELENDY & GAY PLLC
Christine H. Chung
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9009

Attorneys for Defendant Luis Diaz, Jr.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 5

I.      Mr. Diaz's Personal History and Characteristics Are Exceptional................... 5

        A.      Mr. Diaz's Personal History ............................................................... 6

        B.      Mr. Diaz's Characteristics.................................................................. 9

                1.      Mr. Diaz's Devotion to His Family.......................................... 10

                2.      Mr. Diaz's Integrity and His Law-Abiding Nature .................... 13

                3.      The Impossibility that Mr. Diaz Would Do Anything that Might
                        Put His Family in Harm's Way................................................. 16

                4.      Mr. Diaz's Generosity and Care-Taking of Others..................... 18

II.     The Nature and Circumstances of the Offense Weigh Against Imposition of a
        Term of Incarceration ....................................................................................... 20

III.    The Court Should Vary or Depart from the Sentencing Guidelines Range ... 26

        A.      The Guidelines Range Calculated by the Probation Office ................. 26

        B.      Objection to the Guidelines Range Calculation ................................. 27

        C.      The Court Should Depart or Vary from the Guidelines Range, Which
                Grossly Overrepresents The Seriousness of the Offense...................... 29

IV.     The Sentence Sufficient To Serve the Purposes of Punishment Does Not
        Require Incarceration ...................................................................................... 36

V.      The Need To Avoid Disparities Militates in Favor of a Non-Incarceration
        Sentence ......................................................................................................... 41

VI.     The Government Has Not Identified Any Need for Restitution ..................... 42

VII.    The Kinds of Sentences Available Make It Appropriate Not To Subject Mr.
        Diaz to Incarceration ...................................................................................... 42

CONCLUSION...................................................................................................... 43

# TABLE OF AUTHORITIES

**Cases:**

*Gall v. United States*
  552 U.S. 38 (2007) ...................................................................................... 26

*Staples v. United States*
  511 U.S. 600 (1994)...................................................................................... 22

*United States v. Adelson*
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................................... 6

*United States v. Bah*
  2008 WL 6991016 (2d Cir. Feb. 4, 2008) ................................................... 35

*United States v. Bah*
  574 F.3d 106 (2d Cir. 2009) ................................................................. 21, 35

*United States v. Banki*
  685 F.3d 99 (2d Cir. 2011) .......................................................................... 21

*United States v. Eckstein*
  2016 WL 546663 (D. N.M. Feb. 3, 2016)..................................................... 28

*United States v. Elfgeeh*
  515 F.3d 100 (2d Cir. 2008) ................................................................... 2, 20

*United States v. Mazza-Alaluf*
  621 F.3d 205 (2d Cir. 2010) ........................................................................ 21

*United States v. Murgio*
  209 F. Supp. 3d 698 (S.D.N.Y. 2016) ......................................................... 21

*United States v. Velastegui*
  199 F.3d 590 (2d Cir. 1999) ............................................................. 3, 20, 21-22

**Statutes:**

18 U.S.C. § 1956.............................................................................. 20, 27, 29

18 U.S.C. § 1960................................................................................ *passim*

18 U.S.C. § 3553(a) .......................................................................... *passim*

18 U.S.C. § 3621.......................................................................................... 42

18 U.S.C. § 5322.......................................................................................... 30

31 U.S.C. § 5313 ................................................................................................... 30

31 U.S.C. § 5314 ................................................................................................... 30

31 U.S.C. § 5316 ................................................................................................... 30

31 U.S.C. § 5318 ................................................................................................... 30

**Other Authorities:**

2015 Annual Report (2015), U.S. Sentencing Commission ..................................... 28

*Alternative Sentencing in the Federal Criminal Justice System*
   U.S. Sentencing Comm'n, (Jan. 2009) ..................................................................... 40

*Retool Mandatory Sentences*
   Hon. Raymond Dearie, New York L.J. (June 24, 2016) ......................................... 40

*Why the Federal Sentencing Guidelines Should be Scrapped*
   Hon. Jed S. Rakoff, 26 Fed. Sent. R. 6 (2013) ........................................................ 32

**Sentencing Guidelines:**

18 U.S.S.G. § 2S1.1 .......................................................................................... 26, 27, 28

U.S.S.G. § 2B1.1 ............................................................................................... 26, 28, 31

U.S.S.G. § 2S1.3 ...................................................................................................... *passim*

Defendant Luis Diaz, Jr., by and through undersigned counsel, respectfully submits this Sentencing Memorandum to aid the Court in its determination of a fair and just sentence.

### INTRODUCTION

Luis Diaz is a 76 year-old grandfather, patriarch of his extended family, and family business owner.  Even in a country where immigrant success stories are not rare, Mr. Diaz's is exemplary.  Mr. Diaz was born and raised in Cuba, where he had a happy childhood and attended Catholic school in a Havana neighborhood with his sisters and cousins.  As Mr. Diaz was finishing high school, however, in 1959, Fidel Castro had triumphed in his armed revolution and declared himself head of state. Mr. Diaz left Cuba to attend college in the United States, at Georgia Tech, in Atlanta, Georgia.  He briefly returned to Cuba in March of 1960 to visit his family.  By then, Castro's communist government was nationalizing private businesses, persecuting Catholic institutions, and indoctrinating school children.  Mr. Diaz's family saw that they too must leave Cuba, and they departed for the United States in 1961, never to return.

In the now nearly six decades since he left Cuba, Mr. Diaz fulfilled his dreams for his life in America.  He obtained his college degree, married another Cuban émigrée, Lucy Amezaga, in 1966 (52 years ago), and obtained his U.S. citizenship. After stepping from one successful job to the next working for others, in the United States and abroad, he settled in Miami, by which time he and his wife had four children.  In 1983, he started his own business, Miami Equipment and Export ("Miami Export"), which sold and exported heavy machinery mainly to Caribbean and

Central and South American countries.  Through hard work, he was able to nurture the business, which in turn grew to employ and sustain his family.  He and Lucy's five children, now ranging in age from 40 to 51 years, have themselves had nine children, aged three months to 21 years.  In Miami, Mr. Diaz functions as the head of an extended family that encompasses the family of his wife and close friends that he has made through the Cuban-American community, his business, and his church.

Just over two years ago, on May 16, 2016, the life Mr. Diaz had worked so hard to build for his family came crashing down.  Agents raided his business in execution of a search warrant and carted away computers and nearly 50 boxes of files.  The Department of Justice seized nearly $400,000 of the company's earnings by the end of 2016.  When Mr. Diaz and his son were arrested five days before Christmas, in 2016, the company's struggle to maintain some semblance of its operations ended, as banks closed the company's accounts and clients fled.  Mr. Diaz and his son Luis Javier began a different struggle, to maintain their liberty.

The nearly unique circumstance in this case is that the government's charge, and the defendant's undoing, was *not* knowingly breaking the law, or even engaging in behavior that was morally or ethically wrong.  Instead, Mr. Diaz and his son were charged with operating an unlicensed money transmitting business:  conduct denominated a crime in Title 18 but defined by Congress, following the September 11, 2001 attacks, *not* to require a knowing violation of the law or even knowledge of the requirement to license the business.  *United States v. Elfgeeh*, 515 F.3d 100, 132 (2d Cir. 2008).  Mr. Diaz therefore faces the prospect of imprisonment based on having

committed a strict liability crime—at worst, of not having been more *careful* than he should have been.  The scenario is extreme.

Moreover, because the government exercised its discretion to charge conspiracy and money laundering in addition to the operation of an unlicensed money transmitting business, the maximum statutory penalty is not the five-year term that would have applied to the Section 1960 charge that itself encompasses all the conduct at issue.  Instead, the maximum is twenty years' imprisonment, despite the fact that the conduct underlying the money laundering charge is conceded by the government to be, in this case, the very *same* conduct that underlies the charge of operating an unlicensed money transmitting business—the transmitting of funds that, by the act of transmission itself, "promoted" the money transmitting business, irrespective of any bad intent.

Put simply, Mr. Diaz will likely come before the Court exposed to something like a 151-188 month Guidelines range although the government did not prove, or try to prove, that he was aware he was breaking the law or that he should have obtained a license.  Moreover, although the legislative intent behind 18 U.S.C. § 1960 is to prevent the transmission of monetary proceeds "of unlawful enterprises," *United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999), the government has never alleged, or proven, that Mr. Diaz or his son were aware of any illegal source of the funds Miami Equipment transmitted, or that the funds transmitted were promoting any illegal conduct.

The Probation Office, after conducting its interviews and diligence, has already weighed in with a recommendation—five years' imprisonment—that effectively returns Mr. Diaz to the parameters that should be the outer limit, given that Mr. Diaz has been convicted, at all, only because his conduct ran afoul of a statute defining a strict liability crime.  Yet for the reasons that follow, this sentence, too, is far greater than necessary to comply with the penological objectives of 18 U.S.C. § 3553(a).  Mr. Diaz has not committed, and will not commit, any other crime.  Indeed, he *never* would have committed the crimes of which he was convicted, had he had any idea that he was violating the law or endangering his family.  The public does not need to be protected from Mr. Diaz, and it would be a waste of resources for this 76 year-old man to be imprisoned.

Jailing Mr. Diaz or his son would also create an unwarranted disparity between them and, for example, Blas Herrera, who held himself out as the principal of the KCT consortium.  According to a government search warrant application, Mr. Herrera was questioned by law enforcement agents in November 2015, and in speaking with those agents "in the hopes of receiving leniency," admitted "us[ing] Miami Equipment . . . to unlawfully move money into the United States."  Neither Mr. Herrera nor any of the other KCT principals has been prosecuted.  Because those perpetrators live abroad, they are also unlikely ever to be punished.

Most fundamentally, Mr. Diaz has already suffered crushing punishments from which he will not recover.  He stands convicted of violating the laws of the country he loves and to which he owes his life.  He has been publicly humiliated and

4

ruined financially.  While "too big to fail" has become an accepted reason not to enforce the letter of the law against corporate America, Mr. Diaz has lost the small business to which he devoted 35 years of his life and where his family members, and others, were able to make a good living.  Mr. Diaz's own children were forced to take sides in the prosecution, and his son also faces losing his liberty and the ability to support his wife and three children.

Although Mr. Diaz was unaware that failing to obtain a license to engage in money transmitting was wrong, he will never stop regretting how his conduct and his terrible errors in judgment have affected his loved ones.  Nothing could punish him more than what he has caused his family to suffer.  What should have been the contented twilight of his life has been replaced by the shame and losses brought on by his prosecution and conviction.

With awareness that the Court's knowledge of the case and the conduct is deep, we respectfully submit that the balance here weighs in favor of punishment that does not take the form of incarceration.  Mr. Diaz entrusts his future and fate to the Court and respectfully requests fairness and mercy.

## **ARGUMENT**

### I.    **Mr. Diaz's Personal History and Characteristics Are Exceptional**

The focus on the history and characteristics of the defendant stems from the "elementary principle of weighing the good with the bad" and assessing "immediate misconduct . . . in the context of [the defendant's] overall life hitherto," particularly "at the moment of [the defendant's] sentencing, when his very future hangs in the

balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). As in many cases, Mr. Diaz's background also shed light on aspects of his offense conduct.

### A.    Mr. Diaz's Personal History

Mr. Diaz was born in 1941 in Havana, Cuba to parents, Luis and Adela, who had emigrated from Spain. Mr. Diaz's father was a plant manager for the U.S. company, International Harvester Corp., and his mother was a housewife. Mr. Diaz was the second child; his sister Lourdes, is eight years older. Lourdes, who is now 84 years old and also resides in Miami, described the childhoods of herself and her brother to the Probation Office as happy and loving: "We were not rich, but we didn't need for anything." PSR ¶ 91. The Diaz children were surrounded by extended family in Havana and for their secondary education attended LaSalle High School, a Catholic school.

The darkest and most troubling part of Mr. Diaz's upbringing was the success of Castro's revolution in Cuba, which forced his family to uproot themselves and flee. In 1959, the same year that Fidel Castro declared himself head of state, Mr. Diaz left Cuba, at the age of 17, to study engineering at Georgia Tech, in the United States. Mr. Diaz began putting himself through school on student loans and by working odd jobs, like delivering papers and working as a mechanic. He grew proficient in English. In 1961, his family decided that they, too, must leave Cuba. His father, mother, and sister had all lost their jobs because the Cuban government had expropriated the companies that employed them. The transformation of a vibrant country into an authoritarian state in which a communist government controlled

6

politics, the economy, and free speech was well underway. Mr. Diaz's family lost all of their property when they emigrated to the United States.

After he graduated from Georgia Tech, in 1964, Mr. Diaz obtained a service engineer trainee job at his father's old company, International Harvester. In 1966, while working in Chicago for that company, and attending night school at Northwestern University, Chicago campus, he married Lucy Amezaga, who herself had fled Cuba at the age of 14. The pair were 24 and 19 years old when they wed. Two years later, Mr. Diaz became a naturalized U.S. citizen, and the first of the five children of Mr. Diaz and his wife Lucy, Luis Javier, was born. Daughter Annette Marie followed a year later.

Over the next decade, Mr. Diaz continued to experience professional success and personal fulfillment. While still working at International Harvester, Mr. Diaz moved to Mexico City, Mexico, in 1968, after being promoted from his trainee position. Two years later, Mr. Diaz was transferred to Miami, Florida, and took responsibility as a service engineer covering the International Harvester dealerships in the Central American and Caribbean Island regions. Mr. Diaz and his wife welcomed their second son, Michael Albert, during this time. From 1973 to 1975, Mr. Diaz lived with his family in Quito, Ecuador, as a territory manager for International Harvester in Colombia, Ecuador, and Peru. In that role, he supervised the complete operations of the dealerships in those countries. Mr. Diaz's third son, Eduardo Manuel, was born in 1974.

Mr. Diaz returned to Miami for good in 1975, rejoining his own family and the family of his wife Lucy, among many other friends from Cuba. That year, he left International Harvester to join a Florida-based distributor called Florida Georgia Tractor Co. At that company, Mr. Diaz worked as a general manager for nearly eight years, during which time his last child, Alexander Pablo, was born.

By 1983, Mr. Diaz had decided that it was a good time to launch his own company, to put to use his nearly two decades of experience exporting heavy equipment and servicing clients in Central America, South America, and the Caribbean. He began by operating Miami Equipment out of his home. Within the next few years, his company was doing well enough that it had established an office and a warehouse. Ultimately, his company grew to serve over 150 clients and to export millions of dollars' worth of equipment and parts per year. Miami Equipment employed many of Mr. Diaz's children and their spouses, among others.

Mr. Diaz retired in 2004, in the sense that he stopped drawing a paycheck. The family divided the ownership of Miami Equipment to give control to family members other than Mr. Diaz. However, Mr. Diaz continued to go to work at the Miami Equipment office often and to serve as the primary contact for a number of the customers with whom he had the original or ongoing relationship.

Mr. Diaz's five children all remain in the Miami area; four have obtained college degrees. Together his children have had nine grandchildren, with whom Mr. Diaz is close. Mr. Diaz's mother-in-law, Piedad Amezaga, lived with Mr. Diaz and his wife Lucy in their four-bedroom home for 33 years, until she passed away at the age

of 101, on the day after Mr. Diaz was convicted.  Lucy Diaz's brothers and cousins are also a part of the Diaz family network in Miami.  Mr. Diaz counts among his friends and supporters other relatives, neighbors, clients, former employees, and members of his church.

Mr. Diaz has no current medical complaints, but he was treated five years ago with radiation therapy after he was diagnosed with prostate cancer.  He takes medication for acid reflux, as needed, as well as daily medications for high blood pressure and hypothyroidism.

### B.    Mr. Diaz's Characteristics

Nearly four dozen people have written letters to the Court to request that at sentencing, the Court take into account the Luis Diaz, Jr., known to his family and friends.  Many of these friends and family have known Mr. Diaz for three, four, or five decades.[1]

As a group, these letter writers have emphasized, first and foremost, that Mr. Diaz is man of honesty and integrity who would never knowingly engage in illegal, immoral, or unethical conduct.  They have vouched that Mr. Diaz, who is the proud and loving patriarch of his family, also would never have taken any step he thought might risk exposing any member of his family to potential shame or harm.  These friends and family are astounded and dismayed that Mr. Diaz, who has taken care his whole life to nurture and protect his family and business, could have been charged

---

[1] The letters written in support of Mr. Diaz have been ordered alphabetically and filed as Exhibit A to a separate submission entitled "Sentencing Submission Exhibits."

and convicted of a crime that involved his business and put the interests of his wife and children in jeopardy.

The letters written in support of Mr. Diaz also make clear that he has been a giver and contributor his whole life, beyond his family, to anyone he finds to be in need. It emerges from the letters that the role that Mr. Diaz has played in care-taking for others is another reason he is respected and admired in his community.

Mr. Diaz's friends and family urge the Court to show mercy to Mr. Diaz, notwithstanding his grave errors in judgment, and emphasize that Mr. Diaz has lived a life deserving of that mercy. The individuals who have written to support Mr. Diaz are also distressed by the effects the prosecution has already had on Mr. Diaz, his family, and his family's well-being, confused about the worth of jailing Mr. Diaz, and fearful of the consequences if Mr. Diaz is incarcerated.

### 1.    Mr. Diaz's Devotion to His Family

Most central to Mr. Diaz's nature is his devotion to his family. Everyone who has come to know Mr. Diaz understands that family—his wife, children, and grandchildren—is by far the most precious thing to him. Keeping his family close and happy and raising the next generations to live the right values is Mr. Diaz's reason for being.

Family members speak of Mr. Diaz's love for his family in the following terms.

- Lucy Diaz describes her husband of more than five decades as "the center of our family" who "means the whole world to me." She specifies "God, Family, and Honesty" as the most important principles in Mr. Diaz's life and expresses gratitude and pride that despite working hard, and experiencing "ups and downs all

10

our life," "[w]e have been able to raise our children with the same values, and now they are doing the same with their own children."

- Mr. Diaz's son, Eduardo Diaz, says his father is "the center of our family, the rock," who "sacrificed and dedicated his whole life to provide for his family," including to ensure that his children would be educated at Catholic schools and attend college, and to "instill[] in us a strong moral foundation based on our Catholic faith."

- Mr. Diaz's daughter, Annette Diaz-Rojas, states that the Diaz children had "a wonderful upbringing," living "in the house where all our friends wanted to be at." She recognizes that the "tireless" nature of Mr. Diaz's work when he started Miami Equipment, at home and using a rotary phone, "came only from the love he had for us," and his desire to provide for his family, and the education of his children, even in tough times.

- Mr. Diaz's youngest son, Alexander Pablo Diaz, describes that "[a]s I have grown and started a family of my own it is really humbling to realize what a good job my mother and father did raising five children. My mother and father . . . are honest and simple people and have taught us to have good values, faith, and provide us with all that we needed to be successful on our own." Alexander Pablo realizes that his father "had to work many long hours" and "sacrifice" time with his wife and children in order to provide for his family. His father nonetheless also "spent quality time with his family," and "loved us all very much," and in doing so created a model of fatherhood for Alexander Pablo to aspire to.

- Mr. Diaz's daughter-in-law, Michelle Vigil-Diaz, wife of Eduardo, expresses her admiration for Mr. Diaz "for teaching his son through words and actions how to be a good father and husband." She credits her father-in-law's example of "always being present in my husband's life," for the father that her spouse Eduardo has become, one who "comes home and spends time talking to his children and playing with them," taking his son to a car race, or even just "brushing our daughter's hair."

- Mr. Diaz's nephew, Jim Jimenez, states how "very hard" it has been for him personally through this "very tough period" not to "be able to express to all concerned how adamantly and vehemently I stand by my uncle's character & compassion." He describes his uncle as "an irreplaceable cog in the family" and "an

11

outstanding father, uncle, husband & grandfather," whose children and grandchildren serve as "living proof" of his love and compassion.

- Laura Rexach, Mr. Diaz's daughter-in-law, describes that after she started dating Alexander Pablo and began attending dinners at the Diaz home, she saw Mr. Diaz's "utmost respect and love" for his wife and came to admire him.  According to Ms. Rexach, her young daughter is "crazy" about her grandfather.  When Lucy Diaz was babysitting that daughter, after Ms. Rexach went back to work, the child would refuse to leave her grandparents' house until after her grandfather came home and gave her truck rides.

- Manuel Jesus Rojas, husband to Mr. Diaz' daughter Annette Diaz-Rojas, says that he is honored to call Mr. Diaz his father and that Mr. Diaz is a "wonderful grandfather" to his boys Nikolas and Christopher, who "adore" Mr. Diaz and look forward to trips they take, including a yearly outing in a rented Winnebago to see auto racing at Sebring, Florida.

Friends invariably describe themselves as having become so close to Mr. Diaz's family that they feel a part of it.  They also call out the special nature of Mr. Diaz's relationship with his family.

- Martha Rey, who was an executive assistant at Florida Georgia Tractor company and worked with Mr. Diaz 40 years ago, before eventually becoming the executive assistant to Miami Mayor Alex Penelas, relates that she has considered the Diaz family her own and thinks of Mr. Diaz as a "true family man," who worked diligently to provide for his wife and children and also treated "those who worked with him as family."

- Maria Santiago, who is a childhood friend of Lucy Diaz, describes Mr. Diaz as "a gentleman, exemplary son, brother, uncle, husband and father of five outstanding children," whose family is his "outmost priority" and who has "always been attentive to his family's and friend's needs."

- Orlando Bienes, a Miami dentist, states that while he does not have a family of his own, Mr. Diaz "opened his home to me every holiday."  He notes that while "following his dream and starting

12

his own business," Mr. Diaz "also created a beautiful family" and a home that is "always welcoming and overflowing with love."

- Ricardo Suarez, whose sister is Mr. Diaz's neighbor, describes Mr. Diaz as a "person with solid Christian beliefs, happily married, a hard worker, very caring to his grownup children and grandchildren." Mr. Suarez also notes that Mr. Diaz helped Mr. Suarez's own son when he was in high school by giving him a part-time summer job.

- Robert Traviesa, whom Mr. Diaz first employed 39 years ago, when Mr. Traviesa was newly married with a child on the way, states that "family and faith" are of the utmost importance to Mr. Diaz. Mr. Traviesa describes that over the past 20 years, Mr. Diaz's group at the Sebring auto races, which Mr. Traviesa also attends, has grown to include "the children, the grandchildren, friends of the grandchildren, relatives and more friends." According to Mr. Traviesa, the Diaz family group "might have been sixteen in two small campers," but he "[n]ever saw Luis happier."

## 2. Mr. Diaz's Integrity and His Law-Abiding Nature

Mr. Diaz's friends, family, colleagues, and clients—many of whom have known him for decades—are united in describing Mr. Diaz as an honest, upstanding, and law-abiding person. They stress that he never would have broken any law had he known he was doing so, and that nothing would have stopped him from obtaining a license had he ever become aware that one was necessary.

- Peter Abalia, a retired Special Agent for the United States Treasury, states that he knows Mr. Diaz because he has lived across the street from him for 15 years. Mr. Abalia describes that when he heard about Mr. Diaz's indictment and trial, he was "shocked and in a state of disbelief." He regards Mr. Diaz to be "a person of high morals, integrity and incapable of committing a crime against the United States intentionally." Mr. Abalia states that having known Mr. Diaz and his family for many years, he can "attest to his integrity and moral values." Mr. Abalia offered

in his letter, as many other letter writers did, to speak to the Court or to the Probation Office.

▪ Jose M. Amezaga, Mr. Diaz's brother-in-law, notes that while he is aware that "not knowing about the law is not an excuse" he hopes that the Court will consider "that my brother in law is truly a man of his word and I firmly believe that he made an honest mistake based on the belief he was doing nothing wrong and least that he was breaking the law." Mr. Amezaga describes Mr. Diaz as a "very honest man" and "a man of high integrity and social morals."

▪ Angel Gonzalez, the General Equipment Sales Manager at Construction Equipment Services, who has worked in the same field as Mr. Diaz for four decades and done business with Miami Equipment, describes that Mr. Diaz's "name, character and reputation is well known among dozens of equipment dealers, not only in the State of Florida but in many other parts of the country." He relates that Mr. Diaz "has a reputation of honesty, integrity and dedication to his business that is unmatched by any other firm in this field."

▪ Jose P. Amezaga, cousin of Mr. Diaz's wife, states that during his 29-year career with Ingersoll-Rand, he had the chance to work with Mr. Diaz and Miami Equipment, selling them equipment and parts to export to Latin America. Mr. Amezaga describes that "every single transaction we made with them was done with the utmost professionalism," and he states that he "can assure anyone" that Mr. Diaz is "a great professional with great integrity" who would not have intended to break any laws.

▪ Gladys Carbonell, who has known Mr. Diaz and his wife since 1964, and has been a legal secretary and a paralegal, states that she has "always known Mr. Diaz to be a person of exceptional moral character, . . . who has lived an exemplary life with a clean record." Ms. Carbonell believes that "any infringement of the law on the instant case, was a mistake without knowledge or intent in breaking any law."

▪ Donaldo Blanco, the owner of several companies in Venezuela and Colombia that have had business relationships with exporting businesses in Florida, including Miami Equipment, states that Mr. Diaz's business was a "reliable and trustworthy provider," and that his business relationship with Mr. Diaz led to friendship

14

because Mr. Diaz and his family members demonstrated "honesty and commitment."  Mr. Blanco requests with all due respect that the Court consider his knowledge of Mr. Diaz and his son and his view that if Mr. Diaz and his son made mistakes, "it was not with the intention of violating the law," or "of damaging anybody or any institution."

▪ Laura Rexach, Mr. Diaz's daughter-in-law, describes Mr. Diaz as "an honest man, who is extremely grateful to the United States for the opportunities he had when Castro came to power in Cuba. He would never knowingly and willingly do anything to defraud the United States or dishonor U.S. law."

▪ Eduardo Diaz, Mr. Diaz's son, states that his father "would never knowingly break the law or hurt anyone.  At any time if anyone, any organization, bank or government agency would have notified them of requiring a license no doubt they would have complied."

▪ Roberto Traviesa, whom Mr. Diaz employed and trained nearly 40 years ago, and who still sells equipment, notes that "Everyone knows everyone in the equipment business . . . . . Trustworthiness, or the lack of it, is huge . . . . Never, in all these years, has anyone ever spoken negatively to me, mentioned that they felt slighted on a transaction or complained about Luis's ethics and sense of fairness.  It's not in his DNA."

▪ Juseppe Di Falco, a construction businessman who first did business with Miami Equipment and Export in the mid-nineties, states that "[a]ll these years of experience with this family, give[s] me enough confidence to state that in my opinion, they are decent, honest, and respectful people.  If they made mistakes, [it] could not have been with the ulterior intention of breaking the law or harming others."

▪ Cristina Espinosa, a CPA and former Tax Manager at KPMG, who now co-owns an engineering business, tells the Court, "I am just one person whom you do not know, but I give you my word that I as well as my entire family, support and believe that Luis, Jr, and Luis Javier did not knowingly break any laws.  She notes that "Luis, Jr and Luis Javier will spend the rest of their lives castigating themselves for the pain they have inflicted upon their family caused by their ignorance and their trust in humanity."

15

- Emilio Falero, who came to know the Diaz family because he gave art lessons to Mr. Diaz's son Michael, vouches for Mr. Diaz's "nobility of character and his integrity as a husband, as a father and as a person in general." He states that if Mr. Diaz "did break the law in any circumstance, I believe he did it out of ignorance and not out of malice or ill intention, much less out of greed or dishonesty."

- Luis Arevalo Fernandez Castillo, who runs a Venezuelan company called Constructora Los Fernandez, states that from his 10-year business relationship with Mr. Diaz, he knows Mr. Diaz to be "an honest, humble and simple person with impeccable behavior."

- Francisco Grande, who worked for many years at a Caterpillar dealership in Venezuela and has had a business relationship and/or friendship with Mr. Diaz for more than 27 years, attests that Mr. Diaz is a "an honorable person" who "may have made mistakes as all of us do as human beings, which we must correct, but I do not think he intended to break the law."

### 3.    The Impossibility that Mr. Diaz Would Do Anything that Might Put His Family in Harm's Way

Particularly unbelievable to Mr. Diaz's supporters is the notion that he would ever have engaged in a course of conduct that would risk hurting his family or undermining the main work of his lifetime:  promoting the happiness and well-being of his family.

- Annette Diaz, who testified at trial "giving evidence that could possibly hurt [her father and brother]," as she puts it, emphasizes that while she "stated the truth" when testifying, she knows "from the bottom of my heart that they had no intent of doing anything illegal." She continues, "I know these charges against my father are very serious, but please know that he would have never done anything, knowingly, to put his family in this situation. The man I know, love, and respect would have never wanted to hurt his family. He has spent his whole life fighting so that he could give us the values and knowledge to succeed and make a difference in this world."

16

- Alexander Pablo Diaz, Mr. Diaz's son, states "My father will never knowingly do anything against the law and even less do anything that would hurt our family."

- Michael Albert Diaz, also Mr. Diaz's son, expresses that his father and brother "are not criminals.  I guarantee that if my father had any idea or sense that what was presented to him was illegal, he would have never accepted the work.  My father had no intent or knowledge that he was committing a crime."

- Michelle Vigil-Diaz, Mr. Diaz's daughter-in-law, states "Luis is 76 years old and has lived his whole life with honesty and integrity. Believe me there is no circumstance imaginable that Luis would have knowingly put his family through so much turmoil."

- Manuel Vigil, Michelle's father, has known Mr. Diaz for over 20 years.  He describes Mr. Diaz as a "hard working, honest person who would never compromise his integrity or put his family at risk for financial gain. . . . . [T]here is no doubt in my mind that father and son did not intentionally commit any crime."

- Jose R. Fox, who retired three years ago after serving as President and CEO of United Home Care Services, a Section 501(c)(3) organization based in Miami-Dade County, has known Mr. Diaz for more than 40 years, as a result of having been long-time neighbors.  He states that Mr. Diaz and his son are "individuals of integrity and honesty."  He says that "knowing them, I cannot imagine any circumstance where Luis and Luis Javier would willingly risk their family's future."

- Miguel Garcia, a former employee of Miami Equipment who is now retired, states that "Luis (the father) is a hard-working person of high moral character."  He believes that "Neither he nor his son would have ever put their families at risk just to make a little bit more money.  They are not these types of persons."

- Carolina Victoria Vivacqua, Mr. Diaz's daughter-in-law and wife of Michael Albert Diaz, has seen that Mr. Diaz "devotes his life to Lucy, their children and grandchildren."  She says, "Your Honor, to say that Luis Diaz Jr. is a good man would be an understatement.  He has strong moral character and has worked hard all his life to provide for his family.  He would never knowingly proceed in a way that would be detrimental to his family and loved ones."

17

### 4.     Mr. Diaz's Generosity and Care-Taking of Others

Mr. Diaz's friends, family, employees, and clients also praise Mr. Diaz's generosity and give many examples of the many ways in which he has supported others—either financially or emotionally—whenever he has learned of their need. The letters make plain that charity and self-sacrifice are second nature to Mr. Diaz and that his instinct and commitment to lessen the suffering or hardship of others is deep.

- Jose M. Amezaga, Mr. Diaz's brother-in-law, notes that there are "many occasions" in which he has seen Mr. Diaz demonstrate concern for others, including when Mr. Diaz took in his wife's mother, over 33 years ago.  As Mr. Amezaga describes, Mr. Diaz converted a two-car garage that he used to engage in a beloved hobby of working on cars, either on his own or with his children, so that his mother-in-law could move into the Diaz household. She resided there until she passed away last November.

- Mr. Diaz's wife Lucy attributes "a great heart" to her husband and states modestly that "according to our means we have helped many people in need."

- Mr. Diaz's son Eduardo describes that during middle school, when the parents of one of his friends were experiencing financial difficulties, Mr. Diaz reached out to assist the father in identifying possible jobs and provided his friend's family with a car to use for transportation temporarily.

- Gladys Carbonell, who has known Mr. Diaz and his wife for over five decades and considers herself to have been "adopted" by the Diaz family since her father passed away, describes that a few years ago, when she underwent bilateral cataract surgery, Mr. Diaz "drove me to and from the hospital for both surgeries."

- Jose Perdomo, who has been neighbors of the Diaz family since 1978, states that when he was out of work, three decades ago, Mr. Diaz came to his house to offer him a job as an assistant manager at Miami Equipment.  Mr. Perdomo subsequently worked at

18

Miami Equipment for four years, during which time he saw and appreciated Mr. Diaz's "work ethics, honesty and decency."

- Rosa Amezaga, the sister-in-law of Lucy Diaz, tells an account of how when Hurricane Andrew hit Miami in 1992, rendering her home unliveable, Mr. Diaz showed up to pick up her family and take them under his own roof for the next month. According to Ms. Amezaga, Mr. Diaz offered his home "unconditionally and without reservation," although taking in five people meant that "[t]here were 12 of us under his roof, sleeping and eating."

- Margarita Bringas, who describes Mr. Diaz as the "husband of the first cousin of my best friend," states that Mr. Diaz is "noted for his compassion and always being willing to help others at their most desperate moments." She says that she herself has "received his help and that of his dear family when no one would give me a hand." Of Mr. Diaz, Ms. Bringas notes that "he has always given me a plate of food and a word of comfort."

- Mr. Diaz's daughter-in-law Michelle Vigil-Diaz states with respect to her now nine year-old son that in the midst of her pregnancy she was told that there was a problem and that her son might not survive. Mr. Diaz "was there for me that whole time," assuring her of God's plan and taking her to mass so that they could pray together. She describes that, "Luis did not leave my side a moment during this difficult time, his love, faith, and hope was what got me and my husband through."

- Miguel Garcia, a former employee of Miami Equipment, relates that Mr. Diaz and his son Luis Javier always treated him "very well, always respectfully and fairly." He recalled that once when he needed to buy welding equipment for his service truck, but lacked the money to do so, Mr. Diaz and his son bought the equipment for him and let him pay it back, "little by little."

- Eugenio Morin, a longtime friend of Mr. Diaz's, states that Mr. Diaz has "helped for many years a Nun congregation in Miami that helped the Catholic Church in Haiti and Cuba for the needy people." Sister Eva Perez-Puelles writes on behalf of the Daughters of Charity to say that Mr. Diaz is a "man of faith," and an "example of charity." According to Sister Perez-Puelles, Mr. Diaz has "always been a great collaborator and donor for our missions in Haiti and Cuba to those less fortunate."

19

- ▪ Martha Rey, Mr. Diaz's executive assistant at Florida Georgia Tractor company, describes that just after she began working for Mr. Diaz, she became acutely ill and was forced to miss work for three months. Mr. Diaz held open her job for her and compensated her at her regular salary.

## II. The Nature and Circumstances of the Offense Weigh Against Imposition of a Term of Incarceration

Given the exemplary and law-abiding life that Mr. Diaz has led, there would seem to be a "disconnect" between his personal history and traits, on the one hand, and the notion that he has committed crimes sufficiently serious that they warrant imposition of a sentence in the 12- to 15-year range, per the Guidelines range calculated by the Probation Office, or even of five years' imprisonment, as that Office has recommended.

The nature and circumstances of Mr. Diaz's offenses are highly unusual and should not lead to imposition of a sentence of incarceration. This case presents the very rare circumstance of a defendant being convicted of crimes that did not require his awareness that he was doing something illegal, or even wrongful. Since 2001, 18 U.S.C. § 1960 has not required the government to prove that the defendant intentionally operated an unlicensed money transmitting business, only that the defendant knew that his or her money transmitting business was unlicensed. *Compare Elfgeeh*, 515 F.3d at 132, *with Velastegui*, 199 F.3d at 595 n.4. Taking this law to the limit, the government did not contest that Mr. Diaz had no knowledge of the licensing requirement, much less that he was breaking the law; Mr. Diaz was found guilty on a strict liability theory. The government's additional charge—of money laundering in violation of 18 U.S.C. § 1956—likewise did not require the jury

to find any *mens rea* of intent to violate the law or wrongfulness. Instead, the jury was instructed that it could find that money laundering charge proven so long as Mr. Diaz directed international money transfers, which were part of the money transmitting business he believed to be legal, to promote that business. (*E.g.*, Tr. 1057, 1058, 1061).

Mr. Diaz thus faces imprisonment *solely* for not having obtained a license that the government concedes he did not know was required.[2] Moreover, although Section 1960 was enacted "to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds *of unlawful enterprises*," *Velastegui*,

---

[2] It is unusual in this District for Section 1960 charges to even be brought in the absence of charges of other crimes that require scienter. *See, e.g.,* U*nited States v. Banki,* 685 F.3d 99, 112, 114-15 (2d Cir. 2011) (reversing convictions on charges of violating Iran trade sanctions and operating an unlicensed money transmitting business and conspiracy to do same; defendant was also convicted of making false statements); *Velastegui*, 199 F.3d at 592-96; *United States v. Murgio*, 209 F. Supp. 3d 698, 704-19 (S.D.N.Y. 2016). Further, cases commenced in this district in which Section 1960 and/or Section 1960 conspiracy charges were the only ones brought, or the only ones that served as the basis for sentencing, have resulted in substantial downward variances at sentencing, *see, e.g. United States v. Mazza-Alaluf,* 07 Cr. 403 (PKC) Dkt. No. 84 (Transcript of 9/10/09 Sentencing) (annexed hereto as Exhibit B), at 38-40 (referencing value of transmitted funds to be $350 million); 621 F.3d 205, 208, 213-14 (2d Cir. 2010) (affirming reasonableness of 42-month sentence imposed on operator of Chilean business that transmitted money from three U.S. states), *United States v. Faiella,* 14 Cr. 243 (JSR), Dkt. No. 73 (Transcript of 1/20/15 Sentencing) (annexed hereto as Exhibit C) at 21, 28-31 (sentencing lead defendant with prior felony tax conviction, who transmitted nearly $1 million to facilitate narcotics trafficking, to sentence of 48 months' imprisonment); *see United States v. Bah*, 06 Cr. 243 (LAK), Dkt. No. 41 (Transcript of 9/10/07 Sentencing) (annexed hereto as Exhibit D) at 16-21 (imposing sentence of probation on defendant charged and convicted of Section 1960 violation, including for reason that crime was one of strict liability), conviction reversed on appeal based on instructional error, *United States v. Bah*, 574 F.3d 106, 110, 111 (2d Cir. 2009), and case dismissed by *nolle prosequi* on remand, *see United States v. Bah,* 06 Cr. 243 (LAK), Dkt. No. 49.

21

199 F.3d at 593 (citing S. Rep. No. 101-460, at 14 (1990), reprinted in 1990 U.S.C.C.A.N. 6645, 6658-59) (emphasis added), the government did not even attempt to prove that Mr. Diaz's business transmitted money Mr. Diaz knew or suspected to be the proceeds of other crimes, or with the intention of aiding the commission of a crime.

Because any "blame" in this case is isolated to Mr. Diaz *not having known better* about licensing his business—*i.e.*, at worst, having been careless—a sentence of incarceration, especially in light of other factors present in this case, is not called for. *Cf. Staples v. United States*, 511 U.S. 600, 617-18 (1994) (interpreting 26 U.S.C. § 5861(d), which makes possessing an unregistered firearm a felony, to require *mens rea* in light of the ten-year sentence it authorizes and noting debate over it is fundamentally incompatible to fail to require *mens rea* for any offense for which one can be imprisoned). Mr. Diaz is a 76 year-old individual who has never before committed a crime, has contributed to society his whole life, and has already lost the business that is his life's work and that supported himself and his family. In these circumstances, conduct that is essentially negligent rather than "criminal," as crimes are overwhelmingly defined, should not be the reason for Mr. Diaz to be incarcerated.

This is so even accepting the proof at trial that Mr. Diaz may have failed to heed "red flags" that the owners of the companies in the KCT consortium were engaged in wrongful conduct for their own ends. The government presented documentary proof at trial that Blas Herrera and the KCT consortium that he and his associates controlled, repeatedly presented invoices to Mr. Diaz that falsely

22

represented that services were being performed for Miami Equipment or that falsely represented the services performed.  Mr. Diaz will forever feel pain and regret that he did not ask more questions of his long-time clients or seek the advice of lawyers or accountants.  He has learned his lesson in the hardest way imaginable, however, and his failure to act with more care should not be the tipping point into incarceration, for several reasons.

*First*, what Mr. Diaz knew or should have known is irrelevant under the theory of the prosecution, which presumes that all of Mr. Diaz's conduct would have been legal, had he only obtained a license.  *Second*, Mr. Diaz has not denied that he knew the invoices were false.  Based on what his clients told him, he believed that services such as consultancy services were being performed *for their companies*, but that his clients needed to represent otherwise, to be able to send U.S. dollars to the United States, via Miami Equipment, to pay for those services, given currency restrictions in Venezuela.

*Third and most fundamentally*, to the extent that Mr. Diaz believed Mr. Herrera and his other KCT-related clients instead of suspecting them of wrongdoing, it was not out of bad intent but because he mistakenly placed his trust in them and their word.  If anyone, it was Blas Herrera and the other stakeholders in KCT, Antonio Padrin and Enrique Pradella, who knew the advantage of using a "mom and pop" business as the means of making sizeable wire transfers, and not a bank or wire transfer agent.  Herrera's brother Mario and the others had been clients of Miami Equipment for nearly two decades when they introduced Mr. Diaz to Blas Herrera,

23

and Blas Herrera sought Mr. Diaz's help, including in putting through payments on the purchase orders and invoices at issue in this case. The dealings of KCT in Venezuela, including with the state-owned oil and gas giant PDVSA, were also large enough in value to make the amounts Herrera and his companies claimed to be invoicing credible.

Mr. Diaz was predisposed, moreover, to help his customers (whom he also considered at the time to be friends), because of his own family's experience of having had all their property confiscated in Cuba. Watching Venezuela become an increasingly authoritarian regime, accelerating into economic free-fall, Mr. Diaz was sympathetic to what he thought were his clients' efforts to retain and continue to use the value of their funds, rather than having those funds rendered valueless or unusable.

Those who know both Mr. Diaz and the business of exporting equipment to the same regions served by Miami Equipment, have attempted to explain how someone of Mr. Diaz's integrity could have come to engage in criminal conduct. For example, Jose P. Amezaga, the cousin of Mr. Diaz's wife, who worked for nearly 30 years at Ingersoll-Rand, states in his letter to the Court that in his decades in doing business in Latin America and the Caribbean, "I saw many highly ethical and great professionals make unintentional mistakes." He notes that in addition to being a "complicated" region, with different cultures, legal requirements, and currency laws, "[i]t is a region where your word, relationships and character still have a lot of meaning. If you are not careful you may be asked to do things that in some countries

24

may be acceptable but in others, particularly in the United States, are not." Roberto Traviesa, who got his first job exporting equipment from Mr. Diaz forty years ago and is still in the business, states that he has "[n]ever, in all these years," heard anyone speak negatively about Mr. Diaz's "ethics or sense of fairness," adding that "actually, I've always viewed Luis as being a bit of a softy in what can be a rough and tumble business." Peter Abalia, former Special Agent of the Department of the Treasury, and long-time neighbor of Mr. Diaz, writes that to the best of his knowledge, Mr. Diaz "thought that he was helping customers and friends to repatriate money from a corrupt communist country in South America."

Several letter writers conclude, also based on their conviction that Mr. Diaz would never knowingly break the law or hurt his family, that Blas Herrera and his KCT associates exploited Mr. Diaz. *See* Michelle Vigil-Diaz ("He was taken advantage of. He would never knowingly break the law"); Cristina Espinosa ("through ignorance and misguided trust they did not realize that they were committing an unlawful act."); Eduardo Diaz ("My father is not trying to become rich through crime. On the contrary, because he is so good, he was taken advantage of by manipulative individuals").

In sum, while Mr. Diaz made devastating errors in judgment, it is undisputed that he was unaware of the illegal or even wrongful nature of his acts. He did not intend to harm anyone. Tragically, he agreed to help customers and friends without knowing that he could not do so, consistent with the law.

### III.   The Court Should Vary or Depart from the Sentencing Guidelines Range

#### A. The Guidelines Range Calculated by the Probation Office

Among the factors that a sentencing court must consider is the "sentencing range" established for the offenses of conviction as set forth in the U.S. Sentencing Guidelines.  18 U.S.C. § 3553(a)(4); *see Gall v. United States*, 552 U.S. 38, 49-50 & n.6 (2007).  Here, as the Probation Office's recommendation of a term of incarceration far below the Guidelines range implicitly acknowledges, the range significantly overstates the seriousness of Mr. Diaz's conduct, even before consideration of the numerous other Section 3553(a) factors.

Mr. Diaz does not, with the exception of the enhancement for "sophisticated laundering," contest the Guidelines range calculation that the Probation Office has recommended.   That calculation sets forth that after grouping the counts of conviction, the Probation Office followed the directive in the money laundering guideline, 18 U.S.S.G. § 2S1.1, to determine the offense level "for the underlying offense from which the laundered funds were derived"—in this case the offense of operating an unlicensed money transmitting business.   Under the guideline applicable to that offense, U.S.S.G. § 2S1.3(a)(2), the base offense level is 6, and because the "value of the funds" transmitted was, in the Probation Office's view, approximately $100 million,[3] and thus between $65 and $150 million, the Office applied a 24-level increase under U.S.S.G. § 2B1.1(b)(1)(M) of the fraud guideline

---

[3] By comparison, the amount of Mr. Diaz's gain was $1.2 million in fees generated by the KCT transfers, over a period of six or seven years.  (Tr. 811).

26

(which is cross-referenced by U.S.S.G. § 2S1.3(a)(2)).  To the resulting offense level of 30, the Probation Office applied a two-level enhancement resulting from Mr. Diaz's conviction under 18 U.S.C. § 1956, under U.S.S.G. § 2S1.1(b)(2)(B), and another two-level enhancement because in its view the offense involved "sophisticated laundering," pursuant to U.S.S.G. § 2S1.1(b)(3).[4]

At the total offense level of 34, and Criminal History Category I, the resulting Guidelines range is 151-188 months' imprisonment.  PSR ¶ 114.

## B.    Objection to the Guidelines Range Calculation

At the threshold, Mr. Diaz objects to the two-level enhancement for sophisticated laundering.  The Guidelines define "sophisticated laundering" to be "complex or intricate offense conduct" typically involving the use of "fictitious entities; shell corporations; two or more levels (*i.e.*, layering) of transactions . . .  involving criminally derived funds"; or offshore financial accounts.  U.S.S.G. § 2S1.1, appl. n.5(A).  It is inapt, however, to apply a "sophisticated laundering" enhancement in a case in which the defendant has been convicted of promoting "specified unlawful activity" *not* known to him *to be unlawful*.  Mr. Diaz was not trying to enhance the degree of success of his crime by using sophisticated means, such that the guidelines range should reflect a basis for imposing additional punishment.  He was wholly unaware of the unlawfulness or even the wrongfulness of his conduct.

---

[4] The Probation Office did not recommend any enhancement for obstruction of justice, noting that it preferred for the Court to decide the matter.  PSR at 25.  Mr. Diaz will await the government's determination on whether it will request the enhancement before addressing it.

27

The circumstance that it was the KCT consortium, not Mr. Diaz, that generated false documents and created and controlled the companies requesting the transfers also makes it inappropriate to apply a sophisticated laundering enhancement. *See United States v. Eckstein,* No. CR12-3182-JB, 2016 WL 546663 (D. N.M. Feb. 3, 2016) (rejecting enhancement where individuals other than the defendant "own[ed], list[ed], [and] creat[ed]" the fictitious entities used as part of the scheme"). The Sentencing Commission applied similar logic in recently amending the "sophisticated means" guideline, U.S.S.G. § 2B1.1(b)(1), to require that the defendant himself or herself have "intentionally engaged in or caused the conduct constituting sophisticated means." As the Commission put it, that amendment "narrowed the scope" of the enhancement, instructing courts "to consider only [the] defendant's own intentional conduct, as opposed to the conduct of everyone involved in the conspiracy." U.S. Sentencing Commission, 2015 Annual Report, at A-7 to A-8. Mr. Diaz intended neither the offenses nor the means, and accordingly no "sophisticated laundering" enhancement is warranted.[5]

---

[5] The Probation Office appears to attempt to justify the sophisticated laundering enhancement with reasoning that Mr. Diaz engaged in "bulk cash smuggling" with "reckless disregard of the source of the funds." PSR at 25. The PSR, however, quotes not the sophisticated laundering guideline in making this comment, *see* U.S.S.G. § 2S1.1(b)(3), but instead a portion of Section 2S1.3. In addition, although the Probation Office appears to be referring to the cash deposits that were also the subject of a motion for a mistrial and of GX 203-B, the exhibit the Court excluded and directed the jury not to consider (Tr. 866), Mr. Diaz was not proven to have participated in, or to have been aware of, bulk cash smuggling, which is defined to be knowingly concealing more than $10,000 in currency or transferring such cash instruments into or outside the U.S. *See* U.S.S.G. § 2S1.3, appl. n.2.

### C. The Court Should Depart or Vary from the Guidelines Range, Which Grossly Overrepresents The Seriousness of the Offense

The request of far greater consequence, in any event, is that the Court should either vary from the range recommended by the Probation Office (because it substantially overstates the seriousness of the crime) or depart from the range (because the offenses are outside the heartland of the guidelines).[6] The bases are as follows.

*First*, the reason that *any* Guidelines range higher than a maximum of five-years' imprisonment is even in play is solely the government's discretionary decision to add conspiracy and money laundering charges that in Mr. Diaz's case reflect no conduct, state of mind, or culpability beyond the conduct of operating an unlicensed money transmitting business, a charge carrying a statutory maximum penalty of five years. The government, notably, is not consistent in charging a violation of 18 U.S.C. § 1956 together with a violation of 18 U.S.C. § 1960, where the unlicensed business also transmitted funds internationally, as the government did here. For example, there was no charge of money laundering in *United States v. Mazza-Alaluf*, 07 Cr. 403 (PKC), although the defendant there also directed international money transfers, of a value nearly three and a half times the value adopted by the Probation Office here, from branches of the money transmitting business that operated at three locations in the U.S. as well as Chile. *See* discussion *supra* at n.2 and sources cited

---

[6] A sentencing court may depart from a guidelines range when it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b).

therein.  The Honorable P. Kevin Castel sentenced the operator of the business in that case, who was also said by the government to have been aware of the licensing requirement,[7] to 42 months' imprisonment, despite a Guidelines range of 121-155 months' imprisonment.[8]

*Second*, the offense conduct in this case falls outside the heartland of the conduct addressed by the guideline that set the base offense level, U.S.S.G. § 2S1.3. As the title of that guideline indicates, Section 2S1.3 encompasses, in addition to the offense of operating an unlicensed money transmitting business, structuring to evade reporting requirements, failing to file currency reports or report cash transactions,[9] knowingly filing false reports, and bulk cash smuggling, among others.  In other words, the guideline overwhelmingly addresses conduct that is intentional or knowing.  Further, as is argued above, at n.2, the government rarely charges, as it did here, a defendant with violating Section 1960, where the defendant is *not* alleged to have known of the licensing requirement or to have engaged in *other* conduct constituting an intentional or knowing crime.  Mr. Diaz's offenses, because they solely involve unknowing conduct, are at the outer edge, and not the heartland, of the conduct to which the guideline usually is applied.

---

[7] *See* Gov't Sentencing Memorandum, Dkt. No. 78, 2009 WL 3149561 (S.D.N.Y. Sept. 10, 2009) at Section I.B.

[8] The range was capped by a ten-year maximum, as Mazza-Alaluf was convicted of two five-year counts:  Section 1960 and Section 1960 conspiracy.  Dkt. No. 84 (Transcript of 9/10/09 Sentencing) (annexed hereto as Exhibit B), at 4.

[9] The reporting crimes, specified at 31 U.S.C. §§ 5313, 5314, 5316, and 5318, incorporate a "willfulness" requirement.  *See* 18 U.S.C. § 5322.

*Third*, a corollary to the circumstance that the conduct falls outside the heartland is that application of U.S.S.G. § 2S1.3 dramatically overstates the seriousness of the offense. Mr. Diaz's Guidelines range has been calculated in a way that equates his conduct, which was carried out without wrongful intent or knowledge, with a defendant who structured $100 million in transfers, or who knowingly filed false currency reports on that amount. The disparity in seriousness between the conduct of Mr. Diaz and such intentional crimes is vast, but the guideline is unable to calibrate to Mr. Diaz's benign state of mind.

*Fourth*, this case presents the paradigm of the sentence that overstates the gravity of the offense because application of the fraud loss table from U.S.S.G. § 2B1.1 means that dollar value alone—here the value of the transmittals—predominantly determines the offense level. Again, this failing is particularly stark when the crime is a strict liability crime. Given Mr. Diaz's lack of awareness that he needed to obtain a license, Mr. Diaz's culpability is not appropriately "scaled" to a table of ascending dollar values. His failing was binary; Mr. Diaz did not know of the requirement and had he known, he never would have committed the crime. For Mr. Diaz's sentencing range to be determined mainly by the value of the dollars transmitted also ignores that he never intended to cause harm, although Section 2B1.1 itself now limits upward adjustments based on loss—in a case like this one where there is no actual harm—to situations in which the defendant "purposely sought to inflict" pecuniary loss. U.S.S.G. § 2B1.1, appl. n.3.

31

The Honorable Jed S. Rakoff has written about the unfairness that results from the fact that the guidelines for white collar and drug cases put an "overwhelming focus" on a single factor, simply because that factor is easier to measure than other, equally important factors.[10] The cost of treating quantity or loss as "the be all and the end all" is that the Guidelines range that results, and that continues to serve as a starting point in the post-*Booker* world, will not "fairly convey the reality of the crime or the criminal."[11]

This is the case for Mr. Diaz. Even as a starting point for analysis, the sentencing range that results from applying the Guidelines—and especially the blunt instrument of the fraud loss table—is wildly disproportionate to the seriousness of the conduct for which Mr. Diaz is being sentenced.

The Probation Office has, without the benefit of much of the information presented in and with this sentencing memorandum, already recommended a sentence—of five years' imprisonment—far below the Guidelines range it calculated. PSR at 27.

The recommendation is consistent with outcomes in this District in sentencings of defendants convicted solely of operating an unlicensed money transmitting business and/or conspiring to do so. As noted above, in the *Mazza-Alaluf* case, Judge Castel sentenced a defendant who engaged in significantly more serious

---

[10] Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped*, 26 Fed. Sent. R. 6, 7 (2013).

[11] Rakoff, *supra* note 10, at 7.

conduct than Mr. Diaz to 42 months' imprisonment. Defendant Mazza-Alaluf operated a $350 million money transmitting business in two countries and three U.S. states, and he faced at sentencing a guidelines range of 121-155 months' imprisonment. *See* discussion *supra* at n.2 and sources cited therein. The government, which claimed additionally that the defendant was aware of the requirement to license his business, did not seek a Guidelines sentence but instead one of at least five years' imprisonment. Dkt. No. 84 (Transcript of 9/10/09 Sentencing) (annexed hereto as Exhibit B), at 36. Judge Castel noted as factors supporting a downward variance that the defendant was "56 years of age, a hard-working businessman, and a good family man" who was "unlikely to reoffend." *Id.* at 43.

In *United States v. Faiella*, the lead defendant, who pled guilty to conspiring to operate an unlicensed money transmitting business, also was granted a downward variance, and also received a sentence significantly less than 60 months' imprisonment, despite being a repeat offender who engaged in serious, knowing violations of law. *United States v. Faiella*, 14 Cr. 243 (JSR), Dkt. No. 73 (Transcript of 1/20/15 Sentencing) (annexed hereto as Exhibit C), at 28-31. Defendant Faiella pled guilty to operating a money exchange that enabled customers to obtain bitcoin for use on the Silk Road online drug bazaar. Dkt. Nos. 1 (Complaint) and 50 (Transcript of 9/4/2014 Plea Hearing). He faced a Guidelines range of 57-71 months' imprisonment, based on his prior felony tax conviction and admissions that he facilitated nearly $1 million in narcotics transactions, although his range was capped

at 60 months' imprisonment because of the government's agreement to accept a plea to a single conspiracy count. Dkt. No. 73 (Transcript of 1/20/15 Sentencing) (annexed hereto as Exhibit C), at 2, 12, 21. (Judge Rakoff sentenced defendant Faiella principally to 48 months' imprisonment.  *Id.* at 31.

Judges in this District have also imposed sentences of probation in cases charging violations of Section 1960 and/or conspiracy to violate Section 1960 alone, where culpability is negligible or absent.  In *United States v. Younis*, 10 Cr. 813 (JFK), the government prosecuted an individual who transmitted between $10,000 to $30,000 on behalf of Faisal Shahzad, who was himself charged and convicted of committing crimes of terrorism for planting a bomb in Times Square in 2010.  Dkt. No. 31 (11/23/2011 Gov't Sentencing Memorandum), at 4, 7.  Defendant Younis, who pled guilty to a single Section 1960 count, was not alleged to have known of Shahzad's intentions, but the funds he transmitted were in fact used by Shahzad to purchase goods he then used to make the car bomb.  *Id.* at 8.  The Honorable John F. Keenan sentenced Younis to three years' probation and a $2,000 fine.  *See* Transcript of 12/01/2011 Sentencing (annexed hereto as Exhibit E), at 9-11; Dkt. No. 33 (12/02/2011 Judgment).

The Honorable Lewis A. Kaplan in *United States v. Bah*, No. 06 Cr. 243 (LAK), also elected a sentence of probation over a recommended term of imprisonment (before the government dismissed the case following a successful appeal by Bah on grounds of instructional error).  In *Bah*, the defendant was an émigré from Guinea who was convicted of a single count of operating an unlicensed money transmitting

34

business.[12]  According to the trial proof, the defendant had run a money transmitting business in New Jersey that was licensed in that state but also received $10,000 to $15,000 per week in New York for a period of years, which he transmitted from New Jersey, as part of what the government contended was an unlicensed New York business.  *See* 574 F.3d at 110-11.  Judge Kaplan sentenced the defendant to one year of probation and a $1,000 fine, after declining to resolve Guidelines disputes that could have resulted in a range as high as 63 to 78 months' imprisonment.  Dkt. No. 41 (Transcript of 9/10/07 Sentencing) (annexed hereto as Exhibit D) at 11, 16-18.

> In reasoning that has relevance here, Judge Kaplan found:

> Depending upon the resolution of the unresolved offense level issues, the sentence is either within or outside the Guideline range.  If and to the extent that it is outside the Guideline range, the Court finds that a more severe sentence would be greater than necessary to comply with the purposes of 18 U.S.C. 3553(c)(2) in light of the facts that (a) this is a strict liability offense, (b) the defendant seems to have tried to run his business in accordance with the law; (c) the defendant does not require greater punishment to protect the community; and (d) a greater sentence is not required, in the circumstances of this case, for purpose of general deterrence.

Brief and Appendix for Appellant Boubacar Bah, *United States v. Bah*, No. 07-4370, 2008 WL 6991016 (2d Cir. Feb. 4, 2008) (Statement of the Case, quoting Judgment and Commitment entered by the District Court).

---

[12] The government dismissed a money laundering count, which charged the laundering of drug proceeds, just before trial, after its witness fled the country.  *See United States v. Bah*, 574 F.3d at 109.  Mr. Bah was also charged with making false statements but the jury acquitted on that count.  *Id*.

35

While no case analogy is perfect, Mr. Diaz respectfully submits that a similar view should be taken of the Guidelines range, and the sentence, in this case.

## IV. The Sentence Sufficient To Serve the Purposes of Punishment Does Not Require Incarceration

Section 3553(a)(2) requires that the sentence be "sufficient, but not greater than necessary":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In this case, the only Section 3553(a) factor that suggests a sentence of incarceration is an advisory Guidelines range that greatly overstates the seriousness of Mr. Diaz's offense. Full consideration of the Section 3553(a)(2) factors demonstrates that the sentence the Court is required to impose—a sentence "not greater than necessary" to serve the purposes of sentencing—would forgo a term of incarceration.

The question of what punishment is "just" must take into consideration, at the threshold, the punishment that Mr. Diaz has suffered already. Mr. Diaz, who has tried to lead by example his whole life, in his family and in his community, has experienced the shock and shame of having his business raided, of being arrested, and of having his crimes publicized in the local news and on local TV. He has been branded a felon, despite never having known what he was doing was wrong. The

36

perception that he did something against the laws and the country of the United States also distresses him, because as his wife puts it, "[w]e love and respect this country that gave us the opportunity to start a new life." Mr. Diaz's faith is strong, and he is sustained by it, but much of his life's work is in ruins. His wife says, "[t]o this day I cannot believe we are in this awful situation. . . . We are suffering tremendously."

Two of the consequences of being prosecuted for his conduct are particularly painful to Mr. Diaz. *First*, the business that he built up for 35 years, and that was successful even though it never made him or his family rich, has been shut down. After the execution of the search warrant, in May 2016, Mr. Diaz and his family made efforts to continue working, without their files or computers and in the face of bank account closings and seizures of hundreds of thousands of dollars of cash in the operating account of Miami Equipment. The company found that it could not even limp along, however, after Mr. Diaz and his son Luis Javier were arrested and those arrests were publicized. Clients continued to flee, and the company could not make payroll or pay its suppliers or creditors. Miami Equipment was forced to shut down its operations. Today, family members other than Mr. Diaz and his son are attempting to succeed in a new equipment exporting business, but the level of business activity, and their personal income levels, remain depressed. If Luis Javier and Mr. Diaz are unavailable to lend help, the viability of even that venture will be further compromised.

37

*Second*, the effects on his family of Mr. Diaz's prosecution have been devastating—beyond even what most families suffer when a family member is charged and convicted.  Most shattering to Mr. Diaz is that his oldest son, Luis Javier, was prosecuted with him, apparently on the basis that his name appears on a Miami Equipment email box that was not used exclusively (or in some periods, even mainly) by him.

His children, Michael Albert and Annette, were put on the government witness list, and Annette testified against her father and brother.  She states in her letter to the Court that it was "devastating for me as well as for them" for her to tell the truth, knowing that it might hurt the men she admired most, while also believing "from the bottom of [her] heart that they had no intent of doing anything illegal."

The demise of Miami Equipment has caused financial hardship to many of Mr. Diaz's children and other family members, in addition to emotional distress.[13]  Luis Javier and his wife are struggling to determine how their family will obtain and pay for health insurance if he is incarcerated; his teenage daughter was diagnosed with Type 1 diabetes four years ago, his wife suffered a stroke in 2008, and Luis Javier's job has always been the source of the family's coverage.  The demise of Miami Equipment has also hurt other employees of Miami Equipment, which included Michael Albert and Annette, Mr. Diaz's nephew Jim Jimenez, and his daughter-in-law Carolina Vivacqua.  Jim Jimenez has described that as anxious as he is about

---

[13] The Probation Office has found that Mr. Diaz does not have the ability to pay a fine and thus has recommended that the fine in this case be waived.  PSR at 32.

38

"not having a job, or health insurance," those concerns "seem[] miniscule as compared to what the rest of the family is going through.  The weight and consequences has been crippling to all of us."

To have caused harm to his loved ones is, for Mr. Diaz, the cruelest punishment, and it is one he has already suffered and will continue to suffer.

The aims of promoting respect for the law and deterrence—as important as they are—also do not in this case weigh in favor of imposing a term of incarceration. Specific deterrence and promoting Mr. Diaz's respect for the law are not relevant here, as Mr. Diaz did not intend to commit a crime and will never do so again.  As for general deterrence, the prosecution of Mr. Diaz has certainly served as a wake-up call to the community of exporters in Miami in which Miami Equipment operated. Imposing a term of incarceration as a means of making a more general example of Mr. Diaz, however, would disproportionately punish someone who acted without moral fault.  While deterrence has its uses, in no scenario is it more likely to be of merely theoretical effect than where the crime requires no wrongful state of mind. Particularly in light of the forms of punishment that Mr. Diaz has already suffered, and from which he and his family are not likely to recover, he should not be jailed for the sake of promoting incremental general deterrence that may or may not ever make an impact.

The final Section 3553(a)(2) factors also do not call for a term of incarceration. There is no need to protect the public from Mr. Diaz.  And Mr. Diaz would not benefit

39

from any education or vocational training, or any medical care or other correctional treatment, that he might receive if imprisoned.

This is a time of a growing call for the application of more decent and intelligent sentencing and incarceration principles—principles that would reserve prison cells for defendants who either need to be separated from society for society's protection or those who would learn or benefit from incarceration.[14]  Applying these principles to Mr. Diaz's case easily yields the conclusion that there is little point to sending Mr. Diaz to prison.  Mr. Diaz will not learn to be more morally upstanding or law-abiding if incarcerated.  At his age, prison could easily cause his health and well-being to deteriorate.  And jailing Mr. Diaz will serve only to separate him from a family and a community to which he makes meaningful contributions.  As Mr. Diaz's friend of 30 years, Ricardo Suarez, puts it, "[s]entencing him to a term in prison would only cause society to lose a citizen who would be a valuable asset and for his family to suffer even more than they already have."

---

[14] *See, e.g.*, U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal Criminal Justice System*, at 1, 20 (Jan. 2009), available at https://www.ussc.gov/research/research-publications/2009-report-alternative-sentencing-federal-criminal-justice-system (observing that "[i]ncreasingly, criminal justice professionals have argued that dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and non-violent offenders." And that alternatives to incarceration "provide those offenders opportunities by diverting them from prison (or reducing time spent in prison)"; Hon. Raymond Dearie, *Retool Mandatory Sentences*, New York L.J. (June 24, 2016), available at https://www.law.com/newyorklawjournal/almID/1202760853093/ (advocating reserving prison cells "for the violent and those who victimize irreparably" and thinking seriously "about the wisdom and need of incarcerating non-violent first offenders whose only real victims are themselves").

**V.    The Need To Avoid Disparities Militates in Favor of a Non-Incarceration Sentence**

As discussed above, unless the strict liability nature of Mr. Diaz's crime is a central determinant of Mr. Diaz's sentence, unwarranted disparities will be created among those who have engaged in "similar conduct," 18 U.S.C. § 3553(a)(6), at least insofar as U.S.S.G. § 2S1.3 purports to group conduct similar to operating an unlicensed money transmitting business.

Yet another factor that militates strongly in favor of a sentence that does not impose incarceration on Mr. Diaz is that Mr. Diaz and his son are less culpable than others who requested that Mr. Diaz, in effect, begin operating the money transmitting business, and themselves directed that business, but have not been punished, or even prosecuted.  While Mr. Diaz must take responsibility for his lack of vigilance or guile, it is undisputed that the founders of the KCT consortium, who were far more sophisticated businessmen than Mr. Diaz, instigated the idea of having Miami Equipment transfer money for services purportedly performed for them.  Blas Herrera and his associates also determined what transfers to put through, and in what amount, and KCT created the false paperwork that supported the transfers made by Miami Equipment.

According to the application the government filed in order to obtain authorization to search Miami Equipment, the government apparently questioned—and released—Blas Herrera, who was seeking to be treated with leniency in light of the potential that he might be prosecuted.  This was despite the fact that Herrera admitted to using Miami Equipment to transmit money for his own purposes.  The

41

government has never prosecuted Herrera or any of the others who bear greater culpability for the offenses of conviction than Mr. Diaz. Mr. Diaz should not be deprived of his liberty while those who likely sought him out because of his honesty and trusting nature go entirely unpunished.

## VI.   The Government Has Not Identified Any Need for Restitution

The Probation Office has left to the government whether to seek restitution in this case. Because the government has never identified any parties that suffered harm in this case, nor any means of computing any restitution amount, restitution would seem to be inapplicable.

## VII.   The Kinds of Sentences Available Make It Appropriate Not To Subject Mr. Diaz to Incarceration

In the post-*Booker* era, it is clear that even a departure to the sentence of probation, or supervised release, or time served, is a fully available sentence. In addition, 18 U.S.C. § 3553(a)(3) "directs the judge to consider sentences other than punishment."[15]

---

[15] For example, this Court can impose a sentence of probation together with home confinement or community confinement. And if the Court disagrees that a term of incarceration is punishment greater than necessary to serve the purposes of sentencing, and imposes a term of imprisonment, the Court has the power to make a recommendation to the Bureau of Prisons, under 18 U.S.C. § 3621, that Mr. Diaz be designated to serve the term at a half-way house in his home town of Miami. *See, e.g., United States v. Younger*, 16 Cr. 348 (JSR), Dkt. No. 24 (Amended Judgment) (annexed hereto as Exhibit F).

## CONCLUSION

Mr. Diaz violated the law without any wrongful state of mind, and he and his loved ones have paid for his mistakes dearly. For the foregoing reasons, we respectfully request that the Court impose a sentence that does not call for a term of incarceration.

Dated: May 25, 2018
      New York, New York

Respectfully submitted,

SELENDY & GAY PLLC

By: _____
Christine H. Chung
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9009
E-mail: cchung@selendygay.com

*Attorneys for Defendant Luis Diaz, Jr.*

43