I6jddias

Sentences

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    UNITED STATES OF AMERICA,                    New York, N.Y.
4                    v.                           17 Cr. 0077(WHP)
5    LUIS DIAZ, JR. and LUIS JAVIER
     DIAZ,
6
                    Defendants.
7
     ------------------------------x
8
9                                                 June 19, 2018
                                                  2:37 p.m.
10
11   Before:
12                        HON. WILLIAM H. PAULEY III,
13                                                   District Judge
14                             APPEARANCES
15
     GEOFFREY S. BERMAN
16        United States Attorney for the
          Southern District of New York
17   BY:  DANIEL TRACER
          BENET KEARNEY
18             Assistant United States Attorneys
19   SELENDY & GAY PLLC
          Attorneys for Defendant Luis Diaz, Jr.
20   BY:  CHRISTINE H.  CHUNG
21   SCOTT ALAN SREBNICK
     JOSE MANUEL QUINON
22        Attorneys for Defendant Luis Javier Diaz
23
24
25

I6jddias
Sentences

| 1 | THE CLERK:  This is United States of America against |

 1        THE CLERK:  This is United States of America against

 2   Luis Diaz, Jr. and Luis Javier Diaz.

 3        Appearances.

 4        MR. TRACER:  Daniel Tracer and Benet Kearney for the

 5   government.  Good afternoon, your Honor.

 6        THE COURT:  Good afternoon, Mr. Tracer.

 7        MS. CHUNG:  Christine Chung, from Selendy & Gay, for

 8   defendant Luis Diaz, Jr., your Honor.  Good afternoon.

 9        THE COURT:  Good afternoon, Ms. Chung.

10        MR. SREBNICK:  Good afternoon, your Honor.  Scott

11   Srebnick and Jose Quinon on behalf of Luis Javier Diaz, who is

12   present before the Court.

13        THE COURT:  Good afternoon, gentlemen.

14        I note the presence of Luis Diaz, Jr. and Luis Javier

15   Diaz at counsel table.

16        This matter is on for sentencing.  Are the parties

17   ready to proceed?

18        MR. TRACER:  We are, your Honor.

19        MS. CHUNG:  Yes for Luis Diaz, your Honor.

20        MR. SREBNICK:  Yes, your Honor.

21        THE COURT:  All right.  I propose to proceed first

22   with the guidelines issues that have been raised in the

23   parties' papers, and then I will hear from each of the

24   defendants in turn and then the government and proceed to

25   sentencing.

I6jddias
Sentences

1          So at the outset, Ms. Chung, have you reviewed with

2     your client the presentence investigation report?

3          MS. CHUNG:  I have, your Honor.

4          THE COURT:  And are there any factual matters in the

5     report that you believe warrant modification or correction?

6          MS. CHUNG:  Your Honor, I have one which is in

7     paragraph 86 of the final presentence report.

8          THE COURT:  You may proceed.

9          MS. CHUNG:  Your Honor, this is very -- I think this

10    is minor.  I don't think it will be contested.  But in

11    paragraph 86, there is a reference to an incident in which my

12    client was questioned by the Miami police about a license

13    expiration and that he had -- what had happened was he had

14    recently changed the address of his business and he did not

15    pick up the license.  There is a reference in the second

16    sentence to the charges being dropped.  There was never any

17    charge in this incident.  I just wouldn't want someone who read

18    the presentence report later to believe that there was any kind

19    of prior arrest or charge.

20         THE COURT:  Any objection to striking that sentence in

21    line 2?

22         MR. TRACER:  No, your Honor.

23         THE COURT:  All right.  It's stricken.

24         Anything else, Ms. Chung, with respect to the

25    presentence report that is of a factual matter?

I6jddias
                        Sentences

1              MS. CHUNG:  No, your Honor.

2              THE COURT:  All right.

3              Mr. Tracer, does the government believe any

4    modifications or corrections are warranted in the presentence

5    report?

6              MR. TRACER:  No, your Honor.

7              THE COURT:  Very well.

8              Now, Mr. Srebnick.

9              MR. SREBNICK:  Srebnick, yes, your Honor.

10             THE COURT:  Have you reviewed with your client the

11   presentence investigation report?

12             MR. SREBNICK:  Yes, I have, your Honor.

13             THE COURT:  Are there any factual matters set forth in

14   the report that you believe warrant modification or correction?

15             MR. SREBNICK:  Yes, your Honor, and those are the

16   factual statements that pertain to really the guidelines

17   objection to the value of the funds.

18             THE COURT:  Right.  Those we can deal with in the

19   guidelines discussion.

20             MR. SREBNICK:  Other than those, no, your Honor.

21             THE COURT:  Very well.  Once again, Mr. Tracer, does

22   the government believe there are any factual matters set forth

23   in Luis Javier Diaz's presentence report that require

24   correction or modification?

25             MR. TRACER:  No, your Honor.

I6jddias

Sentences

1    THE COURT:  All right.  Now, as I've said, there were

2    a number of arguments made with respect to the guidelines, some

3    by both defendants and others by Luis Javier Diaz alone.  I

4    have reviewed all of the arguments submitted in the papers.

5        Do the parties wish to address further any of those

6    guidelines issues?

7        MR. TRACER:  We can rest on our submissions unless the

8    Court has questions.

9        MR. SREBNICK:  Your Honor, there is only one

10   additional matter.  Obviously, the Court sat through the trial.

11   The court know the evidence very well.  The Court had the

12   unique situation of sitting through the trial and not having

13   this matter come before it just upon a plea, which is more

14   difficult.  So the Court is obviously well positioned to make a

15   guidelines' determination.

16       I would say that the government took the position, in

17   a response filing, that the Taller transaction alone could not

18   have formed the basis for the jury verdict.  And last night I

19   was going through the government's memorandum of law in

20   opposition to the motion for a new trial, judgment of

21   acquittal.  There was something that was bothering me about

22   that statement in the government's response.  And I realize

23   that issue was teed up four the Court.  But in the government's

24   response to the motion for a new trial, at page 10, the

25   government itself says that, "Indeed" -- and I'm quoting,

I6jddias

Sentences

1  "Indeed, the tire transaction -- Government Exhibit 129-T -- is

2  itself sufficient to support the defendant's conviction on both

3  Counts Two and Four.  In that transaction, Taller transferred

4  $69,975.00 from Venezuela to the defendants' operating account

5  in the United States"...

6          And the Court, in its order denying the motion for

7  judgment of acquittal, accepted the proposition that that

8  transaction alone would have been sufficient.  I realize the

9  Court cited other evidence and the government has cited other

10  evidence.  But as a matter of law, I think that we are

11  correct -- and we agree with the government's position in the

12  memo -- that the Taller transaction alone could form the basis

13  for the conviction.

14          Why is that important?  It is important for the

15  reasons I addressed in the papers, which is we believe that's

16  really the only conduct that the jury convicted Luis Javier of,

17  and that was conduct that involved $69,975.  Obviously, this is

18  a hugely important issue.  Because a decision that the Court is

19  going to make, and have to make by a preponderance of the

20  evidence, is going to make all the difference between whether

21  or not the guideline range starts at a number -- a range of

22  perhaps 15 to 21 months or as high as 151 months.  And it seems

23  sort of unfair under the guidelines that that kind of finding

24  can make all the difference in the world.  I suppose that is

25  the world we live in.  But I do want the Court to know that as

I6jddias

Sentences

1    a matter of law certainly the jury could have found Luis Javier

2    guilty of only the Taller transaction.  Obviously, he was

3    acquitted of the conspiracy counts.  And I think those speak

4    volumes -- those acquittals speak volumes, because had the jury

5    found that he was jointly involved in it, jointly undertaken

6    the activity related to the KCT transactions, they necessarily

7    would have convicted him of the conspiracy.

8            So, obviously, the Court is more familiar with the

9    evidence than I am and we rest on the papers beyond that, but I

10   did want the court to understand that one point.

11           THE COURT:  All right.  Thank you, Mr. Srebnick.

12           Mr. Tracer, do you want to be heard?

13           MR. TRACER:  No, your Honor.  I don't have the motion

14   papers for the Rule 29 in front of me.  If I recall, the issue

15   there had to do more with the fee.  That was the only

16   transaction on which Mr. Luis Javier Diaz was identified where

17   there was an explicit fee charged.

18           The point we were making in the sentencing submission

19   is simply that, as your Honor instructed, a single transaction

20   cannot be a business or the operation of a business under 1960,

21   so that's what we intended in the sentencing submission.

22           THE COURT:  All right.  Ms. Chung, do you want to be

23   heard at all?

24           MS. CHUNG:  No, your Honor.  We'll rest on our papers.

25   Mr. Diaz made one guidelines-based objection which was to

I6jddias
Sentences

1    sophisticated laundering, and as your Honor has reviewed the

2    papers, we will rest on those.

3         THE COURT: All right. First, to be clear, the Court

4    has reviewed all the submissions and the presentence

5    investigation reports here.

6         Turning first, as I said I would, to the guidelines'

7    calculation, both defendants object to a two-level enhancement

8    for sophisticated means. Now, the scheme here spanned nearly

9    six years and involved numerous shell companies, fraudulent

10   invoices for, among other things, consulting services when no

11   consulting services were performed, and instead funds were

12   wired at the direction of Venezuelan nationals to accounts in

13   the United States and abroad for personal expenses such as a

14   wedding in Europe. Based on that evidence at trial, this Court

15   finds that the enhancement for sophisticated means is entirely

16   warranted in the case.

17        Now, Luis Javier Diaz challenges the $100 million

18   value of funds transferred without a license, which yields a

19   base offense level, for international money laundering, of 30.

20   He argues that only a relatively small transaction in the

21   amount of $67,975 was directly attributed to him.

22        In reviewing the matter, I find that that argument is

23   not persuasive. First, the evidence at trial included many

24   emails regarding the illegal currency transmissions that were

25   sent and received by Javier, and emails relating to KCT

I6jddias

Sentences

payments arrived at an email address that was used by both Luis

Diaz, Jr. and Luis Javier Diaz.  In addition, among other

things, Javier Diaz transmitted fraudulent certifications to

KCT indicating that tens of millions of dollars transmitted by

KCT were for equipment and goods sold by Miami Equipment when

in fact no such transactions occurred.

Those certifications alone give some indication of

Javier Diaz's knowledge of the magnitude of the scheme, and

both father and son held control of the bank accounts through

which most of the illegal transmissions occurred.

Now, Javier Diaz also seeks a mitigating role

reduction, again premised on the $67,975 transaction, but it's

clear for the reasons that I've already stated that he was well

aware of the scope and structure of the activity, that he

participated in planning and organizing it, and exercised some

decision-making authority.  To the extent he had discretion

over Miami Equipment's business and bank accounts, just as much

as his father, when Miami Equipment profited, he, too, you

know, was part of the scheme.

Finally, Javier Diaz urges that the conduct here does

not fall within the heartland of money laundering.  His

conviction for international money laundering turns on the same

conviction as his conviction for operating an unlicensed money

transmitting business.  He was convicted under that prong of

the money laundering statute that prohibits international

I6jddias
                              Sentences

1    transfer of any funds, even untainted funds, and here the

2    transactions involve the proceeds of legitimate Venezuelan

3    businesses seeking to move their funds outside of Venezuela.

4    But this Court can take all of that into consideration in

5    granting a variance in this case without resorting to the

6    detailed analysis that would otherwise be necessary to warrant

7    a downward departure.  Suffice it to say, this Court presided

8    over the trial, and I'm thoroughly familiar with the evidence

9    presented.

10          And so to recap, then, for the guidelines'

11   calculation, the base offense level is determined by the amount

12   of money involved in the transfers without a license.  That

13   amount is approximately $100 million, and, as such, the base

14   offense level is 30.  Because this offense also involved money

15   laundering, a two-level enhancement is warranted, and because,

16   as I've already determined, it involved sophisticated means, a

17   further two-level enhancement is warranted.  So the total

18   offense level is 34 for each of the defendants.  In this case,

19   neither defendant has any prior criminal history, and,

20   accordingly, their Criminal History Category is a I.  Now, that

21   yields a guideline range here of from 151 to 188 months of

22   imprisonment.  So, the guidelines are a starting point in any

23   sentencing proceeding, just that.

24          And with that, the Court is prepared to hear from the

25   defendants.

I6jddias

Sentences

1    Ms. Chung, would you like to be heard at this time?

2    And I'd ask, if you would, to take the podium so that everyone

3    can hear.

4    And if there is any possibility for the people who are

5    seated to make a little more room so that some of those people

6    who are standing can sit, I certainly would appreciate it and

7    I'm sure that those who are standing would appreciate it even

8    more.

9    (Pause)

10    MS. CHUNG:  Thank you, your Honor.  We appreciate very

11    much the chance to be heard on the matter of variance.

12    And I hope that it doesn't strain the record too much

13    to say that this is a case with very unusual characteristics.

14    One, the base of it is a strict liability crime.  And to be

15    precise about it, in the way the jury was instructed, that

16    means that here the defendants, neither of them were required

17    to have knowledge of illegal conduct, illegality.  They weren't

18    even required to know that there was a licensing requirement.

19    And the money laundering charge was based on the same conduct.

20    Here, the jury found that there was operation of an

21    unlicensed money transmitting business.  They were effectively

22    finding, and did find, that there was money laundering by

23    virtue of the same transfers that because they were

24    international had the effect of promoting the unlicensed

25    business.

I6jddias

Sentences

1    We also have an unusual circumstance of the men who

2    were charged and who have now been convicted.  And your Honor

3    has been through many sentencings.  I have learned much through

4    the process of hearing the people here and the people in Miami

5    who know the defendants speak of them with their hearts, with

6    generosity.  I have only known my client for a matter of

7    months, but some of the people in the courtroom today have

8    known him for decades, three and four decades.  There is at

9    least one person here in the room who my client knew from his

10    days in Cuba.

11    And although I know that your Honor paid the closest

12    attention to the trial, one of the purposes of the sentencing

13    is to put the man in context.  That's what the cases say and

14    that's how we know that it works.  And here I think that the

15    starting place is the man himself, how he is very shamed to be

16    here having been adjudged to have been in disrespect of the

17    laws of a country that is his adopted country, that he owes his

18    life to, and it is almost unfathomable that he finds himself in

19    this position and, again, some of the consequences of the

20    unusual characteristics of the case.

21    But what do the people who know Mr. Diaz say about

22    him?  First of all, that he is a very, very upstanding person,

23    who has integrity.  That's the person that they've known

24    through his whole life.  He's 76 today.  That he is moral.

25    That he believes strongly in his faith and that it has always

I6jddias
Sentences

guided him.  And Mr. Diaz is somebody who is reflected -- his

goodness is -- the way that people have responded to him even

in his darkest hour is a reflection of the respect and the

kindness that he showed to them through all the years, the

generosity that he has shown to them through all the years.

And first of all, for him, it's important to talk

about his family.  And this is definitely a family where when

you see the patriarch and you judge the patriarch, you judge

the father and the grandfather, the fairest estimation of him

is his children and his grandchildren, who he has managed to

make sure have gotten an education, who are fully integrated

into their country, who are productive members of society, who

have the same value system, the same faith that he does.  And

it would be wonderful if that were more common, but it is

really a -- it is exemplary.  It is exemplary.

He has raised his family in his own image and in his

own values.  And all five of his children are here today.  Some

of his grandchildren are here today.  And, again, it is

catastrophic to them -- you know, when you have a strict

liability crime and someone is facing 12 to 15 years in prison,

the element of tragedy that is always present at sentencing is

magnified here.

His friends describe and his family describes somebody

who has been generous his whole life.  He will give a plate of

food to somebody.  He has opened his home to a friend who

I6jddias
Sentences

1 suffered through Hurricane Andrew without any thought to, OK,

2 I'm going to have five or six more people living under my roof.

3 His mother-in-law lived with him for 33 years after he

4 converted his garage so that she could live there, and she

5 passed away the day after the verdict came down.

6       So this is a man who has never hesitated -- and the

7 testimonials are coming from the people who know him best --

8 never hesitated to do things that were selfless when it touched

9 him, not because it was something that he was going to get

10 something out of but because it was the right thing to do.

11       So what comes here is how does somebody like this man,

12 who everybody attests -- and I don't think the government will

13 contest -- has this blameless, completely blemishless

14 background end up before the Court in a situation where the

15 guidelines say that he should get 12 to 15 years in prison?

16 And I should say that I'm not overblowing that.  We do respect

17 and we're thankful that the Probation Office has actually

18 recommended that any sentence be capped at five years, and we

19 think that that's rational.  Obviously, I'm here to argue for a

20 greater variance, but, your Honor, we do appreciate that that

21 attention was paid and that in some sense proportionality has

22 been returned to the proceeding.

23       So how does Mr. Diaz end up here?  Well, he ends up

24 here through really thoughtless, stupid behavior, I think, and

25 I have had many conversations with my client about it.  I

I6jddias
Sentences

1    wasn't here for the trial, as your Honor knows.  And when your

2    Honor talks about the invoices and the length of time that it

3    went on, of course I know what you are speaking of.  And I

4    think that the context that can be given to that, and that I

5    hope will be given to that in this proceeding, is that he was

6    being asked by people that he had dealt with for many, many

7    years to do something that he thought was not -- he certainly

8    did not believe that it was against the laws of the country.

9    These are people who had been his clients and had helped him

10   build his business.

11          It never occurred to him, he could never dream that

12   they were asking him to do something illegal.  He couldn't even

13   think and did not even think that they would ever ask him to do

14   something that was harmful to his business.  They had been

15   longtime customers of his who had helped him build his

16   business.

17          And they were also coming to him with a problem that I

18   think is difficult to explain and convey.  Your Honor has read

19   the letters.  You know that many of them come from people in

20   the same business.  And what they are -- I think the picture

21   that they are painting for the Court is, listen, when you do

22   business in South America and Central America, you are dealing

23   with a lot of different cultures, a lot of different laws.  In

24   this case there were Venezuelan businessmen who feared, as they

25   told it to my client, that they were going to lose the use of

I6jddias
Sentences

1  their own currency because of a socialist regime.  It is not

2  overstating it to say that they nationalize businesses.  They

3  make it possible, as Mr. Diaz himself had suffered in Cuba,

4  that one day you wake up and everything that you built has been

5  taken away, that your ability to use what you have in your bank

6  account is gone -- not through anything that you did but

7  because of an arbitrary and totalitarian regime.

8          And in that wrapper, in a situation where he believed

9  he was doing no one no harm, he let it happen.  And he let it

10  happen and go on, and, yes, those documents were fake and he

11  was thoughtless to it.  And I cannot, your Honor, I can

12  honestly say, I do not understand that.  I'm a lawyer.  I am

13  details-oriented person.  If anybody ever presented me with a

14  document that looked like that, of course it would be a huge

15  red flag.  But one thing that I have learned in my 20 years of

16  being a lawyer, my 25, 28 years of being a lawyer, many people

17  out there aren't as thoughtful about that.  There is

18  thoughtlessness.  There is lack of care.  And there is tragedy

19  that comes in the wake of that for some fraction of the people

20  who are thoughtless like that.

21          The outer limit for Mr. Diaz is if he had known for a

22  second, if it had occurred to him for a second that he was

23  violating the law, or that he was doing anything, anything,

24  that would endanger his family, he never would have done it.

25  And I think that is very clearly put across from the people who

I6jddias
Sentences

know him, and that is the backstop to how bad is his conduct.
What did he really know?  He can't and he is not here to deny
that those invoices were fake and that he saw them and that at
some level he was aware that this paperwork was representing
things that weren't true.  He knew he wasn't doing the work.
He explained that to your Honor at the trial.  He said that
very forthrightly.

        But he also thought this was in the realm of something
that he could do to help his friends and customers without
doing harm to the laws of the United States, to any victim.
And, in fact, we are here today in a situation where the
government is not saying that there was harm other than -- and
I want to acknowledge this -- that it ends up operating as a
shadow bank, so you can't do the monitoring.  But we're not
here talking about widows who lost their money or things like
that.

        So, I hope that that puts some context and boundaries
while being honest about what the -- frank about what the trial
evidence was.  And in some ways, your Honor, I will be -- you
know, I will just say, in some ways I can't relate to it.  I
think there are ways in which when you do what we do, you can't
relate to it.  But I also acknowledge that many, many people
don't think about things that way.  In this case, my client did
not, and he is paying a very, very, very high price for the
mistakes that he made already -- a really high price.

I6jddias

Sentences

1    The business that he built with his own hands for 35

2    years is basically gone now.  His family, which is the most

3    precious thing in the world to him, has been in a great deal of

4    pain and stress and something that it's -- there are families

5    who it is hard to imagine that anything would tear them apart

6    and I think that in the end it has made them closer, but I

7    can't really do justice to what they've been through in the

8    past two years since in May 2016 their business was raided.

9    This is a situation, your Honor, where I think -- and

10   we started with the guidelines and your Honor has already

11   acknowledged that there are things that can be done with

12   variances.  I think this is a case that cries out for that.

13   When you start with the crime that is a strict liability crime,

14   even the latest round of the guidelines' amendments were to put

15   boundaries around intent, to say loss should be intended loss.

16   Role should be the role that you intended, that you undertook.

17   And you just have a fundamental mismatch where the guidelines,

18   which are an imperfect gauge to begin with, when you bring that

19   into a scenario like this, it really has -- it is almost like

20   just spinning a wheel.  It's very difficult to sort of get

21   purchase in where in the guidelines you can relate to this

22   conduct.

23   And so even within the guideline, 2S1.1, I pointed out

24   in our papers, you know, that guideline is mainly about --

25   every other thing in that guideline is about intentionality,

I6jddias

Sentences

structuring.  Mr. Diaz's conduct in letting this big volume --

granted, a big volume of dollars flow through his business,

first of all, it is binary.  He didn't know it was wrong.  So

it could have been one dollar, it could have been $100 million,

his intentionality, his state of mind is all the same as to

that.

But, secondly, his conduct cannot be equated with

someone who structured $100 million, but that's what the

guideline does.  And it's nothing that is new to say but there

are just situations in which the guidelines are not a good

gauge.  They are not a good benchmark.  They don't help, and it

only makes everyone's jobs harder, including, of course, the

Court's, but I can't imagine a situation where that is more

brought home than the case that is before your Honor today.

And that is why, you know, we did the work of looking

at other cases in this district especially where this charge

has been brought, and I pointed out that it is also very rare

for this charge to be brought based only on strict liability

conduct.  I couldn't find another example.  I myself have been

involved in other cases charging unlicensed money operating

businesses, but in the case that I was involved in there was

also an Iran sanctions charge, there was also obstruction

conduct.  So, even in the examples that I managed to give to

the Court, which are never perfect analogies, but in every one

of those cases the sentencing judges -- and there was a range

I6jddias
Sentences

 1    of sentencing judges -- gave -- factored in that it was a

 2    strict liability crime.  And the range in the cases that I

 3    proffered to the Court, the highest was a four-year sentence

 4    and they were as low as probation, and I do believe that the

 5    factors in those cases, there were aggravating circumstances

 6    that are not present in this case.

 7        To start with a very basic thing, my client is 76

 8    years old.  He is not going to learn to be a moral person in

 9    prison.  He is a moral person.  Society is not going to be

10    served by him being in prison.  It's not going to be protected

11    better by him being in prison.  So that's a distinguishing

12    characteristic right off the bat.

13        Secondly, in some of the cases, like the Mazza-Alaluf

14    case, which is a case before Judge Castel, that was a case

15    where the government actually pointed out to the Court at

16    sentencing, this defendant knew that there was a licensing

17    requirement, and that was a $350 million money transmitting

18    business that operated in two countries and three different

19    states and the sentence in that case was 48 months.

20        In the Faiella case, which I pointed out to your

21    Honor, that was a case in which the money transmitting was

22    being used in aid of narcotics transactions, to the tune of a

23    million dollars.  This was related to the Silk Road

24    prosecution.  And that defendant had a prior felony conviction

25    for tax evasion.  And in that case the sentence was 42 months.

I6jddias
Sentences

1      And then even the things that you work down to, there

2 are cases where there was a harm.  So in one of the cases, your

3 Honor, it was the 2010 Times Square bombing.  It was a

4 terrorist bombing.  And the person who supplied the money for

5 the bomb-making materials to be made was prosecuted, and he

6 didn't know that that's what it was going to be used for, the

7 money was going to be used for -- so his state of mind, again,

8 was blameless -- but that was a case where it would be very

9 hard to say that there wasn't harm that came out of it, and he

10 received a sentence of probation.

11      So, none of this is perfect, and, again, all that can

12 be provided is context and data points and hopefully one's

13 benchmarks that are useful to the Court, but I think the common

14 theme is that the courts absolutely recognize that in a strict

15 liability regime, to stay with the guidelines' ranges is

16 imposing a sentence that is greater than necessary to serve the

17 objectives of 3553(a), to go to a familiar formulation.

18      And here, your Honor, I would like to ask the Court

19 also to consider disparities.  I'm not going to go through each

20 one of the factors because I know your Honor is aware of the

21 factors and that you have read the submissions carefully.  But

22 I also find a very fundamental unfairness in who was not

23 prosecuted here.  And certainly your Honor and the jury took

24 the time to figure out who KCT was and who the principals were.

25 And, again, very unusual circumstance where Blas Herrera was

I6jddias
Sentences

1    actually questioned by government agents back in 2015.

2    According to what the search warrant says, he lies to them.  He

3    says that the creators of the fake documents were our clients,

4    which is not true -- and I think your Honor will recognize it

5    was not borne out by the trial evidence -- and then he leaves.

6    And he and the other people who were undoubtedly the huge

7    beneficiaries of this transmission scheme, who did know the

8    ultimate beneficiaries and what their roles in government may

9    or may not have been, and who probably fully appreciated --

10   unlike my client -- that using a mom-and-pop store to transmit

11   these monies was going to be a better idea than trying to put

12   it through Citibank, I think they understood that very well --

13   even if my client was incredibly and stupidly naive about

14   that -- that they will never face justice.  And they won't have

15   to have this hard conversation with the Court that I'm having

16   now about why the guidelines don't really fit the crime and to

17   implore the Court to consider the man and where he fits in the

18   context of the conduct that's being talked about.

19          Your Honor, I realize that it is a tough thing to

20   argue to the Court in a case like this, especially where you've

21   sat in the trial and it has the characteristics that you've

22   described earlier, to say I implore the Court not to impose a

23   sentence of incarceration.  But I do feel strongly that because

24   of the highly unusual characteristics of this crime, and of the

25   man, that a sentence of incarceration is more than what is

I6jddias

Sentences

1   necessary.

2          And the last thing I would like your Honor to factor

3   in is, indeed, all that Mr. Diaz and the family have gone

4   through.  You could imagine a circumstance, your Honor -- you

5   know, one of the things about prosecutions -- and, as your

6   Honor knows, I was a prosecutor myself -- prosecutorial

7   discretion, they have it.  This is a case which I think is

8   somewhat unusual in that there was money laundering charged

9   together with the money transmitting business conduct, where

10  there is no real difference in the elements of the conduct, and

11  that's why we're facing this issue where there is not a

12  five-year cap.

13         Secondly, one, you always have these what ifs.

14  According to the search warrant affidavit, this case was first

15  being investigated in 2014.  If somebody had gone to the door

16  of Miami Equipment back in 2014 and said -- "You know what.

17  Cut it out.  You guys may not be aware of this, but you really

18  shouldn't be transmitting this money and you can't do it

19  without a license and it looks fishy to us and you should just

20  stop."  Or they had said all that plus "We're going to fine

21  you" or "We're going to sue you" or "We're just going to put

22  you out of business" -- would we be here today saying they must

23  go to prison on top of that?

24         The idea that two years later after in between

25  Mr. Herrera gets interviewed and we all go through the work of

I6jddias

Sentences

having the Indictment, having the trial, being here today, is

it really so important, is it called for is really the legal

question, that Mr. Diaz must go to jail on top of all of that?

And of course that's your Honor's decision.  I can ask you and

I think that the statute requires the Court also to consider if

in the end you don't agree that enough punishment has been

suffered or that the circumstances of the conduct warrant it, I

would request that your Honor fulfill the statute by also

considering other possibilities, alternatives to a term of

incarceration.  And that could be something like community

confinement or home confinement.  As your Honor knows, you have

all the discretion in the world.  And one thing that happens

when you sit in the trial and you pay the attention that I know

your Honor does to what we're doing here today is that the

alternatives that are available are ones that you can gauge

that would be appropriate to the case.

          I think that's all I have, your Honor.  I appreciate

the Court's time and its attention.

          THE COURT:  Before you sit down, would you also just

briefly address the question of the government's preliminary --

their proposal for forfeiture of 100 million?

          MS. CHUNG:  So, your Honor, I guess my first

reaction -- and this really only came up recently.  Again, I

really feel the disproportionality of it.  And that's why --

your Honor knows that we've made an excessive fines argument.

I6jddias
Sentences

1   It is not a light thing to stand in front of the Court and say

2   I think this is an Eighth Amendment violation, but I do think

3   in this circumstance, when the Supreme Court has issued a

4   decision in a structuring case that finds that a $15,000 fine

5   is disproportionate under the Constitution for a $10,000

6   structuring violation, we're here today for a strict liability

7   crime and they are asking for a hundred million dollars in

8   forfeiture, which is something that obviously will wipe out any

9   likelihood or ability -- not "likelihood," ability of either of

10  our clients to ever make a living.

11          And for what?  It's a theoretical number.

12  Mr. Srebnick I think is going to argue more about the

13  technicalities of why -- we do think there are reasons that

14  this cannot be imposed now.

15          I would make one point, your Honor, which is that your

16  Honor has been in trials where there has been a forfeiture

17  proceeding after the jury returned a verdict, and I absolutely

18  understand that it doesn't have to be that way.  But the rules

19  the government cited, which is 32.2(b)(5)(A), has two parts,

20  (A) and (B).  They focus -- and here's the procedural hook that

21  I think was not met here.  The rule was amended in 2009 to make

22  clear that everyone has to be alerted.  The actual -- if you

23  have the rulebook, your Honor, the Advisory Committee notes to

24  the Rule, from 2009, say that one of the reasons that (b)(5)(A)

25  was revised was so that there would no longer be inadvertent

I6jddias
                          Sentences

 1    waivers.  OK?  So the government is saying, well, we never

 2    asked for forfeiture even though the parties can ask.

 3            What (b)(5)(A) says is that once it is raised in the

 4    indictment and everybody is alerted to it, the court should

 5    make the inquiry of the parties, who wants to have the jury

 6    determine forfeiture.  And in this case that inquiry was never

 7    made despite the fact -- I'm going to take your Honor back to

 8    the day that you sent the jury out.  You may remember a little

 9    colloquy about we would like the forfeiture allegation to be

10    taken out of the Indictment.  And that was agreed to.  And so

11    these guys went back and they took the forfeiture allegation

12    out.  So it is not like forfeiture was not on anybody's mind,

13    but we think the requirement under the rule is that the

14    government should have raised it at the trial.  The Court

15    should have inquired of the parties, and that the letter and

16    the spirit of the rule has been violated in a way that creates

17    a real issue about whether the hundred million dollars can now

18    be forfeited.  And just so that my record is totally clear, I

19    do object to the imposition of that forfeiture judgment for

20    that reason.

21            The case that the government cites, the Valdez case

22    from the Fifth Circuit, cites the rule.  It is a plain error

23    case.  The part of that case that is not good for the

24    government that they don't call attention to, it is a plain

25    error case.  It says along the way, your Honor, that it was

I6jddias
Sentences

1    clear error -- the Court says it was clear error that the Court

2    did not inquire of both parties, do you want forfeiture to go

3    to the jury.

4            Now, the case goes on -- it is a drug forfeiture case,

5    and the case goes on to find there is no plain error because

6    there isn't any miscarriage of justice because of the fact that

7    the evidence was very, very clear that the proceeds could be

8    traced or that the amount was correct.  I'm not going to get it

9    exactly right, your Honor.  But to me the important part of

10   that case is the Court says we are going to assume that,

11   because the rule says what it says, it was clear error for the

12   defendant not to get the clear chance to have the jury there.

13   And, also, as I mentioned, that means that the Advisory

14   Committee note, the spirit of it has been violated because the

15   point is that we are not going to have inadvertent waivers

16   anymore.  And if there was a waiver here, it was inadvertent.

17           I think Mr. Srebnick is going to address more

18   specifically, your Honor -- I am talking now about the money

19   judgment.  He is going to address the issues about the

20   traceability of the property that the government is seeking to

21   forfeit, and about 400,000 has already been forfeited.  So,

22   Mr. Srebnick will address that.

23           Thank you again.  Do you have any other questions,

24   your Honor?

25           THE COURT:  No.  Thank you, Ms. CHung.

I6jddias
Sentences

1              Mr. Srebnick.

2              MR. SREBNICK:  Yes, your Honor.  May I use the podium

3       as well?

4              THE COURT:  Yes.

5              MR. SREBNICK:  Thank you, your Honor.

6              So if I may address the forfeiture last, if that is

7       OK, and actually do my allocution now, would that be

8       acceptable?

9              THE COURT:  That's fine.

10              MR. SREBNICK:  So I imagine that the Court has over

11       the years presided over many different types of cases -- drug

12       trafficking, fraud, violent cases, firearm cases.  And in each

13       of those types of cases the conduct itself tells the Court,

14       tells the public something about the person.  Is the person

15       violent?  Is the person greedy?  Is the person a fraudster?

16       And typically you can look at the transcript of the trial, read

17       the transcript, and come to a conclusion about something about

18       the person's character.  And as a defense lawyer, if I am

19       representing somebody like that, my goal at sentencing is to

20       kind of offset that, to try to present to the court an argument

21       in mitigation to say that's really not all that that person is,

22       that there is more to that person.

23              This case is different.  I didn't know Luis Javier

24       before this case began.  And so the first way that I could

25       really try to know about him and who he was and what he was

I6jddias
Sentences

1  about was to read the trial transcript.  And I read the trial

2  transcript, and it seemed to me a document-intensive case.  And

3  after I read the transcript of the trial, I was still left with

4  no understanding of who the man is, what is he all about, what

5  makes him tick.  I certainly didn't see a person who acted out

6  of greed.  He was involved in one of the transfers over six

7  years.  And I understand the court's ruling, but I don't think

8  that this is a crime that really one can say was motivated to

9  defraud somebody or out of real greed.  I mean, there were so

10  many transactions that he actually did those Alimentacion

11  transactions that he didn't even charge a fee to these

12  Venezuelan customers.

13         Understanding people who have come from Cuba –– and I

14  know Luis Javier didn't but his father did –– who have the

15  mentality of what it is like to have left a Communist regime ––

16  and my parents actually left Cuba –– and, you know, there is a

17  mentality there that if others are facing those same struggles,

18  you help them get their money out of the country.  And Luis

19  Diaz, Jr. didn't get any money out of the country when he left

20  Cuba.  So when people who are in a socialist regime are

21  figuring out ways to get their money out of the country, it was

22  their natural reaction to help.  So, I don't view this as a

23  crime of greed, and certainly it is not a violent crime.

24         And when I read it, I saw that it was really in effect

25  a strict liability crime.  Then, of course, the presentence

I6jddias
                        Sentences

1    report came back, and I struggled with what I saw because I saw

2    a guideline range that just seemed to be so out of whack with

3    what you think of when you think of a strict liability crime.

4    In fact, the offense itself doesn't seem like it is one that

5    ought to be a strict liability crime.  It ought not to lend

6    itself to that.

7        I mean, when you think about strict liability crimes

8    under our system, you think of environmental crimes where a

9    cruise ship ought to be held accountable if oil spills in the

10   water because they know they're using dangerous substances and

11   they ought -- hazardous substances and they need to take

12   special care, or you think about a doctor or somebody who is

13   not a doctor and prescribing drug without a license.  If you

14   are unlicensed and you prescribe drugs, well, then, you ought

15   to be held accountable because you know that you can't do that

16   without a license.  Or you think about selling securities to

17   the public.  It is well known that the SEC regulates this, and

18   that is the type of conduct that one would understand that

19   would require a license.

20       For Luis Javier, somebody whose real job at the

21   company was really to find -- source used equipment -- and the

22   Court read all the letters about how he would spend 20 hours a

23   day in the hot weather and pouring rain finding equipment for

24   his clients and repairing it and making sure it was in good

25   condition -- the idea of having a license to assist some

I6jddias
                                    Sentences

1   Venezuelans to get money out of their country was the furthest

2   from his mind.

3           And so then the question becomes somebody who is not

4   really aware of the licensing requirement and yet effectuates

5   these transactions, is that the kind of morally blameworthy

6   conduct that deserves prison time?  And it's a question that I

7   imagine that the Court is grappling with, but it's a question

8   that really has no precedent in the law.  I mean, the money

9   transmitter statute was amended in 2001.  Previous to that, it

10  did require that the defendant on trial know that it was

11  illegal to do that.  The statute was amended in 2001 really to

12  deal with the effects of 911 and to deal with the -- to make it

13  easier for the government to prosecute those who were assisting

14  terrorists funnel their money abroad.  The amendment really

15  wasn't designed for Luis Javier Diaz.

16          And so the thought that this strict liability crime

17  can result in a guideline range of 12-and-a-half to 15 years in

18  prison to me is so out of whack with what the Sentencing

19  Commission would have intended that thankfully the Court has

20  discretion after Booker, and I think that is the reason the

21  Court ought to have discretion in a case like this.

22          I started researching, well, what other strict

23  liability crimes are there and what is the general feeling in

24  the law among scholars and commentators about whether strict

25  liability ought to result in prison sentences -- strike

I6jddias
Sentences

1    liability crimes.  And, actually, sort of the literature is all

2    over the board.  And there are a number of commentators who say

3    that these types of regulatory offenses -- which really it is

4    what occurred here, is the failure to get a license -- all of

5    this conduct would have been permitted had they had a license.

6    And so is the regulatory offense of the failure to get a

7    license the type of offense that deserves any prison at all?

8    And there are commentators who say that it really ought not to

9    result in prison, that's what we have civil process for, and

10   that civil process is enough because in strict liability types

11   of situations prison doesn't really deter the conduct of

12   somebody who is unaware that a license was required in the

13   first place.  It doesn't deter the general public if a person

14   doesn't know that a license isn't even -- that a license is

15   required.

16          So, that takes me to the 3553 factors.  And, you know,

17   I read the government's response with great interest, because I

18   really wanted to see how they were going to respond to all of

19   the letters from all of the people who really talked about Luis

20   Javier's character and, really, the type of person that he is.

21   Maybe there was something else out there that didn't come

22   through in the transcript that's going to depict somebody that

23   has something that the government can say that is worthy of

24   prison time.  And the reality is the government focused on two

25   points and two points only -- that's general deterrence and the

I6jddias
Sentences

1    seriousness, the nature of the offense.  The government

2    essentially acknowledged that Luis Javier is not going to do

3    anything like this again.  He is not going to be involved in

4    any kind of criminal conduct again.  Specific deterrence is not

5    a relevant factor.

6           So the only 3553 factors that the government cites are

7    the seriousness of the offense and general deterrence.

8           And so I take first the seriousness of the offense.

9    The seriousness -- the offense here involved the failure to get

10   a license.  And so I'm not here to minimize the importance of

11   1960 in the ordinary case.  I'm not here to minimize the

12   importance of 1956, the money laundering statute, in the

13   ordinary case.  In the ordinary case those statutes are very

14   important.  They are important to guard against people who use

15   the monetary system to process drug money, fraud money, to

16   allow it to be plowed back into the system in order to promote

17   those types of crimes that are plaguing society.

18          1960, I understand the purpose of that statute.  The

19   purpose of that statute is to assist the government in

20   monitoring money that's going to fund drug trafficking, money

21   that's going to fund terrorism.

22          So, those statutes are important.  But to say that the

23   statutes are important, to say that the statutes typically, you

24   know, criminalize serious conduct is not the same as saying

25   that the conduct in this case is the serious type of conduct

I6jddias
Sentences

1    that warrants prison time.  This didn't involve drug money, to

2    Luis Javier's knowledge.  It involved legitimate money, to his

3    knowledge.  He wasn't aware of the licensing requirement.  All

4    of the factors that I set forth in my sentencings memo talk

5    about how this case is really not the type of case that the

6    statute was meant to go after, and it's not the type of serious

7    case that the Court ought to consider as a 3553 factor that

8    weighs significantly against him.

9         So then you get to the issue of general deterrence.

10   And the literature that I've looked at over the last few weeks

11   on the issue of general deterrence in the context of strict

12   liability crimes, most commentators say that it really is not

13   relevant to strict liability crimes, that the idea that you're

14   going to generally deter people who especially in the context

15   of somebody who doesn't even know of the licensing requirement

16   doesn't make sense.  And so if you look at those two as the

17   only factors that the government has cited under 3553 that

18   weigh in favor of a prison sentence, I don't think those

19   factors alone warrant that.

20        But let's look at the flip side.  Let's look at the

21   nature of the person, the characteristics of the person.  And

22   so I didn't really learn much about the character of Luis

23   Javier from reading the trial transcript.  I just read about

24   some emails and some bank transactions but not a lot about him

25   as a person.  And then -- but we have parallel lives, and we

I6jddias
Sentences

1    have some common friends in Miami.  He is roughly my age.  He

2    has three kids like I do, and I know some of the people that he

3    grew up with.  And, in fact, many of them are here.  And a lot

4    of the gentlemen from Belen -- Belen is an all boys school in

5    Miami that has a notorious -- "notorious" is not the right

6    word -- has a great reputation for being close-knit for the

7    kids all supporting each other.  And many of his Belen friends

8    are here from high school to support him.

9          The letters started coming in, and they kept coming

10   and they kept coming.  And I've handled many cases over the

11   years, but the sincerity of the letters, the depth of the

12   letters, the genuineness of the letters really, really struck

13   me.  They struck me because they all really said -- you know,

14   independently said some of the same things about him --

15   courteous, kind, thoughtful, quiet, unassuming, hard working,

16   not greedy, not motivated by money, all he wants to do is

17   support his family and be with his kids and coach his kids and

18   take care of his family.  And I know I cited it in my

19   sentencing memo but one letter in particular really struck

20   plea, and that's because I've coached sports and I've dealt

21   with parents who want their kids to win every game.  And, you

22   know, it is a common theme we hear about all the time.  And the

23   reason this letter struck me is because it attached an email

24   from 2012.  It wasn't a letter written in response to this

25   sentencing hearing, but it was an email that was written at the

I6jddias
                          Sentences

time contemporaneously from a woman named Sara Arazoza, who

just gave her heartfelt feelings towards Luis Javier and

expressed her feelings.  And that's the type of letter, when

nobody is looking, just a one-to-one letter, a one-to-one

email, and to tell him what she really feels about him.  That

really struck me.  And it dealt with the fact that Luis Javier

was her son's basketball coach and there was a draft to pick

teams.  And her son -- and I won't mention his name, but her

son was not one of the better players, and everybody knew it.

And Luis Javier decided it didn't matter to him, he was going

to draft her son because he wanted -- because he knew some of

the other coaches weren't going to play her son.  But he knew

that he would make sure the kid got a lot of playing time so

that he would equalize and have everybody have an enjoyable

experience.

          And she wrote to him it at the time:  "Lou" -- and I'm

reading from her email -- and this is document 85-1 at page 7:

"Lou, I can't thank you enough for all that you did this season

not just for the team but for my son" blank.  He is a minor and

I am not going to mention his name.  "I knew it was going to be

a special team when you stopped me in the hallway at the Belen

back-to-school night to tell me that you were going to do all

that you could to draft him for your team.  Needless to say,

you brought me to tears on the spot.  This is because having

been" blank's "coach before, you were well aware of his

I6jddias
Sentences

1  abilities.  Despite when given the opportunity to choose a

2  better player, you chose my son.  If that doesn't speak volumes

3  about what an amazing person and coach you are, nothing does.

4  But to put this experience in the best words, I would like to

5  share with you a text that my son sent the entire family last

6  night after the game along with the team picture."  Quote --

7  this is from her son:  "'We had a great season but everything

8  is coming to an end.  It was one of the best seasons I've ever

9  been in.  I was thinking on the way over whether we were going

10  to win or lose.  If we won, that would have been awesome.  But

11  I didn't think about how we were going to part ways.  It was

12  very emotional saying goodbye.  The coach was crying and I was

13  crying, too.  I can't believe it's over.  I love this team.'"

14        And that was from her son.

15        That letter, Judge, and all the letters, that tells

16  the Court what he is all about, what this man is all about --

17  not a wire transfer on behalf of a Venezuelan customer or a few

18  emails that he saw that dealt with a client that his father was

19  primarily handling, but the letters that really tell the Court

20  what kind of person he is.

21        I was shocked and amazed at the amount of, the number

22  of people who came here to be -- just to be present on his

23  behalf.  I think all of them are here from South Florida --

24  friends, family, cousins, uncles, aunts -- all of whom are here

25  because they know him.  They love this man.  They know what he

I6jddias
Sentences

 1  is really about.  And, frankly, they're struggling with this.

 2  They're struggling to understand how he can be here.

 3      And, you know, I explained to the family the law is

 4  sometimes unforgiving.  The law sometimes, you know, isn't what

 5  you want it to be, but the law is the law.  And while the law

 6  may be unforgiving, the law does allow a court to be forgiving.

 7  And the law does allow a court to look into the heart and mind

 8  of a person and try to figure out what this person is really

 9  about.

10      And the law allows the court to say, you know what,

11  these numbers, I realize they're numbers, we've dealt with

12  numbers now since 1987, but they are only numbers, that you're

13  sentencing a human being who has suffered so much and is a

14  kind, decent, honorable, thoughtful human being.  I say he

15  suffered so much because the idea of being in trial with your

16  own father and knowing that your father feels the feelings of

17  guilt and shame for being here with you is almost too much for

18  a person to bear, especially two days after Father's Day.

19      I say this suffering because I know what he has been

20  through with his wife, with his three children, who are here.

21  The Court has read what I put forth, I'm sure, about the

22  medical struggles that the family has had.  And it all fell on

23  him.  And he was a warrior in dealing with all of those

24  problems.  And now here he is in a courtroom looking at the

25  possibility of going to prison.  And that thought to him, and

I6jddias

Sentences

1  what it's going to mean to his family, is more important than

2  what it means to himself.  How his kids are going to react, how

3  his wife is going to be able to deal without him is something

4  that haunts him every day.

5      So the Court has the discretion and the Court heard

6  the evidence and the court has seen all the letters, and we

7  would just ask that the Court exercise mercy and compassion

8  upon Mr. Luis Javier Diaz and sentence him to a

9  nonincarceration sentence.

10      May I ask the Court for indulgence?  Mr. Quinon, who

11  sat through the trial and is here, if he has any other words to

12  add?  OK.  I think he's --

13      THE COURT:  Do you wish to speak, Mr. Quinon?

14      MR. QUINON:  Judge, I think Mr. Srebnick covered just

15  about everything.  But I'll say this because I share a lot with

16  Mr. Diaz and his son.  And this is a good family, that it

17  really breaks my heart personally to see them go through the

18  pain that they have gone through.  The only way for me to

19  explain what happened and how this whole thing happened is

20  Mr. Diaz, like many of us Cuban Americans, went through a lot

21  in leaving our own country.

22      And we lost everything -- my family, many families.

23  And I have experienced in my years of representing people --

24  and I've represented individuals -- a conspiracy to kill Fidel

25  Castro in Puerto Rico, that was a national case.  I represented

I6jddias
Sentences

an individual who took a plane out of Cuba with 46 passengers.
I have dealt with this issue. And I can see in talking to
Diaz, Jr., the father, I think that to me the way to explain
this: His desire to help people in many ways to get money out
of a country that is absolutely falling apart -- Venezuela is
falling apart because of the government there, and very similar
to our experience, the Cubans. And very similarly, I have
represented Venezuelans who now leave that country with money,
cash money, U.S. currency, and come to the Miami International
Airport and get arrested at times that they have not declared
over $10,000 because they are trying to take their money out.

So I can see and I can feel how Mr. Diaz, Jr., the
father, these were clients of his for many years, people that
he had dealt with from Venezuela for years doing business, and
he wanted to help them to get their money out of Venezuela. I
don't think for a second that Mr. Diaz, Jr. thought that he was
violating the laws of this country, that he was really doing
something that is as serious, that's something that could put
his family in jeopardy.

I know for a fact -- I feel very confident that he
would have never in a million years jeopardized his family and
that he would not have violated the law intentionally. But he
did want to help them, the Venezuelans, to get their money out
of their country. And that has led to all of this.

But I just wanted to share with you -- because I think

I6jddias
Sentences

1    Mr. Srebnick covered it correctly, everything -- I wanted to

2    share with you that this is a good family, a hard-working

3    family, the kind of family, like my family, like my parents,

4    that always told the kids, since we were little, get a good

5    education, be good, make me proud.  And when I look at his

6    family, no different than mine, and no different than a lot of

7    Cuban families, and so I just wanted to share with you, because

8    personally, it does touch me, because I had walked somewhat of

9    the same path as this family and I see in them some of my own,

10   and I just wanted to tell you that they're good people.

11          This is not the kind of case that I represent people

12   for the most part.  There is always in a lot of the clients

13   that I represent and the cases that I have, the clients always

14   are making a calculation of risk versus benefit in terms of

15   their money or whatever reasons motivated them.  That was not

16   this case.  This is totally off the grid, totally a different

17   scenario, and a good family.  And I just wanted to share that

18   with you more on a personal level than as a lawyer.

19          Thank you.

20          THE COURT:  All right.  Thank you, counsel.

21          MR. SREBNICK:  Would the Court like me to address

22   forfeiture?

23          THE COURT:  If you would for a moment, yes,

24   Mr. Srebnick.

25          MR. SREBNICK:  Thank you, your Honor.

I6jddias

Sentences

1       I think there are really two issues here.  The first

2   is the specific property.  And we're talking about $367,000

3   that was seized over the course of several months in 2016 from

4   the Miami Equipment bank account.  The first seizure occurred

5   in June, and then there were a couple of seizures after that.

6       In order for a specific property to be forfeited under

7   the law -- and I'm putting aside for a moment, although I adopt

8   Ms. Chung's argument about the verdict, but in order -- about

9   the jury verdict issue, but in order for specific property to

10  be forfeited under the law in a criminal forfeiture case, it

11  has to have been involved in or traceable to the conduct of

12  which the defendant was convicted.

13      In this case, once the initial -- the initial seizure

14  occurred in June of 2016, and approximately $50,000 was taken

15  out of the Miami Equipment bank account.  At that point, that

16  account was zeroed out because there was a seizure warrant for

17  a lot more than that.  And so the bank, BB&T, sent the $50,000

18  out.

19      After June of 2016, there was no further conduct

20  relating to this case but yet money would keep coming into the

21  account from other transactions that the clients were doing,

22  legitimate transactions involving used equipment.  The money

23  comes in.  The government still has its seizure warrant, and it

24  goes back to the bank and it says, well, then let us have -- we

25  want to seize the new money that came in.  But the new money

I6jddias

Sentences

1  has nothing to do, is not involved in or traceable to the

2  conduct at trial.

3  Now, the government in its response that it filed

4  yesterday pointed out to a statute, 18 U.S.C. 984, which talks

5  about commingling and that the government has one year to go

6  after money that is in an account if it is commingled.  The

7  statute doesn't apply, for two reasons:  Number one, it is a

8  civil forfeiture statute, and the plain language of the statute

9  says "in all actions in rem."  So 984 has nothing to do with

10  this case.

11  Secondly, that statute, or the concept of commingling,

12  presuppose that there is money together in an account and the

13  government doesn't have to trace which dollar in the account

14  came from the crime and which came from legitimate money.  But

15  if there is zero dollars in the account and all of the money

16  that's subsequently deposited in the account has nothing to do

17  with the conduct at issue, then the government has no ability

18  to forfeit those funds.  Those are not traceable to or involved

19  in the offense of conviction.

20  So as a preliminary matter, we object to the

21  forfeiture of the specific property.  The government proceeded

22  by civil forfeiture and then withdrew its civil forfeiture

23  complaint.  They did so at their own peril, thinking that they

24  could forfeit that property under a criminal forfeiture

25  statute, but under the law they cannot.

I6jddias
Sentences

1          THE COURT:  What about the government's point that

2     this is not the appropriate time to make that argument but

3     rather it should be made by way of a petition?

4          MR. SREBNICK:  That argument that they make relates to

5     third parties.  That is actually a separate argument.  They

6     were responding to my argument, which was an additional

7     argument, that the funds were in an account held by Miami

8     Equipment.  Right?  And their position is, well, Miami

9     Equipment can then make a claim, we're just forfeiting Luis

10    Diaz's interest in the account and Luis Javier Diaz's interest

11    in the account, Miami Equipment can make a claim in an

12    ancillary proceeding.  And I understand that point, but that

13    point presupposes that the property is forfeitable in the first

14    place.

15         You don't even get to the issue of an ancillary

16    hearing if they haven't shown, proved by evidence, that the

17    property in that account is forfeitable.  You only get to the

18    hearing if they prove it is forfeitable, which means it has to

19    be involved in or traceable to the offense, and the $367,000 is

20    not, it just isn't.  They haven't shown any evidence that it

21    is.

22         So if they were to show evidence that it is traceable

23    to or involved in, then they could -- then we would then have

24    an ancillary hearing at which other parties, such as Miami

25    Equipment, such as the brothers and sisters who have an

I6jddias
Sentences

interest in the company could come in and file claims and say,

hey, listen, we're entitled to that money as well.  But I don't

think you even get to that issue because it is not traceable to

or involved in.  So that's the point as to the specific

property.

The government then, as an alternative, wants a money

judgment in the amount of $100 million.  And the first argument

that I want to preserve -- didn't make it in my papers but I

just want to preserve it because the Second Circuit and all the

circuits have ruled against me on this issue, but I think it

ultimately may percolate again -- is that the statute itself,

853, 981, don't -- or 982 do not authorize the imposition of a

money judgment.  That is a creature of case law that has

developed after the fact and that the statutes don't authorize

the imposition of any money judgment at all.

I am just preserving that issue.  I don't think the

Court has to rule on it because the cases are, admittedly,

against me on that.

So then I'm left with really the issue of the

constitutionality of a $100 million money judgment.  And that

really takes the Court to the Bajakajian case and the

similarities between a case of failure -- in that case it was

failure to report.  There were some false statements in that

case, too.  The persons who were stopped at the border had

$350,000 on them and they lied and said that they only had

I6jddias
Sentences

15,000 on them.  And the court ordered the -- the lower courts

ordered the forfeiture of the entire 350,000.  And the Supreme

Court said that's grossly excessive, we're talking about a

regulatory offense, that this statute really wasn't meant to

cover that type of conduct.  They went through four factors

which I have cited in my memo.

          And if you go through those four factors and you add a

fifth factor that the Second Circuit now has adopted in the

Velastegui case, you have five factors that I believe all weigh

against a forfeiture in the amount proposed by the government.

          You start with the crime itself.  And in this case,

like in Bajakajian, you are talking about essentially a

regulatory offense.  In that case it was a reporting -- a

failure to report; here it is a failure to get licensed.

          Then you have the question -- the second factor is

whether the statute was meant to really cover this type of --

whether this is the type of conduct that the statute was

principally designed to go after.  And for the reasons we've

articulated before, you know, in our papers, that the 1960

statute, and 1956, which really in this case piggybacks on the

1960 violation, is -- you know, was meant to go after drug

traffickers and terrorists and money that was being laundered

of unlawful enterprises.

          You look at another factor, which is, "What was the

harm here?"  And I think by all accounts, other than the

I6jddias
                                    Sentences

1    identified harm to the financial system, which is, you know,

2    difficult to quantify, I would suggest in this case not very

3    significant, but nobody suffered any tangible harm.  Nobody

4    lost any money here.  Nobody got hurt, etc.

5         Then you look at the issue of proportionality.  Well,

6    what's the maximum fine here?  Because you can't have a

7    forfeiture that is so grossly disproportionate to the fine.

8    And the government took the position in its response last night

9    that the maximum fine here is several hundred million dollars

10   It's twice the amount involved in the offense.  So, therefore,

11   a $100 million forfeiture is not grossly excessive.

12        But the government is incorrect, because there is a

13   case out of the Supreme Court from 2012 called Southern Union,

14   and in Southern Union the Supreme Court held that Apprendi

15   applies to criminal fines.  So in order for the government to

16   be able to get a criminal fine of $200 million, there had to be

17   a jury verdict that actually specifically set forth what the

18   amount of the involvement in the offense was.  Here there was

19   no jury verdict.  So the fine is actually capped at the amount

20   that the money laundering statute allows, which is $500,000.

21        I was wrong in my papers.  I assumed the maximum fine

22   was 2.16 million because that's what was in the presentence

23   report and I didn't really think to understand about how they

24   calculated that, but that's actually wrong.  The maximum fine

25   here under the Southern Union case is $500,000.

I6jddias
                          Sentences

 1           So you have to now look at the disproportionality

 2      between what the government is seeking as forfeiture, $100

 3      million, and what the maximum fine for this offense is based on

 4      what the jury found, and that's $500,000.  And that's -- I

 5      guess do the quick math -- 200 times the amount of the maximum

 6      fine, which is grossly, grossly excessive.

 7           And so we would argue -- and then, of course, there is

 8      the fifth factor, which is what is the effect that a forfeiture

 9      judgment in this case of that amount, what type of effect that

10      would have on the ability of Luis Javier; Luis, Jr. to earn a

11      living.  And the government says I haven't offered any evidence

12      of what that impact would be.  Obviously, we got their pleading

13      just recently.  But I don't know that I really need to offer

14      evidence for the Court to understand that a $100 million

15      judgment hanging over somebody's head is going to inhibit his

16      ability to borrow money, to start a business, to get credit, to

17      do a lot of things if that's hanging over his head.  And if he

18      has to be paying that back for the rest of his life, the

19      ability to earn a living will be significantly impacted.

20           So I would suggest to the Court that all five factors

21      that the Second Circuit now considers to be relevant weigh in

22      favor of the fact that that the government's request for a $100

23      million forfeiture money judgment is disproportionate in this

24      case.

25           Unless the Court has any other questions?

I6jddias
Sentences

1    THE COURT:  No.  Thank you, Mr. Srebnick.

2    MR. SREBNICK:  Thank you, your Honor.

3    MS. CHUNG:  Your Honor, I'm sorry.  I don't think I

4  made this explicit and I just want to make sure that my record

5  is clear.  If you would permit me to adopt Mr. Srebnick's

6  arguments on the forfeiture matter, I would appreciate it.

7    Nothing further, though.

8    THE COURT:  Very well.

9    Mr. Tracer.

10    MR. TRACER:  Thank you.

11    Your Honor, I would like to respond to just a few of

12  the points that were raised in the defendants' arguments, and

13  then I will address forfeiture at the end, as everybody has

14  been doing.

15    The main point to address here -- and I think it is at

16  the heart of sort of the seriousness-of-the-crime debate that's

17  going on in the papers and in this argument -- is what the

18  defendants refer to as a strict liability offense.  I don't

19  want to make a semantic argument here, but I think we disagree

20  with that characterization.  The reason is that the statute

21  doesn't require the defendant to know of the licensing regime,

22  but it is still a general intent crime.  In other words, the

23  defendants still need to intend the conduct that is unlawful,

24  in this case the fact that they were transmitting, you know,

25  approximately $100 million of money and the fact that they did

I6jddias
Sentences

1   not have a license or were not authorized and were not doing it

2   in the way they were supposed to.

3          The fact is that because the defendants need to

4   understand what they are doing and people don't run money

5   transmission operations by accident, the conduct can be

6   deterred.  And as counsel mentioned, that is of course one of

7   the main considerations in this case, as it is with many

8   white-collar types of sentencings.

9          In addition, the Court is obviously not bound by the

10  government's charging decision, but I submit that this was not

11  a case where there were sort of really accidental conduct or

12  conduct that was not otherwise problematic.  The trial evidence

13  showed, as your Honor is familiar with and so I won't go into

14  it, the false invoices, the false contracts, and a lengthy

15  pattern of behavior that I submit is not consistent with a

16  simple failure -- accidental failure to license.

17         Perhaps another way of putting that is I think the

18  defendants have made the argument that if they would have known

19  about the license requirement, they would have gotten it, or if

20  they had simply had a license, the whole thing would have been

21  legal.  I submit that that's not quite the counterfactual here.

22  In other words, that is not quite what the but for world here

23  looks like.

24         If the defendants had had a license, I think this

25  conduct would have immediately been shut down.  That is the

I6jddias
Sentences

whole point, and I think that's what Ms. Chung was saying when

she said they wouldn't do this through Citibank.  If they had a

license, they would have had to file.  They would have had to

file SARs and other documents and monitor it, perform due

diligence, know your customer, and all of that did not happen

here.  So I don't think it is quite as simple as if you would

have a license there would be no problem here.  If you would

have had a license, you would have uncovered what exactly was

problematic here.

A related point is the fact that the defendants were

unaware of exactly what this money was for, whether it was for

bribery or other purposes, I submit that's exactly the point of

this statue.  In other words, it's not a defense or a

mitigating factor to say we didn't understand what it was for.

The point of the crime is that banks and financial institutions

like banks are supposed to undertake that inquiry.  And the

fact is, as the evidence showed, that was not done here.

The government doesn't dispute that there are people

in Venezuela who, based on the trial evidence, appear to be

equally or more culpable than the defendants.  That's true in

many cases.  There are worse crimes than what the defendants

did.  Again, the government doesn't dispute the essence of that

fact.  It is true in many cases.  And it doesn't take away from

the crime that was committed here.

I want to comment.  There was some discussion during

I6jddias
Sentences

1  counsel's presentation about this being a crime to just help

2  get money out of Venezuela.  Obviously, motive is not relevant

3  to a criminal charge.  It may be relevant in the broader

4  context of the 3553 analysis, but I would point out simply that

5  that is not what the evidence at trial showed.  This was not

6  the case where someone was trying to exit Venezuela and the

7  defendants helped move that money out of Venezuela.  As

8  Mr. Diaz testified, it was purportedly a business arrangement

9  where they were going to be some kind -- or Miami Equipment was

10 going to be some kind of intermediary, and ultimately, as the

11 evidence showed, that intermediary relationship was basically

12 empty and was just a paper trail for them to move money.

13        So unless the Court has other questions about that

14 broader analysis, I will turn to the forfeiture issues, which

15 are somewhat more technical than those.

16        THE COURT:  You may proceed.

17        MR. TRACER:  So the forfeiture, I agree with

18 Mr. Srebnick's comments, it needs to be separated into two

19 prongs here.  So the first is the specific property, the

20 367-and-some-odd-change-thousand dollars that the government

21 seized with a seizure warrant back in the beginning of May of

22 2016.  He is correct, the warrant had what we call damming

23 language, so the account was directed not to let money in but

24 to continue to let money out to the government and so the

25 government continued to seize some of that money.

I6jddias
Sentences

1           As laid out in the seizure warrant, which the

2    defendants have had for a long time and as we tried to

3    present -- we apologize, of course, for the late notice -- in

4    our letter to the Court of last night, under civil forfeiture

5    principles, that money was subject to seizure.  In particular,

6    under 981 and 984, if we can show that money moved through an

7    account that was forfeitable, within a one-year period it is no

8    defense that the actual dirty money left the account and clean

9    money came in.  In other words, money is fungible for a

10   one-year period.  That's true even if the account goes to zero.

11          And we cited in our letter for your Honor what we

12   tried to do here by dismissing the civil forfeiture case and

13   included in part of this case, frankly it was simply to be more

14   efficient.  We could have litigated a criminal case and a civil

15   forfeiture case in parallel but there was no need.  And we

16   cited 28 U.S.C. 2461(c), which is the provision we usually rely

17   on for these kind of forfeitures.  And I won't read it, but the

18   point is that if a person is charged in a criminal case for any

19   acts for which civil forfeiture is mandated, we can pursue that

20   criminally.  So that's what we've done here.  There was notice

21   in the Indictment, and the defendants were on notice of that

22   through the specific allegation in the Indictment as well as

23   the fact that they were aware of the civil case that was

24   dismissed and the fact that they had the seizure warrant.

25          And I want to be clear, it's only with respect to the

I6jddias
Sentences

 1    specific property that the statute really, Rule 32.2, gives

 2    either party the right to ask for a jury.  In this case, no one

 3    was asked, but the facts make very clear that the defendants

 4    were aware of the forfeiture allegation.  The fact that it came

 5    up in the discussions about what to send back for the jury only

 6    buttresses that conclusion.  And so, as we've set forth in our

 7    letter, we think the defendants have waived that right.  In any

 8    event, we think it is harmless.  There is no constitutional

 9    right to a jury finding on forfeiture; the case law is very

10    clear on that.

11            And so that relates only, though, to the $367,000.  A

12    defendant has no right to a jury determination on the money

13    judgment.  The money judgment, which, as Mr. Srebnick conceded,

14    the Second Circuit has held that money judgments are

15    appropriate.  They are routine, as the Court is aware.  It is

16    simply the government's way of preserving its judgment for

17    substitute assets going forward.  That is solely within the

18    province of the Court to determine.  And the government's

19    number of slightly over a hundred million is based on the same

20    evidence which we submitted in support of the guidelines'

21    arguments that we made, that being the amount of funds that

22    were moved through this operation.

23            We agree that that analysis is subject to an Eighth

24    Amendment analysis.  The Court is required to make a finding of

25    whether that amount is Constitutionally excessive.  And we have

I6jddias
                              Sentences

1  looked at the cases and set forth our position -- again,

2  briefly -- in our letter last night.  We submit that the crime

3  here was serious.  This was not a strict liability crime in the

4  way the defendants speak, certainly not in the way the facts

5  were presented in this case.

6          Second of all, we strongly dispute that this is not

7  the intended class for which this crime was enacted.  The

8  defendant made reference to drug trafficking and terrorism.

9  1960 is not aimed at drug traffickers or terrorists.  It's

10 aimed at the people who move money and don't ask questions

11 about that money.  So, in that sense it is within the class of

12 this particular statute.

13         In terms of the statutory max, our position is that

14 the statutory max allows for a fine that is up to double the

15 amount of funds moved.  We're not seeking a fine that large in

16 this case and so I think the Apprendi issue is moot.

17         And in terms of harm, obviously the harm is not --

18         THE COURT:  Isn't a forfeiture order, though,

19 tantamount to a fine?

20         MR. TRACER:  Functionally it imposes a monetary

21 obligation on the defendant, yes.

22         THE COURT:  Where is the proportionality in a

23 hundred-million-dollar fine?

24         MR. TRACER:  So, your Honor, we think that -- the

25 point more broadly here, if we step back, is that Congress

I6jddias
Sentences

1    sought to impose forfeiture on the crimes of money laundering,

2    so 1956 and the related crimes, such that they would

3    essentially take away the entire value of the transactions that

4    were facilitated.  So when the point of a crime -- or when sort

5    of the criminal objective is to engage in illicit financial

6    transactions, the point of these statutes, we submit, is to

7    forfeit the entire value of those funds, to completely take

8    back the value of the illegal transactions.  And so in that way

9    it's proportionate to a five-year business that moved that

10   amount of money on behalf of others.

11           Sorry.  And so I will address just the last two

12   factors briefly.

13           The harm in this case, we agree, is more amorphous

14   than it would be in another case.  This is not a case where a

15   particular individual was taking up funds.  But we do submit

16   that with respect to the last factor, what the defendants

17   correctly point out is raised in Velastegui, in Velastegui the

18   same argument was rejected by the Second Circuit.  In other

19   words, it's not enough to generally say this will hamper the

20   defendant's ability to earn a living.  Frankly speaking, any

21   judgment that was in the millions of dollars, even if it were

22   less than a hundred million dollars, would impose a financial

23   obligation going forward on the defendant.  If the defendants'

24   argument were right, I submit it would nullify the ability to

25   impose a money judgment in every case if we were to say that

I6jddias
                              Sentences

 1    they can't earn a living because there is a judgment.

 2              As we said in our paper, fines, restitution,

 3    forfeitures, they are frequently worked out.  There are plans

 4    that are set over years, and so it does not per se take away

 5    their ability to earn a living such as taking a business from

 6    them or some other tangible asset that can't be recovered.

 7              And I have nothing further to add unless the Court has

 8    questions.

 9              THE COURT:  Mr. Diaz, Jr. is 76, right?  What kind of

10    payout plan will the government be negotiating with him if I

11    were to order a hundred-million-dollar forfeiture?

12              MR. TRACER:  Your Honor, that is something we would

13    take up in due course with the defendant.

14              THE COURT:  All right.  Anything further?

15              MR. TRACER:  No, your Honor.

16              May I add one thing?

17              THE COURT:  Sure, Mr. Tracer.

18              MR. TRACER:  To the extent that the Court is persuaded

19    by the Eighth Amendment argument -- and we've thought about

20    this -- it does leave the question of, therefore what?  In

21    other words, what is the -- what is an alternative here?  And

22    so we have tried to think of some potential alternatives for

23    the Court, but I leave them only if the Court is interested.

24              THE COURT:  I'm interested and I'd also like to know

25    whether it is the government's view that I have to decide that

I6jddias
Sentences

1   precise question at today's sentencing proceeding, or whether I

2   can otherwise sentence the defendants and give further

3   consideration to the forfeiture request.

4           MR. TRACER:  So the government's view on forfeiture is

5   as follows, your Honor.  The Court can defer it.  However, as a

6   technical matter, the Court would need to impose forfeiture

7   today -- although the Court wouldn't have to specify what or

8   what amount -- the Court would have to impose it as part of the

9   sentence and specifically leave open the amount to be resolved

10  subject to whatever it is the Court wants to help make that

11  decision.  And I think the defendants would have to consent.  I

12  think if they do object to that, then I don't think we can do

13  that.

14          THE COURT:  All right.  Well, let me interrupt you for

15  a second and inquire of each of the defendants whether they

16  would object to deferring the issue of forfeiture, that is, the

17  amount of forfeiture?

18          MS. CHUNG:  Your Honor, could we have a moment to

19  confer?  Part of this is I have this uneasy -- I think we've

20  all done our best.  We are -- this has been an issue that's

21  moved a lot in the last 48 hours.

22          THE COURT:  We've been going at this for an hour and

23  40 minutes.  Let's take a very short recess.  You can consider

24  that question.  Then I will hear from the defendants, if they

25  wish to address the Court.

I6jddias
                                Sentences
 1           MS. CHUNG:  Yes, your Honor.  And that's the one
 2   thing, we definitely would have a preference for doing the rest
 3   of the proceeding.  The defendants have worked very hard, and
 4   they do want to address your Honor.
 5           THE COURT:  Sure.
 6           All right.  We'll take a short recess.
 7           MR. TRACER:  Thank you.
 8           THE CLERK:  All rise.
 9           (Recess)
10           THE COURT:  Please be seated.
11           Have counsel had an opportunity to confer?
12           MR. TRACER:  We have, your Honor.  And I believe -- I
13   believe -- I'll let them speak, but I think the intention is
14   that they will consent to at least let this matter be further
15   addressed by the Court.
16           MS. CHUNG:  So, your Honor, yes.  And thank you again
17   for letting us confer.  So we are fine with the idea of
18   deferring the question of the forfeiture and the forfeiture
19   amount.  If it was -- I think what we had contemplated in
20   discussions with the government was that each side would make
21   proposals on what the amount should be, but obviously we will
22   do what your Honor wants us to do, but we're also fine with
23   proceeding with the rest of sentencing.
24           THE COURT:  Very well.
25           MR. SREBNICK:  Yes, your Honor.  May I just add, as a

I6jddias
                        Sentences

 1   technical matter, since the judgment has to include the order

 2   of forfeiture, I suppose that means that the entry of the

 3   judgment would have to wait until -- you know, until the Court

 4   resolves the forfeiture issue.  I leave that obviously to the

 5   Court, but I think that is the proper procedure.

 6           THE COURT:  I will endeavor to resolve the issue very,

 7   very quickly.  I need a day or two to think about this and get

 8   something from you with respect to forfeiture.  The only thing

 9   I will say in the course of sentencing today apropos of what

10   Mr. Tracer suggested is that the Court will enter an order of

11   forfeiture with the amount to be determined.

12           All right.  So with that housekeeping matter

13   addressed, Ms. Chung, does your client wish to address the

14   Court before sentence is imposed?

15           MS. CHUNG:  He does, your Honor.  And from where would

16   you prefer that he address you?

17           THE COURT:  He can sit at counsel table, if you would

18   like, just pull the microphone close to him, or he can take the

19   podium, if he wishes.

20           MS. CHUNG:  Your Honor, I think his preference is to

21   stand but to be here at the table.

22           THE COURT:  All right.  Well, one of the problems is

23   getting the ability of everyone to hear it if the microphone is

24   not close by.  So --

25           MS. CHUNG:  He can proceed to the podium, then, your

I6jddias
Sentences

1    Honor.

2            DEFENDANT L. DIAZ, JR.:  Your Honor, I would like to

3    thank you for taking the time to permit me to address you in

4    this matter.

5            I have made terrible mistakes.  The laws I always

6    follow and I cherished when I came to this country.  They have

7    found me to be a criminal.  I have worked all my life for my

8    family, to grow my family, and now as a result of the actions

9    that I took, my family is broken and devastated.

10            I would like to -- bear with me if you don't mind.  I

11    would like to address my son, Luis Javier.  I want to apologize

12    for all the pain and suffering that that I have caused you

13    because of my actions.  I have seen you for the last two years

14    to suffer tremendously.  And I can tell you that the worst

15    thing for a father is to see a son -- your son suffer as you

16    have suffered in the last two years.  I don't -- and I know

17    that now you are suffering with the situation that you have

18    with your case.  So, I would like to ask for your forgiveness

19    for what I've done.

20            I know that your children are going through a very

21    difficult time, especially the youngest one, who is only 14,

22    and he has to cry himself to sleep every night because of all

23    of this, the uncertainty as to what is going to happen to his

24    father and the fact that, being only 14, he cannot help you any

25    more.

I6jddias
Sentences

1        Again, I ask your forgiveness.

2        I would like to talk to Elena, my daughter-in-law.  I

3  am sorry that I disappointed you.  I am sorry for all the pain

4  that I have caused you and your children.  And I beg you,

5  forgive me, please.

6        And to all my grandchildren, Javier's and Elena's

7  children, I know what you are going through, and I want to tell

8  you that your father is a good and honorable man and you should

9  always, always look up to him.

10        To my wife Lucy, we have been together for 52 years.

11  We have been through many ups and downs.  We both have worked

12  very, very hard to nurture and bring up our family.  Family is

13  everything for us.  And I also would like to ask your

14  forgiveness for the actions that I took that have put our

15  family in danger and facing ultimately that we might be

16  separated.  If I'm separated from you, it would be like cutting

17  me in half.  Again, forgive me.

18        Your Honor, you have treated my son and I with

19  fairness and dignity.  We've, through the actions that I took,

20  that's why I'm here today.  My journey is coming to an end.

21  But I please, please, ask you for mercy for my son.  Don't

22  separate him -- please, do not separate him from his wife and

23  children, and allow him to complete his journey -- to continue

24  his journey.

25        Thank you very much, your Honor.

I6jddias
Sentences

1          If you don't mind, I would like to say -- sorry, I

2     forgot about it -- I would like to thank my friends that

3     have -- that are here with me, that traveled with me today to

4     be here with us, and those who took the time to write letters

5     on my behalf to your Honor.  Their support has been invaluable

6     through these last two years, and I promise to try to be a

7     better man so I can continue having your support.

8          Thank you, your Honor.

9          THE COURT:  All right.  You may be seated.

10          DEFENDANT L. DIAZ, JR.:  Thank you.

11          THE COURT:  Mr. Srebnick, does your client wish to

12     address the Court?

13          MR. SREBNICK:  Yes, your Honor.

14          THE COURT:  All right.  I will hear from him now.

15          MR. SREBNICK:  May I stand with my client at the

16     podium?

17          THE COURT:  You may.

18          DEFENDANT L. JAVIER DIAZ:  Good afternoon, your Honor.

19          Before I start, I just wanted to make a quick comment

20     or explanation.  I wanted to be able to get up here and say

21     what I'm about to say from memory.  I just can't.  And I want

22     to make sure that I can touch all the points that I have on

23     this paper.

24          (Pause)

25          And I have one more thing I want to say before I

I6jddias
Sentences

 1    begin:  That you don't have to ask me for forgiveness.  Never.

 2              First, your Honor, I want to thank you for being kind

 3    to my father and I throughout this whole process, especially

 4    for trusting me for about the last seven months, which allowed

 5    me -- and you allowed me -- to go watch my oldest son's senior

 6    basketball tournament in Atlanta.  You granted that permission,

 7    and I'm extremely grateful.  And I also had the privilege of

 8    seeing my oldest son graduate from high school, which I thought

 9    I would not have that opportunity.

10              This has obviously been one of the most stressful

11    experiences I have ever had to deal with and it's possibly not

12    over yet.  But, again, I think you have treated my dad and I

13    with respect and compassion.

14              I believe I've always been a very fortunate person.  I

15    was born into a close family with incredibly loving parents,

16    who taught me the importance of hard work and perseverance.  I

17    have many loyal friends who have supported me and truly went

18    above and beyond to write these really kind letters about me.

19    I am truly, truly amazed and blessed with the support I have

20    received since this whole ordeal started.  I never expected to

21    have that many people here present today.

22              To my wife, what can I say?  She is the love of my

23    life, the most amazing person I've ever met.  She has made me

24    such a better person.  And she has always stuck by me, even

25    through these incredibly difficult times.  And together we are

I6jddias
Sentences

1    raising three amazing children who are excellent students,

2    respectful, honest, and something that I really always try to

3    instill in them, which is to be humble.  They do not deserve

4    the stress that I put them through, or I'm putting them

5    through.  I am grateful that the humiliating experience of

6    being arrested and indicted didn't make them lose their love

7    and respect for me.  If at all, it has only brought us closer

8    together.

9          So with so much to be thankful for, how is it possible

10   that I'm here today facing sentencing in a courtroom in New

11   York?  This is one of the last places I ever expected to find

12   myself in.  And it is a question that I ask myself every single

13   day.

14         And I also ask myself how is it possible that my

15   76-year-old father, the most unselfish man I have ever known,

16   and someone I admire so much, is looking at the possibility of

17   spending the last years of his life in prison away from my mom.

18         These are questions that I struggle with every day.

19         My parents fled Castro and a Communist regime and lost

20   everything.  They came to America penniless because of a hope

21   of a better future for their family.

22         Something that's not in here that I wanted to say:

23   When my dad came from Cuba, he was studying in Georgia Tech,

24   and he would eat one time a day because that's all he had money

25   for.  And every time I hear that story, it breaks my heart but

I6jddias
Sentences

1    it gives me courage to fight forward.

2         They did not come here out of greed.  They came here

3    for freedom and the opportunity to work hard and earn a living.

4    This country has given us that opportunity.  I respect our laws

5    and our justice system.  I have always believed in the system.

6    But I must tell you that this case has made me question many

7    things that I have never questioned before.  It's not because

8    you treated me unfairly, because you haven't, and it's not

9    because I'm perfect, because I'm far from it.  I am human and I

10   make my share of mistakes, and I accept that I made mistakes in

11   this case.  And I sincerely apologize to the Court, but, more

12   importantly, to my family.

13        It's because I have trouble understanding why these

14   mistakes can result in years in prison and the loss of

15   everything that I own, I have trouble explaining that to my

16   children and friends.  I'm not an expert in the law, and I can

17   only tell them and the Court what I know to be true in my

18   heart.  I never intended to violate any law of this country, or

19   harm anyone.  I'm not sure if that helps me or hurts me to say

20   that, but that's the truth.

21        I know, your Honor, you have a huge responsibility

22   before you.  You have to decide whether someone like myself

23   deserves to spend years behind bars.  Even though you really

24   didn't hear much about me at trial, I hope that the sentencing

25   process has allowed you to learn more about me and to give you

I6jddias

Sentences

1    comfort in whatever decision you make.

2          Thank you, your Honor.

3          THE COURT:  You may be seated.

4          The defendants, Luis Diaz, Jr. and his son Luis Javier

5    Diaz, come before this Court after a jury found Mr. Diaz, Jr.

6    guilty of unlicensed money transmitting, international money

7    laundering, and conspiracies to commit each of those crimes.

8    The jury found his son, Luis Javier, guilty of the substantive

9    crimes of unlicensed money transmitting and international money

10   laundering but acquitted him of the conspiracies.

11         The criminal activity at issue in this case spanned

12   six years and involved hundreds of transactions and

13   approximately a hundred million dollars in funds.  It

14   principally involved Venezuelan citizens and corporate entities

15   seeking to avoid Venezuelan governmental restrictions on the

16   conversion of bolivars to U.S. dollars.  According to the

17   evidence at trial, the defendants' corporation, Miami

18   Equipment, served as the conduit for these transactions and

19   received a 1 percent fee on, or roughly a million dollars over

20   the course of the scheme.

21         Now, this Court has reviewed the presentence

22   investigation reports for both defendants.  I adopt the

23   findings of fact in those reports as my own, and I will cause

24   those reports to be docketed and filed under seal as part of

25   the record in this case.

I6jddias

Sentences

1    I have already discussed with the parties the

2  guidelines' calculation, which I find in this case to be

3  breathtaking, and that's why I said they are just a starting

4  point for any court's consideration, but in a case like this

5  they are skewed in such a way as to be completely disconnected

6  from the realities of this case.

7    And so this Court has to look at each of these

8  defendants individually and make an assessment giving regard to

9  all of the factors under Section 3553(a).  First, there is no

10 question in my mind that it is vitally important to the United

11 States that general deterrence be served.  While I note that

12 there was no evidence in this case that any of the transfers

13 here were transfers to aid narcotics trafficking or terrorism

14 or anything of the like, there is also always the possibility

15 that unknowingly these defendants or others who engage in money

16 transmitting could aid nefarious pursuits around the world that

17 endanger all of us, and so there is a compelling reason for

18 general deterrence.

19    At the same time, I don't think that either of these

20 defendants are ever going to be back before the bar of justice

21 facing a judge in a criminal matter.  You know, Mr. Diaz, Jr.,

22 he was born in Cuba, grew up there in a middle-class

23 environment, was attending private school, and of course then

24 everything changed for him and his family.  He came to the

25 United States and earned a college degree at Georgia Tech,

I6jddias
Sentences

1   worked on a master's degree at Northwestern, I think, in

2   Chicago, worked, became part of the fabric of this country.

3   Then working for International Harvester and other entities in

4   Central and South America before ultimately moving to Miami in

5   1975.

6           He became a U.S. citizen in 1968.  And aside from this

7   scheme that he got himself involved in, he has otherwise led an

8   exemplary life, devoted to his family. his church, his

9   neighbors, as is so evident from all of the letters that I

10  received from family members, relatives, friends, former

11  government agents who live across the street.  They were

12  poignant and they point to the character of the man.

13          And the very same thing can be said about his son, who

14  had the good fortune, like me, to be born here in the United

15  States, who started out in Chicago, when his father was working

16  there and going to school, and he grew up in a middle-class

17  environment.  He went off to university, and has worked in his

18  father's business since 1992.

19          Now, his father decided, after working for large

20  corporations, that he would try to do something entrepreneurial

21  himself, and so he started Miami Equipment 35 years ago and

22  built a small family business that it was full employment for

23  the Diaz family.  Anybody who wanted a job there could learn

24  the ropes and learn what it was to work hard and participate in

25  this great experiment that we call America.

I6jddias

Sentences

1    And so there are compelling personal reasons with both

2    of them that move this Court and their support for their

3    families.

4    Now, at the same time, this scheme went on for a long

5    time, and ultimately the effects of it cannot be known, where

6    all that money actually went, and it winds up undermining the

7    banking system in the United States in a very important way.

8    There are very compelling reasons why large monetary

9    transactions have to be subject to government scrutiny.  And,

10   so, there really is a need here for deterrence.

11   I find, if I haven't already said it, that the

12   guidelines' calculation here, the guidelines' range is wildly

13   inappropriate in this case.  And I also find, although as one

14   counsel acknowledged appreciation for the variance that was

15   proposed by the Probation Department, I have in my informed

16   discretion the ability to do what I think ultimately is right

17   in this case.  I must say that there is a need for some

18   incarceration because of the magnitude, the potential gravity,

19   the need for general deterrence, but I think that that can be

20   adequately covered by the Court.

21   And so it's against that backdrop that I'm prepared to

22   sentence both of the defendants.

23   And Mr. Diaz, Jr., I'd ask you, sir, to stand and I'll

24   impose sentence.

25   As you've said earlier, you made a terrible mistake.

I6jddias
Sentences

1   And my heart goes out to your family and to everybody in the

2   room.  I can see all the concern on their faces.  And I lived

3   through the trial and saw what that could do to a family with

4   one daughter being called to the stand to testify, under

5   compulsion, against her father and her brother.  You and I both

6   know that she had no choice but to do that.

7       I am confident that the sentence that I'm about to

8   impose will address the issues here and vindicate the criminal

9   justice system.

10      It's my judgment that you be sentenced to a term of

11  eight months of imprisonment, to be followed by two years of

12  supervised release, subject to all of the standard conditions

13  of supervised release and the following special conditions:

14  First, that you provide Probation with access to any requested

15  financial information; second, that you submit your person,

16  residence, place of business, vehicle, or any electronic

17  devices under your control to a search on the basis that the

18  Probation Department has some reasonable suspicion that

19  contraband or other evidence of a violation of the conditions

20  of your release may be found.  That search can be conducted at

21  a reasonable time and in a reasonable manner.  And your failure

22  to submit to such a search may be grounds for revocation.  So,

23  you are to inform the residents of your premises where you

24  reside that those premises might be subject to search pursuant

25  to this condition.

I6jddias
Sentences

1    And I'm going to require you -- I'm going to impose an

2    order of forfeiture in an amount to be determined.

3    Finally, I'm going to impose the mandatory $400

4    special assessment on you for each count, for a total of $400.

5    You may be seated.

6    Mr. Luis Javier Diaz, I'd ask, sir, that you stand.

7    Again, everything that I've said to your father,

8    really, it applies with equal force to you.  But, of course,

9    it's also the question of fathers and sons.  And he brought you

10    into the business when you were a young man, and we all at

11    times can follow our father without question.  And sometimes we

12    all need to think about what it is that we're being asked to

13    do, even if it seems innocent.  You know, the lawyers here have

14    expressed it all so well both today and in their papers.

15    It's my judgment that you be sentenced to a term of

16    four months of imprisonment, to be followed by two years of

17    supervised release, subject to all the standard conditions and

18    the very same special conditions that I've imposed on your

19    father.

20    With respect to you, however, I'm imposing a $200

21    mandatory special assessment.

22    And I will require each of you -- no, I'm going to

23    impose the special conditions on you the same as your father,

24    namely, that you will provide Probation with access to any

25    requested financial information; and, second, that you will

I6jddias
Sentences

1    subject your person, residence, place of business, vehicle, or

2    any electronic device to a search based on Probation's belief

3    that contraband or evidence of a violation of the conditions of

4    release can be found.  And that search, again, can be conducted

5    at a reasonable time and in a reasonable manner.  Your failure

6    to submit to such a search may be grounds for revocation, so,

7    you, too, will have to notify your family when you return to

8    home that the house can be subject to search pursuant to this

9    condition.

10            This constitutes the sentence of this Court.

11            You may be seated.

12            I wish to advise both defendants that each of you have

13    the right to appeal.  If you cannot afford counsel, counsel

14    will be provided to you free of cost.  If it's not clear to you

15    by now, it should be, that all of your attorneys, both your

16    attorneys here at sentencing and your attorneys at trial, did

17    excellent jobs on your behalves, and I'm confident that they

18    will advise you with respect to your appellate rights.

19            Now, I take it that the government has no objection to

20    voluntary surrender?

21            MR. TRACER:  We don't, your Honor.

22            THE COURT:  All right.  Ms. Chung, do you want to

23    confer with your client for a moment?  I'll select a date for a

24    voluntary surrender.

25            MR. TRACER:  Your Honor, if I may briefly just for the

I6jddias
Sentences

1  record -- and I admit, I apologize, I missed it -- I believe

2  your Honor did impose forfeiture on Mr. Diaz, and I just want

3  to make the record for the son.  Thank you.

4          THE COURT:  Sure.

5          Mr. Luis Javier Diaz, like your father, I am imposing

6  an order of forfeiture on you in an amount to be determined

7  very soon.

8          DEFENDANT L. JAVIER DIAZ:  Understood.

9          THE COURT:  All right.  Thank you.

10          Thank you, Mr. Tracer.

11          MS. CHUNG:  And thank you, your Honor.

12          If we could confer for a moment?

13          THE COURT:  Sure.

14          (Pause)

15          MR. SREBNICK:  May I address the Court?

16          THE COURT:  Yes.

17          MR. SREBNICK:  We both have the same request, which is

18  60 days for a voluntary surrender and a Court recommendation of

19  a designation to the Federal Correctional Institute at Miami,

20  which has a satellite camp, and I'm sure they both qualify for

21  the camp, it is a question of space.  And I understand it would

22  be just a recommendation, I understand that.

23          And assuming they are not designated before the 60

24  days, we would obviously ask that we have an opportunity to

25  come back before the Court to request an extension of that time

I6jddias
                        Sentences

1   period.

2              THE COURT:  Of course.  All right.

3              So, I will direct the defendants to surrender

4   August 16th —— Thursday, August 16th —— and I will include on

5   the face of each of the judgments a recommendation that they be

6   housed at the Miami Correctional Facility or as close to Miami

7   as possible.

8              Anything further?

9              MR. TRACER:  Not from us, your Honor.

10             MS. CHUNG:  No, your Honor.  But was there a date by

11  which you wanted to hear the proposals on forfeiture?

12             THE COURT:  Yes.  How soon can —— it's not going to be

13  fresher than it is now.  Can you get me something by Thursday?

14             MR. SREBNICK:  Yes, your Honor.

15             MR. TRACER:  Yes, your Honor.

16             THE COURT:  All right.

17             MS. CHUNG:  Yes, your Honor.

18             MR. SREBNICK:  And the Court is looking, I assume, for

19  a proposal as to an amount with some principled basis for it?

20             THE COURT:  Yes.

21             All right.  Anything else?

22             MR. SREBNICK:  May I address just one point?  And,

23  obviously, we are very appreciative of the variance.  I don't

24  know what the government is going to do, and so I just need to

25  preserve any objections I have regarding the sentencing, the

I6jddias
                              Sentences

1   value of the funds and things of that nature, whatever I have

2   already articulated to the Court I am assuming is preserved.

3             THE COURT:  It's all in all of this and more, right?

4             MR. SREBNICK:  Thank you, your Honor.

5             THE COURT:  All right.  Have a good afternoon.

6             MR. QUINON:  Your Honor, thank you.

7             MR. TRACER:  Thank you.

8             THE CLERK:  All rise.

9             (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25